**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**BALTIMORE DISTRICT OFFICE**
CITY CRESCENT BUILDING
10 South Howard Street, Suite 3000
Baltimore, Maryland 21201

| | |
|---|---|
| KEVIN D. WEST | ( EEOC CASE NO:.<br>( 120-2004-00080X<br>( |
| COMPLAINANT | ( <br>( |
| v. | ( AGENCY CASE NOS.:<br>( 4K-200-0220-01 |
| JOHN E. POTTER, POSTMASTER GENERAL<br>UNITED STATES POSTAL SERVICE | ( 4K-200-0031-02<br>( 4K-200-0048-02<br>( 4K-200-0108-02 |
| AGENCY | ( 4K-206-0074-02<br>( 4K-200-0177-02<br>( 4K-200-0016-03 |

## ORDER ENTERING JUDGMENT

For the reasons set forth in the Decision dated May 10, 2005,
judgment in the above-captioned matter is hereby entered in favor
of the Postmaster General, United States Postal Service.

A notice of appeal rights is attached hereto.

It is so ORDERED,

For the Commission:

_Linda A Kincaid_
LINDA A. KINCAID
ADMINISTRATIVE JUDGE

### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### BALTIMORE DISTRICT OFFICE
### ~~CITY CRESCENT BUILDING~~
10 South Howard Street, Suite 3000
Baltimore, Maryland 21201

|  |  |
|---|---|
| KEVIN D. WEST | ( EEOC CASE NO:. |
| | ( 120-2004-00080X |
| | ( |
| COMPLAINANT | ( |
| | ( - |
| v. | ( AGENCY CASE NOS.: |
| | ( 4K-200-0220-01 |
| JOHN E. POTTER, POSTMASTER GENERAL | ( 4K-200-0031-02 |
| UNITED STATES POSTAL SERVICE | ( 4K-200-0048-02 |
| | ( 4K-200-0108-02 |
| AGENCY | ( 4K-206-0074-02 |
| | ( 4K-200-0177-02 |
| | ( 4K-200-0016-03 |

### DECISION

APPEARANCES:

COMPLAINANT'S REPRESENTATIVE: Teresa W. Murray

AGENCY'S REPRESENTATIVE:      Andrew A. Chakeres

BEFORE:              LINDA A. KINCAID
                     ADMINISTRATIVE JUDGE

## I. INTRODUCTION

This matter came before the United States Equal Employment Opportunity Commission pursuant to § 717 of Title VII of the Civil Rights Act of 1964, as amended. The procedural requirements provided in the Commission's regulations at 29 C.F.R. § 1614.101 et seq. were completed.

In March 2004, the Agency submitted a Motion for Summary Judgment (Motion). On June 4, 2004, after requested extensions were Granted, Complainant submitted an Opposition to the Agency's Motion. On June 14, 2004, the Agency filed a Reply. On June 20, 2004, Complainant filed a Sur-Reply.[1]

---

[1] EEOC Regulations governing Federal sector EEO complaints provide for the issuance of a decision without a hearing. EEOC Regulations at 29 C.F.R. § 1614.109(g) provide:

(1)  If a party believes that some or all material facts are not in genuine dispute and there is no genuine issue as to credibility, the party may, at least 15 days prior to the date of the hearing or at such earlier time as required by the administrative judge, file a statement with the administrative judge prior to the hearing setting forth the fact or facts and referring to the parts of the record relied on to support the statement. The statement must demonstrate that there is no genuine issue as to any such material fact. The party shall serve the statement on the opposing party.

(2)  The opposing party may file an opposition within 15 days of receipt of the statement in paragraph (g)(1) of this section. The opposition may refer to the record in the case to rebut the statement that a fact is not in dispute or may file an affidavit stating that the party cannot, for reasons stated, present facts to oppose the request. After considering the submissions, the administrative judge may order that discovery be permitted on the fact or facts involved, limit the hearing to the issues remaining in dispute, issue a decision without a hearing or make such other ruling as is appropriate.

The Commission's Regulations are patterned after the summary judgement procedure set forth at Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides for the granting of summary judgement if the trial judge determines that no genuine issue of material fact exists and that the moving party is entitled to judgement as a matter of law. Beard v. Whitley County REMC, 840 F.2d 405, 409-410 (7th Cir. 1988). An issue is genuine if the evidence is such that a reasonable fact-finder could find in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Oliver v. Digital Equipment Corp., 846 F. 2d 103, 105 (1st Cir. 1988). The Supreme Court has stated that summary judgement is appropriate where the adjudicator determines that no genuine issue of material fact exists, as governed by the applicable substantive law. Anderson, 477 U.S. at 242, 255.

In order to avoid summary judgement, the non-moving party must produce admissible factual evidence sufficient to demonstrate the existence of a

Prior to the EEOC Hearing, based on a review of the record and submissions, the undersigned Administrative Judge ruled that there ~~was no genuine dispute as to the relevant material facts and there~~ was sufficient information upon which to base a decision without a hearing in regard to some of the issues noted below. Consequently, the Agency's Motion was GRANTED in part. Accordingly, on July 27, 2004, a Summary Judgment Decision without hearing was rendered on those issues which are noted below in bold type face in Section **II.**

---

genuine issue of material fact requiring resolution by the fact-finder. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson*, 477 U.S. at 247-50. The party opposing a properly made motion for summary judgment may not simply rest upon the allegations contained in his or her pleading, but must set forth specific facts showing that there is a genuine issue still in dispute. *Anderson*, 477 U.S. at 248.

In response to a motion for summary judgement, the fact-finder's function is not to weigh the evidence and render a determination as to the truth of the matter, but only to determine whether there exists a genuine factual dispute. Summary Judgment (Decision Without Hearing) is appropriate in Title VII cases if a plaintiff cannot prevail as a matter of law and there exists no dispute of material fact. Id. at 248-49; *Bhuller v. USPS*, EEOC Request No. 05910523 (Aug. 1, 1991); *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other materials show that there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is proper if a party fails to establish an essential element of his/her case on which s/he bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making this determination, the trier of fact must draw inferences from the record in the light most favorable to the opposing party. *Anderson*, 477 U.S. 242, 255; *Celotex Corp.*, 477 U.S. at 330 n. 2 (Brennan, J., concurring). Only disputes over facts that might affect the outcome of the suit under governing law will preclude summary judgment. *Anderson*, 477 U.S. at 248. There is no genuine issue of *material* fact if the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not return a verdict for the party opposing summary judgment. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Where the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Where the factual context renders the position implausible, the party opposing summary judgment must come forward with strong persuasive evidence to defeat it. *Matsushita*, 475 U.S. at 587.

When opposing a properly supported motion for summary judgment, a party must respond with *specific facts* showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 250. An opposing party may not rest upon mere allegations or denials in the pleadings or upon conclusory statements in affidavits; rather, s/he must go beyond the pleadings and support her/his contentions with proper documentary evidence. *Celotex Corp.*, 477 U.S. at 324. To defeat summary judgment, a party must show that there is sufficient material evidence supporting the claimed factual dispute to require a fact finder to resolve the parties' differing versions of the truth at trial. *Anderson*, 477 U.S. at 248-49.

3

**ISSUES**. See, H.T., July 27, 2004, at 2-5; and H.T., November 18, 2004, at 2895. That Summary Judgment Decision is noted below in Section **VII. DECISION**.

During the EEOC Hearing, which was conducted on a number of days between July and December 2004, testimonial and documentary evidence was admitted into the record on the remaining issues, which are noted below in regular type face in Section **II. ISSUES**. Closing arguments were received from the parties in January 2005.

## II. ISSUES[2]

Did the United States Postal Service, Agency, unlawfully discriminate against Kevin D. West, Complainant, because of his race and in reprisal for prior EEO activity, by subjecting him to harassment during the period May 2001-June 2002. The specific allegations of harassment are:

4K-200-0220-01

1) On May 22, 2001, Complainant was denied 204B class and on-the-job training in the Southern Maryland Vehicle Maintenance Facility (VMF);

**2) On June 8, 2001, Complainant received a Letter of Warning for an Absence from Scheduled Overtime;**

3) On June 18, 2001, Complainant was allegedly physically assaulted by David Cook, Manager of Largo I VMF;

4) Between June 19 and 21, 2001, Complainant was denied his timecard and not allowed to punch in;

5) On June 25, 2001, Complainant's request for June leave slips was denied; and

**6) On July 18, 2001, Complainant received a 7-Day Suspension for Failure To Maintain a Regular Work Schedule?**

---

[2] Issues in bold were decided without hearing.

4K-200-0031-02[3]

**1) On October 3, 2001, Complainant's leave request was denied;**

2) On October 27-28, 2001, Complainant was denied overtime (OT); and

**3) On November 12 and 23, 2001, Complainant's leave requests for the holiday periods were denied?**

4K-200-0048-02

1) On January 28, 2002, Complainant received a 7-Day Suspension?

4K-200-0108-02[4]

1) On February 11, 2002, Complainant was denied a revised schedule; and

**2) On February 13, 2002, Complainant became aware that Largo I VMF Tour 3 Mechanics were being paid Level 8 pay?**

1K-206-0074-02

**1) On July 4, 2002, Complainant became aware that another employee was given annual leave for the day while his leave for the holiday period was denied; and**

**2) On July 17, 2002, Complainant received a 14-Day Suspension for Failure to be Regular in Attendance?**

4K-200-0177-02

**1) On August 22, 2002, Complainant was sent home by Acting Supervisor Franklin Green after reporting a safety hazard and**

---

[3] The Agency investigated this EEO complaint and produced a file containing EEO complaints docketed by the Agency as 4K-200-0031-02 and 4K-200-0048-02.

[4] The Agency investigated this EEO complaint and produced a file containing EEO complaints docketed by the Agency as 4K-200-0108-02, 1K-206-0074-02, 4K-200-0177-02, and 4K-200-0016-03.

5

refused work; and

2) Complainant was not awarded positions of Supervisor, EAS-16, announced under Numbers 31-02 and 33-02?

4K-200-0016-03

1) On the basis of his race - In June 2002, Complainant became aware that one Caucasian and two African-American employees were being utilized as 204B's and his request was denied?

2) On the basis of reprisal - In June 2002, Complainant became aware that one Caucasian and two African-American employees were being utilized as 204B's and his request was denied?

## III. FINDINGS OF FACT[5]

1.  At the time this matter arose, there were three Vehicle Maintenance Facilities (VMF) in the Agency's Capitol District - (1) Southern in Capitol Heights, Maryland, (2) Suburban at Gaithersburg, Maryland, and (3) T Street in Washington, DC. Timothy Currie (Caucasian) was the overall Manager of the Agency's Capitol District VMF and directly managed the T Street VMF. Joseph King (Caucasian) was the manager of the Suburban VMF. David Cook (Caucasian) was the manager of the Southern Maryland VMF.

2.  The Southern Maryland VMF had three operations - (1) Largo I, (2) Largo II and (3) Riverdale.

3.  Largo I had two Tours - Tour 2 from 6 am to 2:30 pm and Tour 3 from 3 pm to 11:30 pm. Largo I, Tour 2 included 11 employees, of whom four (including Complainant) were Level 7's. Largo I, Tour 3 included four employees of whom two were Level 7's.

4.  Kevin West (African-American), Complainant, was employed as an Automotive Technician/Mechanic, Level 7, on Tour 2 at the Largo I VMF in Capitol Heights, Maryland. In 2001, Complainant was scheduled to be off on Saturday and Sunday.

---

[5] References:
  I.F. - Investigative File
  Ex. - Exhibit

6

5.  Prior to the EEO complaints herein at issue, Complainant had engaged in EEO activity by filing both administrative and judicial cases.   He had filed approximately eight cases between 1992 and 1999.  In many, he named the same managers named in instant cases.   He did not prevail on any of them. By 2001, when the period at issue began, Currie and Cook were aware of Complainant's previous EEO activity.

6.  By memo dated February 26, 2001, and at a March 1st meeting to explain and publicize the program, Currie notified employees that he had created an in-house 204B program to train acting supervisors and would accept a PS Form 991 Application for Promotion or Assignment for the program from all employees who wanted to have opportunities for management positions.   He notified all that future assignments as 204B, Acting Supervisor, would be made from those applying for the program. All were notified that the process for acceptance into this program would mirror the application process for a supervisory position, i.e. application, Review Committee assessment and recommendation, interview by a selecting official and then selection.

7.  Many applied. Six were selected.  The applicants not selected were informed that their interest and commitment was noted from their participation in the process to be considered for the program.   Some, as they testified, were later given opportunities for a few 204B assignments.

8.  Complainant did not apply for admission into the program. Although Complainant told and wrote Currie that he wanted to be a 204B, he informed him that he would not submit a 991 for a training program.  On March 18th, Currie responded to Complainant's letter by providing Complainant with an application on disc and encouraging him to apply. Based on the lack of application, Complainant was not admitted into the 204B training program.

9.  During the period from March 2001 through July 2002, Complainant was not utilized as a 204B.  The six selected into the program were given opportunities for 204B assignments.  In addition, some of the applicants not selected were later given opportunities for 204B assignments.

10. During this period from March 2001 through July 2002, Cleveland Mansfield (Caucasian), John Bowser (Caucasian), Tom Buchanan, John P. Miller (Caucasian), Michael Scott (Caucasian), Napoleon Woodhouse (African-American), Robert Parker (African-American) and Franklin Green (African-

7

American) worked as 204B Acting Supervisors.  Body and Fender
Repairmen Miller and Parker worked on a special assignment at
the T Street Paint Shop.  After the Paint Shop assignment
where he demonstrated good leadership skills, Miller was
assigned to another T Street 204B assignment supervising
Mechanics as well as those in the Paint Shop.

11.  On May 16, 2001 Complainant submitted a request for leave for
     8 hours for Tuesday, May 29, 2001.  It was approved.

12.  On May 22, 2001, Cook posted the Memorial Day holiday schedule
     requiring all employees to work Sunday and Monday, May 27 and
     28, 2001 unless an employee had pre-approved leave for the
     three-day 24-hour period including Sunday, Monday and Tuesday.
     All employees had previously been notified that when a holiday
     period was specially posted for mandatory work, only those
     previously approved for 24 hours of leave during that period
     would be excused from working.  Leave for less than 24 hours
     would not exempt an employee from working a "mandatory work"
     specially posted holiday period and that lesser amount of
     requested leave would not be approved or if previously
     approved would be cancelled.

13.  Complainant did not report for work on Sunday, May 27, 2001,
     or Monday, May 28, 2001.  He stated that he was scheduled off
     on Sunday and had pre-approved leave for Monday and Tuesday.
     No other employee failed to report for work.

14.  On June 8, 2001, Complainant received a Letter of Warning for
     Absence from Scheduled Overtime (OT) over the Memorial Day
     holiday period.  Complainant's Grievance of the Letter was
     settled by holding the Letter in abeyance providing
     Complainant did not have a similar AWOL infraction before
     December 31, 2001.

15.  On May 22, 2001, Complainant was denied 204B training.

16.  On Sunday, June 17, 2001, Complainant phoned the supervisor of
     the day requesting sick leave (SL) rather than working the
     scheduled Overtime (OT).  He was granted SL on condition that
     he provide documentation of his daughter's illness when he
     returned to work or, if not, then be placed in a no pay status
     of Away Without Leave (AWOL).

17.  On June 18, 2001, Cook asked Complainant to report to his
     office where he started to discuss the need for the
     documentation for June 17th.  Complainant asked that the
     requirement be put in writing and then left Cook's office.

8

Cook followed to complete his instruction to Complainant. As they met/passed each other in the hallway, Complainant claimed that Cook stepped in front of him, blocked his way, and put ~~his hands on Complainant's shoulders. Complainant yelled~~ "Don't touch me Mr. Cook." He also shouted, "I cannot hear you."

18. Cook claimed that he did not touch Complainant. A Postal Inspector called by Complainant spoke with Cook and determined that no corrective action was needed. Mansfield, Simmons, Smith and Thompson witnessed parts of the incident between Cook and Complainant. All reported to the Inspector, the EEO Investigator and during hearing that they did not witness Cook touching Complainant. Three out of the four heard Complainant yelling at Cook. Based on the totality of the evidence, Complainant's version of these events is less credible than that of others. I find that Cook did not "physically assault" or even intentionally bump or touch Complainant on June 18, 2001.

19. On June 19-21, 2001, Complainant reported to work but was not allowed to enter the facility and work.

20. Cook withheld Complainant's timecard during the period of June 19-21, 2001, while awaiting Complainant's acknowledgment of and compliance with his instruction to provide documentation for the Sunday SL usage. Complainant refused to acknowledge having heard the instruction and left the premises without providing any supporting documentation for his use of SL.

21. On June 25, 2001, Complainant reported to work as instructed in a letter from Cook. After he clocked in, he was told to report to Cook. When he did so, the heated discussion of the June SL event and required documentation began again between the two men.

22. Complainant sought leave slips to revise his schedule and apply for SL for the past few days and Cook refused to give Complainant a leave slip. Complainant asked for a union representative. Cook denied the request. Cook had Complainant removed from the facility.

23. On June 26th, Complainant was ordered in writing to report to work the next day. He did not report to work.

24. On a number of occasions during this period, Complainant stated to Cook, "I cannot hear you."

9

25. Complainant was charged AWOL for June 17, 27 and 28, and July 6, 2001. He was granted SL for June 22, 2001.

26. Complainant returned to work on July 8th.

27. On July 18, 2001, based on Cook's decision to do so, the Agency issued Complainant a 7-Day Suspension for Failure To Maintain a Regular Work Schedule. Complainant's attendance in June and early July was cited in the suspension.   After a Grievance, on August 3, 2001, the Suspension was rescinded. I.F. 0220-01, at 149.

28. During the period January 2001 through October 2001, the records demonstrate that Complainant used more SL than Childs (African-American) or Miller (Caucasian), the two employees cited by Complainant as comparative employees who were treated more favorably by being granted leave while Complainant was denied leave. I.F. 0220-01, Exs. 15-17.

29. On October 3, 2001, Complainant's leave request was denied. He then worked on the date requested and was paid.

30. Complainant claimed he was denied OT on Saturday and Sunday, October 27 and 28, 2001.   However, he has not demonstrated that he was willing to work the two days.   While at home, Cook called all employees to report to T Street for OT.   He left Complainant a message.   Some employees reported to T Street and worked.   Among those who worked on one or both days were employees of both African-American and Caucasian races and some with prior EEO activity. Complainant had not indicated, prior to these dates, that he was interested in working OT on his day off.   Complainant was scheduled off on Saturday and Sunday. See I.F. 0031-02, Ex. 12.

31. Complainant was denied leave for November 12, 2001, the Veterans Day holiday.   Complainant had informed Cook that he was unavailable to work on Veterans Day because he was a veteran.   However, Cook had posted a notice on November 6, 2001, to all employees that it was a mandatory work period and therefore all must work on November 10-12, 2001, unless they had pre-approved leave including the day before, the day after and the holiday in order to be excused from work. I.F. 0031-02, Ex. 18. Complainant had not requested all necessary days. Thus, his leave request was denied. Consequently, Complainant reported to work.   Complainant noted that Storekeeper Childs worked November 10th but not on the 12th and was not disciplined.   Cook explained that Childs was granted SL for a pre-scheduled   medical   appointment   and   had   presented

10

documentation for that SL.

32. Complainant claimed that he was denied leave for the November 23, 2001, holiday period. However, after his October 10, 2001, request for 16 hours of leave to cover the period November 22-26, 2001, was disapproved by Cook, Complainant requested 24 hours for November 22-27, 2001, which was approved on October 10, 2001. Complainant subsequently cancelled the 24-hour request and was granted 8 hours for Thanksgiving Day, November 23, 2001, since there was no mandatory work posting for that holiday period.

33. On October 16, 2001, Mansfield requested 8 hours of leave for November 23, 1001 - Thanksgiving Day. Cook approved the request.

34. On December 10, 2001, Complainant requested 8 hours of leave for January 19, 2002 until January 22, 2001. Complainant assumed that since he was off on the 19th and 20th and the Martin Luther King holiday fell on January 21st, he should only be required to seek leave for a day when he was not scheduled to be off. After the request was disapproved, he requested 24 hours of leave for January 19-24, 2002. This request was approved. Subsequently, on January 2, 2002, Complainant cancelled his leave. See I.F. 0031-02, Ex. 21.

35. On January 15, 2002, Cook posted a notice of mandatory work for the period between January 19-21, 2002. See I.F. 0031-02, Ex. 20. Green verbally informed Complainant on January 15th that, since his leave request was withdrawn, he had to report to work. Complaint, however, did not report to work. He was charged AWOL.

36. Simmons and Childs also were absent and required to provide documentation or be charged AWOL. After Grievances and proper documentation, both charges were rescinded. Complainant did not provide sufficient documentation to have his AWOL charge rescinded.

37. On January 28, 2002, Complainant was issued a 7-Day Suspension for being AWOL. See I.F. 0031-02, Ex. 19.

38. On February 7, 2002, Tom Sponaugle (Caucasian) requested a schedule change for February 11, 2002. Cook approved it.

39. On February 11, 2002, Complainant phoned Supervisor Green that he would be reporting to work late. After he arrived he requested a revised schedule instead of taking leave.

11

Although on at least a half dozen other occasions, Green had approved Complainant's requests for schedule changes to cover late arrivals or early departures, he denied the requested change of schedule because another employee had already been approved for a schedule change for that day. In addition, Complainant was more than 30 minutes late. Previously Green had approved Complainant's and other employees' schedule changes but only when they were no more than 30 minutes late.

40. In early 2002, the decision was made that Largo I, Tour 3, Level 7 Mechanics would have additional duties of preventive maintenance and diagnosis of problems. Thus, Tom Buchanan (Caucasian) and George Spenser (African-American), who were employed as Automotive Technicians/Mechanics on Tour 3 at the Largo I VMF in Capitol Heights, Maryland, were temporarily assigned Level 8 work by Green and paid accordingly starting on January 10, 2002. No Level 7 employee from Tour 2 was assigned the same additional duties or detailed or transferred to Tour 3.

41. In June and July 2002, Mansfield and others worked as a 204B supervisor.

42. Complainant requested leave on several different occasions for time off around the July 4th holiday in 2002. In January, he requested 72 hours; in May he requested 32 hours and then 24 hours. At all times, Green denied the requests because the calendar was closed for that period. Stephen Clark, Michael Scott and Richard Ziehl, all Caucasian, had their leave requests approved by Supervisor Michel Hill after their submissions in February 2002. However, they worked a different tour and their requests were approved by a different supervisor. Accordingly, they are not similarly situated to Complainant. Mansfield (Caucasian), who is senior to Complainant on Tour 2, also was approved for leave during this period.

43. Even though prior requests were denied, Complainant did not work over the July 4th holiday. He called in for emergency leave, which was granted pending documentation, and left the area in late June to travel to and assist his mother in Tennessee. He then developed car problems. He did not report to work until July 8th. He did not provide adequate documentation for his absence. He was charged AWOL and later issued a 14-Day Suspension. The July 4th period leave request matter was Grieved. An Arbitrator heard the matter. Complainant did not prevail.

44. Complainant claimed that John Miller and Sandra Childs were either out of leave or late during the same period and did not receive a Suspension. The record does not show that they were ~~similarly situated to Complainant in the amount of leave used.~~

45. In July 2002, the Agency posted Vacancy Announcements 31-02 and 33-02 for positions of Vehicle Maintenance Supervisor, EAS-16. Cook and Currie were the selecting officials.

46. Complainant and Virgil Chase, Jeffery Credle, Franklin Green, Jordan Hart, Roland Johnson, Layton Jones, Stamatios Karoutsos, Cleveland Mansfield, John P. Miller, William Morris and Robert Smith applied for the position at the T Street VMF. Complainant and Henry Barnett, Virgil Chase, Franklin Green, Roland Johnson, Layton Jones, Cleveland Mansfield, John P. Miller, William Morris, Michael Scott and Robert Smith applied for the position at the Southern Maryland VMF.

47. Joseph King, Diane Hattfield and Adrian Ames, who sat as a Review Committee individually rated the applications based on the applicants' listed experience and responses to questions about their knowledge, abilities and skills. The Committee members then met via conference telephone call to discuss their ratings and arrive at a consensus.

48. No evidence was presented disputing that the Review Committee members were unaware of Complainant's EEO activity prior to serving on the committee.

49. The Committee recommended Jeffery Credle, Franklin Green, Stamatios Karoutsos, John P. Miller, William Morris and Robert Smith for interviews by the selecting official. The applicants had each been rated Superior based on supervisory experience as a Level 8 Lead Mechanic or as a 204B supervisor. Credle already was a Level 16 supervisor who wanted a lateral reassignment.

50. Complainant was rated Average by the Review Committee. He was not interviewed for the EAS-16 positions.

51. Cook and Currie selected Franklin Green (African-American) and Stamatios Karoutsos (Caucasian). Green then became Complainant's supervisor. This too became a point of contention for Complaint. All co-workers' testimony demonstrated that they were clear that Green now supervised them because of his orders and where he sat in the facility. Complainant stated that he did not know Green was the supervisor because he did not see it in writing. On occasion,

he told Green, "I cannot hear you" when given directions to work.

52. ~~On August 22, 2002, Green sent Complainant home for failing to~~ follow instructions or obey an order after Complainant refused to repair an engine without an engine stand. After Complainant refused to perform the work, another Mechanic did the work. A Safety Inspector verified that the engine work using the stand as Green had ordered Complainant to do, did not result in a safety hazard as Complainant claimed. Complainant claimed he lost 7.82 hours of pay and possibly two hours of OT. The records indicate that after a Grievance was filed, a pay adjustment was made and the Complainant was paid for the time.

53. Several witnesses, co-workers and managers, attested to Complainant being a good Mechanic. No witness attested to him having good supervisory or leadership skills. Some, co-workers and managers, attested to his bad leadership and communication skills and gave examples of his aggressive behavior when previously given such opportunities. Childs testified that in 2001 she told Cook and Currie about Complainant's aggressive nature toward her and others when put into a leadership role whether it was a higher level craft position or an acting supervisory role.

54. As noted specifically above, most of the discipline issued to Complainant by either Cook or Green was rescinded as a result of Union grievances.

55. Complainant's witnesses - Reginald Trice, Edward Clark and Gwendolyn Simms-Hearn - testified about their opinions of Currie as a VMF Manager in Bedford Park, Illinois. None provided evidence that they prevailed in a forum where they proved their allegations that Currie had expressed a racially discriminatory animus toward them.

56. In 2000, Currie became Complainant's manager. He met with him to have a frank discussion about problems and issues Complainant had had with his managers in the past. Complainant testified that Currie told him that he had heard about the complaints he had filed in the past and that this was going to stop. He told Complainant that if Complainant was not happy, he had two choices; he could become happy or he could leave. Currie credibly testified that it was only a frank discussion between himself as a new manager and Complainant because he wanted to work out any problems that might have existed.

14

57. Although claimed, no direct evidence of racial or retaliatory motives by Cook or Currie or Green was presented. Complainant speculated about Curries' comments to him in 2000, but failed to produce corroborating evidence of his interpretation of their discussion or that Currie's explanation was not credible.

## IV. APPLICABLE LAW

Title VII of the Civil Rights Act of 1964, as amended, provides that it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(i).

In *County of Los Angeles v. Davis*, 440 U.S. 625 (1979), the U.S. Supreme Court set forth a test for determining when a case no longer presents a live controversy. According to the Supreme Court in *Davis, supra*, a court's jurisdiction will abate if:

(1) it can be said with assurance that there is no reasonable expectation that the violation will recur; and

(2) interim relief or events have completely eradicated the effects of the alleged violation.

Under such circumstances, no relief is available and thus there is no need for a determination of the rights of the parties. In accordance with *Davis*, the Commission has held that where the only matter to be resolved is the underlying issue of whether discrimination in fact occurred, the matter is closed if it meets the two criteria in *Davis*.

A Complainant may establish discrimination by presenting direct or circumstantial evidence sufficient to justify a mixed motive theory of liability. *Desert Palace, Inc. v. Costa*, 123 S.Ct. 2148 (June 9, 2003). In the absence of direct evidence of discrimination, a Complainant may establish discrimination through an indirect method of proof.

In order for a Complainant to prevail, the evidence of record must initially establish at least a prima facie case of discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) (Title VII case); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (Title VII case). If a prima facie case

15

is established, the burden shifts to the Agency to articulate a legitimate nondiscriminatory reason for the challenged action. *Burdine*, 450 U.S. at 253-54; *McDonnell Douglas*, 411 U.S. at 802. Complainant may then show that the reason articulated by the Agency is a mere pretext for discrimination. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. However, it is not enough to disbelieve the employer's articulated reason. In addition, the fact finder must believe the Complainant's explanation of intentional discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2749, 2751-54 (1993). A prima facie case and sufficient evidence of the Agency's pretext may permit a finding of discrimination, even without additional, independent evidence of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S. Ct. 2097, 2108-2109 (June 12, 2000). The ultimate burden of persuading the trier of fact that the Agency discriminated against the Complainant remains at all time with the Complainant.

As noted by the Court, the factual circumstances necessarily vary in discrimination cases. Consequently, the courts have developed models for certain common situations to assist in determining whether a prima facie case has been established. *Burdine* at 256, n. 6; *McDonnell Douglas* at 802, n. 13.

A prima facie case of unlawful discrimination based on race, analyzed under the disparate treatment theory, may be established by showing that: (1) Complainant is a member of a protected class; and (2) he was treated differently, with respect to a term, privilege or condition of employment, from a similarly situated person who is not a member of Complainant's protected class under circumstances that give rise to an inference of unlawful discrimination.

In order for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, a Complainant must show that all of the relevant aspects of his employment situation are nearly identical to those of the non-protected employees whom he alleges were treated differently. *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985); *Murray v. Thistledown Racing Club Inc.*, 770 F.2d 63, 68 (6th Cir.1985); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181,1185 (11th Cir. 1984); *Payne v. Illinois Central Gulf Railroad*, 665 F. Supp. 1308, 1333 (W.D. Tenn. 1987); and *Cynthia A. Scott v. U.S. Postal Service*, EEOC No. 01902344, Sept 20, 1990.

A prima facie case of unlawful discrimination based on reprisal may be established by showing that: (1) Complainant engaged in protected EEO activity; (2) a relevant Agency official

16

was aware of the protected activity; (3) an Agency action subsequently adversely affected Complainant; and (4) the action in question followed the protected activity within such a time that a retaliatory motive may be inferred. *Barnes v. Small*, 840 F.2d 972, 976 (D.C. Cir. 1988); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *Hicks v. United States Postal Serv.*, EEOC Request No. 05930774 (June 23, 1994).

In order to establish a case of harassment that rises to the level of a hostile work environment, the harassment must be ongoing and continuous to constitute unlawful discrimination. *Mangan v. Department of Veteran Affairs*, EEOC Appeal No. 01961472, at 3-4 (December 30, 1996) (vacating dismissal by Agency). Moreover, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an objectively hostile or abusive work environment. The conduct must also be subjectively perceived by the victim to be abuse. *Harris v. Forklift Systems, Inc.*, 114 S.Ct. 367, 370; 510 U.S. 17 (1993); *Oncale v. Sundowner Offshore Services, Inc.*, 118 S.Ct. 998, 1998 WL 88039 at 3-4 (March 4, 1993) (same, stressing requirement that the harassment be severe).

In determining whether harassment is sufficiently severe or pervasive to create a hostile environment, the harasser's conduct should be evaluated from the standpoint of a "reasonable person". A Complainant must demonstrate that he or she perceived, and a reasonable person would perceive, the work environment to be abusive. *Harris*, 510 U.S. at 17. Title VII does not serve "as a vehicle for vindicating the petty slights suffered by the hypersensitive." *Zabkowicz v. West Bend Co.*, 589 F. Supp. 780, 784 (E.D. Wis. 1984). See also, *Ross v. Comsat*, 34 FEP Cases 260, 265 (D. Md. 1984), *rev'd on other grounds*, 759 F.2d 355 (4th Cir. 1985). Thus, if the challenged conduct would not substantially affect the work environment of a reasonable person, no violation should be found. Liability may be imputed to the Agency if the Agency had actual or constructive knowledge of the existence of a hostile work environment and took no prompt and adequate remedial action.

Further, the harassment must be (a) based on a protected basis raised in the complainant, and (b) imputable on some factual basis to the employer. *Spicer v. Com. of Va. Dept. of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995)(en banc).

Where a supervisor creates a hostile environment with no tangible employment consequences, an employer may avoid liability only by raising an affirmative defense subject to proof by a preponderance of the evidence that (a) the employer exercised

reasonable care to prevent and correct promptly the harassing behavior, and (b) the complainant unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise. *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257, 1998 WL 336326, p. 18 (June 26, 1998); and *Faragher v. City of Boca Raton*, 118 S.Ct. 2275, 1998 WL 336322, p. 24 (June 26, 1998) (same).

In order to establish a prima facie case of harassment, a Complainant must demonstrate that (1) he belongs to a class provided protection from unlawful discrimination under the civil rights laws; (2) the harassment complained of was based on a protected basis; (3) the harassment affected a term, condition, or privilege of employment, and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile or offensive work environment; and (4) the employer knew or should have known of the harassment and failed to take proper remedial action.

## V. ANALYSIS AND CONCLUSIONS OF LAW[6]

Complainant speculated and opined about what he considered to be direct evidence of race discrimination or reprisal. However, after thoroughly reviewing the evidence, I conclude that the record does not contain any direct evidence of a discriminatory animus. Neither the 2000 discussion between Currie and Complainant nor the Illinois VMF employees' opinions constitute direct evidence of discriminatory actions or statements by any of the managers who interacted with Complainant for the Agency. As set forth above, I find Currie's testimony credible that his discussion with Complainant was just a good faith effort to resolve any problems that may have existed previously between Complainant and his former managers.

### Summary Judgement Analysis and Conclusions

Based on the evidence of record, when viewed in a light most favorable to Complainant, the undisputed facts show Complainant cannot establish that the Agency unlawfully discriminated against him based on race or in reprisal for prior EEO activity in regard

---

[6] The issues at hearing analyzed in this Decision utilized the record produced at hearing through testimony and admitted exhibits, as well as the evidence within the exhibits in the Investigative Files. Some of the facts are undisputed and were also utilized in arriving at the Summary Judgment Decision without hearing rendered on July 27, 2004, at the beginning of the EEOC Hearing.

18

to each of the following issues. He failed to demonstrate, in each issue analyzed within the Summary Judgment Decision, that there was a similarly situated person who was treated differently because of race or EEO activity. Complainant created the atmosphere and violated the regulations and policies with which others complied. The Agency's reactions to Complainant's disobedient and disorderly conduct was the discipline imposed on him to have him comply with workplace norms accepted by his co-workers or at least not violated by them. However, Complainant repeatedly expected to be given privileges not given to his co-workers. No showing has been made that any decision by the managers in Complainant's chain-of-command was made while considering his race or his prior EEO activity. Complainant did not conduct himself in accordance with the rules and was treated accordingly. When others conducted themselves similarly, they too were denied leave and/or disciplined. Based on the record, Complainant failed to establish a prima facie case or show that the Agency's reasons for the actions noted below were a pretext for discrimination. Complainant failed to prove that the Agency discriminated against him based on race or reprisal.

<u>0220-01</u>

2) On June 8, 2001, Complainant received a Letter of Warning for an Absence from Scheduled Overtime - Complainant was absent and has not shown that, because of his race or EEO activity, he was treated differently or less favorably than others who conducted themselves similarly. Complainant did not rebut the Agency's explanation that he was issued the Letter of Warning because he was absent without approved leave on May 27 and 28, 2001.

6) On July 18, 2001, Complainant received a 7-Day Suspension for Failure To Maintain a Regular Work Schedule - Complainant has not shown that, because of his race or EEO activity, he was treated differently or less favorably than others who conducted themselves similarly. Complainant did not rebut the Agency's explanation that he was issued the 7-day suspension because of his failure to be regular in attendance in June and July 2001.

<u>0031-02</u>

1) On October 3, 2001, Complainant's leave request was denied - Complainant has not shown that, because of his race or EEO activity, he was treated differently or less favorably than others who conducted themselves similarly. The Agency dismissed this issue because Complainant suffered no loss or harm since he worked on the date for which he requested leave and was paid for the day.

Complainant has not provided evidence disputing the Agency's conclusions or showing that Complainant has any outstanding harm or loss to an employment condition, benefit or privilege. Therefore, the issue is moot.

3) On November 12 and 23, 2001, Complainant's leave requests for the holiday periods were denied - Complainant has not shown that, because of his race or EEO activity, he was treated differently or less favorably than others who conducted themselves similarly. Complainant was denied for November 12, 2001, because he did not comply with the policy of requesting 24 hours of leave during a holiday mandatory work period.    For the November 23rd period Complainant made several requests for leave which he later withdrew.    Ultimately, Complainant requested and was on approved leave on November 23, 2001, and was paid.

0108-02

2) On February 13, 2002, Complainant became aware that Largo I VMF Tour 3 Mechanics were being paid Level 8 pay - Although he is a member of a racially protected class, Complainant failed to proffer evidence that he was similarly situated to these employees. He worked on Tour 2. No Tour 2 employee was treated differently than Complainant. In addition, although he had previously engaged in EEO activity of which his managers were aware, Complainant failed to show that he was adversely treated when denied a benefit other similarly situated employees received. Therefore, Complainant failed to establish a prima facie case of race discrimination or reprisal. He also failed to show that the Agency's legitimate non-discriminatory explanation of the events at issue were a pretext for discrimination.

1K-206-0074-02

1) On July 4, 2002, Complainant became aware that another employee was given annual leave while his leave for the holiday period was denied - This matter was raised in a Grievance and was heard by an Arbitrator who ruled that Complainant did not prevail. The senior employee was granted leave in accordance with the collective bargaining agreement. In addition, herein, Complainant failed to proffer evidence of a similarly situated employee on Tour 2 where he worked who was treated differently. According to the Agency's official policies, procedures and agreed requirements, leave is determined by seniority. Thus, in regard to leave for this holiday, which Complainant requested a number of times, he was not similarly situated to Mansfield, who was the senior employee and granted leave before Complainant requested it.    It is also noted that

20

Complainant was not at work on July 4, 2002, because he left town on June 28th to assist his mother and did not return to work until July 8, 2002. He was eventually charged AWOL for July 2-5, 2002 ~~when he failed to present appropriate documentation for his~~ absence. Complainant did not establish a prima facie case of race discrimination or reprisal.  He failed to demonstrate either a discriminatory animus or that he was treated differently because of his race or prior EEO activity in regard to the denial of leave for the July 4th period.   He also failed to show that the Agency's reasons were a pretext for discrimination.

2) On July 17, 2002, Complainant received a 14-Day Suspension for failure to be regular in attendance - After failing to provide sufficient documentation for his July absence, as noted above, he was charged AWOL. Based on this, he was issued a 14-Day Suspension. Complainant was absent and failed to provide documentation.  He has not shown that, because of his race or EEO activity, he was treated differently or less favorably than others who conducted themselves similarly. Complainant grieved the Suspension. The Arbitrator ruled that the Agency acted within its rules and denied the Grievance. Complainant has not presented any evidence of a discriminatory animus or of a similarly situated employee who was treated differently.   Therefore, Complainant failed to establish a prima facie case of race discrimination or reprisal or prove that the Agency unlawfully discriminated against him based on race or reprisal in regard to the Suspension.

0177-02

1) On August 22, 2002, Complainant was sent home by Acting Supervisor Franklin Green after reporting a safety hazard and refusing to work - Complainant did not show that, because of his race or EEO activity, he was treated differently or less favorably than others who conducted themselves similarly.  Complainant did not rebut the Agency's explanation that he was sent home for failing to obey his supervisor's order to repair an engine. Another mechanic did the work and a safety inspector verified that the assignment was not a safety hazard.

2) Complainant was not awarded positions of Supervisor, EAS-16, announced under Numbers 31-02 and 33-02 - Complainant was not recommended by Review Committee members who reached consensus rating  Complainant  Average,  not  Superior  like  those  they recommended for interview by the selecting official. Two men, a Caucasian and an African-American, were selected.   One had prior EEO activity.  Complainant did not establish a prima facie case of race discrimination or of reprisal.  The Review Committee did not

21

know of his prior EEO activity and thus he has not established a prima facie case of reprisal. Assuming a prima facie case of race discrimination, he has not rebutted the Agency's articulated explanation that the Review Committee recommended individuals who had supervisory experience as Level 8 Lead Mechanics or as 204B Supervisors.

0016-03

1) In June 2002, Complainant became aware that one Caucasian and two African-American employees were being utilized as 204B's and he was not - Complainant did not apply for the 204B program by submitting a 991. Exceptions to the appointment of program-accepted 204B's on Tour 2 was the detailing of a Body and Fender Repairman to work in the T Street Paint Shop. Later, while at that location, he was also detailed to a 204B for the Tour. However, Complainant was not designated as a Body and Fender Repairman and thus was not similarly situated. For the second detail, Complainant was not at the facility where the detail was needed: A few others, who had applied but were not among the six accepted, were also later utilized in a 204B assignment. However, these exceptions could not have included Complainant because he did not complete the application process or have the documented skills to work in the T Street Paint Shop. He was not similarly situated to anyone appointed as a 204B during this period. Therefore, based on the record, Complainant cannot establish a prima facie case or prove that the Agency unlawfully discriminated against him based on race.

In each and every issue analyzed and decided above, Complainant cannot prove that the Agency discriminated against him because of race or reprisal.

Post-Hearing Analysis and Conclusions

4K-200-0220-01

1) Complainant was denied 204B class and on-the-job training in the Southern Maryland VMF during May 2001 - However, Complainant did not apply for the program. After all testimony and exhibits have been reviewed, I find that Complainant was not similarly situated to those appointed to 204B assignments. He did not want to compete and then expected to have the benefits others had worked to receive. Even those not accepted in the program, worked hard to complete applications and go through interviews. Complainant did not do so. He also did not demonstrate a discriminatory animus

22

based on race or reprisal since others of his race and those with
prior EEO activity were appointed to 204B assignments.   Although
some very few exceptions were shown to appointing only those
accepted within the program to a 204B assignment, each exception
was fully and credibly explained. No assignment was shown to have
been made while considering race or EEO activity. Consequently, I
conclude that no circumstances were shown to have existed raising
an inference of discrimination. Thus, Complainant failed to
establish a prima facie case of race discrimination or reprisal or
demonstrate pretext.

3) On June 18, 2001, Complainant was allegedly physically assaulted
by David Cook, Manager of Largo I VMF; and 4) denied his timecard
and not allowed to punch in between June 19-21, 2001; and 5) his
request for leave slips was denied on June 25, 2001 - Complainant
has not proven, by a preponderance of the evidence, that he was
assaulted. After adjudging the credibility of the witnesses, I
find that Complainant's version of the events during that week, do
not support the conclusion that he was assaulted. The evidence
shows that both men acted childishly. Complainant, on this and
other occasions, shouted "I cannot hear you". Cook angrily tried
to keep him out of work. Complainant had been told to bring
documentation of his daughter's illness when he called in for sick
leave in June. He refused to do it. He pretended being unable to
hear Cook. He deliberately refused to listen to Cook telling him
repeatedly that he had to provide documentation as he was told to
do. Complainant has not shown that Cook's actions were based on
race or Complainant's prior EEO activity. Therefore, Complainant
failed to establish a prima facie case based on race or reprisal or
show that the Agency's reasons are a pretext for discrimination.

4K-200-0031-03

2) On October 27-28, 2001, Complainant was denied overtime (OT) -
Based on the record and having adjudged the credibility of the
witnesses, I conclude that Cook telephoned Complainant. Cook called
workers of all races from home to report to T Street.   The fact
that Complainant did not report for OT, does not show that he was
not called or that he was denied OT. Based on the totality of the
evidence and the credibility of witnesses, I conclude that he was
called and elected to not report to T Street. This was not the
first time that Complainant did not want to work OT on his day off.
He has created reasons to be paid for not working in this and other
instances. He has, however, not demonstrated that his version of
this event is worthy of credence. Employees with prior EEO activity
and of Complainant's race were called and some worked.  No showing
has been made of any circumstances raising an inference of  a
discriminatory animus.    Consequently, Complainant failed to

23

establish a prima facie case or prove that the Agency discriminated
against him based on race or reprisal when he did not work OT on
October 27-28, 2001.

4K-200-0048-02

1) On January 28, 2002, Complainant received a 7-Day Suspension -
Complainant requested leave for the Martin Luther King Jr. holiday
on January 21, 2002 by submitting a request for January 19-22.
However, as he had many times before, he did not request sufficient
hours to cover the weekend holiday period. After the request was
denied, Complainant requested time off for the period again but
listed the needed 24 hours off.  Green approved the request.
Shortly thereafter, Complainant withdrew the request and canceled
the leave.  Subsequently, after the holiday was posted for
mandatory work, Green reminded Complainant that he was expected to
work since he had withdrawn his request. However, Complainant did
not report to work.  He was charged AWOL and issued a 7-Day
Suspension.  Chris Simmons and Monique Childs also were absent
during the mandatory work period. Childs was sick and subsequently
provided appropriate documentation and was charged Sick Leave.
Simmons was charged AWOL. He grieved the charge, provided adequate
documentation and the Grievance was settled.  Thus, based on the
record, Complainant has not shown that he was treated differently
than similarly situated workers. Complainant failed to demonstrate
any circumstances from which one could infer a discriminatory
animus based on race or reprisal.  Consequently, Complainant failed
to establish a prima facie case of race discrimination or reprisal
or prove that the Agency discriminated against him based on race or
reprisal when he was issued a 7-Day Suspension in January 2002.

4K-200-0108-02

1) On February 11, 2002, Complainant was denied a revised schedule
- On a number of occasions when Complainant requested a revised
schedule, Green approved the request.  On this occasion, Green
credibly explained with supporting documentation that Complainant
was not within the 30-minute late time allowed when approving such
a request. Complainant has not demonstrated that there are any
circumstances from which one could infer a discriminatory animus in
this matter.  Based on the evidence, Complainant failed to
establish a prima facie case or prove unlawful discrimination based
on race or reprisal in regard to this schedule change request being
denied.

24

4K-200-0016-03

2) In June 2002, Complainant became aware that one Caucasian and two African-American employees were utilized as 204B's. Based on the evidence, I find that Complainant did not present evidence showing circumstances from which one could infer a discriminatory intent by any decision maker in the assignment of employees to act as a 204B supervisor. Complainant had not applied for the program; nor was he as skilled in leadership and communications as others were. The record contains evidence showing Complainant's many failures to communicate with others. Thus, based on the record, Complainant has not shown that he was treated differently than similarly situated workers. Consequently, Complainant failed to establish a prima facie case of reprisal or prove that he was discriminated against by the Agency based on reprisal when he was not assigned work as a 204B.

*Harassment/Hostile Work Environment*

As noted above, in order to establish a prima facie case of harassment, a Complainant must demonstrate that (1) he belongs to a class provided protection from unlawful discrimination under the civil rights laws; (2) **the harassment complained of was based on a protected basis**; (3) the harassment affected a term, condition, or privilege of employment, and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile or offensive work environment; and (4) the employer knew or should have known of the harassment and failed to take proper remedial action.

Based on his race, Complainant is a member of a protected class. He engaged in EEO activity prior to the decisions and actions at issue. However, as noted above, he failed to demonstrate the claims comprising the alleged harassment were based on either of these prohibited factors. None of the incidents and decisions which Complainant has raised as constituting harassment have been shown to be the result of intentional discriminatory conduct by the Agency toward Complainant, as noted above. Complainant has not shown that the requirement to participate in a training program for 204B's was an intentional act of discrimination or harassment. Evidence shows that Complainant had the opportunity, as did others, to apply for the program. He chose not to participate. Then he complained on a number of occasions, noted above, about the consequential actions of that decision. Assignment of tasks is at a manager's discretion; the Agency has the discretion to carry out its business as it sees fit, and may act for a good reason, a bad reason or no reason at all, provided it is not motivated by a

discriminatory reason. *Nix v. WLCY Radio*, 738 F.2d 1181, 1187 (11th Cir. 1984). Complainant has not shown that a discriminatory motive was behind the creation of the program. Furthermore, the ~~Agency has demonstrated that Complainant refused to participate.~~ And, when rare exceptions were made in 204B assignments from those accepted into the Cook program, there were legitimate non-discriminatory reasons for those decisions.

Complainant refused to acknowledge that there was a requirement to take 24 hours of leave within a holiday period. His refusal to follow the same rules that others followed created the underlying cause for much of the discipline issued to him. The Agency's remedial actions, while no doubt difficult to endure, represent a legitimate and necessary series of actions to correct deficiencies. Other employees had occasional deficiencies corrected as well. The Agency's reactions to Complainant's repeated and deliberate violations of rules and procedures was consistent with actions toward others who occasionally violated the rules.

Complainant argued that Currie, Cook and Green created the abusive atmosphere that caused him to have discipline issued to him by Cook and Green. However, Complainant has not proven his point. He did not produce evidence that he was treated differently from others who were similarly situated or that these decisions about leave procedures or training (204B and higher craft position) assignments were made based on a discriminatory motive. Complainant refused to follow the rules that all similarly situated employees had to endure and comply with. Harassment of an employee that would not occur but for the employee's protected status is unlawful. *McKinney v. Dole*, 765 F.2d 1129, 1138-39 (D.C. Cir. 1985). The Agency's actions toward Complainant have not been shown to be related to Complainant's protected status based on race or EEO activity. Instead, all have been shown to be based on Complainant's deliberate violations of rules. The record also shows that although some were rescinded or settled after Complainant filed Grievances, this was caused by the Agency's failures to comply with the procedures established in the collective bargaining agreement. No showing was made that the Complainant did not commit the violations for which he was disciplined or that his protected status was the basis for the Agency's actions.

It is clear that Complainant and management, i.e. Currie, Cook and Green, did not get along. However, most of the incidents to which Complainant points represent everyday workplace problems and/or exist when a manager considers deficiencies in performance or conduct. Without being based on a prohibited factor, they do not constitute harassment. While Complainant objects to programs,

management decisions and rules about holiday periods, Complainant did not suffer from discriminatory decisions, as noted above. He has not shown that his perception objectively reflects the encounters. Complainant was unwilling to perform his duties without questioning everything and objecting whenever he could.

In support of his claim, Complainant points to numerous events after May, 2001, and has stated that he subjectively perceived his treatment as abuse. Each Agency action was justified based on Complainant's refusal to follow the rules as his co-workers did. Complainant at all times was paid the salary due him for his work. During the period at issue, Complainant's duties and assignments never changed significantly. He was allowed to take leave or have schedule changes on occasion when scheduling permitted and he adhered to the same rules that others had to follow - i.e., 24 hours leave within a posted holiday period and not more than 30 minutes late. It is clear that Complainant was embarrassed by the remedial actions when work was monitored, his unruly behavior challenged, rules applied with which he disagreed and discipline issued. However, management's actions were not based on Complainant's race or EEO activity and did not create a hostile work environment.

Based on the evidence of record, I conclude that Complainant was not subjected to harassment and was not a victim of a discriminatory hostile work environment created by the Agency. Complainant refused to accept orders. He created tension by his refusal and childish antagonistic behavior. Based on the evidence, I conclude that the incidents and decisions described above are not related or based on Complainant's race or protected activity and did not cause a hostile work environment.

27

## VI. DECISION

### Summary Judgement

Based on the evidence of record, when viewed in a light most favorable to Complainant, the undisputed facts do not establish that the Agency unlawfully discriminated against Complainant based on race or in reprisal for prior EEO activity in regard to the issues noted in bold in Section **II. ISSUES** and analyzed above.

### Post-Hearing Decision

Based on the evidence of record, Complainant failed to prove, by a preponderance of the evidence, that the Agency unlawfully discriminated against him because of race or reprisal in regard to the issues noted in regular typeface in Section **II. ISSUES** and analyzed above, or harassed him or subjected him to a hostile work environment between May 2001 and August 2002.

For the Commission:

_____
**MAY 1 0 2005**
DATE

_____
LINDA A. KINCAID
ADMINISTRATIVE JUDGE

28

## NOTICE

This is a decision by an Equal Employment Opportunity Commission Administrative Judge issued pursuant to C.F.R. § 1614.109(b), 109(g) or 109(I). **With the exception detailed below, the complainant may not appeal to the Commission directly from this decision.** EEOC regulations require the Agency to take final action on the complaint by issuing a final order notifying the complainant whether or not the Agency will fully implement this decision within forty (40) calendar days of receipt of the order entering judgment and this decision. The complainant may appeal to the Commission within thirty (30) calendar days of receipt of the Agency's final order. The complainant may file an appeal whether the Agency decides to fully implement this decision or not.

The Agency's final order shall also contain notice of the complainant's right to appeal to the Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for such appeal or lawsuit. If the final order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. §1614.403, and append a copy of the appeal to the final order. A copy of EEOC Form 573 must be attached. A copy of the final order shall also be provided by the Agency to the Administrative Judge.

If the Agency has <u>not</u> issued its final order within forty (40) calendar days of its receipt of the order entering judgment and this decision, the complainant may file an appeal to the Commission directly from this decision. In this event, a copy of the Administrative Judge's decision should be attached to the appeal. The complainant should furnish a copy of the appeal to the Agency at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such service was made on the Agency. All appeals to the Commission must be filed by mail, personal delivery or facsimile to the following address:

Director
Office of Federal Operations
Equal Employment Opportunity Commission
Post Office Box 19848
Washington, D.C. 20036
Fax No. (202)663-7022

Facsimile transmissions over 10 pages will not be accepted.

29

## COMPLIANCE WITH AN AGENCY FINAL ACTION

~~An Agency's final action that has not been the subject of an~~
appeal to the Commission or civil action is binding on the Agency.
See 29 C.F.R. §1614.504. If the complainant believes that the
Agency has failed to comply with the terms of its final action, the
complainant shall notify the Agency's EEO Director, in writing, of
the alleged noncompliance within thirty (30) calendar days of when
the complainant knew or should have known of the alleged
noncompliance. The Agency shall resolve the matter and respond to
the complainant in writing. If the complainant is not satisfied
with the Agency's attempt to resolve the matter, the complainant
may appeal to the Commission for a determination of whether the
Agency has complied with the terms of its final action. The
complainant may file such an appeal within thirty (30) calendar
days of receipt of the Agency's determination or, in the event that
the Agency fails to respond, at least thirty-five (35) calendar
days after complainant has served the Agency with the allegations
of noncompliance. A copy of the appeal must be served on the
Agency, and the Agency may submit a response to the Commission
within thirty (30) calendar days of receiving the notice of appeal.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the DECISION AND ORDER ENTERING JUDGEMENT were served by regular U.S. Mail on May 11, 2005 to the following:

Kevin D. West
831 Chatsworth Drive
Accokeek, MD 20607-2032

Teesa W. Murrary, Esq.
The Law Office of T.W. Murray
1717 K St., N.W.
Suite 600
Washington, DC 20036

Andrew Chakeres, Esq.
USPS-Law Dept.
400 Virginia Ave., S.W.
Suite 650
Washington, DC 20024-2730

POSTMASTER GENERAL[1]
UNITED STATES POSTAL SERVICE
Office of EEO Compliance & Appeals
Capital Metro Operations
Post Office Box 1730
Ashburn, VA 20146-1730

/S/
Lynn A. Tognocchi
Legal Technician
(410) 962-7711
FAX# (410) 962-6633

---

[1] The Report of Investigations, hearing record and hearing transcripts were given to the Agency representative.