kls                                                                          1

JH

                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x
                                  :
KEVIN D. WEST,                    :
                                  :
           Plaintiff,             :
                                  :   Case No.
       v.                         :   CR01-0746
                                  :
JOHN E. POTTER,                   :
  Postmaster General,             :
                                  :
           Defendant.             :
                                  :
- - - - - - - - - - - - - - - - -x

                                  Washington, D.C.
                                  April 5, 2002
                                  9:10 a.m.

                   Transcript of Status Call
              Before the Honorable James Robertson
                   United States District Judge

APPEARANCES:

For the Plaintiff:        KEVIN D. WEST, Pro Se

For the Defendant:        DAVID J. BALL, JR., ESQ.
                          HERMAN A. MANUEL, ESQ.

Court Reporter:           JON HUNDLEY
                          Miller Reporting Company
                          735 8th Street, S.E.
                          Washington, D.C. 20003
                          (202) 546-6666

kls                                                                          2

1                    P R O C E E D I N G S

2              THE CLERK:  Civil Action 01-0746, Kevin D.

3    West v. John E. Potter, Postmaster General.  Mr.

4    West is appearing pro se.  Representing the

5    defendant, Mr. Ball.

6              THE COURT:  When we were last here, I

7    think the way we left it was I strongly encouraged

8    Mr. West to get a lawyer.  I don't think he has

9    done that.  And I told him he can continue this

10   suit in D.C., but only if he dismisses the Maryland

11   case.

12             Mr. West, where do you stand on that?

13             MR. WEST:  I have dismissed the Maryland

14   case, Your Honor.

15             THE COURT:  The Maryland case has been

16   dismissed?

17             MR. WEST:  Yes, it has, Your Honor.

18             THE COURT:  Any dispute about that, Mr.

19   Ball?

20             MR. BALL:  Your Honor, I checked the case

21   this morning, and it indicates the case was indeed

22   dismissed.

23             THE COURT:  All right.

24             Well, then, I guess we are going forward

25   here, but we are going forward pro se.

1          Mr. West--

2          MR. WEST:  Yes, that is correct, Your

3   Honor.

4          THE COURT:  I think I told you this the

5   last time, you have got a rough road to hoe going

6   pro se.

7          MR. WEST:  Yes, I understand, Your Honor.

8          THE COURT:  I am not going to help you.  I

9   can't help you.

10          MR. WEST:  I understand.

11          THE COURT:  If I did, I would be putting

12   my thumb on your side of the scale.

13          Now, how do you wish to proceed in this

14   case, Mr. West?  Have you had your--have you sat

15   down with Mr. Ball to work out a plan for

16   proceeding with this litigation?

17          MR. WEST:  No, I have not, Your Honor,

18   because you put a stay on it until this hearing.

19   So I hadn't had a chance to get in touch with Mr.

20   Ball.

21          THE COURT:  It is your obligation, under

22   the local rules, to initiate what we call a "meet

23   and confer" conference with Mr. Ball and sit down

24   and organize a way of proceeding with this case,

25   unless, of course--Mr. Ball looks like he is

1  halfway up to the podium--unless he tells me that

2  he is going to file some dispositive motion and try

3  to interdict any further proceedings.

4        Mr. Ball, what is your plan?

5        MR. BALL:  Your Honor, I can't say that I

6  am going to file a dispositive motion.  What I did

7  come to the conference with this morning was a

8  schedule that the government thinks would be

9  appropriate for the case, based on the schedule

10  that Your Honor set when we met in January, before

11  we filed the motion to transfer for convenience.

12        I would be glad to go through that, Your

13  Honor.  I would also be glad to confer with Mr.

14  West, perhaps that would be more convenient for the

15  court, and submit something agreed.

16        THE COURT:  We are here, we are all here

17  together right now.  We might as well go through

18  it.  Do you have it written down?

19        MR. BALL:  Yes, I do, Your Honor.

20        THE COURT:  Copy to Mr. West?

21        MR. BALL:  I don't, but I can--well, I

22  have it written down to tell it, to say it--I am

23  sorry, Your Honor.  I did not type it up.

24        THE COURT:  All right.  Well, tell it,

25  then.

1              MR. BALL:  Okay.  What I would propose is

2    initial disclosure, what Your Honor, referred to,

3    of course, is the Rule 26(a)(1) disclosures being

4    due in two weeks.  That would be April 19th.

5              We would then propose that the discovery

6    cut off be, approximately, four months from now,

7    which is actually a little less than the court set

8    in January.  That would be August 2nd.

9              Then we would propose that summary

10   judgment motions be due six weeks after the

11   discovery cut off, approximately six weeks, which

12   is September 20th.

13             That opposition to summary judgment

14   motions be due on October 18th, and that summary

15   judgment replies be due on November 8th.

16             Your Honor, with respect to expert

17   reports, again, going with the schedule that Your

18   Honor had set at the previous conference, that

19   schedule called for expert reports being finished

20   at the same time as FAG discovery which the

21   government thinks is very much the best way to do

22   it.

23             So we would propose that plaintiff's

24   expert reports, if he is going to have any, be due

25   by July 12th, and then the government's be due by

1   August 2nd.  And any expert depositions take place

2   before September 6th.

3         Your Honor, looking at this schedule and

4   again looking at what Your Honor had set before, we

5   think that with summary judgment replies due in

6   early November, it looks like a good time for the

7   court to set a pretrial is January.  And, of

8   course, that is a matter for the court's

9   convenience.

10        And, of course, if the court wants to hold

11  status conferences, we are also very available to

12  do that.

13        Your Honor, just the only other thing I

14  have this morning and, to save time, I will mention

15  it now, is this matter of dispositive motions.  I

16  am told by agency counsel, who could not be here

17  this morning, that he had a dispositive motion that

18  he was working on for the Maryland case, in

19  anticipation the case was going to go forward in

20  Maryland.

21        I have not seen that paper.  And, Your

22  Honor, I would prefer not to file a motion that I

23  don't think is a strong motion before the close of

24  the discovery period, if it looks to me like there

25  may be more discovery appropriate on it.  So I am

1  not going to undertake to file such a motion this

2  morning, and I am not going to try and postpone the

3  discovery period.

4           If we are going to have to try--if we are

5  going to have to litigate the case, we are ready to

6  get on with it.  But we will be--I would be

7  extremely surprised if we did not file a

8  dispositive motion at the conclusion of discovery,

9  if not before then.

10          THE COURT:  Okay, Mr. West, what is your

11  response to all of that?

12          MR. WEST:  Your Honor, I have already

13  processed the discovery procedures with Mr. Ball,

14  and I haven't received any response from him.  I

15  did so as the court ordered on January 23rd.  I

16  have given him the five depositions for the people

17  that I need for my depositions, and I haven't got

18  any response because of the issues that were set on

19  March 5th.

20          THE COURT:  Well, we are just talking

21  about schedule now, Mr. West.

22          MR. WEST:  Well, as far as the scheduling

23  go, I have started and I was going to request for

24  five more depositions because this case also

25  includes Mr. David Cook, who is not in the

1  complaint that I filed in D.C.

2         THE COURT:  Let's talk about the schedule,

3  first, and then we will talk about how many

4  depositions.

5         MR. WEST:  I don't have any problem with

6  the schedule.

7         THE COURT:  Mr. Ball says, exchange

8  initial disclosures in two weeks, by April 19th;

9  discovery cutoff, no matter how many depositions,

10  on August 2nd; motions for summary judgment due

11  September 20th; opposition, October 18th; reply,

12  November 8th; your expert disclosures under Rule

13  26(a)(2), July 12th; defendant's expert disclosures

14  under Rule 26(a)(2), August 2nd; expert depositions

15  to be completed by September 6th; and I would set

16  the pretrial conference for January 30, 2003 and

17  trial for February 10, 2003.

18         Do you have any objection to that

19  schedule, Mr. West?

20         MR. WEST:  No, Your Honor.

21         THE COURT:  That will be the schedule.

22         Now, let's talk about how many

23  depositions.  You say you want to take how many

24  depositions?

25         MR. WEST:  I need five more for the issue

1    concerning Mr. David Cook.

2         THE COURT:  Well, which--instead of

3    numbers, tell me whose depositions you want to

4    take.

5         MR. WEST:  I have already given the

6    government five and those were given to the

7    government on March 5th.  The names--

8         THE COURT:  The names.

9         MR. WEST:  All right.  The five that were

10   previously given were Mr. Ray Williams, president

11   of the--vice president of APW Union--excuse me,

12   Your Honor.

13        Okay, they were Mr. Earnest Quick,

14   supervisor, Largo One VMF--

15        THE COURT:  Largo what?

16        MR. WEST:  Largo One VMF.  He is the

17   supervisor there, Your Honor.

18        THE COURT:  All right.

19        MR. WEST:  Mr. John P. Miller, he is a

20   body and fender repairman at Largo One VMF.  Mr.

21   James Thompson, he is the lead automotive

22   technician at Largo One VMF.  And Mr. Warren

23   Plater, automotive technician at Largo One VMF.

24        THE COURT:  Now, let's see, give me just a

25   second here.

1          Okay, now, which other depositions do you

2   want to take?

3          MR. WEST:  The other five I am requesting

4   for are Mr. Roland Johnson, he is a voman at

5   Capitol Post Office.

6          THE COURT:  He is a foreman?

7          MR. WEST:  Voman, he works on--he assists

8   the vehicles.

9          THE COURT:  And where is he?

10         MR. WEST:  He is located at Capitol

11  Heights Post Office.

12         THE COURT:  What has he got to do with

13  this case?

14         MR. WEST:  He is a witness for the events

15  concerning Mr. Cook.

16         THE COURT:  All right, who else?

17         MR. WEST:  Mr. Cleveland Mansfield, he is

18  located at Largo One VMF.

19         THE COURT:  What has he got to do with the

20  case?

21         MR. WEST:  He is also a witness including

22  concerning Mr. Cook.

23         THE COURT:  How do you know this, have you

24  been told that by the defendant?

25         MR. WEST:  Yes.

1           THE COURT:  All right.

2           MR. WEST:  No.  I knew that because he was

3   there when certain issues happened concerning Mr.

4   Cook.

5           THE COURT:  All right.

6           MR. WEST:  Third, is Mr. Franklin Greene.

7           THE COURT:  Franklin Greene?

8           MR. WEST:  Yes.  He is also assigned to

9   Largo One VMF.

10          THE COURT:  What has he got to do with the

11  case?

12          MR. WEST:  He is one of the witnesses

13  concerning favoritisms that Mr. Cook has given.

14          THE COURT:  All right.  That is three.

15          MR. WEST:  Right.  The fourth is Mr. Chris

16  Simmons.

17          THE COURT:  Simmons?

18          MR. WEST:  Yes.  He is also assigned to

19  Largo One VMF.

20          THE COURT:  How about him; what has he got

21  to do with this?

22          MR. WEST:  He is also a witness concerning

23  Mr. Cook's actions.

24          THE COURT:  All right.  Who else?

25          MR. WEST:  Mr. Robert Mason, he is

1    assigned to Largo Two VMF.

2            THE COURT:  What has he got to do with

3    this case?

4            MR. WEST:  He is also a witness concerning

5    Mr. Cook's actions.

6            THE COURT:  Now as I understand your case,

7    Mr. West, your complaint about David Cook is that,

8    on or about September 22, 2000, Mr. Currie had Mr.

9    Cook give you a warning letter; is that it?

10           MR. WEST:  That is correct.

11           THE COURT:  Ever take a deposition before,

12    Mr. West?

13           MR. WEST:  Yes, I have, Your Honor.

14           THE COURT:  So you know you have got to

15    order and pay for a court reporter?

16           MR. WEST:  Yes, I do, Your Honor.  I was

17    going to get with the government on that, on the

18    procedures, because all these employees work for

19    the government.

20           THE COURT:  And therefore what, the

21    government should pay for the transcript?

22           MR. WEST:  Well, I was going to get with

23    Mr. Ball on that on the procedures because I was

24    assuming he was going to do them at my place of

25    business or wherever he chose, because I work for

1    the government.

2              THE COURT:  Well, I understand that.  I am

3    talking about paying for the court reporter.

4              MR. WEST:  I have no problems paying for

5    that, Your Honor.

6              THE COURT:  You are investing a lot of

7    money in this case, aren't you, Mr. West?

8              MR. WEST:  I have no choice.  My

9    constitutional rights have been violated, Your

10   Honor.

11             THE COURT:  Well, Mr. West, how hard have

12   you tried to find a lawyer for this case?

13             MR. WEST:  I am still trying, as we speak.

14   I have two interviews.  I have talked to two

15   attorneys.

16             THE COURT:  Let me suggest to you,

17   respectfully, Mr. West, that if it were all that

18   clear that your constitutional rights had been

19   violated, lawyers would be knocking on your door

20   and not the other way around.

21             These issues get tested in a marketplace.

22   Lawyers get paid attorney's fees for successfully

23   representing people in employment discrimination

24   cases.  There are lawyers who, if they thought your

25   case had merit, would be very happy to take it.  If

kls

14

1    you are having trouble finding a lawyer, you may

2    wish to consider, Mr. West, how strong your case

3    really is, and whether you have the kind of

4    objective view of it that you need to have.

5            Now you can pursue this thing.  You

6    certainly have the constitutional right to do that,

7    but you are throwing a lot of money and time at

8    this case.  If you cannot find a lawyer to take it,

9    you may want to consider whether it is really all

10   that good an idea.

11           MR. WEST:  I understand.

12           THE COURT:  Mr. Ball, he now wants ten

13   depositions.  Any objection?

14           MR. BALL:  Yes, Your Honor.  Your Honor,

15   frankly, listening to the list and I think it was

16   very helpful to go through the list of additional

17   depositions requested--it does sound to me that

18   there is a strong possibility here that Mr. West is

19   seeking, perhaps, to relitigate issues that are not

20   matter for this case, but perhaps are matters

21   concerning prior incidents between himself and Mr.

22   Cook.

23           I think the court--Your Honor, you put

24   your finger on it, the complaint about Mr. Cook is

25   very narrow in this particular case.  The complaint

1  that is at issue here is whether--is this matter of

2  Mr. Cook disciplining or being involved in

3  disciplining plaintiff for not going to training

4  out in Oklahoma.

5        I certainly don't see that these people

6  need to be deposed for this purpose.  I will note

7  also, Your Honor, that looking at the list of

8  depositions or people that Mr. West has previously

9  indicated that he wanted to be deposed--I mean, for

10  instance, he wants to depose a Union official.  We

11  know from reading the complaint in this case that

12  there has been and perhaps still is proceeding, I

13  am not sure, litigation against the Union brought

14  by Mr. West.  You know, if he is concerned about

15  that, that is a matter for that lawsuit, not this

16  one.  That is not at issue here.

17        So we would object to going above five

18  depositions.  Having said that, Your Honor, I will

19  say what I am sure all of my colleagues say when

20  they appear in front of you--because we do try and

21  be reasonable about these things--if discovery

22  proceeds and it looks like there is a reason why

23  Mr. West would need more depositions, we don't

24  intend to be difficult about that.  We do object to

25  being subjected to difficulties in dealing with--in

1    litigating this case that don't really appear at

2    this point to be something that is really

3    necessary.

4           So I would say we should limit this case

5    to five depositions and, at maximum, revisit the

6    issue later.

7           THE COURT:  Mr. West, the rules governing

8    discovery in the federal courts provide that you

9    are entitled to broad discovery, as long as what

10   you are seeking to discover is reasonably likely to

11   lead to the discovery of admissible evidence.

12          Now what admissible evidence do you

13   believe your depositions of Mr. Johnson, Mr.

14   Mansfield, Mr. Greene, Mr. Simmons and Mr. Mason is

15   reasonably likely to lead to?

16          MR. WEST:  Okay, Your Honor, the issue on

17   hand on Mr. Cook is discipline that was given

18   concerning travel and denial of upper mobility

19   opportunities.  Those are the two issues.  When he

20   gave me the discipline--

21          THE COURT:  The discipline concerning

22   travel and what else?

23          MR. WEST:  Upper mobility opportunities.

24          THE COURT:  You mean promotion?

25          MR. WEST:  Correct.

1          THE COURT:  Yeah.

2          MR. WEST:  The discipline was given

3    unjust, and Mr. Currie had already informed me that

4    I would not get any other upper mobility

5    opportunities, and Mr. Cook confirmed that with the

6    discipline.

7          These witnesses I present will witness the

8    facts concerning the upper mobility opportunities

9    and two of them is concerning the training.

10         THE COURT:  You are going to have to

11   explain that in more detail.  I mean, upward

12   mobility opportunities doesn't mean anything to me.

13   How does Cook giving you discipline destroy your

14   upward mobility opportunities?

15         MR. WEST:  I will explain.  Mr. Mansfield

16   was the witness that I was taking his place for

17   training.  He witnessed the event and what took

18   place when Mr. Cook asked me would I take training.

19   He is the witness who came to me first and asked me

20   would I take his place.  I made a statement to him

21   which I made to Mr. Cook.

22         Mr. Cook did not honor that statement.

23   Mr. Cook, in return, gave me discipline because I

24   could not travel on the date of class, which we had

25   already been to that issue before in the past which

kls                                                                    18

1    he had already granted me.  He always let me come

2    back before the day after class.  But this incident

3    here, he would not let me come back--

4           THE COURT:  All right, stop there.  Let me

5    make sure, let me read that back to you and make

6    sure I understand it.

7           Mansfield asked you would you take his

8    place in training.

9           MR. WEST:  Correct.

10          THE COURT:  And you said, what?

11          MR. WEST:  I told Mr. Mansfield, I have no

12   problems taking your place in training, as long as

13   I see the travel orders before the trip.  I can't

14   accept without seeing the travel orders because the

15   travel orders show when you are supposed to leave

16   and come back.

17          THE COURT:  Okay.

18          MR. WEST:  And Mr. Cook agreed to that.

19          THE COURT:  Mr. Cook agreed to that?

20          MR. WEST:  Yes, he did.

21          THE COURT:  Then what happened?

22          MR. WEST:  Then, I got the travel orders

23   two days--three days before the trip.  Mr. Cook

24   gave them to me at the end of the day.  Once I

25   received them--when I read the travel orders

1  because he gave them to me at the end of my tour,

2  when I came back after one day of sick leave, I

3  informed him then I could not go based on these

4  travel orders.

5          And then Mr. Cook said, "You will go to

6  Oklahoma, you are being ordered." He made it

7  mandatory which training is not mandatory.

8  Training is voluntary. And I was the only person

9  ever punished for telling him, I can't go because

10  of a stress for flying. And we had been through

11  that in February where he had changed my travel.

12          So this was already a known fact that I

13  have problems flying. He had already changed them

14  before, and he denied me this because of Mr.

15  Currie. So, therefore, he put in a situation where

16  I am mandated to go to training which is not true.

17  That is voluntary.

18          THE COURT: Tell me about the stress with

19  flying. What is that all about?

20          MR. WEST: Since I was young, I have never

21  liked flying. Since I--

22          THE COURT: How do you get to Oklahoma if

23  you don't fly?

24          MR. WEST: I have no problems flying as

25  long as I can take an early flight, and as long as

1  I can fly when I don't have to go to work.  In

2  other words, if I go to work in the morning, I

3  don't fly to the next day.

4         Because Oklahoma is always a two transfer

5  flight, you transfer from Oklahoma to someone else,

6  and you could be there all day.  And that, right

7  there, is what I gave them in writing prior to

8  this.  And it was granted that, "Mr. West, okay, no

9  problem, you can come back the next day."  But, for

10 this situation here, I was punished.  And I was the

11 only person ever punished.

12        THE COURT:  What punishment were you

13 given?

14        MR. WEST:  I was given a letter of warning

15 which a letter of warning means you have done

16 something wrong, therefore, we can deny you upward

17 mobility, and I am the senior mechanic.  I am the

18 senior level--I was the senior level 6, which means

19 when the level 7 is out doing something else, I

20 takes his place.

21        THE COURT:  And what reason did he give

22 for giving you the discipline?

23        MR. WEST:  He gave me the reason that I

24 refused to go to Oklahoma.  And I had given him--I

25 gave it to him in writing what the safety violation

kls                                                                    21

1    was and why I couldn't go that day.  And I

2    requested for it to be changed to another--return

3    flight for Saturday which we had done before.

4              THE COURT:  What training was this?

5              MR. WEST:  This was training for a diesel

6    class, a Mack 1 diesel class.

7              THE COURT:  How long was the training?

8              MR. WEST:  The training was two weeks.

9              THE COURT:  So the real issue was would

10   you go to Oklahoma for two weeks for training and

11   then come back.  And you said, yes, I will take

12   your training Mansfield.  Then you got the travel

13   orders.  Then you didn't like the travel orders.

14   Then you stayed home for a day on sick leave, and

15   then you came back and told your supervisor two

16   days before you were supposed to leave, I am not

17   doing this.

18             MR. WEST:  No, that is not true.

19             THE COURT:  Wait a minute, I thought that

20   is what you just told me.

21             MR. WEST:  No.  Mr. Mansfield came to me

22   and said, Mr. West, will you take my place, I am

23   not feeling well.

24             THE COURT:  Yes.

25             MR. WEST:  I said, sure, I will take your

kls                                                                      22

1    place as long as I see the travel orders first.

2              THE COURT:  I heard that.

3              MR. WEST:  The procedure is to order the

4    events the way it took place.  And I told the same

5    thing to Mr. Cook when he asked me.  And Mr. Cook

6    said, okay, before we arrange it, I will show you

7    the travel orders.  He didn't do that.  He waited

8    three days prior to the Sunday to give them to me

9    at the end of the day.  I didn't look at them, he

10   gave them to me I went home.  I didn't come back

11   the next day because I was sick.  The first day I

12   came back which was a Thursday--

13             THE COURT:  Maybe you should have called

14   him from home.  You weren't too sick to read them

15   that night, were you?

16             MR. WEST:  I didn't even pay attention to

17   them, actually, Your Honor.  When I got home, I

18   looked at them and I said, oh, okay, I can't do

19   this right here.  I then typed up a letter and I

20   wasn't feeling well, so I called in sick.  Then

21   when I came to work--

22             THE COURT:  Does everybody in the Post

23   Office deal with each other by letters?

24             MR. WEST:  No.  Only me, because we have a

25   problem with communicating, they lie so much.  So,

 1    therefore, I don't want to be confused with what

 2    transpired four months ago.  So I give it to you in

 3    writing, and I request for a response in writing.

 4    That way, we create the reality which actually took

 5    place.  Because they all--unfortunately, they

 6    falsify a whole lot.

 7            THE COURT:  All right.  So Cook--so Cook

 8    found himself in a position where he had a training

 9    slot in Oklahoma and nobody to send on two-days

10    notice.

11            MR. WEST:  Correct.

12            THE COURT:  So he was upset about that.

13            MR. WEST:  No.  He had two weeks notice.

14    He didn't inform me until--see, the point is--

15            THE COURT:  No, no, no, I understand that.

16    But two days before this travel was supposed to

17    commence, no matter whether he should have given

18    you the travel orders first or not, the fact was he

19    found himself two days before the training with

20    nobody to send, correct?

21            MR. WEST:  I am not for sure.  All I know

22    is he found himself two days with me only

23    requesting for something I had already--that he had

24    already given me before.  All I requested is I

25    can't come back the same day, and we had been

1    through that before and he had granted it.  So I

2    didn't put him in a position which he had never

3    been in before, he already knew my record.

4             THE COURT:  Let's go back and talk about

5    the depositions you want to take of Williams,

6    Quick, Miller, Thompson--what are they all about?

7             MR. WEST:  Quick is a witness concerning

8    Ms. Chiles.

9             THE COURT:  Who is Ms. Chiles?

10            MR. WEST:  Ms. Chiles is the reason that

11   Mr. Currie says he called me to D.C. to harass me.

12   And Mr. Quick is a witness that can confer and

13   straighten those issues out with Ms. Chiles and the

14   procedures for Mr. Cook and Mr. Currie.

15            THE COURT:  Wait, wait.  You are throwing

16   names around too fast here.

17            MR. WEST:  Mr. Quick is a supervisor.

18            THE COURT:  Yeah.

19            MR. WEST:  Ms. Chiles is an employee that

20   Mr. Cook--that Mr. Currie uses for his excuse to

21   call me to Washington, D.C. to harass and threaten

22   me.  In other words, he said he called me to D.C.

23   to give me--to investigate a situation that Ms.

24   Chiles had accused me of sexual harassing her.

25            THE COURT:  Did she accuse her?

1          MR. WEST:  I never saw anything, Your

2     Honor.  I was only told by the postal police to

3     give a statement and that was it.  I gave a

4     statement concerning Ms. Chiles to the postal

5     inspectors, to the postal police and sent a copy to

6     the postmaster general, even before Ms. Chiles made

7     any accusations.  I had already sent letters--took

8     place, to all those folks, before Ms. Chiles made

9     her accusations.

10         And this was Ms. Chiles' third time using

11    vulgar language towards me and she had already been

12    disciplined once before by Mr. Cook for that.  So

13    the third time, more or less, was her third strike.

14    She is out.  So she retaliated by falsifying a

15    statement that she had already done before.  That

16    is when Mr. Quick comes in, he can witness that Ms.

17    Chiles has done this before.  Her record precedes

18    that.  That is why I requested for the documents.

19    Ms. Chiles has a history of being violent, being in

20    fights and have vulgar language.

21         Mr. Cook has condoned that for years.

22    When I transferred in in 1999, she came at me with

23    vulgar language and I wrote her up and gave it to

24    Mr. Cook, and he dealt with that.  The second time,

25    she did it again, he gave her discipline.  This was

1  the third time, when Mr. Currie got involved.

2          I informed Mr. Currie that I had informed

3  everyone concerning the Mr. Cook issue, and if you

4  have anything concerning it, I need to see it in

5  writing.  I don't have anything more to say about

6  Ms. Chiles.  I have given it to the postal police,

7  the postal inspectors and the postmaster general.

8  It was well documented that Ms. Chiles had a

9  problem with her language, and Mr. Cook used that

10 because I had prior grievances against the

11 postmaster general, so he used that to bring me to

12 D.C.

13         THE COURT:  It sounds like you got a file

14 cabinet full of grievances.

15         MR. WEST:  Yes, I do, Your Honor.  Because

16 the facts are I have to document things because

17 they lie so often.  I am just showing that the

18 pattern is, I am being harassed because I have only

19 done what the code of ethics informed me to do.  I

20 report the violations as I see them.

21         I report them to my supervisor, my

22 manager, first.  They take it personal and they

23 treat me different than they treat all the rest.

24 They treat all the blacks the same, we have to be a

25 bar above and beyond to get anything that is just.

kls                                                                    27

1    And that is why I have my list.  I am showing the

2    witnesses that will show the clear pattern.

3              THE COURT:  Well, Mr. Quick, you want to

4    call Mr. Quick to testify that Ms. Chiles had a

5    history of poor behavior, right?

6              MR. WEST:  That is part of it.  Mr. Quick

7    was her supervisor, and he is well--he has things

8    well documented of her conduct.  He is the one who

9    can justify the Ms. Chiles' issues.

10             THE COURT:  All right.  What does Ray

11   Williams have to do with anything?  He is a Union

12   guy.

13             MR. WEST:  Yes.  Mr. Williams will

14   document the facts that has taken place with Mr.

15   Currie, Mr. Cook and myself on issues that I had to

16   file with the Union that was unjust and that was

17   rescinded.  He will show that Mr. Cook and Mr.

18   Currie has filed false accusations, not once but

19   four times; three suspensions, two letters--three

20   suspensions, two letters of warning, everything was

21   rescinded.

22             He will show that this, right here, is a

23   problem with management and Mr. West, and they are

24   picking on the plaintiff to show that they are in

25   charge, regardless if they are right or wrong.

1        THE COURT:  And you think Williams is

2   going to say all that?

3        MR. WEST:  No.  He will show that based on

4   the complaints and the results of the complaints.

5        THE COURT:  You mean, he has got records

6   that show that?

7        MR. WEST:  Yes.  And he also can

8   straighten out the rules and regulations that

9   governs--for the management and the Union, governs

10  the employees with.  He knows all the rules because

11  a lot of these things that they done, as I filed,

12  were against federal rules--when Mr. Currie called

13  me to D.C. and I requested for Union

14  representation.

15       THE COURT:  So what you are using Williams

16  for is to prove that, as a Union member, you filed

17  grievances every time--

18       MR. WEST:  No.  I am using him to show

19  that I had to file grievances and all the

20  grievances I filed was rescinded; in other words,

21  the actions that was given to me was unjustly

22  given.

23       And also the rules and regulations--he can

24  define and answer the questions that the court

25  doesn't understand that governs between the

 1   management and the craft employee.

 2          THE COURT:  And what does John Miller have

 3   to say?

 4          MR. WEST:  Mr. Miller is an example of

 5   what Mr. Currie has promoted that has no annual, no

 6   sick leave, no driver's license, and he has treated

 7   him different than I.  Here is the same person--he

 8   is a Caucasian that has been put on promotions, and

 9   he has no annual, no sick and has never been given

10   any discipline.

11          He is the one who shows that Mr. West is

12   being treated different.  He is treating Caucasians

13   different than Afro Americans.  That is my example.

14          THE COURT:  What about James Thompson?

15          MR. WEST:  Mr. James Thompson, the same.

16   He is a black Afro American, has 32 years of

17   service, and Mr. Cook and Mr. Currie has treated

18   him different because he is Afro American.  Has

19   promoted whites with only two years and no

20   experience over him; has given jobs that the Union

21   has done for one person, has created two slots

22   because they didn't like the selectee.

23          He is the witness that will explain that

24   blacks are treated different than whites in the

25   postal service where I work at.  In other words,

1  Your Honor, I work under Jim Crow Laws, this is a

2  slave mentality I am in.  We have a house nigger

3  and a field nigger and the master.  And the

4  government is protecting the facts that this is

5  what goes on.

6           And they use the fact--the issue that when

7  I file the EEO, I have the right to sue.  Under the

8  EEO, it says that the court will give me legal

9  representation--which is not true, but that is what

10 it says.  But the defense gets representation which

11 is free, regardless if they are right or wrong.

12 And they are wrong on every issue, but they get

13 representation from the government.  I can't.  I

14 work for the same government.  I am being violated.

15          As Your Honor just stated, it is hard to

16 find an attorney that will represent me because he

17 facts that the government already has attorneys

18 free.  So that is the situation we are in.

19          THE COURT:  Mr. West, at 2 o'clock this

20 afternoon, I am going over to Georgetown University

21 to an Equal Employment Opportunity Seminar.  There

22 are about 400 lawyers that go to that, more than

23 half of whom represent plaintiffs in EEO cases.

24          They don't mind taking cases against the

25 government.  As a matter of fact, they love to take

1    cases against the government because at the end of

2    them they get attorney's fees out of them.

3        MR. WEST:  Well, maybe I have bad

4    resources.  Maybe I better go to that conference.

5    I am just going by what I can get out of the legal

6    sources for D.C. and Maryland.  I can't get

7    anything that--I asked the government to provide me

8    legal counsel.  I work for the government.  I can't

9    get it because I make too much.

10       THE COURT:  No.  This is not a criminal

11   case.  You don't have a right to counsel like you

12   do in a criminal case.  And, unfortunately,

13   although you are probably not very highly paid, you

14   are not indigent, you are not a pauper and,

15   therefore, we can't give you free lawyers from the

16   Pro Bono Panel.  So you are in that kind of middle

17   class never-never land where we can't give you a

18   free lawyer here.

19       I have to tell you, though, Mr. West, if

20   this case were purely about the failure of the

21   postal service to promote blacks, at your level and

22   in your place, and not about these grievances and

23   these language things and these warning letters and

24   all this stuff that you are fixated on, it would be

25   a lot more interesting Title VII case.

1          You know, if your complaint is that you

2    have been treated differently from whites because

3    of your race on this job, that is a lawsuit.

4          MR. WEST:  That is my complaint, Your

5    Honor.  I am using example and that is what I

6    filed.

7          THE COURT:  This business about who said

8    what to whom and your fixation on David Cook and a

9    warning letter--

10          MR. WEST:  These are the tools they used,

11   Your Honor.

12          THE COURT:  --is not helpful to your--to

13   the thrust of your case.

14          MR. WEST:  Well, these are the tools they

15   used to deny one.  In other words, Your Honor, this

16   is not the old slavery mentality where you call me

17   a nigger and put me in my place.  This is the

18   mentality where you take me as a black, you give me

19   a letter of warning and you take the same scenario

20   with a white and you don't give him one, you

21   promote him.  That is what this is.

22          See, in order to justify not promoting me,

23   you must give me something.  So you give me a

24   trumped up letter of warning.  That justifies you

25   now.  "I don't have to promote him, I gave him a

1  letter of warning.  Now whatever he says, is his

2  word."

3          So the facts are I present the people who

4  shows the record, my record versus the white

5  record.  He has no sick leave, no annual leave.  He

6  has four DWIs, no driver's license.  The marshals

7  has come in Mr. Cook's office and let him come and

8  work from the jail.  He has been there over 10

9  years, no sick leave and no annual leave.  He gets

10 promoted to 204(b) and works for Mr. Currie for a

11 year.

12         "Mr. West because he told management what

13 a rule violation is, we gave him a letter of

14 warning, we are not going to promote him.  He has

15 great annual leave, great sick leave.  He has

16 college education.  He is not going anywhere.  He

17 is a black Afro American that is a smart nigger;

18 so, therefore, we are not going to promote him.  We

19 are not going to give"--

20         I have been there 10 years.  I have

21 requested for 204(b) training since 1996.  I have

22 not been given one day of high level; whereas, they

23 take a white that comes in off the street with no

24 experience, no time in, no qualifications, and

25 automatically give him a 204(b).  Now I have blacks

1    that will witness that and make statements to that;

2    that, in order for a black to be higher trained, he

3    must request in writing.  For a white, all he has

4    to do is be there.  Management comes to him, "Sir,

5    would you like to be 204(b) for three days?"

6         Whereas, when the black, if he even gives

7    it in writing, management says, no.  And that is

8    what I can prove.  I can prove that Mr. Cook and

9    Mr. Currie, since I have been filing on what they

10   have been doing, they have created another course

11   called a 204(b) course and that course there, that

12   is what they use now to justify who they select.

13   They just created that course in 2001.  Whereas,

14   from I got there to now, it was 204(b) all you had

15   to do is request in writing to management, I would

16   like for an opportunity for higher level training

17   when the supervisor is not here, and it was

18   granted.

19        But since I have done all that, they said,

20   no, we got to come up with another method.  We are

21   going to create something else new, whereas, Mr.

22   West--and if he don't want to submit to that, then

23   we don't have to pick him.  Then in the same

24   situation, I have blacks who has requested for the

25   same thing under the rules and he has denied them;

kls                                                                    35

1   said, "You are not qualified," with no

2   justification with his qualification.

3           And my example is Mr. Preston Miller; no

4   annual, no sick, four DWIs, no driver's license,

5   been incarcerated, no letter of warning, no

6   suspensions, clean record.  He is promoted.

7           Mr. Ray Williams can tell you what the

8   qualifications is to be promoted.  They can tell

9   you what the standards is.  They set the ladder,

10  and all I want to do is, if I am equal, let me

11  participate.  That is all I ask.

12          But don't let--don't hold it against me

13  because I go by your rules and your regulations.  I

14  report to you what is wrong with this organization

15  so we can be productive.  And then you sit there

16  and hold it against me because you don't like me.

17  Because you feel, if I get a chance, I am going to

18  be above you.

19          That is the problems I am having.  Every

20  supervisor and manager where I work at, they have

21  what they call a qualifications--

22          THE COURT:  All right.  All right.  Mr.

23  West, what you have just outlined sounds like a

24  lawsuit.  All this stuff about Mr. Cook doesn't

25  sound like a lawsuit.

1          I am going to, initially, limit you to

2   five depositions--initially, limit you to five

3   depositions.  If you can--and you take those five

4   depositions, don't wait until the end of August.

5   Take them as soon as you can, and then come back

6   and tell me why you need more and I will consider

7   it.

8          MR. WEST:  Okay.

9          THE COURT:  I also want you to--sometime

10  today, I want you to call my chambers and ask to

11  speak to Ms. Cochran sitting right over there.

12         MR. WEST:  Yes, Your Honor.

13         THE COURT:  Ms. Cochran is going to give

14  you the names and telephone numbers of a couple of

15  lawyers that you should try to get in touch with.

16  The employment discrimination laws of this country

17  are getting harder and harder to navigate.  People

18  that have even legitimate grievances under the

19  employment discrimination laws find it harder and

20  harder to frame them in a way that is legally

21  appropriate.

22         Your complaint, your basic complaint, as I

23  understand it, is that because of your race you

24  have been hampered in getting the promotions that

25  you deserve while white men and women with

1   substantially less qualifications and with more bad

2   stuff on their records are getting promoted.

3           That is a case that needs--you need to

4   find a lawyer to help you frame that case up and

5   give it a decent hearing.  But you have got to stop

6   getting fixated on these little insults.  The

7   little insults don't make it, it is the big picture

8   you have got to present.

9           I will issue a scheduling order that sets

10  forth the schedule that we have agreed on here.

11  Initially, you have five depositions.  You don't

12  have to take those five, you can take any five you

13  want, but you have got five depositions, initially.

14          I will also set a status conference,

15  another status conference kind of midway in the

16  discovery process to see how we are doing and to

17  see how the case is progressing.  Meanwhile, if you

18  can get connected with a lawyer who will take your

19  case for you, you will be way, way, way ahead of

20  the game.

21          Anything further?

22          MR. WEST:  Thank you.

23          MR. BALL:  Your Honor, two things,

24  briefly.  First of all, just in listening to

25  plaintiff, I think it might behoove the government

 1   to just put this formally on the record.  Since

 2   discovery is unstayed as of today, I have--I would

 3   just like the record to reflect that our responses

 4   to Mr. West's interrogatories and document requests

 5   are due as if he served them today.  That seems to

 6   me to be the reasonable course.

 7              THE COURT:  Yes, that is correct.

 8              MR. BALL:  So that would be 30 days from

 9   today.

10              MR. WEST:  Would you repeat that, Your

11   Honor.

12              THE COURT:  He says he has got 30 days

13   from today to respond to your written discovery

14   requests, and he is right, he does.  But he has got

15   two weeks from today to turn over--

16              MR. BALL:  Yes.

17              THE COURT:  --your Rule 26(a)(1) materials

18   and you have the same two weeks, Mr. West, initial

19   disclosures.

20              MR. WEST:  So we have 30 days from today

21   to complete the discoveries I requested; is that

22   what you are saying?

23              THE COURT:  Yes.

24              MR. BALL:  We are talking the written

25   discovery.

1      THE COURT:  Yes; interrogatories, document

2  production, so forth.

3      MR. BALL:  That is right.  And, you know,

4  if I may just beg the court's indulgence, I think

5  that maybe I better say this right now.  We haven't

6  gotten a formal notice of deposition from Mr. West

7  for anybody.  We don't intend to put him through

8  that hoop, but that doesn't mean that he can say,

9  well, I expect that on Day "X," this person is

10  going to show up.

11      He has got to work with us so that

12  everybody is available on the same day.  And we are

13  not going to try and delay Mr. West, but he has got

14  to understand that that is how a lawsuit works if

15  we are going to make any progress.

16      THE COURT:  Did you understand that?

17      MR. WEST:  Not all, Your Honor.  I gave

18  the feds the list of the discovery as you request.

19  I gave them a list of my depositions, folks I

20  planned on having depositions.  Now I hadn't heard

21  anything because of the problem we had with

22  Maryland--

23      THE COURT:  What he is saying is you have

24  got to work with him to set up a schedule.

25      MR. WEST:  That is what I want to do.

1              THE COURT:  Otherwise, you have to

2     formally notice them and they will file formal

3     objections and it is a big paper chase.

4              MR. WEST:  Okay.

5              THE COURT:  But what he is saying to you

6     is he doesn't see any reason why these depositions

7     can't all or most of them be done on the same day.

8              MR. WEST:  Yes.

9              THE COURT:  But people have to be

10    scheduled and you have got a schedule and you have

11    got to work with him.

12             MR. WEST:  That is what I was saying.  You

13    was talking about the persons I was going to give

14    him for the government and we do the depositions.

15             THE COURT:  All right.

16             Mr. Ball, I am sure you will, in good

17    faith, work with Mr. West and try to make this

18    happen smoothly as possible.

19             MR. BALL:  Indeed we will, Your Honor.

20    And, if I may just ask one more question, could you

21    say again the trial date; is it February 12th?

22             THE COURT:  It is February 10th.

23             MR. BALL:  10th; thank you, Your Honor.

24             THE COURT:  Anything further?

25             MR. BALL:  No, Your Honor.

1          THE COURT:  All right.  Thank you.

2          MR. WEST:  I have one question.  The two

3    weeks--you said I had two weeks if we had a

4    problem--you said two weeks from today concerning

5    the discoveries?  In other words, we couldn't get

6    together on the discovery issues, I have two weeks

7    to make a complaint to the court?

8          THE COURT:  No, no, no, no, no.  You will

9    have two weeks from today to make the required

10   disclosures--

11         MR. WEST:  Okay.

12         THE COURT:  --under Federal Rule 26(a)(1).

13   The initial disclosures include the name, address

14   and telephone number of everybody likely to have

15   discoverable information that you may use to

16   support your claims; a copy of all documents, et

17   cetera, that you may use to support your claim; a

18   computation of any damages you claim.  That is

19   basically it, but you have to read Rule 26(a)(1).

20         MR. WEST:  Yes, sir.

21         THE COURT:  Okay?

22         MR. WEST:  No other questions.

23         THE COURT:  We are adjourned.

24         [Whereupon, at 9:57 a.m., the proceedings

25   were adjourned.]

# CERTIFICATE

I, **JON HUNDLEY**, the Official Court Reporter for Miller Reporting Company, Inc., hereby certify that I recorded the foregoing proceedings; that the proceedings have been reduced to typewriting by me, or under my direction and that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

_____

**JON HUNDLEY**