**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KEVIN WEST                          :
                                    :
        Plaintiff                   :
                                    :
v.                                  :          Civil Action No. 05-1339  (JR)
                                    :
JOHN E. POTTER                      :
                                    :
        Defendant.                  :

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56, Federal Rules of Civil Procedure, defendant respectfully submits this

Motion for Summary Judgment.

Plaintiff  is an African American male employed by the United States Postal Service in its

Vehicle Maintenance  Facility ("VMF").

Plaintiff's complaint charges:

Count I,  Disparate Treatment Based on Race and Color, Complaint at ¶¶39-51;

Count II,  Racial Harassment/Hostile Work Environment, Complaint at ¶¶ 52-65;

Count III, Disparate Treatment Based on Protected Activity, Complaint at ¶¶66-79; and

Count IV, Retaliatory Harassment/Hostile Work Environment, Complaint at ¶¶ 80-91.

Under Counts I and III, plaintiff claims that he suffered the following adverse

employment actions

a) continual denial of temporary detail to 204b acting supervisor,

b) continual denial of supervisory training with higher-level pay, since his May 1999,
request,

c) denial of temporary promotions to higher-level, higher-paying lead mechanic positions,

d) denial of permanent promotions to Supervisor on at least five occasions,

e) denial of promotion to Lead Automotive Technician, PS-8,

f) denial of overtime opportunities and pay in October 2001 and April-July 2003,

g) denial of revised schedules and forced use of annual leave on February 11, 2002 and
January 25, 2005, and

h) six or more unjust and excessive disciplinary actions.

Complaint at ¶¶ 42, 71.

Counts II and IV, respectively, claim that plaintiff suffered a racially hostile work environment and a retaliatory hostile work environment because defendant allegedly

i) systematically harassed Mr. West when it issued six corrective actions against him in addition to two "emergency" suspensions,

j) denied Mr. West's leave requests at least 14 times,

k) subjected him to physical harassment and intimidation,

l) refused to grant two of his requests for revised schedules,

m) rejected him for five Supervisor positions and a Lead Mechanic position, and

n) continually barred him from higher-level craft and supervisory details and supervisory training.

Complaint at ¶¶ 53, 82.

The claims in the present action stem from numerous complaints of discrimination filed by plaintiff. The EEO complaints made the following claims:

**Agency Case No. 4K-200-0220-01 ("220-01")[1]**

1) On May 22, 2001, Plaintiff was denied 204B class and on-the job training in the Southern Maryland Vehicle Maintenance Facility (VMF) ;

2) On June 8, 2001, Plaintiff received a Letter of Warning for an Absence from Scheduled Overtime;

3) On June 18, 2001, Plaintiff was allegedly physically assaulted by David Cook, Manager of Largo I VMF;

4) Between June 19 and 21, 2001, Plaintiff was denied his timecard and not allowed to punch in;

5) On June 25, 2001, Plaintiff's request for June leave slips was denied; and

6) On July 18, 2001, Plaintiff received a 7-Day Suspension for Failure To Maintain a Regular Work Schedule.

---

[1] All of the Agency case numbers are identified by their last 4-5 numbers throughout defendant's pleading.

220-01 ROI at p. 2, 117-18.

**Agency Case No. 4K-200-0031-02 ("31-02")[2]**

**31-02**

1) On October 3, 2001, his leave request was disapproved for the holiday period;

2) On October 27 and 28, 2001, he was denied overtime;

3) On November 12, 2001, and November 23, 2001, his leave request was disapproved for the holiday period; and

**48-02**

4) On January 28, 2002 plaintiff was  issued a seven (7) days suspension.

  ROI 31-02 at p. 55-56, and see plaintiff's initial written complaints.  ROI 31-32 at pp. 96,

97,98, 100-101.

**Agency No. 4K-200-0108-02  ("108-02")[3]**

 1) On February 11, 2002, he was denied a revised schedule;

2) On February 13, 2002, he became aware that all of  Largo VMF Tour 3 mechanics were being paid level 8 pay;

ROI 108-2 at p. 399.

3) In June 2002, he became aware that two African American employees and one Caucasian employee were being utilized as 204B's and his request was denied;

ROI 108-2 at p. 402-403.

4) On July 4, 2002, he became aware that other employees were given annual leave for July 4, 2002, whereas his request for a vacation period which included July 4, 2002 was denied;

5) On July 17, 2002, he was issued a 14-day suspension for failure to be regular in attendance;

ROI 108-2 at p. 9, 405-406.

6) On August 22, 2002, he was sent home by Acting Supervisor Franklin Green after

---

[2]  This case number is a consolidation of case numbers 4K-200-0031-02 and 4K200-0048-02. ROI 31-02 at p. 55.

[3]  Complaint 108-02 is a consolidation of the following four complaints from plaintiff: 4K-200-0108-02, 4K-206-0074-02, 4K-200-0177-02, 4K-2000016-03.

reporting a safety hazard; and

7) He was not awarded the position of Supervisor EAS-16 for position numbers 31-02 and 33-02.

*Id*. at p.9, 408-10.

**Agency Case No. K-200-0235-03 ("235-03")**

1) On June 28, 2003, plaintiff was not promoted to the position of Supervisor Vehicle Maintenance;

2) On July 31, 2003, plaintiff became aware that manager Cook denied him a before Tour overtime opportunity at Largo II from April 1 through July 25, 2003;and

3) On September 3, 2003, plaintiff was not promoted to the position of Lead Automotive Technician Level 8, Vacancy # 03-43.

ROI 235-03, EEO Report, p. 1.

**Agency Case No 4k-200-0099-05 ("99-05")**

On January 25, 2005, plaintiff's request for a temporary schedule change was denied by

Acting Supervisor Clark.

99-05 ROI at Counselor's report pp. 1-3 of 8.

As set forth in the Memorandum of Points and Authorities in support of this motion, there

are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law.

Wherefore, defendant respectfully requests that plaintiff's complaint be dismissed with prejudice as to all of his claims.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEVIN WEST                :
                                    :
       Plaintiff            :
v.                            :            Civil Action No.  05-1339 (JR)

JOHN E. POTTER         :
                                      :
       Defendant.        :

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF SUMMARY JUDGMENT MOTION

Defendant respectfully submits this memorandum of points and authorities in support of his summary judgment motion.

### PROCEDURAL BACKGROUND

The claims in the present action stem from numerous complaints of discrimination filed by plaintiff.   The EEO complaints are :

1)  Agency Case No. 4K-200-0235-03, Complaint at ¶4.a.;

2)  Agency Case Numbers 4K-200-0220-01, 4K-200-0031-02, 4K-200-0048-02, 4K-200-0108-2, 4K-200-0047-02, 4K-200-0177-02, 4K-200-0016-03, all of which ultimately were consolidated and adjudicated before an Administrative Law Judge as EEOC Case No. 120-2004-00080X ("EEO-80X").  Complaint at ¶4.b., and

3)  Agency Case No. 4K-200-0099-05.  Complaint at ¶ 4.c.

On July 27, 2004 the EEO Administrative Judge in EEO-80X issued a partial Summary Judgment Decision without hearing.  EEO-80X  Decision at p. 3.   A hearing was conducted on a number of days between July and December 2004.  *Id.* at p. 4.  A post hearing decision  granted summary judgment to defendant Agency.  *Id.* at pp. 1-28.

### STATEMENT OF FACTS

Please see defendant's Statement of Material Facts, which is incorporated herein by

reference.

## ARGUMENT

### A.  Summary Judgment

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir. 1995).  A genuine issue is one that could change the outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986).  While all evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party, *see, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), a complaint should be dismissed if it "appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### B.  Discrimination Claims

The procedure for resolving claims of discrimination such as the instant ones is well-established.  In the absence of direct evidence, a district court may rely on the *McDonald Douglas* scheme for evaluating the plaintiff's case and determine if trial is necessary.  Under the scheme first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of prohibited discrimination.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  If the employee succeeds, the employer then must articulate legitimate, nondiscriminatory reasons for its actions.  *See McDonnell Douglas*, 411 U.S. at 802. The  plaintiff then has an opportunity to discredit the employer's explanation or otherwise demonstrate that  discrimination was a motivating factor.  *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998).  The plaintiff at all times retains the burden of persuasion.  *McDonnell Douglas*, 411 U.S. at 802.

The Supreme Court has explained that the elements of a prima facie case of

2

discrimination may differ from case to case. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981). The fundamental requirement, however, is that the prima facie case give rise to an inference that the defendant's conduct was discriminatory. *See Simens v. Reno*, 960 F.Supp 6, 8-9 (D.D.C. 1997). As a general matter, therefore, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) he was a member of a protected group, (2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)(Title VII), *Aka*, 156 F.3d at 1288.

A plaintiff must present substantial and credible evidence of discrimination in order to survive a motion for summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson,* 121 F.Supp.2d, 72, 77 (D.D.C. 2000) *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); *Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001). Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Weigert v. Georgetown University*, 120 F.Supp. 2d 1, 22 (D.D.C. 2000), *quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

### C. Retaliation Claim

A prima facie case alleging retaliation or reprisal is established when the plaintiff demonstrates: (1) that he engaged in protected behavior, (2) defendant subjected him to a material adverse action, and (3) that a causal connection existed between the protected activity and the materially adverse action. *See E.E.O.C. v. Go Daddy Software,* 2006 WL 1791295, *6

(D.Ariz 2006); *Argo v. Blue Cross and Blue Shield of Kansas, Inc,*. 452 F.3d 1193, 1202 (10th Cir 2006); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 ( 2006); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). In defining a materially adverse action, the Supreme Court has ruled that

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

*Burlington,* 126 S.Ct. at 2415 (citations omitted).

If plaintiff is able to establish a prima facie case of retaliation, the analysis then follows that for a discrimination claim, i.e. the employer then must articulate legitimate, nondiscriminatory reasons for its actions. The plaintiff then has an opportunity to discredit the employer's explanation or otherwise demonstrate that retaliation was a motivating factor.

In order to establish a prima facie case of retaliation, a plaintiff also must show a causal connection existed between the materially adverse action and his statutorily protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). The causal connection required to establish a prima facie case of retaliation may be shown by evidence that the agency had knowledge of the protected activity and that there was a temporal link between the activity and the adverse personnel action. *Jones v. Washington Metropolitan Area Transit Authority*, 946 F. Supp. 1011, 1021 (D.D.C. 1996). "The cases that accept mere temporal proximity between an agency's knowledge of the protected activity and [a materially adverse action] as sufficient evidence of causality to establish a prima facie case, uniformly hold that temporal proximity must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268 (2001), *citing Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)(three month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(four month period insufficient). As set forth below, plaintiff cannot establish a causal connection between the alleged discriminatory/retaliatory act and any protected activity.

4

**D. Nature of Agency Action: adverse personnel action or a materially adverse action**

**Discrimination Claims–Adverse Personnel Action**

In discrimination claims against federal employers a required element is some form of legally cognizable adverse personnel action by the employer. *Brown v. Brody*, 199 F.3d 446, 453 (D.C.Cir. 1999); *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 17-18 (D.D.C. 2000 ). To establish an "adverse personnel action" there must be a significant change in the plaintiff's employment status--such as failing to hire, firing, failing to promote, or a decision causing a significant change in benefits. *Id.*

Courts have further defined the concept of an "adverse personnel action" as one involving a **material** change in the aggrieved employee's employment status. A materially adverse change can be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F. 2d 132, 136 (7th Cir. 1993)*; compare with Flaherty v. Gas Research Institute* (7th Cir. 1994)(a "bruised ego" is not enough), *Koscis v. Multi-Care Mgt., Inc.,* 97 F. 3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties, or prestige insufficient), *Harlston v. McDonnell Douglas Corp.,* 37 F. 3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

**Retaliation Claims-Materially Adverse Action**

In explaining the retaliation standard of "materially adverse" actions, the Supreme Court has stated  that

> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace.". . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington*, 126 S. Ct. at 2415 (citations omitted). The Court also stated that the standard is to be objective.

5

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

*Burlington*, 126 S.Ct at 2415 (Citations omitted).

### E.  Non-Selection Claims

In a non-selection or non-promotion case, one of the essential elements which a plaintiff must establish is that he was qualified for the position.  *See, e.g., Taylor v. Small*, 350 F.3d 1286, 1294 (D.C.Cir. 2003).

A plaintiff also must establish that he properly applied for the position.  *See, e.g., Khan v. State of Maryland*, 903 F. Supp 881 (D. Md. 1995)(No discrimination when employee fails to complete application process); *Tagupa v. Board of Directors*, 633 F.2d 1309 (9th Cir. 1980)(employee must prove that he actually applied for the position); *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C.Cir. 2004)(To state a prima facie case for failure to hire, a plaintiff must show, *inter alia*, "that, despite his qualifications, he was *rejected.*")

## ANALYSIS OF PLAINTIFF'S CLAIMS

## NON-SELECTIONS

### Prima Facie Case

Plaintiff is a member of protected groups concerning his claims of race and color discrimination.  The non-selection of plaintiff for promotion to a supervisory position also is a materially adverse employment action.  However, plaintiff cannot establish a prima facie case of retaliation or discrimination because he cannot show a causal connection between his non-selection and protected activity, and he cannot establish any inference of discrimination due to his non-selection.

### 253-03:  Vacancies 14-03, 15-03, and 23-03

Vacancies 14-03, 15-03 and 23-3 were announced on February 28, 2003.  Dickerson Dec.

at Ex. 1.  Plaintiff claimed that "VMF Management Mr. Timothy Currie and Mr. David Cook

discriminated and retaliated against me because I reported their postal violations to their

superiors." [4] West Aff. at p11-12, answers to Issue 1 ¶¶ I-L.  However, those two individuals were

not involved in the selection process.  Indeed, by the time these positions were posted, Mr. Currie

was in a new job at headquarters.  Mr. Currie reported to his new job on September 7, 2002.

Currie Depo. at  p. 140 The selections for the positions were made by Joseph King based on

applicants referred to him for interview by a review committee.  The applicants were referred by

memoranda dated May 20, 2003. Dickerson Dec. at Ex.2-4.   Plaintiff's name was not among

those referred.  *Id.* and King aff.

Timothy Dickerson was the Chairperson for the review board on Vacancies 14-03, 15-03

and 23-03.  Dickerson Dec. at ¶2  The other members of the review board were Rose Barner and

Harvey Banks.  *Id.* at ¶4.

The committee members rated the applicants based on their responses to the KSAs

(Knowledge, Skills and Abilities) requirements.  They then recommended that the top applicants

be interviewed by the selecting official.  *Id.* at ¶3-7 and at exhibits 1-4.

Applicant Credle's name was submitted because he was already an EAS-Supervisor. *Id*. at

p. 3 fn1.  Therefore, his selection would have been a lateral reassignment rather than a promotion.

Forwarding Credle's name to the selecting official was in accord with the Postal Handbook EL-

312 at p. 183 ¶ 743.11:  "Management should consider noncompetitive applications for voluntary

lateral reassignment . . at any time they are received, before the competitive announcement

process begins, during the process, or after the competitive applications have been assessed."

Mr. Dickerson worked in the Columbia, Maryland facility, not in the Washington D.C.

facility. Dickerson Dec. at ¶1.   He did not know the race, color, or prior EEO activity of any of

---

[4]  Title VII only offers protection from retaliation for having engaged in protected activity.  See
*Baldridge, 759 F.2d at 86.*

the applicants, including Mr. West. *Id.* at ¶¶ 11-12.

Rose Barner was the Manager of Vehicle Maintenance in Richmond, Virginia in 2003 when the selections were made. Barner Dec. at ¶1. She had never met any of the applicants and had no knowledge of their race, color, or prior EEO activity. *Id.* at ¶¶11-12.

Committee member Harvey Banks also had no knowledge of the applicants' race, color, or prior EEO activity. Banks Dec. at ¶¶ 11-12.

Joseph King was the selecting official for the positions. Dickerson Dec. at Ex.2-4. Plaintiff's name was not on the lists of candidates to be interviewed. *Id.*

Diane Hatfield sat in on the interview of applicants for the experience and for training purposes. The selections were made by Mr. King, and she was not included in the selection process. Hatfield aff. at p. 8.

Thus, there is no causal connection between the non-selection and plaintiff's prior protected activity since the review board members had never met plaintiff and did not know about his prior EEO activity.

Additionally, he cannot establish a prima facie case of discrimination based on race or color since the board members did not know his race or color.

The legitimate non-discriminatory reason for plaintiff's non-selection is that his name was not sent by the review committee to the selecting official for interview because his FSAs did not compare favorably to those of the other applicants..

**Vacancy 03-43**

On July 24, 2003, vacancy 03-43 was opened for Lead Automotive Technician. Plaintiff applied and was one of four individuals considered "Best Qualified." Ex 41. On August 25, 2003, another individual, Stephen Clark, was selected. *Id.* Mr. Clark is a Caucasian male. Cook aff. at p. 9. David Cook was the review board and selecting official for the position. Ex. 41. and Cook affidavit at pp.8-9.

Mr. Cook rated the applicants to be about equally qualified. Cook aff. at p. 9. Plaintiff's total points were 42 and Mr. Clark's total points were 43. Ex 38 at p. 2 and ex. 39 at p. 2.

Plaintiff identified the prior EEO activity which led to the alleged retaliation as EEO case 4K-200-0108-2 filed on July 13, 2002. West aff at p. 5¶24, p. 15¶36. He also pointed to Mr. Currie's statement on September 7, 2000 "that I would no longer be used in any upper mobility opportunities." West Aff at p. 14¶24.[5] Here, the identified prior EEO activity occurred approximately one year before the alleged retaliatory act. Therefore, causality cannot be established by temporal proximity .

The legitimate non-discriminatory reason for Cook's selection was that the selectee interviewed better than plaintiff. Cook aff. at p. 9.

**Vacancies 31-02 & 33-02**

In July 2002, the Agency posted vacancy announcements for three Vehicle Maintenance Supervisor positions. 108-02 ROI at 205, 267.[6] Ames Dec 12. The vacancy announcements identified the requisite "knowledge, skills and abilities" ("KSAs") for the position. *Id*.

Plaintiff applied for the supervisor positions at the T Street and Southern Maryland VMFs. *Id*.

The applicants' 991 Forms were forwarded to a review committee. Ames Dec 16. The review committee was responsible for reviewing each 991 Form, rating the applicants and recommending individuals to the deciding official for an interview. *Id*. The deciding official was then responsible for interviewing the recommended candidates and selecting one of the

---

[5] The conversation at this meeting was one of the alleged acts of discrimination/retaliation in plaintiff's prior case before this court, *West v. Potter*, C.A. No. 1-746, Complaint at p. 2.

[6] References to the report of investigations for Agency Case Numbers 4K-200-0220-01, 4K-2000031-02 and 4K-200-0180-02 will be cited as "220-01 ROI at__, "0031-02 ROI at __ and"108-02 ROI at__", respectively.

interviewees for the position.  *Id*

Plaintiff's name was not among the applicants recommended for interview by the review committee.  ROI 108-02 at pp 264-266, 329-331.  Stamatios Karoutsios was selected for vacancy 31-02 and Franklin Green was selected for vacancy number 33-02.  *Id.*

Thus, the legitimate non-discriminatory reason for plaintiff's non-selection was that his name was not forwarded to the selecting official for interview because his application did not compare favorably to those of the other applicants..

The review committee consisted of three individuals, Joseph King, Diane Hatfield and Adrian Ames.  Ames Dec. at ¶ 7.  Each review committee member initially rated the candidates separately.  *Id*.  Each committee member rated each candidate based on his experiences and responses to the KSA questions.  *Id*.  The committee then met telephonically to discuss their ratings and to come to a group consensus on rating the applicants.  *Id*.  The only information used by the committee to rate the applicants were the Form 991s.  *Id*.  An employee's race and prior EEO activity were neither known by Mr. Ames nor discussed during the evaluation process. *Id*.

For the T Street Position, the review committee recommended 6 individuals for interviews.  Ames Dec. at  ¶8.   They were Jeffery Credle, Franklin Green, Stamatios Karoutsos, John Miller, William Morris, and Robert Smith.  Credle was recommended for an interview because he was already a level 16 supervisor applying for a lateral transfer.  *Id*.  The committee recommend all other candidates rated"S" for superior.  *Id*.  King Depo at p. 165.  To get a Superior rating at least two of the committee members had to rate the applicant superior.  King Depo. at p. 167. They received superior ratings because they each had substantial supervisory experience working either as a level 8 lead mechanic or as 204B supervisors, i.e. acting supervisors.  *Id*. and King Depo at pp.196-213.

For example, Franklin Greene had been a lead automotive mechanic for over one year and

had worked as a 204B for over one year.  Ames Dec. at ¶ 9.  He had strong experience in diagnostic and repair issues, familiarity and training on stockroom issues, and 204B experience. *Id*.  Mr. Miller had served as a 204B for the past 14 months and demonstrated on his 991 that he was very knowledgeable regarding vehicle maintenance procedures, safety and other supervisory responsibilities.  *Id*.  William Morris and Robert Smith also had very strong 204B experience and very good knowledge and skills in handling the supervisor's position.  In other words, these candidates demonstrated that they not only had the knowledge to perform the job as a supervisor but also had successfully acted in that capacity.  *Id*.  Similarly, Mr. Karoutsos  had served as a lead mechanic from 1988 to August 2001, a  level 17 Supervisor of Vehicles Supplies from August 2001 to March 2002, and a level 16 VMF supervisor from March 2002 to the date of his application, July 21, 2002.  ROI 108-02 at pp. 207, 209; Hatfield Depo at pp. 100-102 (Karoutsos had training and experience that was recent and relevant to the VMF, as well as supervisory experience.)

Mr. West was rated "A" for average.  Ames Dec. at ¶ 10. Although he did a good job in preparing his form 991 and showed good knowledge regarding a number of KSAs, his application was not as good as the persons recommended for interviews.  *Id*.  For example, he was not, like Mr. Green, a full time level 8 mechanic responsible for stockroom issues.  *Id*. Nor had he had the 204B experience that the other candidates demonstrated on their 991s.  *Id*. and see also King Depo. at pp. 213-219.  Ms. Hatfield noted that plaintiff did not indicate that he had ever been detailed for 30 or more days to act as acting analyst or lead mechanic;  he reflected only "periodic assignment" listed as training.  Hatfield Depo. at p. 125, 127-128.  Also, plaintiff did not supply relevant recent examples in all of his KSA's.   For example, at ROI 108-02 page 270, plaintiff's example of his "knowledge and innovation, resulting in cost savings for the USPS was from 1992,"  i.e. it was 10 years old.  Hatfield Depo at p. 125-126.  Other applicants had more "recent experience, and long term detail assignments that they could use to show that they had the

11

knowledge, skills and abilities to perform the task." *Id.* at p. 126. Ms. Hatfield was not impressed with plaintiff's response to the factor "Ability to evaluate the quality of maintenance and repair work." ROI 108-02 at p. 273. Plaintiff's example was that someone did not sign a form.  Ms. Hatfield believed that  "[t]he fact that someone didn't sign the repair order doesn't necessarily show his ability to evaluate the  quality of the repair work." Hatfield Depo. at p. 126-127.  In "Ability to prepare cost estimates. . .",  plaintiff cited to a form which was "not a form we use to prepare. . .cost estimates." Hatfield Depo. at p. 127 and ROI 108-02 at p. 274.  Plaintiff's examples referring to the Army and Naval Service Warfare Center were not recent. *Id.* at p. 27. Plaintiff's response concerning ability to prepare reports and records only had the most basic example pertinent to the Postal Service. *Id.* at p. 128 and ROI 108-02 at p. 275.  In factor number 7, plaintiff gave no "examples of how he organized work and gave people the work to do, what he did when they didn't do it . . . ." Hatfield Depo at p. 128-129.

Thus, the review committee did not forward plaintiff's application to the selecting official because it did not demonstrate that his qualifications were comparable to those of the individuals recommended for interview.

**Other Alleged Grounds for Inference of Discrimination**

Plaintiff contends that an inference of discrimination can be made because he was better qualified for the positions than the selectees  because "I exceed with my educational training with college education, labor relations knowledge and knowledge of VMF rules and regulations." West Aff.  at p. 11¶2b, p. 14 ¶26b.

 "[T]he D.C. Circuit has explained that discrimination will not be inferred absent a showing that plaintiff's qualifications were far superior to the successful candidate's." *Singleton v. Potter,*  2005 WL 3273133, *15 (D.D.C.2005) (*citing Aka*, 156 F.3d at 1296).  *See also Keeley v. Small*  391 F.Supp.2d 30, 50 (D.D.C.2005).  In this case, comparison between the selectees and plaintiff does not reflect that plaintiff was significantly better qualified, or better qualified at all,

than they were.

As to plaintiff's college education, his application reflects that from 1981 to 1984, he attended the University of Maryland (14 credit hours in business management) and Ohio State University (77 credits in civil engineering). There is no indication that he received a degree from either institution. ROI 235-03 Ex. 38 at 3, Education/training. ref. No 2&3. Additionally, there is no indication of what grades he received. The only pertinent course work that is reflected is a certification of participation in a 3 months course in Diesel & Automotive Engine Design at Ohio State University in 1982. *Id.* at ref. 24.

Stephen Clark, the selectee for vacancy 03-43 attended the Lincoln Technical Institute for six months and received a diploma in Automotive Technology. *Id*. at Ex. 39 at p. 3.

The selectees for the 14-03, 15-03 and 23-3 vacancies were John Miller, Michael Scott, and Anthony Shelton.

John Miller's application reflected that he had completed a two year degree course at the Charles County Vocational where he graduated at the top of his class in autobody repair and refinishing. Ex. 9 at p. 1. Additionally, Mr. Miller also was currently a vehicle maintenance supervisor, grade 16. *Id.*

Michael Scott's application reflected that he was a supervisor, grade 17 and had been an Automotive Service Excellence (ASE) Master Technician for 21 years. Ex. 19 at p. 3.

Anthony Shelton's application reflected that he had received a certificate of completion for a 7 months course in Diesel Engine/Transmission, Repairs from the Diesel Institute of America and had a certificate for three months training from the Airforce in 1&2 Engine Aircraft Maintenance. Moreover since November, 2002 he had been an acting supervisor, EAS-17. Ex 29 at p. 2

Plaintiff's college courses also did not demonstrate that his qualifications were superior to those of the selectees for vacancies 31-02 & 33-02. Mr. Karoutsos had graduated from the Diesel

Institute of America, receiving a degree in Diesel Mechanics.  ROI 108-2 at p. 207.  He also had

taken numerous postal supervisory courses as well as environmental courses.  *Id.* at 207-208.   Mr.

Greene was an Automotive Technology Graduate from the Lincoln Technical Institute and had

taken courses in Organizational Management and Introduction to Business at the University of the

District of Columbia and PG Community College.  ROI 108-02 at p. 278.  He also had taken

numerous postal supervisory courses.  *Id.*

    As Ms. Hatfield stated:

> that business background contributed to his nice 991.  Civil engineering, I know
> nothing about it myself personally.  I considered it as additional education that I
> don't think is ever a bad thing for anybody but didn't see that it would relate
> directly to managing a vehicle maintenance facility or his ability to be a supervisor
> of automotive mechanics. * * *  to me the education wasn't all that relevant to the
> position.  Education unto itself is a positive thing for me, **but relevant education
> is more positive**.

Hatfield Depo. at p. 131-132 (emphasis added.)

Merely stating that he had taken unspecified college courses in business management and

civil engineering, does not establish that plaintiff was better qualified than the selectees for the

vehicle maintenance positions at issue.  Even if plaintiff had obtained graduate degrees, which he

had not, that would not demonstrate better qualification unless his application reflected  not only

the pertinence of the educational background to the knowledge and skills required for a job, but

also that the educational background resulted in him having better knowledge and skills.  Indeed,

having an JD or PhD having nothing to do with vehicle maintenance simply would not make one

more qualified than any of the selectees.

Plaintiff also has not established that his unspecified "labor relations knowledge"  and

knowledge of VMF rules and regulations was "far superior" than that of the selectees who had

acted in supervisory positions.

Plaintiff has not met his burden to show that his qualifications were "far superior" to those

of any of the selectees.  *Horvath v. Thompson*, 329 F.Supp.2d 1, 7 (D.D.C.2004).  "[F]ine

distinctions" between applicants is insufficient to raise a jury question. *Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C.Cir.2003) and *see Barnette v. Chertoff*, 453 F.3d 513, *517 (C.A.D.C.,2006)("courts must defer to the employer's decision as to which qualities required by the job (substantive versus managerial) it weighs more heavily.")

**Supervisory Training program**

Plaintiff also claimed that he was in some manner discriminated against because the selectees for vacancies 31-02 & 33-02 participated in the supervisory training program developed by Mr. Curry. ROI-108-02 at pp 23-24. He claimed that "Mr. Greene and Mr. Karoutsos has been training and prepped by the VMF management and by Mr. Curry's in-house training program. The PS form 991 was used totally as a tool to discriminate against Mr. West by denying him the same training as Mr. Greene and Mr. Karoutsos received from Mr. Currie." *Id*. at p. 24 ¶37.

The application process for the training program mirrored the process for applying for promotional vacancy announcements. Applicants for the training program were required to submit the standard postal application form used for responding to vacancy announcements – the form 991, and to respond to standard VMF knowledge and skills requirements for entry level supervisors.

Mr. Currie specifically designed the program in this manner because skills which he wanted the training program to address included the application process:

> [T]he number one barrier for a mechanic to become a supervisor is the application process. They've only had an interview once and that's when they came to work for the Post Office. They've never completed a 991 form. They've never even seen it. They don't know what it is. They don't know how to complete it. They don't know the format its in. They've never had their 991s reviewed by a committee that they never get to talk to, interview experience. So, the course was designed to give them exposure on that and help develop those skill sets to improve their chances at getting a promotion when a vacancy occurred.

Currie: Admin Tr. at pp. 2500-2501, and see *Id*. at p. 2506-2508. Thus, the requirement for a 991 was not to discriminate against Mr. West, but for the entirely legitimate non-discriminatory reason

15

of training VMF employees in the application process.

Plaintiff also alleged evidence of discrimination because some applicants for vacancies 31-02 & 33-02 had received assistance from managers in the preparation of their 991 application forms.  Prior to the submission of applications for the training program,  multiple supervisors, including Mr. Currie, assisted employees in the preparation of their 991s, and employees were encouraged to ask supervisors to review their 991s and ask for assistance.  Currie Depo dated 12/15/03 at p. 295.  Indeed off-site training open to all VMF employees was conducted on how to do 991s.  Currie Depo 12/15/03 at p. 296.  Mr. Currie remembered that during the training program Mr. Morris had asked for assistance with his 991.  *Id.* at p. 296-297, 299.  Mr. Currie allowed Mr. Morris to see a copy of Mr. Currie's 991 for the Vehicle Maintenance Manager position which Currie was then currently in.  *Id.* at 299.  Other employees who attended the 911 training also received assistance with their 991s.  *Id.* at p. 301.

Ms. Hatfield was a member of the review committee for the supervisory training program.  Everyone who was not selected  was offered the opportunity to have their 991s reviewed by any of the committee members to obtain suggestions for improvement.  Hatfield depo12/10/2003 at p. 69-70.  Ms. Hatfield assisted several people with their 991s whether or not it pertained specifically to the 991 training.  *Id.* at p. 70-78.  Of the individuals on the list of selectees for the training program, she reviewed the 991s of Mr. Karoutsos, who did not take her advice,  Mr. Morris and possibly  Mr. Scott.  *Id.* at 71-72.  Franklin Greene did not show her his application for training.  However,  "Whoever – anybody that asked me, I helped.  I never turn anybody down when it comes to that, so – never have, never will."   In addition to those who applied for the training program, Ms. Hatfield assisted Preston Miller with the preparation of his 991 for positions 31-02 and 33-32.  *Id.* at p. 73- 77.  Mr. Miller was not selected  for either position.

In addition to the application process training, the top six applicants received on-the-job training and classroom training.  *Id.* at 2508-2511.  Mr. Currie even negotiated that if the local

16

district had a last minute vacancy in a supervisory class, that they would let him have the empty

seat, and he would send one of the training selectees to the class. *Id.* at p. 2509. The selectees

were also supposed to be given priority as acting supervisors. *Id.* at p. 2508. *Id.* at p. 2546. Mr.

Currie would only have been involved in supervisory details at T Street or if a training class was

provided. *Id.* at 2549, 2551-52; King Depo at p. 61.

Mr. Greene, Mr. Karoutsos and others received training and preparation from the VMF

management and from Mr. Curry's in-house training program because they applied for the

program and because they availed themselves of the offered opportunities for managers and

supervisors to assist them in improving their 991s.

Mr. West chose not to apply for the training program or avail himself of the other

opportunities offered. On March 8, 2001 plaintiff sent Mr. Currie a letter concerning the training

program stating:

> I am not interested in the program itself only the classroom training that the
> program offers. . .and all of the Oklahoma training courses as I have requested
> before. I am also requesting all Acting Supervisor (204B) opportunities in the
> absence of the supervisor at Largo I, Largo II, and Riverdale VMF's in the absence
> of the supervisor, as previously requested to Mr. David Cook. . . .

West Ex. 71. Mr. Currie responded by letter dated March 19, 2001 encouraging Mr. West to

apply for the in-house training program, advising him that: As successful candidates complete the

training program, their names will be listed for use when any supervisor or manager is absent for a

minimum of five days, up to a maximum of 199 days." West Ex. 71.

Plaintiff voluntarily chose not to apply for the position, even though Currie had urged him

to apply. 145-01 ROI Currie affidavit ("Mr. West is the sole person, who chose not to participate

in the process to improve his knowledge or skills through the in-house training program * * * . .

.Mr. West failed to submit a PS form 991 for consideration."). Plaintiff's decision not to avail

himself of the available opportunities, not any discriminatory or retaliatory animus, was the

primary impetus for precluding him from obtaining the 204B training and possibly being accepted

into the training program.  Therefore, since plaintiff was not rejected from the training program there was no adverse action by the defendant.  Therefore, plaintiff has failed to establish a prima facie case of discrimination or retaliation with respect to not receiving the in house traiing and not being an acting supervisor under the program.

It appears that Mr. West wanted an exception made for him.  However, management basically felt it would be unfair to the other employees to make an exception just for plaintiff.

> He [Mr. Currie] was disappointed that Mr. West did not want to participate in the program and talked about with the limited resources that we had. . . [i]f somebody doesn't want to put in for the program but wants everything that goes on with the program and in the course of the conversation I think he decided that it wasn't going to be fair to let somebody participate in the program but not participate in the program, that there were a lot of people who may have requested that if they thought that they had that option. * * * So rather than opening a big can of worms with throwing it open to everybody he decided to keep it within the program. Either you're going to apply for the program and be afforded the opportunity or not."

Hatfield Depo at pp. 79-80.  Thus, plaintiff was treated the same as every other employee.  Thal is all Title VII requires.[7]

### 235-03 OVERTIME

Plaintiff claimed discrimination and retaliation because he was not given overtime at the Largo II facility from April 1, 2003 through July 25, 2003.  235-03 ROI West Aff. at p. 10. Plaintiff was on the Largo II overtime desired list for "before tour duty"  235-03 ROI Ex.34 at p. 3-4.

Largo I, Largo II and Riverdale are in different buildings in the Capitol Heights VMF. Cook Supplemental aff at p. 4.   At the time in question, plaintiff was assigned to Largo I, pay location 892.  See 235-03 ROI Ex. 36.  Qualified employees can sign up for quarterly overtime desired on the list for their building and for the other two buildings.  *Id.* at Cook Supp. Aff at p. 4.

---

[7]  From October 2001 until September 2002, when he was promoted, Mr. Currie did not perform the duties of manager of the VMF.  Currie: AdminTr. at  p. 2550.  He was assigned to the Brentwood post office, involved in supervising contractors in relation to the anthrax contamination.  *Id.* at p. 2545.  With Mr. Currie's absence due to the anthrax detail, the 204B training program was abandoned.  King Depo. at p. 226-227.

If the need for overtime at a particular building exceeds the employees from that building on the list, a senior employee from another building who has signed the list is given the opportunity to work overtime. *Id.* Michael Scott was the manager at the Largo II building, and he determined the need for overtime there. *Id.* at p.3-4. If additional personnel was needed for overtime at Largo II, Mr. Scott would ask Mr. Cook for Largo I personnel. *Id.*

The legitimate non-discriminatory reason for plaintiff not being called for overtime is that on the date in question, the employees assigned to the Largo II building who signed the overtime desired list, gave management enough employees to accomplish the needs of the Largo II operation. *Id.* at p. 3. Thus, plaintiff has not shown that any similarly-situated employees not of plaintiff's protected groups were treated more favorably than he.

### DETAILS AND HIGHER LEVEL CRAFT OPPORTUNITIES

### ACTING SUPERVISORS/204Bs

In the Postal Service the term "204B" is used to denote when a craft employee is detailed into an acting supervisory position. Vedral:Admin. Tr. at p. 80. The collective bargaining agreement has no provisions concerning selection of acting supervisors. *Id.* and at p. 79 (Collective bargaining agreement does not apply to supervisory or management ("EAS") positions.) Selection of acting supervisors is at management discretion. *Id.* at p. 81, 82.

At about the time that his 204B training program was being created, Mr. Currie decided to make another separate and distinct acting supervisor opportunity. Currie Dec at ¶ 8. Mr. Currie wanted to evaluate use of the paint shop at T Street in Washington D.C. to service the entire Capital District. *Id.* However, that paint shop was not operating in compliance with OSHA standards. *Id.*

Thomas Hall had been supervising both the mechanics and the body and fender personnel at T Street. Parker:Admin Tr.. at p. 2735. Mr. Currie decided to place a Level 7 fender and body person at T Street in an Acting Supervisory position with responsibility for supervising the fender

and body personnel at T Street and for bringing the T Street paint shop up to OSHA and District of Columbia Standards. Currie Dec at ¶ 8.

Mr. Currie wanted a fender and repair person for the assignment since the duties and responsibilities of that position require familiarity with paint shop requirements. Currie Dec ¶ 9. Currie did not request any mechanic to oversee the project since a mechanic does not work in a paint shop. *Id.*

Body and Fender Repairman Robert Parker (black male) was the first person given the acting supervisor assignment. Parker:Admin Tr. at p. *2727.* His detail to the T Street shop began before Mr. Currie announced the 204b training program, and lasted approximately 120 days. *Id.* at pp. 2754, 2743. Mr. Parker's duties while on the detail included supervising the three body shop employees and getting the paint booth up and operational. *Id.* at p. 2734, 2738-39. He also was assigned to supervise mechanics in the absence of their supervisor, Thomas Hill. *Id.* at ¶ 2739. Mr. Parker's detail was ended and another body and fender repairman, "J. M." was detailed into the acting supervisory position with responsibility to oversee the paint shop project. Currie Dec. at ¶ 10.

The legitimate non-discriminatory reason for the assignment of the body and fender repair men as acting supervisor in the T Street body shop is that management believed that individuals in the body and fender repair area had the best skills and knowledge for setting up a paint shop. Currie:Admin Tr. at p. 2555., Currie Depo 12/15/03 at 158.

Plaintiff alleges that the selection of J.M. as the acting supervisor was discriminatory because J.M. had not been selected into the 204b training program and because J.M. had no drivers license, and had a DWI record and poor leave record.

First, Mr. Currie only wanted body and fender men because they had the skill set Mr. Currie needed to get the paint shop up and running. Plaintiff has not alleged or submitted any evidence that he was in the body and fender repairman craft or that he had the requisite skills and

knowledge to get a paint shop operational. Thus, there is no evidence that plaintiff was even qualified for the acting supervisory position. Therefore, plaintiff has not established a prima facie case of discrimination in his non-selection for the acting position.

Second, there is no evidence that plaintiff had advised Mr. Currie that he was interested in an Acting Supervisory position at T Street. Plaintiff's letter to Mr. Currie stating that he did not want to participate in the training program also stated that he was interested in acting supervisory positions in three locations, none of which was T Street. *See* ROI 108-2 at p. 83. (" I am also requesting all Acting Supervisor (204B) opportunities in the absence of the supervisor at Largo I, Largo II and Riverdale VMF's . . . ." ). Therefore, plaintiff has not proven that he applied for an acting position at that location.

Third, J.M.'s legal problems have no relevance to the issue. While it is true that J.M.'s license was suspended for 120 days, there is no requirement that a body and fender repairman have a driver's license. Vedral: Admin. Tr. at p 133. Miller: Admin Tr. at p. 1643-44, 1648. Additionally, Mr. Currie did not know that J.M. did not have a license until after J.M.  was in the position. J.M. did not tell Mr. Currie about his license suspension until there was an inquiry in relation to plaintiff's EEO complaint. J.M.:Admin Tr. at p. 1673-74, 1681-82.

J.M. was granted a work permit for the period of his two months incarceration. J.M.:Admin. Tr. at p. 1650. He only missed work for two days annual leave in relation to his incarceration. *Id.* at p. 1651-52. Moreover, the Sheriff's Office  notice concerning the work release program clearly stated

> The employer's responsibilities are as follows:
> 1. To treat work release participants the same as he does his regular employees as far as opportunities and benefits are concerned.

Complainants' Exhibit 40. Additionally, Mr. Currie was advised that J.M. was a recovering alcoholic, whose attendance record had greatly improved. Currie: Admin Tr. at p. 2566-2570. It could well have been a violation of J.M.'s rights had Mr. Currie used his former disability against

him.

Plaintiff also alleged discrimination because J.M. supervised mechanics as well as body and fender repair men. But when J.M. first took on the position, it was solely to supervise the body and fender repair men. *Id.* at p. 1663.  J.M. initially "was not in charge of inputting leave or anything like that.  I was just basically watching over and trying to have the body shop work in a more smooth manner, fashion." *Id.* at p. 1661.  As had been done with  Mr. Parker, when Mr. Hall,  the supervisor of the mechanics,  was not available due to a knee operation, J.M. was asked to act in his stead.  *Id* at pp. 1661-1668.  Mr. Currie assigned him to also supervise the mechanics because he was doing an adequate job in supervising the body and fender repair men, and he was skilled in managing people. Currie:Admin. Tr. at p. 2579-84.

Plaintiff also alleged evidence of discrimination because individuals who were not selected for Mr. Currie's supervisory training program were given acting supervisor assignments. At the Southern Maryland VMF, during May 2001 through June 2002 period, Mr. Cook, the installation head, had a particular order for selecting 204Bs.  Cook: Admin Tr. at 1926-27.  First, Cook awarded 204B opportunities to the top 6 candidates in the 204B program.  *Id.* at 1927.  If those six were not available and a 204B opportunity arose, then Mr. Cook would award the 204B opportunity to other 204B program applicants.  *Id*. at 1927-28.  If those persons were not available, then Cook awarded the 204B opportunity to his senior mechanic.  *Id*. at 1927.  He gave the senior mechanics the 204B opportunities because their regular duty assignment of senior mechanic already encompassed many of the job duties performed by the supervisor.  *Id.* at 1925-26.  Plaintiff did not fit into any of those categories.

Following this selection order, Mr. Cook selected Mr. James Buchanan for the May 2001 204B detail assignment.  As Mr. Cook testified, Buchanan was selected for the position because

he was in the program".".[8]  *Id*. at 1928.

Cook similarly followed the selection order in June 2002.  In that month, only 4 Southern Maryland employees served as 204Bs at Southern Maryland.  They were Green, Mansfield, Harris and Thompson.  *Id*. at 1930-42.  Cook selected Mr. Green to be a 204B because he was one of the top 6 in the 204B program. Id. at 1933-34.  Cook selected Mansfield to be the 204B while Green was away at training in Oklahoma.  *Id*. at 1933.  Cook selected Mansfield for the position because he was in the program, i.e., had applied for the 204B program. *Id*.  at 1936.  Thompson, who was not in the 204B program, served as a 204B because Green was in training and Mansfield was on leave. *Id.* at 1940-41.  Thompson was selected because he was the lead mechanic.  *Id*.  Harris was also selected due to the unavailability of others and because he was the lead mechanic. *Id*. at 1937-38.

Plaintiff contends that Mr. Cook's selection format is pretextual because it deviated from the 204B program guidelines.  This argument is meritless.  First, as Mr. Currie, the program's creator, testified, the program's guidelines were not set in stone. Currie:Admin Tr. at 2690-91.  This program was an experiment requiring adjustments as the program evolved.  *Id*.  Indeed, the notification for the program did not indicate that it would be the exclusive means of selection of acting supervisors.  145 ROI at Ex. 1.  ("As successful candidates complete the program, their names will be listed for use when any supervisor or manager is absent for a minimum of five days, up to a maximum of 119 days.")

Second, Cook administered the program consistently.  He awarded 204B opportunities in a given order.   Two other witnesses – Mansfield and Thompson – both corroborated Cook's testimony.  Both individuals attested that Cook stated that it was his intent to provide 204 B opportunities to those who had applied for the program.  Admin Tr. at 1740, 2246-47.

---

[8] Cook also noted that Buchanan was a good candidate to be a 204B due to his past experience as a supervisor and garage shop owner.  *Id*.  at 1930.

**Higher level Craft assignment for Tour Three Mechanics**

The Vehicle Maintenance craft is comprised of several different positions, each receiving different levels of pay.  '80X Cook Dec ¶ 5.  There are level 4 garage men and tire repairmen, Level 7 mechanics, Level 7 body and fender repairmen, and Level 8 lead technicians. *Id*. Each job category has specific duties and responsibilities. For example, mechanics perform engine and other mechanical work on Postal vehicles.  *Id*.  Level 7 body men primarily repair fenders, bumpers and bodies of Postal vehicles.  Level 8 employees  perform not just mechanical work like level 7s but also perform additional duties. *Id*. These additional duties include performing preventive maintenance inspections and complicated diagnosis of electrical mechanical problems. *Id*.

Under the collective bargaining agreement, Management has the right to ask qualified level 7 mechanics to perform work performed by level 8s. EEO-80X Cook Dec at ¶ 6.  When a Level 7 mechanic is directed to perform level 8 work, the collective bargaining agreement requires that the level 7 employee  receive level 8 pay. *Id*.  In other words, when a person does level 8 work, he/she receives level 8 pay.[9] *Id*.  This is referred to as  "higher lever craft details " and "higher level assignments" See Vedral:Admin Tr. at pp. 86-88; West Ex. 110 at p. 131-132.

The collective bargaining agreement requires that an individual detailed to higher level work "shall be paid at the higher level for time actually spent on such job." *Id.* at §2.  Thus, for example, if a level 6 does a core duty of a level 8 mechanic for two hours, the level 6 would receive pay at the level 8  rate for those two hours.  See Vedral:Admin Tr. at pp. 98-101.

The agreement further provides that "Detailing of employees to higher level bargaining

---

[9]  A  lower level employee may also be detailed into a level 8 position. '80X Cook Dec at ¶ 6.  A detail is different from performing level 8 work. *Id* . In a detail situation, one is placed in a level 8 job and is responsible for performing the full duties of the level 8 position. *Id*. When assigned level 8 work, an employee may be required to perform some but not all of the responsibilities of a level 8 position. *Id*.

unit work in each craft shall be from those eligible, qualified and available employees in each craft in the immediate work area in which the temporarily vacant higher level position exists. *Id.* at § 4. The term "available in the immediate area" in the Postal Service means "tour and section." Vedral: Admin Tr at p. 86. Thus, an employee assigned to Tour Two at Largo 1 is not "available in the immediate area" for a higher level detail opportunity on Tour Three. *Id.* at pp 87-88.

At Largo One, there are two shifts, known as tour 2 and tour 3. EEO-80X Cook Dec ¶ at 7. On tour 2, there were 9 employees. *Id.* The composition of the workforce included two level 4s, 4 level 7s, and 3 clerical employees. *Id.* On tour 3, there were 4 employees. *Id.*

In June 2002, management determined that Largo One would operate more efficiently if the level 7 employees on Tour 3 performed both preventive maintenance inspections ("PMI") and mechanical work on vehicles. *Id. at* ¶8. Thus, the level 7 employees on tour 3 were assigned both level 7 and level 8 work. Consequently, under the collective bargaining agreement, those Tour 3 Level 7 employees who performed level 8 work were entitled to receive level 8 pay. *Id.* The two level 7 employees on tour 3 were Thomas Buchanan (White Male) and George Spenser (Black Male). *Id.*

Plaintiff was assigned to Tour 2. *Id.* at ¶ 9. At all relevant times, he was not assigned to work on Tour 3. *Id.* Therefore, under the collective bargaining agreement he was not eligible for a higher level craft detail/assignment in Tour 3.

He maintains that he was discriminated and retaliated against because Buchanan and Spenser were assigned to perform level 8 work. *Id.* The difference in treatment arises from the simple fact that Buchanan and Spenser worked a different shift and had work demands different from the work demands on Tour 2. *Id.* Plaintiff was treated just like every other level 7 mechanic on tour 2. *Id.*

**80X - LEAVE AND DISCIPLINE ISSUES**

Plaintiff raises a number of claims relating to leave requests and/or discipline issues. The

25

facts germane to these claims are discussed below.

**June 8, 2001 letter of Warning for failure to report for Memorial Day Overtime ('220-01)**

The collective bargaining agreement and the local agreement established rules under which mechanics were required to work holiday periods. EEOC-80X Cook Dec. at ¶10. The collective bargaining agreement recognizes management's right to have employees work over a holiday period. *Id*. The collective bargaining agreement provides that management can determine the number of employees who will be required to work the holiday period. *Id*. The collective bargaining agreement further provides that management shall post the holiday work schedule on the Tuesday before the holiday period. *Id*.

The local agreement governing Largo One contains supplemental rules on holiday work. *Id*. at. ¶ 11. The local agreement defines the method for selecting employees to work during the holiday period.

The local agreement exempts only certain motor vehicle craft employees from working the holiday period. *Id*. at ¶12. The local agreement exempts only those motor vehicle craft employees who have 24 hours of pre-approved annual leave. *Id*.

On May 16, 2001, Mr. West requested and was approved 8 hours of annual leave for May 29, 2001, the Tuesday after Memorial Day. *Id.* at ¶13 and West Ex. 1.

During this period, Mr. Currie determined that the VMFs were behind on their scheduled maintenance. *Id*. at ¶ 14. Mr. Currie determined that the VMF would have to work over the holiday period. *Id.* In accordance with the contractual requirements, Mr. Cook posted the holiday work schedule for Largo I, Largo II and Riverdale employees. *Id*. The notice specifically stated:

> This memo is posted to notify **all employees** that they are scheduled to work Sunday (5/27/01) and Monday (5/28/01). **The exception to this are those employees who have 24 hrs. of preapproved leave before or after the three day holiday period.**

*Id.* at ¶14, West Ex. 2.

Under the terms of the notice and in accordance with the local agreement, only those

employees with 24 hours of preapproved leave were exempt from working the holiday period. Cook Dec. ¶ 15.[10]    Plaintiff admits that he saw the notice.  West Depo. at p. 25-26.  Nonetheless, he states that he felt that he was exempted from the notice.  *Id.* at p. 27-32.   He did not report to work on the 27th and 28th as mandated by the notice and the local agreement. Cook Dec.at ¶ 16.

Because plaintiff was required to work on the 27th and 28th and because he failed to report to work, plaintiff was absent without leave.  Cook Dec. ¶ 16.  No other employee scheduled to work during that holiday period failed to report to work.  *Id*.

As a result of his AWOL, Mr. Cook, the vehicle maintenance manager over Largo One, issued Plaintiff a letter of warning.  *Id*. at ¶ 17 and West Ex. 4.  The letter of warning was issued solely to impress on plaintiff the need to comply with scheduling notices. *Id*.  Also, Mr. Cook issued the letter of warning because he did not believe plaintiff had made a mistake in not coming to work because the notice had been posted on the time clock for everyone to see.  Cook:Admin. Tr. at p. 1088.

A letter of warning not accompanied by some adverse action such as job loss or demotion is not an adverse employment action, nor has plaintiff demonstrated it to be a material adverse action.  *See West v. Potter*, Civil Action 01-0746, Memorandum Opinion at p. 4-5 (January 30, 2003)( "As a matter of law. . .a letter of warning or criticism is not an adverse employment action unless it is accompanied by some other action such as job loss or demotion.  *E.g. Brown*, 199 F.3d at 458; *Krause v. City of La Crosse,* 246 F.3d 995, 1000 (7th Cir. 2001 ); *Hill v. Children's Village*, 196 F.Supp.2d 389, 400(S.D.N.Y.2002)).  Therefore, plaintiff has failed to establish a prima facie case of discrimination or retaliation.

Plaintiff attempted to show evidence of discrimination/retaliation because clock rings indicate that Mr. Lowe did not report to work on Sunday, the 27th and was not disciplined.

---

[10]  Prior to Currie's tenure, Mr. Cook had not been following the Local Memorandum of Understanding.  Cook:Admin. Hearing Tr. at p. 1074.  Mr. Currie found out that the LMOU was not being followed, and directed that the LMOU be followed.  Admin. Tr. at p. 1080.

Cook:Admin Tr. at p. 1089. However, plaintiff and Mr. Lowe were not similarly situated because Mr. Hill was Mr. Lowe's supervisor, and not Mr. Cook. See *Id*. at p. 1090 and Lowe: Admin Tr. at p. 2824.

Mr. Lowe testified that he did not report on May 27 and 28 because he had a pre- approved leave slip from Mr. Hill under the Family Leave Act. Lowe:Admin Tr. at 2836-37 .

Weeks later, plaintiff was involved in another AWOL situation.

**June 17, 2001 AWOL, Insubordination, and Disciplinary Action**

Plaintiff's regular work schedule was Monday through Friday. EEOC-80X Cook Dec. at ¶ 18. On Sunday June 17, 2001, plaintiff was scheduled to work overtime on his day off commencing at 6 am. *Id*. He was assigned to work at the Riverdale operation under the direction of supervisor Greg Absher. *Id*. On that day, plaintiff called in requesting to be excused from working overtime, claiming that his daughter was sick. *Id*. Mr. Absher took the call but forwarded the leave request to Mr. Cook. Mr. Cook initially granted the request for dependant care pending documentation. *Id* and and ROI '220-01 at p. 55.

Mr. Cook's request for documentation was entirely consistent with the Postal Service's rules on sick leave and dependent care. Under the ELM, "an employee requesting time off to care for a spouse, parent, son or daughter who has a serious health condition may be required to provide documentation from the health care provider." 220-01 ROI at p. 67 §515.53. The ELM further provides that for absences of less than 3 days, the manager has a right to request documentation to support an absence. Id. at Ex. 6.

On Monday June 18th, plaintiff reported to work. Cook Dec. ¶ 19. On that day, Mr. Cook attempted to discuss with Plaintiff his need to provide documentation to justify his absence on June 17th. Cook:Admin Tr. at p. 1094-1098. Plaintiff started yelling and screaming that he could not hear and did not understand Mr. Cook, putting his hands over his ears. *Id*. at p. 1098. Part of the incident was witnessed by Mr. Mansfield. Mansfield:Admin Tr. at p. 1786-1796,

28

1806, 1818-22.  Mr. West's voice was loud  and he  said "something of the sort I don't want to talk to you.  I cannot hear you, raising his hands."  *Id.* at p. 1786.  Mr. Mansfield could not hear Mr. Cook's voice.  *Id.*  He did not see Mr. Cook touch plaintiff.  *Id* at p. 1788.  Mr. Mansfield described plaintiff as acting aggressively in this incident with Mr. Cook.  *Id.* at p. 1896*.*

His supervisor is not the only person plaintiff has played the juvenile  "I can't hear you" antic with.  Mr. Buchanan, a co-worker,  has heard plaintiff do it twice.  Buchanan: Admin Tr. at p. 1871-73.  Once was when Mr. Buchanan was trying to apologize for calling plaintiff a name.  Plaintiff "jumped up.  I don't hear you, I don't hear you and just walked away. . . ."*Id.* at p. 1871-72.

In his complaint, plaintiff claims that Mr. Cook "assaulted him."  Plaintiff claims that he was in a hallway at a water fountain when Mr. Cook approached him about his request for leave.  West Depo at 39.  He claims that during this conversation, Mr. Cook placed his hands on Plaintiff's shoulders.  West Depo at 39.  Complaint claims that he yelled do not assault me.  He further claims that Cook immediately backed off and Plaintiff walked passed Cook and entered the shop.  *Id*. at 39.[11]  Plaintiff said that he felt threatened "A. Because that was the second time I have been touched by a supervisor or manager and I don't touch anyone, so you touch me, I am threatened.  Q.  Who was the first -- when was the first time?  A.  Mr. Michael Hill did the same thing, he put his arm on my shoulder. . . ."  West Depo. at p. 48.  Assuming, arguendo, that this no more than "two seconds"[12] touching occurred, by any objective standard the incident described is far from an assault.  Nor has plaintiff shown any causality between the touching and discriminatory or retaliatory intent.

The events of June 18th were extraordinary.  Plaintiff quickly escalated a simple conversation between him and his boss over a leave issue into allegations of assault, stalking and

---

[11]  Cook denies touching Plaintiff. Cook Dec ¶ 19.

[12]  West: Admin Tr. at 571.

harassment.  Cook has never had an employee so insubordinate before.  Cook Admin Tr. at 1983.
Cook concluded that he needed to take some out of the ordinary measures to deal with plaintiff's
extraordinary conduct.  *Id*. at 1105.  Cook took it upon himself to approach Plaintiff on June 19th
and hold his time card in order to get him to acknowledge Cook's instruction and then give him
the time card once the instruction was acknowledged.   *Id* at 1105-1110.

Once again, plaintiff escalated the matter far out of proportion.  Rather than have a
conversation with his superior asking the superior, "what do you want" or "what is your
instruction", Plaintiff again stated, "give it to me in writing" and said, "you keep the time card, I'll
go report to the Postal Police."  *Id.*  at 583, 585.  Thus, plaintiff voluntarily chose to walk off the
job and not work.  Plaintiff could have worked that day by simply acknowledging Cook's
instruction to bring in documentation to substantiate his absence.  This scenario was repeated on
Wednesday and Thursday.  On both days, Plaintiff voluntarily walked off the job. Admin Tr. at
1108-1119; West Ex 13, 15 & 17.

 Plaintiff admitted in a report to the Postal Police on June 20 that "Mr. Cook stated that he
has my time card and if I do not address what he was talking about on Monday that I would not be
getting my time card.  I informed him that I do not know what he is talking about."  West Ex. 14.

June 21, Plaintiff admitted to Postal Police: "Mr. Cook said if I address what he asked me
on Monday June 18, 2001, he would give me my time card.  I responded to Mr. Cook by telling
him that I do not understand what he is talking about."  West Ex. 16.

On Friday, June 22, plaintiff called in sick and was given sick leave. Cook Dec. ¶ 23 and
West Exs. 18 & 19.

On Monday, June 25th, plaintiff reported back to work.  Cook had plaintiff clock in but
instructed him to meet Cook in his office.  Cook Dec. ¶ 23  Cook this time asked plaintiff for the
documentation supporting Plaintiff's absence on June 17th.  *Id*.  Cook asked Plaintiff if he had
brought the requested documentation for the 17th and Plaintiff claimed that he did not understand

what Cook was talking about. *Id*. Plaintiff demanded from his manager to put whatever he wanted in writing and then "that will be the first time that [he, Plaintiff,] can respond to it." *Id*. and West Ex. 21-22. Mr. Cook sent Plaintiff home in a non-pay, non-duty status pursuant to Article 16.7 of the collective bargaining agreement. Postal Police arrived at the facility. Cook Dec. at ¶ 23. Cook asked the Postal Police to take Plaintiff's identification badge and to escort plainitff from the building. *Id*.

The next day, on June 26th, management had delivered to Plaintiff's home a letter, instructing him "to report for duty at [his] regularly scheduled time (0550) the day after you receive this letter." Cook Dec. at¶ 24 and Ex. 3. The carrier who delivered the letter to Plaintiff's home confirmed delivery of this letter on June 26. *Id.*

Plaintiff did not report back to work on the 27th or subsequent days. Cook Dec. at ¶ 25. By letter dated July 6th, Cook advised Plaintiff that he had been absent from work from June 26th and that he needed to provide documentation to support his absence. *Id*.

Eventually, plaintiff returned to work. On July 9, 2001, Mr. Cook met with plaintiff and a shop steward. West Ex. 25 & 26. Plaintiff was asked if he received the letter from Mr. Cook on June 26. Plaintiff responded no and he was not home. When asked why he was not home, plaintiff responded "That's none of your business." West Ex. 25. Mr. West signed a statement on July 9, 2001 stating that he was taking care of family personal business on June 27, 28, and 29. West Ex. 26. [13]

On June 26, Cook had issued plaintiff a directive to return to work. West Ex 23& 24. Plaintiff did not respond to the directive causing Cook to again mark plaintiff AWOL. Cook Admin Tr. at 1983. Cook therefore issued discipline to plaintiff consistent with progressive

---

[13] After plaintiff left the Postal Service on the 25th, he and his wife drove down to his mother's house in Memphis, Tennessee. He remained there until July 5. West Depo. at p. 94-96. Instead of simply telling Mr. Cook that he had not seen the directive to return to work when it was delivered because he had gone out of town, plaintiff chose to be combative rather than informative.

discipline practices. *Id* at 1983. The discipline, a suspension, contained a charge of "failure to be regular in attendance" but the impetus for the discipline was plaintiff's attendance infractions of being AWOL. The suspension letter, dated July 17, 2001, clearly states that "if a timely grievance is initiated, the effective date of the suspension will be delayed until disposition of the Grievance, either by settlement or an arbitrator's final binding decision." West Ex. 28. Plaintiff grieved the suspension. Cook Dec. ¶ 26 and West ex. 29. The suspension was never placed in effect and ultimately was rescinded through a grievance resolution. Cook Dec. ¶ 26 and West Ex 30, 31, West Depo. at 100-101.[14]

Thus, there was no adverse employment action and no material adverse action. Unlike the plaintiff in *Burlington*, Plaintiff never was suspended and thus never missed a paycheck due to suspension. Additionally, although Cook had declared plaintiff AWOL, July 2-5 were keyed into the system as leave, which is a pay status. West Depo at 98-100, 267-269 and its Ex. 17. Therefore, plaintiff has failed to establish a prima facie case of discrimination or retaliation.

Plaintiff attempts to show four other employees – Preston Miller, Monique Childs, Mr. Simmons and Mr. Wood – had attendance issues but were disparately treated. West Depo at p 101-102. Plaintiff's argument is meritless; none of these individuals was similarly situated to plaintiff. At the time of plaintiff's discipline Miller and Wood did not have the same supervisors as plaintiff and did not work at his location. *Id*. Additionally, although Miller and Childs had attendance issues that raised concerns about their regularity in attendance, neither employee was AWOL. Admin Tr. at 1241. As Cook explained, AWOL was by-far a more serious offense. *Id* at 1294-99; 1949-51. Because Miller's and Child's infractions did not rise to the level of Plaintiff's attendance infraction, they were both treated differently. *Id*. at 1294-99; 1307-8. Both employees were given verbal admonishments and told to improve their attendance. Miller was a white male

---

[14]Although declared AWOL by Cook, plaintiff was paid for the period because it was keyed into the system as leave. West Depo. at 267-269 and its Ex. 17.

with no prior EEO activity. Childs a black female with prior EEO activity. Both employees had similar attendance infractions and Cook treated both employees equally. Mr. Wood was not disciplined for being on leave without pay for 50 days, because he had back surgery and was under what plaintiff admits is protected FMLA protection. *Id.* at p. 105-107.

**October 27 and 28, 2001 Overtime Issues**

Plaintiff contends that he was discriminated and retaliated against when he was denied over time on October 27 and 28, 2001. ROI 31-02 at p. 85, 96.

The Collective Bargaining Agreement establishes rules and procedures for employees to work overtime. EEOC-80X Cook Dec ¶ at 27. The agreement established an overtime desired list, which is comprised of names of employees who have volunteered to work overtime. *Id*. Those employees on the overtime desired list are given first opportunity to work overtime and are offered overtime opportunities based on a rotating seniority basis. *Id.* The contract recognizes, however, that the overtime desired list may not meet the needs of the Postal Service. *Id.* Where there is an insufficient number of volunteers to work overtime, management can require persons not on the overtime desired list to work overtime as well. *Id.*

In October 2001, the Capital District faced an emergency situation. *Id.* at ¶ 28. During that month, the Capital District closed its Washington Processing and Distribution Center ("Brentwood") due to an exposure to anthrax. *Id.* Not only was the plant closed but most of the Capital District's fleet was rendered inoperable due to the vehicles' possible exposure to anthrax. *Id*. In response, the District had to lease a fleet of trucks while the Capital District's fleet was being decontaminated. During the weekend of October 27 and 28, 2001, the Capital District's lease on the trucks was expiring. *Id.* All of these vehicles had to be returned to the truck rental facility. *Id.* As a result, mechanics were needed to drive and return the trucks. *Id*.

At this time, the T Street VMF employees had been stretched to the limit and were unable to handle the additional work of returning the leased trucks. *Id.* Because the truck rental facility

was located near the Southern Maryland VMF, it was decided to have the Southern Maryland VMF mechanics drive and return the trucks along with assisting with other tasks throughout the District. *Id.*

At Mr. Currie's direction, Preston Miller, an acting supervisor at the T Street VMF, called David Cook at home. *Id.* at ¶ 30. Mr. Miller informed Mr. Cook that Mr. Currie wanted as many southern Maryland VMF mechanics as possible to report to the T Street VMF to assist with the return of the rented vehicles and other tasks. *Id.*

Mr. Cook was at home and did not have an overtime desired list. *Id.* at. ¶ 30. He did, however, maintain a list of employees' telephone numbers in his day planner. *Id.* He called each person on the day planner and noted on the planner whether he was able to contact that person or left a message. *Id.* Cook called plaintiff but received no answer. *Id.* and see West Ex. 33.

James Smith was at Mr. Cook's house while Cook was making the calls to mechanics. He recounted that:

> He called everybody. He told every body, persons that he didn't get in touch with to please call him back as an emergency. They needed people to come in to work down T street.

Smith: Admin Tr. at p. 1612. Mr. Smith heard Mr. Cook call Mr. West. He heard Mr. Cook speak Mr. West's name into the telephone. *Id.* at page 1613. Plaintiff admits that although Mr. Cook had his home telephone number, he did not have plaintiff's emergency pager number nor his cell phone number. West Depo. at 112, 116-120.

Thus, the legitimate non-discriminatory reason that plaintiff was not contacted concerning overtime was that Mr. Cook attempted to contact Mr. West using the telephone number in his day planner and was unable to reach him.

**November 2001 Holiday Leave Issues**

**Veterans Day**

In November 2001, Mr. Currie determined that the number of scheduled maintenances for

34

the Capital District lagged well behind performance goal figures. EEO-80X Cook Dec. at ¶ 31.

Mr. Currie determined that the VMF employees would be required to work during the upcoming

Veterans Day holiday period. *Id.*

      Consistent with contractual requirements, Mr. Cook solicited volunteers to work the

holiday period. *Id.* at ¶ 32. After management posted a request for employees to work the holiday

weekend, plaintiff wrote Mr. Cook, stating:

> I am informing you that I will not be available for the Veteran's Day holiday period
> from September [sic] 10-12, 2001, concerning the volunteer list that you posted on
> October 22, 2001 at Largo I VMF. I am a veteran and I will be spending that time
> in celebration with my fellow comrades and the Department of Defense.

*Id* at. ¶32 and its Ex. 5.

      Mr. Cook responded to Plaintiff's letter. EEO-80X Cook Dec. at ¶ 33. By memo dated

November 1, 2001, Mr. Cook advised:

> I am informing you that to be excused from the holiday period, you must have a
> preapproved leave request for 24 hours prior to or subsequent to the holiday period.

*Id.* at ¶ 33. Cook attached to the memo a copy of the local agreement. *Id.*

      The number of overtime volunteers was insufficient to meet the work needs of the VMF.

*Id.* at ¶ 34. On November 6, 2001, Mr. Cook timely posted a holiday work schedule. The

schedule provided:

> This notice is to inform you that all employees are scheduled to work Saturday
> (11/10/01) and Monday (11/12/01). The exception to this notice are employees
> who have 24 hours preapproved leave prior to or subsequent to the holiday period.

*Id.*

      Plaintiff reported to work as required. *Id.* at ¶ 35. Plaintif testified that he did not feel it

was discriminatory to have to work Veterans Day weekend. West Depo. at p. 135.

      Plaintiff, however, maintains that he was discriminated against because the Agency did not

discipline and impermissibly excused another employee, Monique Childs, from working the

holiday schedule. West Depo. at p. 135-136.

      On November 6th, Ms. Monique Childs (Black Female), the Storeroom clerk, submitted a

3971 Form to Mr. Cook, requesting to be excused from working the holiday weekend because she "already had family plans." *Id*. at ¶ 36. Cook denied her request as the request for leave violated the local agreement. *Id*.. Thus, Ms. Childs was treated similarly to plaintiff.

Ms. Childs reported to work and worked on November 10th. *Id*. at. ¶ 37. As part of her duties and responsibilities, she is responsible for issuing parts to mechanics, for ordering parts from suppliers, maintaining the inventory and paying suppliers. Many of her duties can be assigned to other employees. *Id*. For example, the Level 8 lead mechanic is authorized to retrieve and issue parts to Mechanics. *Id*. Other clerks assigned to the office can also perform many of Ms. Child's storeroom clerk duties. *Id*.

While at work on Saturday November 10th, Ms. Childs requested to leave work early. *Id*. *at*. ¶ 38. In accordance with postal procedures, she submitted a Form 3971 seeking to leave work 2 1/2 hours early. *Id*. She presented her request to Mr. Cook. *Id*. Mr. Cook granted the request and permitted her to leave work early. *Id*. Mr. Cook granted the request, because there was little work for her to do at that time and her duties and responsibilities could be assumed by other persons at work at that time. *Id*.

On November 1, 2001, prior to the posting of the mandatory holiday work notice, Ms. Childs had submitted a leave slip for an annual check up. West Ex. 41. That leave slip had been approved on November 1, 2001. *Id*. Because management had been encouraging her to schedule her doctor's appointments during her non-work schedule, management determined that it was in the best interests of the Postal Service to excuse her from working on that day. *Id*. Management determined that she was not needed to work on November 12th because other employees could fill in for her. *Id*. Additionally, Ms. Child submitted proper documentation from her doctor, showing that she did in fact have an appointment. ROI 31-02 at p. 33.

Mr. West maintains that excusing Ms. Childs from work on November 10th and 12th somehow discriminated against him. He, however, never submitted a 3971 leave form requesting

36

to be excused early on the 10th, nor did he request to be excused on the 12th. West Depo. at p. 138. Moreover, the presence of the storeroom clerk was not as important to meeting the scheduled maintenance performance goal as that of a mechanic who actually repairs and maintains vehicles. Therefore, plaintiff was not similarly situated to Ms. Childs, and no inference of discrimination is raised.

**Thanksgiving 2001**

In 2001, Thanksgiving Day was November 22, 2001.  Green Dec. at ¶2.  On October 10, 2001, Plaintiff submitted a leave slip for the Thanksgiving holiday weekend.  *Id*.  His original leave slip requested 16 hours of leave for the period Thursday, November 22, 2001 through Monday, November 26, 2001.  *Id*. at its Ex. 1.  Mr. Green disapproved the leave slip on the grounds that it violated the local agreement for holiday leave.  In effect, Plaintiff was looking to secure leave for the holiday period of November 22 through November 26.  *Id*. at. ¶2.  However, to assure that he would be exempt from a mandatory holiday period, Plaintiff needed to have 24 hours of approved leave. *Id.*  See West Depo. at p. 152 (Q.  Mr. Green told you you had to take 24 hours off to do what? A.  To be off the holiday.  Q.  In other words, not to be required to come in on the holiday?  A. Correct.").  His leave request was denied because he only asked for 16 not 24 hours of leave. *Id .*[15]

---

[15]  This was not the first time Plaintiff was advised that he could not include his nonscheduled days in a leave request without securing 24 hours of leave in connection with the holiday. On September 7, 2001, Plaintiff submitted a leave request seeking time off in connection with the Columbus Day holiday weekend in October. EE)-80X Cook Dec.at ¶ 40. To that end, Plaintiff requested Saturday October 6th through Tuesday, October 9th off.  *Id.*  Plaintiff requested only 8 hours of leave, since October 6, 7, and 8 were his non-scheduled days off and only October 9th was a scheduled work day.  *Id.*  Mr. Cook altered the leave slip to include only his scheduled workday, Tuesday, October 9th.  *Id.*  Cook also provided Plaintiff with a memo, advising him that:

> This notice is to inform you that a review of your 3971 requesting the holiday weekend off for Columbus Day (10/6/01 through 10/8/01) is in violation of the LMOU in that to be excused from holiday weekend work assignments you must have 24 hours preapproved annual leave prior to or subsequent to the three day holiday.  I am granting your request of Tuesday 10/09/01. You are expected to comply with the holiday schedule.

Plaintiff resubmitted his leave slip on October 10, requesting 24 hours of leave from November 22 through November 27. *Id*. at ¶ 3.  This leave slip was approved by Mr. Green.  *Id.* and *Id.* at Ex. 1 (bottom slip).   When Plaintiff learned that there was not going to be any mandatory holiday work, he canceled his leave for November 26th and 27th and requested  8 hours of leave on November 23rd. *Id.* at ¶ 3.

Mr. Michael Mansfield (White Male) also submitted a leave slip to Mr. Green.  *Id*. at ¶ 4. His leave slip did not attempt to block off the holiday period .  *Id*.  Instead, Mansfield requested only 8 hours of leave for Friday, November 23, 2003.  *Id*.  Mr. Green granted his leave slip as well. *Id*. ROI 31-02 at p. 34.

Plaintiff alleges that he was "harassed" because he was required to complete a leave slip for 24 hours of leave while Mr. Mansfield was not.  However, Mr. Mansfield was not similarly situated to plaintiff because Mr. Mansfield did not appear to be attempting to block off the entire holiday period.  If plaintiff truly did not wish to block off the holiday period, he could have reflected that by clearly requesting just the day or days off he actually was requesting, just as Mansfield had done on his leave slip.  Instead, as with the other leave slips with which the same issue arose, plaintiff included non-scheduled days within the time span of his request.   See Vedral: Admin Tr. at p. 110-111 (not proper to include non-scheduled days on leave slip "Because you are not going to charge them with AL or sick leave on their days off.")

**Martin Luther King Day Holiday, January 2002;  7-Day Suspension**

Just two months after his Thanksgiving leave slip was denied because it did not conform to the local agreement, on December 10, 2001, plaintiff submitted a leave slip to Mr. Green seeking time off over the Martin Luther King weekend in January 2002.  Green Dec. at  ¶5. Martin Luther King Day was celebrated on Monday January 21, 2002.  *Id*.  Plaintiff submitted a

---

*Id.*. at Ex. 9.

leave slip to have Saturday January 19th through Tuesday January 22nd off.  Once again, the leave slip was denied because Plaintiff could not seek to have his non-scheduled days off.   If Plaintiff was seeking to be excused from working the mandatory holiday, his leave request was inconsistent with the local agreement's requirement to have 24 hours of preapproved leave.  *Id.* Mr. Green denied the request on the grounds that the leave slip violated the local agreement's mandatory holiday leave exemption.  *Id.  See* West Depo. at p. 173-174 ("He [Mr. Green] was grumbling again this time about the days, that you put on your -- 'Why you keep putting on your leave slip Saturdays and Sundays?  You are not on scheduled working days.'  And I said, 'I am acknowledging to you I am not available for Saturday and Sunday'. . . .").

Plaintiff submitted another leave request. *Id.* at ¶ 6.  This time he requested January 19th through the 24th off and requested 24 hours of leave.  *Id.*  This request was initially denied, but Mr. Green corrected his decision because Plaintiff had requested the requisite amount of time off to be exempt from holiday work.  *Id*.  Mr. Green whited out the denial and approved the leave.  *Id.* and West Ex. 46.

Just weeks later, by letter dated January 2, 2002,  plaintiff submitted a note stating that he wanted to cancel his leave for **January 22nd through the 24th**.  Green Dec. at ¶ 7;West Ex. 48. His cancellation of his leave was duly noted on his 3971 form. *Id.*

Once again, management determined that work backlogs required employees to work the mandatory holiday period.  Green Dec.at ¶ 8.  By notice dated January 15, 2002, all VMF employees were notified that they were scheduled to work on Saturday January 19th and Monday January 21st.  *Id.* and West Ex. 49.   Again only those employees with requisite preapproved leave would be exempt from the overtime.  *Id.*  That same day, Mr. Green discussed with plaintiff his obligation to report to work over the holiday weekend.  Green Dec. at  ¶ 8.  Mr. Green informed plaintiff that he had to report to work over the holiday period.  *Id*.  and ROI 31-02 at p. 43. Plaintiff returned to his past tactics.  Similar to the June 2001 incident with Mr. Cook, plaintiff

attempted to dodge the discussion by saying that he did not understand what [Green] meant and telling Green to stop harassing him. Green Dec. at ¶ 8, RO1 0031-02 ap. 43.

Despite being given an oral notice by Mr. Green that he had to report to work on the weekend and despite seeing the notice requiring employees to report to work, plaintiff failed to report to work on the mandatory weekend, January 19 and 21, 2002. Green Dec. at ¶ 9. [16] Green determined that West was AWOL and issued him a 7-day suspension by letter dated January 28, 2002. *Id*. and West Ex. 51. The suspension was issued because this was the second time within one year that plaintiff was AWOL from a mandatory holiday work schedule. *Id*.

Two other employees - Chris Simmons and Monique Childs -- were absent from overtime over the Martin Luther King Weekend. Green Dec. at ¶10.

Mr. Simmons called in on Saturday January 19th requesting to be excused from work due to an illness. *Id*. This request was approved pending documentation. *Id*. On Monday, Simmons failed to call in or report to work. *Id*. He was therefore charged AWOL. *Id*. Simmons grieved the issue and the grievance was ultimately settled after he provided adequate documentation that he was incapacitated from work. *Id*. and see Simmons Grievance.

Monique Childs failed to report to work on January 21st. Green Dec. at ¶ 11. Ms. Childs was initially charged with absent from overtime i.e., AWOL. She, however, produced adequate documentation of an illness justifying her absence from work. She accordingly was not disciplined. *Id*. See Childs Depo. at p. 95-101 and Ex. 17.

Thus, both Mr. Simmons and Ms. Childs initially were treated similarly to plaintiff. They were charged AWOL for their absence when they presented no adequate justification therefore. However, unlike plaintiff, they subsequently presented adequate documentation of illness,

---

[16] Plaintiff now says that he did not come in over the weekend because he did not know that his request to cancel his leave had been approved. West Depo at p. 194. Yet, although under this scenario plaintiff had leave for the 22nd-24th, he came in to work on January 22. West Depo at 194. Plaintiff also admitted that it was neither required, nor was it the practice in the shop to submit a written statement to cancel leave or get a written response. *Id*. at p. 195-201.

justifying their absences and, therefore, were not disciplined.  Plaintiff never provided any

legitimate justification for his absence.

**Denial of Revised Schedule Change Feb. 11, 2002**

In February 2002, Plaintiff was late for work.  Green Dec.at  ¶ 12.  He called Mr. Green to

advise him that Plaintiff was running late to work.  *Id*. Mr. Green prepared a 3971. *Id*.  Plaintiff

arrived to work at 6:63, more than ½ hour after his scheduled reporting time. *Id*.  He requested a

change in schedule so that his start and end times would be adjusted, thereby enabling him to

work a full 8 hour day.  *Id*.  Mr. Green denied the schedule change request because Plaintiff was

more than 1/2 hour late to work.  *Id*.  Thus, plaintiff had to take annual leave for the period he was

late.  *See* West Ex. 52, Form 3971 dated Feb. 11, 2002.

Mr. Green's decision was consistent with the terms of the local agreement. The local

agreement specifically provides:

> Employees reporting up to thirty minutes late at the beginning of tour or late from
> lunch may be permitted to work their full eight (8) hour tour of duty by mutual
> agreement with the supervisor, or the supervisor may approve the employees [sic]
> request for leave.

Memorandum of Understanding, Cook Dec. Ex. 2 at p. 13 ¶24.

When plaintiff has been less than 30 minutes late for work, Mr. Green has granted

plaintiff's request for a schedule adjustment.  Green Dec. ¶ at 13.  See e.g. West Ex. 52, Forms

3971 dated Nov 11, 2001, October 31, 2001, June 20, 2001, October 24, 2001.

Plaintiff contends that he was discriminated against because another individual, Mr.

Sponaugle, was allowed a revised schedule on February 11, 2002.  However, Mr. Sponagle was

not similarly situated to plaintiff.  Mr. Sponaugle was not late for work on that day.  On February

7, 2002, Mr. Sponaugle had submitted an advance request to revise his schedule on February 11,

so that he could begin work early.  West Ex. 53.   Mr. Green was the supervisor notified of the

request and Mr. Cook approved it.  *Id.*

**July 4, 2002 Request for Leave and 14 Day Suspension**

The collective bargaining agreement and local agreement establish rules and procedures for employees to take time off during choice vacation periods. Green Dec. at ¶ 14. Under these procedures, Management will post a notice soliciting the employees' requests for time off during choice vacation periods. *Id.* The solicitation period is open for a limited period of time. *Id.* Once the solicitation period is closed, the supervisor gathers each request and determines who has requested which week off. *Id.*

The local agreement establishes that vacation time is awarded based on workshift, seniority and employee classification. Id. at ¶ 15. At the Southern Maryland VMF, there are two classes of employees, mechanics and clerks. *Id.* The local agreement establishes a maximum number of employees who must be granted time off on a particular week during the choice vacation period. Only 15% of the maintenance craft must be given leave during any week in July. *Id.* Consequently, at Largo One Tour 2, only one mechanic per week was entitled to take vacation. *Id.*

In 2002, Management properly solicited the employees' requests for choice vacation time. *Id.* at. ¶ 16 and West Ex. 54. Mr. Green prepared the vacation calendar for employees at Largo One. Green Dec. ¶ 16. Following established procedures, Green solicited employees' requests for vacation time. *Id.* He then prepared a calendar based on the maintenance employees' vacation schedules based on their workshift and seniority. *Id.* and West Ex. 55.

Both Cleveland Mansfield and plaintiff requested off for the week that encompassed the Fourth of July. Green Dec. at ¶ 17. Because Mr. Mansfield was the senior employee, Mr. Green granted Mr. Mansfield's request for time off and denied plaintiff's request. *Id.* and West leave slip submitted Feb. 28, 2002, West Ex. Ex. 56.

Later during the year, plaintiff again attempted to secure time off in connection with the 4th of July. Green Dec. at ¶18. On May 20, 2002, plaintiff submitted a leave slip for time off between June 29 through July 7, 2002. *Id.* and West Ex. 56. Plaintiff's renewed request was

denied because the choice vacation period calendar was closed and Mr. Mansfield had already been given time off from June 24 to July 5, 2002.  Green Dec. ¶18 and West Ex. 56.  The VMF could not adequately perform the necessary amount of work if both mechanics were absent from Tour 2.  Green Dec. at ¶ 18.

On that same day, May 20, 2002,  plaintiff resubmitted another leave slip this time requesting July 1 through July 5, 2002 off.  Green Dec. ¶ 18; West Ex. 56 second page (top slip) Again, Mr. Green denied the request because the "leave calendar was closed, quota met IAW contract/LMOU."  Green Dec. at ¶ 18.

On May 22, 2002, Plaintiff submitted a third request to have time off from July 1 through July 3, 2002.  This request was again denied for the same reasons.  Green Dec. ¶ 18; West Ex. 56 second page (bottom slip).

On June 28, 2002, Plaintiff called into work and requested emergency annual leave, claiming that his mother who lived in Tennessee had an accident and was seriously injured. Green Dec. at ¶ 19.  On June 29th, he called work leaving a voice mail message providing similar information and indicating that he was going to Tennessee.  *Id*.  On June 30, Plaintiff called work and left a voice mail, stating that his mother's injury was not that serious but that he was now having car trouble.  *Id*.  On July 1st, he contacted Mr. Cook to tell him that he could not return for the remainder of the week because he was having car trouble and had to wait for an ordered part. *Id*.  Cook advised plaintiff that he had to bring in documentation to support his absence.  Cook further advised Plaintiff that he should contact his supervisor Mr. Green.  *Id*.  Plaintiff ignored Cook's directive and never contacted his Mr. Green.  *Id*.

Plaintiff returned to work on July 8th. *Id. at* ¶ 20.  As documentation he brought an unverified note from his mother.  *Id*.  She stated that she had had an accident, that plaintiff had come to assist her, and that while he was in Tennessee, he had car trouble that required him to get a new part.  *Id*. and West Ex. 57.  Mr. Green determined that the letter was adequate

documentation to justify his absence from work on July 1; Mr. Green, however, advised plaintiff that he needed to produce some form of receipt or other document to prove that he had in fact needed to purchase a car part and the date of the purchase. Green Dec. at ¶ 20.

Plaintiff failed to produce the required documentation. Green Dec. at ¶ 21. Accordingly, he was charged AWOL for July 2 through 5, 2002. *Id.* Consequently, Mr. Green issued plaintiff a 14 day suspension for being AWOL. *Id.* Mr. Green gave plaintiff a 14 day suspension because this was the third time that plaintiff was disciplined for being AWOL. *Id.* This is the legitimate non-discriminatory reason for Mr. Green's action.

Plaintiff grieved the denial of leave and the AWOL designation. The grievance went to arbitration. Plaintiff, the grievant, was present and testified at the arbitration hearing. Green Dec. Ex. 2 at p. 2. The arbitrator upheld management's actions, finding:

> The evidence persuades me that the Postal Service was under no contractual obligation to grant Grievant a leave, either scheduled or emergency, for the period July 2 through July 5, 2002.Article 10 of the National Agreement, applicable sections of the ELM and the cited Local Memorandum of Agreement, provide together that annual leave applications are subject to advance approval (except for "emergencies") according to a formula designed to afford senior employees their first choices <u>and</u> to protect the Service from staffing shortages caused by annual leave.
>
> In this case, I am persuaded that the Employer was only obligated under the Local MOU to grant a single Mechanic in Grievant's section and tour annual leave during the week of July 4, 2002 . . . .
>
> I find the arguments of the Union that Grievant should have been granted "emergency" leave to also be without merit. Under section 512.412 of the ELM, emergency leave is clearly discretionary on the part of the Postal Service and is subject to both proper notification and satisfactory documentation that the emergency condition existed. Here, the circumstances leading to and accompanying Grievant's request for emergency leave are highly suspect. The evidence suggests that Grievant deliberately avoided contact with his immediate supervisor, the "proper official" from whom such leave was to be obtained, until after he returned to work on July 8, 2002, perhaps to avoid having to answer his supervisor's questions and to avoid disapproval of his request.
>
> Moreover, grievant was obligated, following his return, to submit "satisfactory documentation". Management properly deemed Grievant's mother's unsworn, unsupported and self-serving note - the only documentation he submitted - not to constitute satisfactory documentation for his July 2nd through 5th absence. Grievant's reliance on a non-receipt cash payment for the alleged part to fix his allegedly disabled vehicle is simply too convenient to be credible.

Green Dec. Ex. 2 at p.9-11.

Plaintiff contends that an inference of discrimination can be drawn because in an August 4, 2004 award, a different arbitrator disagreed with the agency's interpretation of Article 30 of the LMOU. Complainant's Ex 27 and see Greene: Admin Tr. at p. 2390-2401. This 2004 award also appears to be in disagreement with the arbitration finding recited above. From the 2004 finding, plaintiff asserts that Mr. Green's interpretation of the LMOU was wrong.   Even if plaintiff's contention were true, that alone would not establish discriminatory intent.  It is well settled that mere procedural irregularities do not establish prohibited discrimination. *Johnson v. Lehman*, 679 F.2d 918, 921-922 (D.C.Cir. 1982)(it is essential that the claimant establish "discriminatory motive."); *Risher v. Aldridge*, 889 F.2d 592, 597(5th Cir. 1989). *See also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C.Cir.1997)(When an employer's departure from the prescribed procedure has become "the norm," that departure "lends no support at all to the plaintiff's inference that" the employer's departure "is a pretext.") [citing *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996)].  Here, Mr. Green's interpretation was that the vacation policy applied to the mechanics as a group, and thus the quota applied to the mechanics as a group and not by their grade levels.  Greene: Admin Tr. at p. 2391.  Therefore, only one mechanic could be let off for choice vacation at a time. *Id.* at p. 2395.  Mr. Green did not ever allow two employees off for the choice vacation period at the same time during the relevant period of time. *Id.* at p. 2398.  Thus, even if his interpretation was wrong, it was his "norm."   Thus, the alleged wrong interpretation of the LMOU does not raise an inference of discrimination.

Plaintiff also claims evidence of discrimination because Mr. Green would not allow more than one mechanic leave at the same time in July 2002, while at other times two mechanics had been allowed to take vacation leave at the same time.  However, those individuals were not similarly situated to plaintiff, because Mr. Green was not the supervisor responsible for their leave. Two mechanics and a store keeper under the supervision of Mr. Hill at Largo Two, were allowed

by Mr. Hill to be off at the same time.  Green:Admin Tr. at p. 2393.  Also two mechanics at Largo 2 on Tour 3 were allowed by Mr. Cook to take leave at the same time because they had tickets for a special affair in Minnesota.  *Id.* at p. 2303-94.  Mr. Green did not ever allow two employees off at the same time during the relevant period of time.  *Id.* at p. 2398.

Thus plaintiff was not similarly situated to these other individuals because the supervisors were different.  In order to satisfy this test, plaintiff must prove that all of the relevant aspects of his employment situation were "nearly identical" to those of the employees who he alleges were treated more favorably.  Moreover, the similarity between the compared employees must exist **in all relevant aspects** of their respective employment circumstances. (emphasis added)  *See Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999); *Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1554 (D.C. Cir. 1997); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).

### August 22, 2002 Insubordination

As a mechanic, Plaintiff's duties and responsibilities included performing "R & R" on truck engines.  Green Dec. at ¶ 24.  This job entails removing the engine from a truck and installing a new engine in the vehicle.  *Id*.

To perform this work, an employee may use an engine stand.  *Id.*  The purpose of the stand is to hold the engine in place while it is being disconnected from the vehicle and to transport the engine once it is disconnected.  *Id*.  On August 9, 2002, Plaintiff raised a safety concern, claiming that he needed an engine stand to perform the work.  *Id*. and Complainant's Ex. 22.  Mr. Green contacted an engine supplier and got an engine stand.  *Id.* and Green:Admin Tr. at p. 2410-11. Plaintiff's supervisor, Mr. Green, investigated the claim.  Green called outside contractors who perform similar work regarding what type of equipment they used to remove and install the engine. *Id*.  The contractors advised Mr.Green that they used the same piece of equipment that the Southern Maryland VMF used to perform an R&R.  *Id*.  The contractor also sent another engine

stand to the VMF to use on R&R projects.  *Id.* Management was satisfied that they had the proper equipment to perform an R&R.  *Id*.

Mr. Green responded to Plaintiff's concerns, advising him that use of the engine stand did not present a safety hazard.  Green Dec. at ¶ 25.  On August 22, 2002, Mr. Green instructed plaintiff to perform an R&R on a vehicle.  *Id*.  Plaintiff refused. Plaintiff simply walked over to the analyst's desk, sat down, and refused to work.  *Id*.  Several times, Mr. Green instructed plaintiff to perform work.  Plaintiff repeatedly refused.  *Id*.  As a result Mr. Green placed  plaintiff in a non-pay, non-duty status.  Thus the legitimate non-discriminatory reason for Mr. Green's action is that plaintiff had been insubordinate and failed to follow his work instruction. *Id*.  Mr. Green has never before had an insubordinate employee. Green Dec. ¶ 25.  After plaintiff refused to do the work, the engine repair was assigned to Mr. Mansfield.  Mansfield:Admin Tr. at p. 1809-1814.

**January 25, 2005 Request for Revised Schedule**

On January 25, 2005,after arriving to work more than 30 minutes late,  plaintiff requested a revised schedule.  Plaintiff's request was denied because he was more than thirty minutes late. Instead, annual leave was approved for the time missed due to tardiness.. ROI 99-05 at Ex. 3.  The legitimate non-discriminatory reason for the agency's action is that the denial is in accordance with the LMOU.  *Id.* at Ex. 7.  *See supra* pp.

At the time plaintiff requested a revised schedule he was working at the Largo II VMF. West Aff. at p. 4.  The Acting supervisor was Steven Clark.  *Id.*   Mr. Clark had never done a schedule change.  He asked Mr. Cook who told him to mark the leave slip disapproved due to the greater than 30 minutes tardiness period..  See also Cook Affidavit.  Both he and Mr. Green informed Mr. Clark of the 30 minute rule in the MOU.

Moreover, the ROI reflects that  a grievance settlement was entered into on February 14, 2005.  See Grievance Settlement. At the Step 2- grievance phase, the matter was settled by an agreement to compensate plaintiff for all hours lost and to allow him to makeup over time.   King

Depo. at p. 109-12 and its Ex. 2. Since plaintiff initially was granted annual leave for this lateness he lost no salary. With the grievance settlement plaintiff was restored annual leave. There was no adverse employment action, nor a material adverse action. Therefore, plaintiff has failed to establish a prima facie case of discrimination or retaliation.

### PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT.

Employees are also protected from a hostile work environment stemming from discrimination or retaliation. A violation occurs where a plaintiff's workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). To make a prima facie case of a hostile work environment, plaintiff must show: (1) that he is a member of a protected class; (2) that he was subject to unwelcomed harassment; (3) that the harassment occurred because of his protected status; and (4) that the employer knew or should have known of the harassment and failed to take preventative action. *Jones v. Billington*, 12 F.Supp. 2d 1 (D.D.C. 1997). Beyond simply a mechanical test, courts judge the workplace conditions by looking at the totality of the circumstances. These factors include the frequency of the conduct in question, its severity, its offensiveness, and its impact on work performance. *See Faragher v. City of Boca Raton*, 524 U.S. 774, 787-88 (1998); *Raymond v. United States Capitol Police Board*, 157 F.Supp. 2d 50, 58 (D.D.C. 2001).

Vital to a claim is the connection between the alleged hostility and a plaintiff's protected status. "Everyone can be characterized by sex, race, ethnicity, and many bosses are harsh, unjust, and rude. It is therefore important in hostile environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Bryant v. Brownlee*, 265 F.Supp. 52, 63 (D.D.C. 2003) (*citing Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). The Supreme Court has stated its expectation that "these standards for judging hostility are sufficiently

48

demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788.

Plaintiff's complaint claims he suffered a hostile work environment because defendant

i) systematically harassed Mr. West when it issued six corrective actions against him in addition to two "emergency" suspensions;
j) denied Mr. West's leave requests at least 14 times;
k) subjected him to physical harassment and intimidation;
l) refused to grant two of his requests for revised schedules;
m) rejected him for five Supervisor positions and a Lead Mechanic position;
n) continually barred him from higher-level craft and supervisory details and supervisory training.

Complaint at ¶¶53, 58.

Individually, each act discussed above fails to establish a successful discrimination or retaliation claim under *McDonnell Douglas*. Likewise, plaintiff's work environment as a whole cannot be said to have been one of severe and pervasive hostility that is full of discriminatory or retaliatory intimidation, ridicule, and insult such that the conditions of employment have been altered. *See Harris*, 510 U.S. at 21.

None of the incidents recited by plaintiff show an environment *permeated* with discriminatory or retaliatory intimidation, ridicule and insult. Additionally, plaintiff has not established that any conduct was sufficiently severe to compensate for his failure to establish pervasive conduct. *See Harris*, 510 U.S. at 23. As was discussed above, Plaintiff's claim that Mr. Cook "assaulted him" is belied by plaintiff's own description of the event.

When viewed in its totality, the evidence does not demonstrate that Plaintiff was subjected to working in a workplace that was in any manner permeated "with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment. . . ." *Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999)(citing *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997) (five mild incidents of harassment over 16 month period did not create hostile working environment); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir.1993) (same with two incidents over three week period); *cf. Tomka v.*

*Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) (sexual assault sufficiently severe to create hostile

work environment).   *George v. Leavitt*, No.03-5356 (D.C.Cir. May 17, 2005), Slip Op. at p. 19.

(The Supreme Court has made it clear that "conduct must be extreme to amount to discriminatory

changes in the terms and conditions of employment.") citing  *Faragher v. City of Boca Raton*, 524

U.S. 775, 788(1998).   Similar to *Keeley v. Small*

> [P]laintiff's alleged "hostile" events are the very employment actions he claims are
> retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader
> hostile work environment claim. *See Lester v. Natsios*, 290 F.Supp.2d at 33
> ("Discrete acts constituting discrimination or retaliation claims are different in kind
> from a hostile work environment claim that must be based on severe and pervasive
> discriminatory intimidation or insult."). Plaintiff's claim simply does not meet the
> threshold of severe, pervasive and abusive retaliatory conduct, and thus defendant is
> entitled to summary judgment on this claim as well.

*Keeley v. Small,* 391 F.Supp.2d 30, 51 (D.D.C.2005).  Plaintiff has failed to establish that this

series of legitimate managerial actions have anything whatsoever to do with either his race or his

protected activity.

## CONCLUSION

Accordingly, based on the foregoing and the entire record herein, the defendant's motion for

summary judgment should be granted.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970