# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**KEVIN D. WEST,**           )
                               )

           Plaintiff,       )
                               )

         v.                 )        Civil Action No.  05-1339 (JR)
                               )

**JOHN E. POTTER,**         )
**POSTMASTER GENERAL**    )
**U.S. POSTAL SERVICE**      )
                               )

          Defendant.     )
_____)

## PLAINTIFF KEVIN WEST'S OPPOSITION
## <u>TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Teresa W. Murray
**THE LAW OFFICE OF T.W. MURRAY**
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C., 20036
Phone: 202-327-5477
Fax: 202-327-5451

Counsel for the Plaintiff


Date: January 31, 2007

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................... 1
II.  STATEMENT OF FACTS ......................................................................... 2
   A.  VEHICLE MAINTENANCE FACILITY ...................................................... 2
   B.  DENIAL OF SUPERVISORY OPPORTUNITIES ......................................... 5
   C.  DENIAL OF HIGHER-LEVEL CRAFT OPPORTUNITIES.......................... 8
   D.  OTHER ADVERSE EMPLOYMENT ACTIONS.......................................... 8
       *1.  DISCIPLINARY ACTION* ................................................................ 8
       *2.  ADDITIONAL DISCIPLINARY ACTIONS & HARASSMENT* ................. 9
       *3.  DENIAL OF OVERTIME*.................................................................. 11
       *4.  FORCED LEAVE & DISCIPLINARY ACTION* ................................... 11
       *5.  DENIAL OF REVISED SCHEDULE* .................................................. 13
       *6.  DENIAL OF LEAVE* ...................................................................... 13
       *7.  MORE DISCIPLINARY ACTIONS* .................................................... 13
       *8.  NON-PROMOTION TO SUPERVISOR* ............................................... 14
       *9.  DENIAL OF OVERTIME* ................................................................ 15
       *10.  NON-PROMOTION TO LEVEL 8*...................................................... 15
       *11.  DENIAL OF REVISED SCHEDULE* .................................................. 15
       *12.  ONGOING DENIAL OF SUPERVISORY TRAINING AND TEMPORARY PROMOTION.............. 16*
III.  APPLICABLE LEGAL STANDARDS ..................................................... 16
   A.  SUMMARY JUDGMENT STANDARD......................................................... 16
       *1.  F.R.C.P. 56*................................................................................. 16
       *2.  CREDIBILITY ISSUES* ................................................................... 17
   B. BURDEN OF PROOF IN EMPLOYMENT DISCRIMINATION CASES....................... 17
       *1.  DIRECT EVIDENCE* ...................................................................... 17
       *2.  MIXED MOTIVE*........................................................................... 18
       *3.  CIRCUMSTANTIAL EVIDENCE/BURDEN-SHIFTING* ........................ 18
          a. Retaliation – *Prima Facie* Case........................................ 18
          b. Race/Color Discrimination – *Prima Facie* Case.............. 19
          *c.* Hostile Work Environment – *Prima Facie* Case ............. 19
          d.  Employer's Burden of Production ...................................... 20
          e.  Pretext and Plaintiff's Ultimate Burden ........................... 20

IV.  LEGAL ARGUMENT .............................................................................. 21
   A.  THE USPS RETALIATED AGAINST KEVIN WEST ............................... 21
       *1.  WEST PRESENTS DIRECT EVIDENCE OF RETALIATION* ................. 22
       *2.  WEST ESTABLISHES A PRIMA FACIE CASE OF RETALIATION* ....... 23
   B. *PRIMA FACIE* CASE OF RACE/COLOR DISCRIMINATION...................... 24
   C.  ADVERSE TREATMENT, CAUSAL LINKS AND INFERENCES OF DISCRIMINATION ................................................................................... 26
       *1.  CONTINUAL DENIAL OF ACTING 204B SUPERVISOR DETAILS AND SUPERVISORY TRAINING 26*
          a.  The USPS' Rationale for Denying West Supervisor Opportunities is Pretext.... 26
          b.  Supervisor Opportunities: Retaliation - Causal Link ........... 28
          c.  Supervisor Opportunities: Race Discrimination.................... 29
             *1)  Mechanics* ............................................................... 29

      *2)  John P. Miller, III* ........................................................................ *30*
    **d.  The USPS Denied West Permanent Promotion to Supervisor** ............................. **33**
        *1)  West Is Fully Qualified for Supervisor Promotion* ................................ *34*
        *2) Selecting Officials Prevented West From Successfully Competing for the Supervisor Positions By Persistently Blocking Higher-Level and Supervisory Detail Opportunities and Training.* ........................................................ *35*
  **2.  ALONG WITH DENYING WEST SUPERVISORY OPPORTUNITIES, THE USPS DENIED WEST HIGHER-LEVEL CRAFT TEMPORARY AND PERMANENT PROMOTIONS** ............................. *37*
    **a.  Higher-Level Craft Details** ........................................................ **37**
    **b.  Level 8 Duties** ...................................................................... **38**
    **c.  Denial of Permanent Level 8 Position, Vacancy 03-43** ........................ **39**
  **3.  HARASSMENT/HOSTILE WORK ENVIRONMENT** ................................................ *40*
  **4.  RESPONSIBLE MANAGEMENT OFFICIALS DISCIPLINED WEST IMPROPERLY AND EXCESSIVELY DUE TO HIS RACE AND PRIOR EEO ACTIVITY** ................................. *42*
    **a.  June 8, 2001 Letter of Warning** .................................................. **43**
    **b.  July 17, 2001 7-Day Suspension** .................................................. **44**
    **c.  August 24, 2001 7-Day Suspension** .............................................. **45**
    **d.  January 28, 2002 7-Day Suspension** ............................................ **45**
    **e.  July 17, 2002 14-Day Suspension** ................................................ **46**
    **f.  August 22, 2002 "Emergency" Suspension** .................................... **46**
    **g.  USPS Disciplined West Close In Time To His Filing Of EEO Complaints And Prosecution Of A Federal Court Lawsuit.** .......................................... **47**
  **5.  USPS DENIED WEST VACATION AND ANNUAL LEAVE, REFUSED HIM REVISED SCHEDULES, AND DISPARATELY APPLYING LEAVE RULES.** ................................. *48*
    **a.  November 2001 Holidays** .......................................................... **48**
    **b.  Denial of Revised Schedule on February 11, 2002** .......................... **49**
    **c.  Denial of Vacation for July 4, 2002 Holiday** ................................ **49**
    **d.  Denial of Revised Schedule on January 25, 2005** .......................... **50**
  **6.  DISCRIMINATORY AND RETALIATORY DENIAL OF OVERTIME** ............................. *50*
    **a.  October 2001** ...................................................................... **50**
    **b.  April – July 2003** ................................................................ **52**
V.  CONCLUSION ................................................................................ 52

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

**KEVIN D. WEST,**                  )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Civil Action No.  05-1339 (JR)
                                    )
**JOHN E. POTTER,**                 )
**POSTMASTER GENERAL**              )
**U.S. POSTAL SERVICE**             )
                                    )
            Defendant.              )
_____)

## PLAINTIFF KEVIN WEST'S OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kevin D. West, by and through undersigned counsel, hereby submits his

Opposition to the United States Postal Service (hereinafter "Defendant" "USPS" or "Agency")'s

Motion for Summary Judgment.

## I.  INTRODUCTION

Essentially, this case presents two critical issues:

> **Race Discrimination.**  Agency Manager Timothy Currie called African-American postal employees "lazy," "stupid," "worthless," and "hard-headed" and has previously been found guilty of employment discrimination.  Currie and his managers disciplined African-American employee, Kevin West six times, denied him overtime and continuously refuse him promotion and training, while affording promotions, training, leave and overtime to similarly-situated, Caucasian employees who are groomed, under-qualified, and junior.  Isn't a trial necessary to determine whether the USPS' actions were motivated by race?

> **Retaliation.**  West opposed USPS actions that he believed to be discriminatory by filing a lawsuit and several EEO complaints.  Agency managers call West a "problem," a "troublemaker" and the "boy who cried wolf," and have vowed to block his advancement.  These managers instituted six disciplinary actions against West, denied him leave and overtime, and steadfastly refuse him higher-level jobs and training.  Isn't a trial necessary to determine whether Agency officials retaliated against West for his EEO activity?

According to governing law, the answer to both these questions is yes.

## II.  STATEMENT OF FACTS[1]

### A. VEHICLE MAINTENANCE FACILITY

The United States Postal Service ("USPS") maintains a subsidiary division called the Vehicle Maintenance Facility ("VMF"), which, services and repairs Postal vehicles.  The local arm of the VMF is known as the Capital District VMF, which is comprised of three major facilities:  1) "Suburban" in Gaithersburg, Maryland; 2) "T Street" in Washington, D.C.; and, 3) "Southern Maryland" in Largo and Riverdale, Maryland.  Most relevant to this case is the Southern Maryland facility, which consists of three garages – Largo I and Largo II (separate facilities located on the same USPS compound), and Riverdale.

At all times relevant to this case, Timothy Currie, in the position of Manger of Vehicle Maintenance, oversaw the Capital District VMF, where he was responsible for the "day-to-day operations of all VMF within the Capital District."[2]  Mr. Currie personally supervised two managers, Joseph King, who managed the Suburban facility, and David Cook, who managed the Southern Maryland facility.

The Capital District VMF employs various personnel, including body and fender repairmen and vehicle mechanics who are members of the American Postal Workers Union (APWU) and are known as "craft employees."  The vehicle mechanic craft consists of four levels depending on the employees' skill level and seniority. Level 6, and Level 7 Automotive Mechanic and Automotive Technician, respectively are craft mechanics possess progressively greater skill and seniority, and perform maintenance work on vehicles as assigned by Lead

---

[1] In a separate document filed contemporaneously herewith as Exhibit 1 and through reference, incorporated herein, Plaintiff responds to Defendant's Statement of Material Facts and identifies further material facts to which there is a genuine dispute.
[2] Ex. 2, Currie Depo. at 10-11.

Mechanics, Supervisors or Managers.  Level 8 mechanics or "Lead Automotive Technicians" not only perform vehicle repairs but also diagnose and analyze potential mechanical problems. Level 9 mechanics perform the same duties as Level 8 mechanics but have additional authority to assign vehicle repair work to junior mechanics and perform supervisory functions when a supervisor is not on duty.

Vehicle mechanics have the ability to receive supervisory classroom training as well as on-the-job training via temporary promotion to "Acting" Supervisor, (a.k.a. 204B).[3]  USPS management may detail mechanics and other craft employees, on a temporary basis (not to exceed 120 days), into these higher level positions.  The Postal Service promulgates no rules or regulations governing its officials' selection of craft employees for 204B details.[4]  Requiring no formal application, VMF management chooses the "best qualified" craft employee for each detail opportunity, based on management's personal assessment.[5]  There exists, however, a practice of selecting the lead, senior mechanic to serve as acting 204B supervisor when a permanent supervisor is absent.[6]  If the lead mechanic declines, the next senior technician would be afforded the opportunity.[7]  Once selected, the USPS pays the mechanic a higher salary for the period of time he works in the higher-level position.

To permanently promote individuals into supervisory positions, the USPS must award these positions in accordance with USPS EAS competitive selections policies and procedures.[8] Under these procedures, a candidate submits an application (PS Form 991), which is evaluated

---

[3] Ex.3, Vedral Hrg. Testimony Vol. 1 p.80:4-9.  When citing to the transcript of the hearing before an U.S. EEOC Adminitrative Judge, Plaintiff cites the last name of the witness (and first name if necessary for clear identification) the volume of the transcript and page number followed by a colon and the line numbers, i.e. "80:4-9" means page 80, lines 4-9.
[4] Ibid Vedral Vol 1 p.80:20-21; p.81:1.  Ex. 4, Cook Vol. 3 p: 806: 30-21; p.807:1.
[5] Ex. 5 Cook Depo. at 29; Ex. 2 Currie Depo. at 37.
[6] Ex. 4, Cook Vol. 3 p. 877: 4-17, p.879: 2-11;  Ex. 6, Absher Vol. 4 p.960:7-21, p. 961: 1-9. Ex,. 7 Mansfield Vol. 6 p. 1729:16-21.  Ex. 8 Thompson Vol.8 p.2223:3-21, p.2224:1-10.
[7] Ex. 4 Cook Vol. 7 p.1924:20-21, p.1925:1-15.
[8] Ex. 9, Selection Procedures.

by a Review Committee.  Depending on one's rating, the candidate is interviewed by the

Committee or the Selecting official, and if successful, is selected by the Selecting Official.

With that background, our story begins in 1999.  Plaintiff Kevin West, an African-

American is a Level 7 Automotive Mechanic.  At all times relevant to this case, West was an

Automotive Mechanic (Level 6, then Level 7) at the Largo I, Southern Maryland Facility.[9]

David Cook has served as Manager of that facility since 1993.[10]  Working under Cook in the

1990s, West found some of management actions to be improper under EEO laws and filed EEO

complaints against the Agency.[11]

In May 1999, West wrote to Cook asking to serve as "acting supervisor or a 204B when

the supervisor's absent at Largo, Largo 2 and Riverdale VMF".[12]  Cook informed West that he

would be afforded this opportunity when the need arises.[13]

Meanwhile, during the years 1999 and 2000, Timothy Currie served as Manager Vehicle

Maintenance for the USPS VMF in Bedford Park, Illinois.  During his tenure there, he managed

several USPS employees, many of whom are African-American.  Between the years 1999 and

2000, African American employees filed over 15 EEO complaints against the USPS alleging that

Currie discriminated against them.[14]  Several VMF employees gave statements under oath that

they personally observed Currie make racist statements regarding African-Americans.  Currie

called African-American workers "lazy," "stupid," and remarked to a Black employee that he

---

[9] Ex. 10 West Decl. ¶ 1.
[10] Ex. 5 Cook Depo. at 21.
[11] Ex. 10 West Decl. ¶ 3.
[12] West testified that he requested these Southern MD VMF locations because they were the only locations management had, at the time, offered to Southern MD craft employees. Ex. 11 West Vol. 2 pp.241:308, Ex. 5 Cook Vol. 3 pp.919:19-21, 920:1-21, 921:1-21, 922:1-12, Ex. 12.
[13] Ex. 11 West Vol. p. 239:1-17;(Id.)
[14] Ex. 13.

[didn't] know why you people are so hard-headed."[15]  The USPS officially designated the Bedford Park VMF a "hot spot" for volatile management-employee relations necessitating monthly meetings to cool racial tensions.[16]  Shortly thereafter, the USPS brought Currie to Washington D.C., after promoting him to Manager Vehicle Maintenance in the Capital District.[17]

On September 7, 2000, Currie summoned West to his office on T Street.  During the meeting, Currie told West that he had been "brought" to Washington, D.C., to take care of "VMF problems," and that West was "one of those problems that he will solve."  West requested union representation but Currie denied him a union representative.  Currie admitted to West that "he was informed by his supervisor of [West's] prior EEO history."  He repeatedly asked West if "he liked his job," then handed him a resignation slip.  When West responded that he "love[s his] job" and refused to resign, Currie told him he "would never be used as acting Lead Mechanic or any other upper mobility positions in the VMF."[18]  Although he claims he decided this for non-discriminatory reasons, Currie admits that he purposely barred West from upward mobility.[19]  Since his conversation with Currie, Kevin West has been denied supervisory opportunities.

### B.  DENIAL OF SUPERVISORY OPPORTUNITIES

Sometime between February and April 2001,[20] Currie created a program entitled the "204B Supervisory Training Program".  The program was voluntary and open to all VMF employees who wished to apply and compete for admittance.  Program participants were provided supervisory classroom training, supervisory training materials, the opportunity to

---

[15] Ex. 14, Statement of Edward Clark; Ex.15, Declaration of Gwendolyn Simms-Hearn and Statement by Gwendolyn Simms-Hearn
[16] Ex. 16, Declaration of Alonzo Taylor at Ex. 3, ¶ 6; Ex. 15 Simms-Hearn Decl. ¶ 7.
[17] Ibid. ¶ 8.
[18] Ex. 10 West Decl. ¶ 11-13.
[19] Ex. 17, Currie Vol. 9 p. 2601:13-17.
[20] ex. 4 Cook Vol.3 p. 883:16-18, Vol. 7 p.1928:6-10. Ex. 17 Currie Vol. 9 p.2493:17-21, p.2494:1, 2501:19-21, 2506:1-2.

participate in management meetings, and long-term 204B assignments.[21] Currie's program was a separate, autonomous program which did not operate to replace or limit existing supervisory details or training within the USPS.[22] And, unlike other USPS training programs or opportunities, Currie's Program required employees to officially apply via a 991 job application and a 991X leave summary form.[23] Currie selected twelve applicants for interviews, and then admitted only six individuals to the program: Michael Scott, Frank Green, Pam Alston, Steve Karoutsos, Gene Morris, and Robert Smith.[24] The remaining applicants were denied entry into the program.[25] Kevin West, among many others,[26] did not apply to Currie's special program.[27]

Believing that he had little chance of being selected for the Program, after his conversation with Currie in September, West remained interested in customary supervisory details and training that existed prior to and outside of the program.[28] By letter dated March 8, 2001 to Currie, West expressed his continued desire for supervisory training and 204B supervisory opportunities.[29] Besides inviting West to apply to his special program, at no time did Currie offer West either classroom or on-the-job training as a Supervisor, or a supervisor detail. This was so, even though Currie admits that "many" other employers besides the six individuals admitted to his program served as 204Bs while his program was in operation,[30] and that when the six program admittees were already "occupied", VMF managers could consider

---

[21] Ex. 2, Currie Depo. at 70-72.
[22] Ibid. at 68-69.
[23] Ex. 17m Currie Vol. 9 pp. 2500:3-21, 2501:1-20.
[24] Ex. 17 Currie Vol. 9 p. 2526:11-21, p.2527:1-21; pp. 2528:1, 2529:14-19, 2691:14-21, 2692:1-21. Ex. 4 Cook Vol. 3 884:7-16.
[25] Ex. 17 Currie Vol. 9 p. 2526:11-21, p.2527:1-21;p.2528:1, 12-16;p.2529:14-19; Ex. 18.
[26] Ex. 19, Miller Vol. 6 p.1691:12-21, 1692:1-5, 14-17, 21, 1693:3. Ex. 8 Thompson Vol. 8 p.2226-2230.
[27] Ex. 11, West Vol 2 p.261:15-21, p.262:1-21.
[28] Ex. 10, West Decl. ¶ 19.
[29] Ex. 20 Chg. 220/p. 139.
[30] Ex. 17, Currie Vol.9 p.2524:7-21, p.2525:1-3.

those who did not apply to his program to fill temporary vacancies.[31]  Indeed, Postal Service time

and attendance records demonstrate that several employees who were not admitted into Currie's

program were provided 204B details.[32]  Despite West's expressed interest in 204B opportunities,

his sixteen years of dedication to the Postal Service,[33] and his excellent performance record,[34]

USPS management passed over West for 204B opportunities and have **never** allowed him to take

supervisor classroom training or serve on a 204B temporary detail.[35]

West has also been consistently rejected for permanent supervisor positions.  In late

summer 2002, the USPS rejected West for two Supervisor positions for which he applied.[36]  The

selecting officials were David Cook (for Supervisor position no. 31-02) and Timothy Currie (for

Supervisor position no. 33-02).[37]  A Review Committee consisting of Joseph King, Dianne

Hatfield, and Adrian Ames accepted and evaluated the applications (Form 991's).[38]  Although

Hatfield served on the Review Committee, she assisted Layton Jones and Robert Smith with

their 991's,[39] gave a copy of her personal 991 to applicant Eugene Morris,[40] and prepared John

Miller's 991 application for him.[41]  The following individuals received ratings of "Superior,"[42]

and were selected for interviews:  Jeffrey Credle (lateral), Frank Green, Stamtous Karoutsos,

John Miller, William Morris, Robert Smith and Michael Scott.[43]  The USPS' Review Committee

---

[31] Ex. 17, Currie Vol. 9 p.2556:9-17.
[32] The dates and duration of VMF temporary promotions are varied and extensive and where possible, have been summarized by both parties.  Ex. Ex. 21.
[33] Ex. 4, Cook Vol. 3 p. 923:11-21, 924:1-10
[34] Ex, 6 Absher Vol. 4: pp. 933:11-21, 934:1-14, 935:5-19, Ex. 22, Buchanan, Vol. 6 p.1869:6-13
[35] Ex. 11, West Vol.2 p.227:10-16.
[36] Ex. 23, Chg. 108/Ex.70,80.
[37] Ex. 2, Currie Depo. at 288-289.
[38] Ex. 23, Chg. 108/Ex. 22; Ex. 5, Cook Depo. at 71.
[39] Ex. 24, Hatfield Depo. at 134.
[40] See Ex. 25, Virgil Chase's Pre-Complaint Investigation Statement.
[41] Ex. 26, Green Depo. at 72-78.
[42] Ex. 23, Chg. 108/Ex. 68,78.
[43] Ex. 5, Cook Depo. at 67; Ex. 23, Chg. 108/Ex. 68,78.

rated West's 991 application as "Average."[44] Both Cook and Currie interviewed the candidates forwarded by the Review Committee. Ultimately, they selected Frank Green and Stamtous Karoutsos for the Supervisor jobs.

### C. DENIAL OF HIGHER-LEVEL CRAFT OPPORTUNITIES

Just as the USPS temporarily promotes craft employees to supervisor, the USPS temporarily promotes vehicle mechanics to higher positions within the vehicle-maintenance craft. Per the governing collective bargaining agreement[45] and USPS' practice,[46] higher-level craft details must be offered to the next-highest-level mechanic according to seniority.[47] The USPS often selected Caucasian mechanics for these opportunities over West who was next in line and more senior. Cook intentionally denied West higher-level craft details at Currie's direction.[48] In so doing, Cook selected three Caucasian mechanics who had no EEO history and were junior to West for long-term higher-level craft details: Thomas Buchanan, David Lowe and David Wood.[49]

### D. OTHER ADVERSE EMPLOYMENT ACTIONS

#### 1. DISCIPLINARY ACTION

On May 16, 2001, Cook approved West's request for 8 hours annual leave to be used on May 28 and 29, 2001 (Memorial Day Holiday) and told West that he was excused from the holiday.[50] On May 22, 2001, Cook posted notice of mandatory work that required all VMF employees to report for duty on May 27 and 28 exempting "those who have 24 hours pre-approved leave immediately before or after the holiday;" The Local Memorandum of

---

[44] Ex. 23, Chg. 108/Ex. 69, 79.
[45] Ex. 3, Vedral Vol. 1 pp. 86:6-15, 89:2-7, 100:4-17, 102:17-21, 103:1.
[46] Ex. 4, Cook Vol. 3 pp. 877:4-17, 879:2-11, 923:11-21, 924:1, Vol. 7 p.1924:7-21, 1925:1-15. Ex. 6, Absher Vol. 4 pp. 960:7-21, 961:1-9.
[47] Ex. 27.
[48] Ex. 17, Currie Vol. 9 pp. 2604:3-21, 2605:1-9.
[49] Ex. 21.
[50] Ex. 11, West Vol. 2 p. 470-72.

Understanding (LMOU) provides that if the management mandates work on a holiday, an employee must have 24 hours or more of annual leave to be excused from working the holiday period.[51]  West subsequently did not report to work on either day believing that he was excused from reporting, given the newly-enforced rule and Cook's approval and representation.

About six weeks after West received EEO counseling for West (Agency Case No. 4K-200-0145-01)[52] Cook marked West "AWOL" for May 27, 2001 - the first time in West's then 10-year postal career  - and disciplined West with a Letter of Warning (LOW).[53]

### 2. ADDITIONAL DISCIPLINARY ACTIONS & HARASSMENT

On June 17, 2001, the USPS scheduled West to work overtime at the Riverdale VMF facility.  West was unable to report for overtime because his infant daughter had a high fever. He called to his reporting supervisor, Gregory Absher to request dependant care leave.[54]  Absher responded "ok" to West's request for dependant care.[55]  Dependant Care sick leave is leave provided by the USPS for the care of a dependant who is ill.[56]  Approval of dependant care sick leave requests is governed by "normal" sick leave procedures, which require employees to provide documentation *if their absence exceeds three days.*[57]

Although West was not required to submit documentation for his one-day, dependant-care absence, Cook accused West of failing to provide documentation.  On June 18, 2001, Cook waited until West was alone in a hallway to come up behind him and confront him.  He physically intimidated West by approaching him in an isolated area and clasping West's

---

[51] Ex. 3, Vedral Vol. 1 p. 106:2-16.
[52] Ex. 28 at 1
[53] Since Currie's meeting with West, Cook issued a prior Letter of Warning in reprisal for West's complaint regarding his meeting with Currie on September 7, 2000.  See Ex. 29.
[54] Ex. 11, West Vol. 2 p. 533:7-21.
[55] Ex. 11, West Vol. 2 p. 332-334.
[56] Ex. 3, Vedral Vol. 1 p. 142:7-18.  Although West did not actually take leave on June 17, 2001 his absence was nonetheless still an absence covered by the Dependant Care provisions of the USPS ELM.
[57] Ex. 4, Cook Vol. 5 p; 1301-02.

shoulders while he talked to him.[58]  West shouted "don't touch me," to draw the attention of others who could not see what Cook was doing to him.[59]  Mr. Cook continued to physically harass West by following him out of the hallway and onto the shop floor.[60]  Given West and Cook's position in the hallway, no other employee saw what transpired between them. West promptly called the Postal Police to report what West believed was physical harassment and intimidation.[61]

For the next three days, Cook arrived early to work,[62] as he admits, to "challenge"[63] West about not providing documentation of his daughter's fever.  Each day: on June 19, 2001, June 20, 2001 and June 21, 2001, West reported to work and Cook withheld his timecard and refused to allow him to clock in.

On June 25, 2001, Cook denied. West copies of his leave slips, refused to provide him requested union representation, "verbally" suspended him from work and summoned the Postal Police to escort West off the premises and remove his badge.[64] For the days Cook forced West off the job, Cook marked him "AWOL" and disciplined him twice.[65]  Currie admits that he was well aware of Cook's "technique" to "instigate" West,[66] and Cook similarly admits that he discussed all of these activities with Currie and that Currie provided him advice.[67]  Notably, Currie used this same "technique" with other African American employees – Melvin Barksdale and Edward Clark.[68]  Currie also concurred on the two disciplinary actions against West.[69]

---

[58] Ex. 11, West Vol. 2 pp. 34516-21, 346:1-13. Ex. 30.
[59] Ex. 8, Thompson Vol. 8 p. 2212-2215,2218
[60] Id.
[61] Ex. 30, Ex. 31, Smith Vol. 6 p. 1595:11-21, 1597: 1-2.
[62] Ex. 4, Cook Vol. 4 pp. 1123:15-21, 1124:1-13.Cook Vol. 4 pp. 1122-28.
[63] Ibid p. 1123:15-1124:4.
[64] Ex. 32 at 4)
[65] Ex. 33.
[66] Ex. 17, Currie Vol. 9 p. 2533-34.
[67] Ex. 4, Cook Vol. 4 p. 1126-28, 1144-46.  Ex. 17, Currie Vol. 9 p. 2660-65.
[68] Ex. 34, Clark, Edward Vol. 11: p. 3054:19-3056:2; Ex. 35.

### 3. DENIAL OF OVERTIME

On October 27 and 28, 2001, an overtime opportunity became available to VMF mechanics to shuttle rental vehicles back to the rental car agency and to perform other tasks as needed. When an overtime opportunities arises, the collective bargaining agreement (CBA) provides that management must utilize those identified on the overtime desired list in seniority order.[70] West properly placed his name on the overtime desired list for the relevant time period and for all three Southern Maryland VMF locations.[71] Mr. Cook, however, did not contact West to offer him the opportunity. Rather, Cook offered the overtime to employees who, according to the CBA should not have been offered the opportunity before West. The employees from Largo I who were offered the overtime by Cook were all Caucasian: Thomas Sponaugle, Cleveland Mansfield, Thomas Buchanan, and Robert Smith.

### 4. FORCED LEAVE & DISCIPLINARY ACTION

West is a Veteran and advised Cook on October 28, 2001 that he preferred not to work on Veterans' Day. Cook, nonetheless, required West to work on that holiday. Meanwhile, Cook did not require David Lowe (Caucasian) to work the entire Veterans' Day holiday.[72]

Also in November, Green denied another of West's leave request for the Thanksgiving holiday - a request that he made 45 days before the leave date. Green acknowledges that annual leave *should* be granted up to 45 days prior.[73] When Green denied the leave, he invoked the 24-hour leave rule for mandatory holidays. Yet, Thanksgiving 2001 wasn't a mandatory holiday.[74]

---

[69] USPS rescinded these actions because they were "improperly issued." Ex. 4, Cook Vol. 4 p. 1150:2-19, 1151:1; Ex. 33.
[70] Ex. 11, West Vol. 2 pp. 356:21, 357:1-21, 358:1-7
[71] Ex. 36
[72] Ex. 37, David Lowe Absence
[73] Ex. 38, Green Vol. 10 p. 2987:12-18.
[74] Ibid  p. 2863-66. Ex. 11, West Vol. 2 p. 377:4-12.

Unlike West, Green granted a Caucasian mechanic's request for 8-hours leave during the same time period – Cleveland Mansfield.

In December 2001, West requested leave around the Dr. Martin Luther King, Jr. holiday (January 21, 2002) and was twice denied by Supervisor Green who eventually granted his request, once West requested 24 hours leave.[75]  Green states he denied West's leave requests because of the dates West placed on his leave slips and his belief that West needed to take a minimum of 24 hours of leave due to the MLK holiday.[76]  Yet, Green applied a mandatory holiday rule before the MLK mandatory holiday notice was posted. West later requested that a portion of his leave be cancelled;[77] however, he received no response to his cancellation request, [78] as he had previously.[79]  West believed his cancellation request had not been granted.

On January 15, 2002, the USPS posted a notice mandating all VMF employees to work the holiday - January 19 and 21, 2002.  (Agency Ex. 49).  The notice, however, did not specify a need for 24 hours of pre-approved leave, as other recent holiday notices had.[80]  Cook concedes that the MLK notice was improperly worded[81] and that its inconsistency with prior notices could have led West to believe that he was exempt from working the holiday.[82]  And this it did.[83]

Nevertheless, Green marked West AWOL for January 19 and 21, 2002 and issued him a 7-Day suspension.  David  Lowe (Caucasian) failed to report on January 19 and 21, 2002, like West, but unlike West, was not suspended or issued any discipline.[84]

---

[75] Ex. 11, West Vol. 2 pp. 377-379.
[76] Ex. 38, Green Vol. 10 p. 2950:17-21, 2951: 1-13.
[77] Ex. 39, Chg. 31 ROI Ex. 22.
[78] Ex. 11, West Vol. 2 pp. 381-82, 514:215.
[79] Ex. 11, West Vol. 2 p. 381:16-21-382:11.
[80] Ex. 39, Chg. 31 ROI Ex. 17.
[81] Ex. 4, Cook Vol. 5 p. 1372:5-21, 1373:1-3, 1475:20-21; 1376:1-8.
[82] Ex. 4, Cook Vol. 5 p. 1377:16-21.
[83] Ex. 11, West Vol. 2 pp. 381: 16-21, 382:1-2, 514:2-15
[84] Ex. 40, Lowe Vol. 2 pp. 383:5-389:20, 394:4-14, 436:7-21, 438:1-10, 516:10-14

### 5. DENIAL OF REVISED SCHEDULE

On February 11, 2002, West arrived just over 30 minutes late (.63 units); yet, Green denied his request for revised schedule.[85]  USPS management routinely grants employees revised schedules for employee convenience.[86]  The LMOU provides that if an employee arrives up to 30 minutes late for work, he or she may receive a revision to their schedule.[87]   Revised schedules had been granted by Green to two Caucasian employees: John P. Miller who received an approved revised schedule while being late by 33 minutes,[88]  and Thomas Sponaugle, received an approval for a revised schedule over 30 minutes the exact same day that West's revised-schedule request was denied – February 11, 2002.[89]

### 6. DENIAL OF LEAVE

On February 28, 2002 and twice more in May 2002, Green denied West's vacation leave requests for the July 4th holiday claiming that there existed an LMOU's "workplace compliment" prohibition, which required the garages be staffed by a minimum number of employees.[90]  Yet, the LMOU does not actually prohibit the USPS from allowing two mechanics off at the same time,[91] and the USPS has granted two mechanics – Spencer and Buchanan - leave simultaneously for a motorcycle trip.

### 7. MORE DISCIPLINARY ACTIONS

On July 17, 2002, Green issued a 14-Day suspension to West for failure to maintain a regular work schedule.  Green states that West did not sufficiently document his absences around the July 4th holiday when he visited his mother out of town and experienced car trouble, which

---

[85] Ex. 41.
[86] Ex. 11, West Vol. 2 p.394:9-17. Ex. 42, Cowan Vol. 8 p.2185:12-15. Ex. 38, Green Vol. 8 p. 2350:6-9.
[87] Ex. 38, Green Vol. 10 p. 2948:1-21.
[88] Miller PP 1, YR 2001 (Dec. 19, 2000).
[89] Ex. 43  ¶¶4-12.
[90] Ex. 38, Green Vol. 8 p. 2370-73, 2379-84, Vol. 10 p. 2880-82; Ex. 44.
[91] Ex. 45.

rendered him unable to report to work. Other employees with poor attendance records went without discipline.

On August 22, 2002, Green tasked West to remove and replace or "R&R" a 7.8 diesel engine without the appropriate engine stand. (Compl. Ex. 22). The USPS was aware that this practice was unsafe, since weeks prior, West reported the hazard in writing.[92] In response, the USPS obtained a no-cost transport stand, which holds the engine core in place while it is being transported to its destination, claiming that this stand would abate the hazard.[93] Thus, when Green asked West to R&R the engine with the transport stand on August 22nd, West was unable to perform the function safely.[94] Green called in the Postal Police to remove West from the premises[95] and immediately suspended West under "emergency placement" for his failure to perform an unsafe repair procedure, which Green considered insubordinate.[96] The CBA does not permit suspensions under emergency placement for mere insubordination.

### 8. NON-PROMOTION TO SUPERVISOR

In June, 2003, the USPS again advertised three supervisor positions. Several candidates applied, including West. The Review panel consisted of Timothy Dickerson (chair), Rose Barner and Harvey Banks. The selecting official was Joseph King. After the Review Committee reviewed and evaluated the applications, several candidates were recommended for interview: for Vacancy 14-03 Roland Johnson, John P. Miller, Eugene Morris, and Anthony Shelton were offered interviews; for Vacancy 15-03 Jeffrey Credle, Michael Scott, and Messrs. Johnson, Miller Morris and Shelton were offered interviews, and for Vacancy 23-03 Messrs.Credle,

---

[92] Ex. 46.
[93] Ex. 47at 2.
[94] Ex. 11, West Vol. 2 p. 428-29;Ex. 7,Mansfield Vol. 6 p. 1831-33. Ex. 22, Buchanan Vol. 6 p. 179)18-21-1880:1; Ex. 48, Simmons Vo. 10 p. 2772-76.
[95]Ex. 47 at 3.
[96] Ex. 38, Green Vol. 10 p. 2994-95.

Johnson, Miller, and Shelton and Robert Price were offered interviews.[97]  The Committee rated

the applications of the candidates offered interviews were "S" for superior.[98]  The Committee

rated West's application an "A" for average and did not offer West an interview.[99] King selected,

Anthony Shelton, Michael Scott, and John Preston Miller for Supervisor.

### 9. DENIAL OF OVERTIME

From April through July, 2003, unbeknownst to West, the USPS allowed craft employees

to work before-tour overtime at its Largo II facility.  West signed up for these overtime

opportunities and was senior to some of the individuals who worked overtime.  West was not

offered the opportunities in accordance with the CBA and lost out on substantial pay.

### 10. NON-PROMOTION TO LEVEL 8

On September 3, 2003, the USPS selected Caucasian Stephen Clark for a permanent

position of Lead Automotive Technician, Level 8.  Messrs. West, Roland Johnson and David

Lowe also applied and were deemed qualified.[100]  Cook interviewed all four candidates and

selected Clark for the position.[101]  West posseses qualifications superior to Mr. Clark's.[102]

### 11. DENIAL OF REVISED SCHEDULE

On January 25, 2005, West was again denied a revised schedule, but this time by Mr.

Clark who had been temporarily promoted to Acting Supervisor.  Clark indicates that Cook

informed him to deny West a revised schedule.[103]

---

[97] Ex. 49, Promotion Reports for Vacancies 14-03. 15-03, 23-03.
[98] Ibid.
[99] Ibid.
[100] Ex. 50.
[101] Ibid.
[102] Ex. 51, West 56(f) Affidavit ¶ 11.
[103] Ex. 52, Clark Affidavit.

**12.  ONGOING DENIAL OF SUPERVISORY TRAINING AND TEMPORARY PROMOTION**

West continues to be overlooked for supervisory training and acting supervisor/204B temporary promotions.  As recent as April 2006, West became aware that two Caucasian, junior mechanics with inferior qualifications – David Lowe and John Bowser – have been selected by the USPS to serve as acting supervisors from early 2006 to present.[104]

### III.  APPLICABLE LEGAL STANDARDS

#### A.  SUMMARY JUDGMENT STANDARD

#### 1.  F.R.C.P. 56

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings, depositions, responses to discovery, affidavits, etc., show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  F.R.C.P. 56(c).  The non-moving party is entitled to all reasonable inferences that may be drawn from the facts placed before the court.[105]  Facts in support of a motion for summary judgment must be more than persuasive; they must establish that the other party cannot recover under any "discernible circumstances."[106]  Once the moving party meets its burden, the opposing party must come forward with specific facts, to show that a genuine issue remains for trial.[107]  Moreover, the Supreme Court has held that in ruling on summary judgment motions, a court cannot weigh the evidence or grant summary judgment merely because it believes that the nonmoving party will lose at trial.[108]  The court in *Lutes v. Golden*, noted that if the non-moving

---

[104] Ex. 53, West Affidavit, EEO Case No. 4k-200-0131-06.  This allegation is the subject of West's motion under Rule 15 for amendment of his Complaint.  As of the date of this filing, the Court has not yeter permitted amendment of this claim.

[105] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *see also,* 29 C.F.R. § 1614.109(g).

[106] *Shields v. Grocers Supply Co.,* 568 F. Supp. 61, 63 (S.D. Tex. 1983).

[107] *DeHorney v. Bank of America Nat. Trust & Sav. Assoc.,* 879 F.2d 459 (9th Cir. 1989); *see also Hayes v. Dep't of Health and Human Serv.*, 902 F. Supp. 259, 263 (D.D.C. 1995) (the non-moving party must present evidence that would permit a reasonable jury to find in its favor).

[108] *Anderson*, 477 U.S. at 249.

party supports their allegations or denials through affidavits or other competent evidence that sets forth specific facts to show that a genuine issue for trial exists, summary judgment should not be granted.[109]  In *Reeves v. Sanderson Plumbing Products, Inc.*,[110] the Supreme Court held that evidence from the moving party will be credited only when that evidence is uncontroverted, unimpeached and from uninterested parties.[111]

## 2. CREDIBILITY ISSUES

In certain cases, summary judgment is clearly inappropriate and precluded, such as where there are factual disputes, where the veracity of witnesses is crucial, or where issues of motive or intent are involved.[112]  Also, courts "recognize the difficulty of disposing of issues of discriminatory or retaliatory intent at the summary judgment stage, particularly after a plaintiff establishes a *prima facie* case."[113]

## B. BURDEN OF PROOF IN EMPLOYMENT DISCRIMINATION CASES

### 1. DIRECT EVIDENCE

When there is direct evidence of reprisal for protected EEO activity or discrimination, the traditional Title VII analysis is inapplicable.[114]  "Direct evidence" may be any written or verbal policy or statement made by an employer that on its face demonstrates a bias against a protected group and is linked to the adverse action in question.[115]  A link between the evidence of bias and

---

[109] *See Lutes*, 62 F. Supp.2d at 118.

[110] 530 U.S. 133 (2000).

[111] *Id.* at 151.

[112] *Scwapp v. Town of Avon,* 118 F.3d 106, 110 (2nd Cir. 1997) (court is "particularly cautious" in granting summary judgment when defendant's intent is at issue); *Grier v. Medtronic Inc.,* 99 F.3d 238, 240 (7th Cir. 1996) (applying summary judgment standards with "special scrutiny" where cases turn on issues of intent or credibility); *Hossaini v. Western Missouri Medical Ctr.,* 97 F.3d 1085, 1088 (8th Cir. 1996) (recognizing the difficulty of disposing of intent issues at the summary judgment stage).

[113] *Hossaini,* 97 F.3d at 1086.  *See also Davis v. Fleming Companies, Inc.,* 55 F.3d 1369, 1371 (8th Cir. 1995); *Gill v. Reorganized Sen. Dist. R-6, Fostus, Mo.*, 32 F. 3d 376, 378 (8th Cir. 1994).

[114] *See Carson v. Veterans Admin.*, EEOC No. 01871596 (1988), *citing Trans World Air Lines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

[115] *See* EEOC Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory, N-915.002 (July 14, 1992) (Guidance), Part III. A., 6.

the challenged employment action can be shown if the biased statements were made by the decision maker or the one who was involved in the decision, at or around the time the decision was made, even if the biased remarks were not specifically related to the particular employment decision at issue. Once the plaintiff offers direct evidence of discrimination or retaliation, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have taken the same adverse action absent the retaliatory or discriminatory motive.

## 2. MIXED MOTIVE

In *Desert Palace Inc. v. Costa*, the Supreme Court held that the presentation of direct evidence is not required to prove discrimination in mixed-motive cases under Title VII. 123 S.C.t. 2148 (2003). When there exists evidence of both legitimate and illegitimate motivations for an adverse action, a plaintiff need not refute the employer's legitimate reason or show pretext, but may proceed to a jury to determine whether the plaintiff's protected status was really the motivating factor for the challenged employment action. *Id.*

## 3. CIRCUMSTANTIAL EVIDENCE/BURDEN-SHIFTING

### a. Retaliation – *Prima Facie* Case

Courts have interpreted Title VII to provide "exceptionally broad protection" to those who oppose unlawful employment practices or policies.[116] A violation of Title VII should be found if an employer retaliates against a worker for engaging in protected activity through threats, harassment in or out of the workplace, or any other adverse treatment that is reasonably likely to deter protected activity by that individual or other employees.[117]

To prove retaliation through circumstantial evidence, a plaintiff must demonstrate: (1) s/he engaged in protected activity; (2) s/he suffered an adverse action and (3) they are causally

---

[116] *See Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 n. 18 (5th Cir. 1969)).
[117] EEOC Compliance Manual on Retaliation, No. 915.003, 8-14 – 8-16 (May 20, 1998).

connected. *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). Protected activity consists of two kinds of activities: (1) opposition to an activity made unlawful under Title VII; and (2) participation whether directly or indirectly in a process to redress perceived violations of the Act. Agencies may not retaliate against employees for pursuing a good faith, reasonable charge of discrimination, whether a finding of discrimination is made or not. 42 U.S.C. § 2000e-3(a).

### b. Race/Color Discrimination – *Prima Facie* Case

The analytical framework for disparate treatment cases involving circumstantial evidence of race discrimination has long been established through the *McDonnell Douglas* analysis. To satisfy his or her prima facie burden, a plaintiff must show: (1) s/he is a member of a protected group; (2) s/he suffered an adverse employment action; and (3) that circumstances exist, which give rise to an inference of discrimination. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005; *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004). In a case concerning a discriminatory nonselection, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) he is a member of a protected group, (2) he was qualified for the position and not selected, and (3) someone outside his protected group was selected.[118] Once the plaintiff has demonstrated *a prima facie* case of discrimination, the burden then shifts to the agency to articulate legitimate, nondiscriminatory reason(s) for the plaintiff's nonselection.[119] The D.C. Circuit characterizes the burden on the plaintiff as a "relatively light prima face burden" and "not onerous," indicating that courts should weigh all inferences in the light most favorable to the non-moving party.[120]

### c. Hostile Work Environment – *Prima Facie* Case

Under Title VII, discrimination based on protected characteristics, including race and

---

[118] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).
[119] *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).
[120] *Cones* at 516 (citation omitted).

protected activity,[121] creates an unlawful hostile work environment if the "discriminatory intimidation, ridicule, and insult" is sufficient to affect a "term, condition, or privilege" of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). A plaintiff establishes a prima facie case of hostile work environment by demonstrating that: (1) s/he is a member of a protected class; (2) s/he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Davis v. Coastal Int'l Sec., Inc.,* 275 F.3d 1119, 1122-23 (D.C. Cir. 2000)(citing *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997). Looking at the totality of "all the circumstances" including the severity, frequency, any physicality or humiliation and whether the alleged actions unreasonably interfered with an employee's work performance, a court determines if the environment is sufficiently hostile or abusive to be deemed unlawful. *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998).

### d. Employer's Burden of Production

Once an employee establishes a prima facie case of discrimination or retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the agency satisfies its burden of production, *Burdine* teaches that the burden then shifts back to the plaintiff to prove that proffered reasons are a mere pretext for discrimination.[122]

### e. Pretext and Plaintiff's Ultimate Burden

To meet her ultimate burden, the plaintiff may, depending on how strong it is, rely upon

---

[121] See *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006); *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003).
[122] *Burdine*, 450 U.S. at 255-56.

the same evidence that comprised her prima facie case, without more.[123]  And as with the first

stage of *McDonnel Douglass*, a plaintiff is not required to show that similarly situated employees

outside his group were treated differently.[124]    Rather, per *Reeves v. Sanderson Plumbing*

*Products, Inc.*,[125] the plaintiff' need only establish a *prima facie* case and proffer evidence

concerning the falsity of the defendant's reason(s) for its action to create a jury issue.  In *Aka v.*

*Washington Hosp. Ctr.*, the D.C. Circuit held a plaintiff may defeat a summary judgment motion

and prevail at trial by presenting other evidence that permits an inference of discrimination.[126]

Additionally, this circuit recognizes that "[i]n employment discrimination cases,

summary judgment 'must be viewed with special caution because intentional discrimination . . .

[is] difficult for a plaintiff to establish."[127]  Thus, unless the defendants' proffered

nondiscriminatory reason is "dispositive and forecloses any issue of material fact," summary

judgment is inappropriate.[128]  In other words, summary judgment should only be granted if "no

reasonable juror could find in favor of the non-movant,"  *Carter v. George Washington*

*University*, 387 F.3d 872, 878 (D.C. Cir. 2004).

IV.    LEGAL ARGUMENT[129]

A.  THE USPS RETALIATED AGAINST KEVIN WEST

---

[123] *See Holtz v. Rockefeller & Co.*, 258 F. 3d 62, 79 (*citing Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

[124] *Id.* at 78 ("[J]ust as evidence of disparate treatment is not an essential element of a prima facie case of discrimination, such evidence is also not always necessary at the final state of the *McDonnell Douglas* analysis." (citation omitted)).

[125] 530 U.S. 133 (2000).

[126] 156 F.3d 1284, 1295, n. 11 (D.C. Cir. 1998).

[127] *Lutes v. Goldin*, 62 F. Supp.2d 118, 122 (D.C. Cir. 1999) (*citing Plummer v. Safeway, Inc.*, 1995 WL 1291001 (D.C. Cir. 1995) (citation omitted)).

[128] *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *see also Holtz*, 258 F.3d at 79 (noting that the issue of pretext "is ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment").

[129] In addition to the arguments presented here opposing Defendant's Motion for Summary Judgment, Plaintiff West files an accompanying Motion under Federal Rule of Civil Procedure 56(f) respectfully requesting that the Court deny Defendant's Motion due to West's need to obtain additional facts and evidence supporting his claims that he has not yet discovered.  See attached Appendix.

1. **WEST PRESENTS DIRECT EVIDENCE OF RETALIATION**

The Manager of the VMF, Timothy Currie, admittedly banned West from any promotion within the Agency.  On September 7, 2000, Currie hauled West into his office and explained that he had heard of West's EEO history from his superiors and considered West to be a "problem". Currie asked West to resign and when West refused, Currie vowed to never allow West any upward mobility and specifically referenced lead mechanics details. [130]

Currie's statements constitute direct evidence of reprisal as they directly link West's prior EEO activity and the denial of promotional opportunities.[131]  Currie admits that he decided to not allow West to serve in a lead mechanic or supervisor position.[132]  Yet, he has not admitted to telling West that his protected activity was the basis for this decision.

He further denies having any knowledge of West's EEO history until the September meeting where Currie claims that West informed Currie of his prior EEO complaints.[133] Currie, however, contradicts his own sworn statement on this issue.  In a prior EEO complaint filed by West against the USPS, Currie provided a sworn affidavit stating that "he found out about [West's] EEO activity from his manager."[134]  Currie's statements marrying West's EEO activity and his denial of lead and supervisory opportunities constitute direct evidence of retaliation.  As such, they create triable issues of fact that must be determined by a jury along with any evidence that the Defendant would have made the same decision absent the discriminatory motive.[135] At a minimum, these contradictions raise questions of fact as to: 1) how and when Currie became aware of West's protected activity; 2) what statements Currie made concerning this activity; and

---

[130] Ex. 10, West. Decl. ¶¶ 11-13.
[131] *Carson v. Veteran's Admin.*, EEOC No. 01871596 (1988)
[132] Ex. 2, Currie Depo. at 252-256.
[133] Id.
[134] Ex. 54, Currie Affidavit for Agency Case No. 4K-2000-004-01.
[135] *Higbee v. Billington*, 246 F.Supp.2d 10, 15 (D.D.C. 2003) (direct evidence of discriminatory animus raises a genuine issue of the motive or intent of defendant).

3) the real reason why Currie decided to prevent West's advancement in the Postal Service.

Both preclude summary judgment.

### 2. WEST ESTABLISHES A *PRIMA FACIE* CASE OF RETALIATION

If the Court finds that West has not demonstrated direct evidence of reprisal, West fully

meets his burden under the *McDonnell Douglass* model for circumstantial evidence. First, West

engaged in protected activity by participating in the administrative and civil litigation EEO

processes and by opposing actions which he reasonably believed violated Title VII and other

federal laws.  Prior to Currie's meeting with West in September 2000, West filed eight EEO

complaints against the USPS alleging "discriminatory and retaliatory conduct."[136]  After

September 2000, West filed approximately seven EEO complaints for a series of acts he believed

to violate Title VII.  On September 8, 2000, he filed a written complaint concerning Currie's

meeting with him the day prior.[137]  In April 2001, West initiated EEO counseling regarding

Currie's 204B program and filed suit in federal district court regarding Currie's threats.[138] On or

around May 22, 2001, West registered an EEO complaint regarding Buchanan and Miller's

selection for 204B details.[139]  On August 29, 2001, West filed a formal complaint of

discrimination,[140] and on February 6, 2002, West filed a complaint regarding denial of leave.[141]

West also filed a complaint of discrimination regarding a 14-day suspension in August 2002.[142]

Additionally, West has consistently opposed practices at his workplace that reeked of disparate

treatment and reprisal.  West expressly challenged management's unlawful conduct by writing

---

[136] Ex. 10, West Decl. ¶ 3.
[137] Ex. 11, West Vol. 2 p.252:0-13. Compl. Ex. 4, Compl. 4K-200-0145-01.
[138] Ex. 28.
[139] Ex. 11, West Vol. 2 p. 300:3-16.
[140] Ex.55.
[141] Ex. 56 at 5.
[142] Ex. 11, West Vol. 2 pp. 416-18.

several letters of complaint to the Postmaster and Congressman,[143]  and by noting his opposition directly on the corrective action and letters USPS management issued him.

Second, the responsible management officials in this case were fully aware of West's protected activity before taking the employment actions challenged here.  Prior to Currie's meeting with West on September 7, 2000, Currie became aware of West's history of EEO activity "from [his] manager."[144]  Joseph King states that he is "aware that West was active in filing grievances and has previously filed EEO," and claims West's EEO activity is "partially common knowledge among many people."[145]  And Diane Hatfield admits to having knowledge of West's history, also.[146]  David Cook testified that he was aware of West's EEO activity in 1999 and had personally responded to investigatory inquiries regarding allegations of discrimination concerning him.  Cook further testified to maintaining a "special file" of documents relating to West's EEO filings.[147] Frank Green stated that he became aware of West's EEO history around the year 2000 or before, and had spoken to other employees and West about this history.[148]  Thus, all of the discriminating officials had knowledge of West's protected activity.[149]  Having satisfied the first two elements of retaliation, West sets forth below the adverse actions he suffered and their causal link to his protected activity.

## B.  *PRIMA FACIE* CASE OF RACE/COLOR DISCRIMINATION

West is an African American of a brown color[150] who suffered a panoply of adverse treatment, which for ease of analysis, Plaintiff has categorized as follows: 1) ongoing denial of

---

[143] Ex. 2, Currie Depo. Ex.3.
[144] Ex. 54, Currie Affidavit.
[145] Ex. 57, King Depo. at 152-53.
[146] Ex. 24, Hatfield Depo. at 23-24.
[147] Ex. 4, Cook Vol. 3 pp.798:4-801:3.
[148] Ex. 38, Green Vol. 8 p.2269:20-21, p.2270:1-18, p. 2416: 17-21, p. 2417:1-9.
[149] Ex. 11, West Vol.2 p. 222:8-10, 11-14, 223:7-18, 247:12-17; Ex. 4, Cook, Vol. 3 pp. 798:8-15, 799:2-21, 800:7-16.
[150] Ex. 10, West Decl. ¶ 2.

temporary and permanent supervisory promotions and training; 2) harassment/hostile work

environment; 3) denial of temporary and permanent higher-level craft promotions and work; 4)

denial of overtime, and 5) several disciplinary actions.

Compelling evidence of racial animus creates an inference of discrimination. The two

key decisionmakers in this case – Currie and Cook – harbor a bias against African-Americans.

Currie has made numerous derogatory remarks to African-Americans that express a pronounced

animus toward them. Reginald Trice, for instance, was a Garageman at the Bedford Park VMF

who Currie directly managed. Mr. Trice averred in his pre-complaint counseling statement that,

in a meeting on March 17, 1999, between the union and Postal management about Currie

disallowing Mr. Trice to work or enter the building, Currie said to Trice "in a very threatening

way, that he was not go[ing] to stand for any of [his] shit, and that [he] will throw [his] black ass

out."[151]  In another EEO case involving Currie, Currie told an African-American tire repairman,

Edward Clark that he was going to change his start time "because [he] was lazy, stupid, and that

[he] stink[s]."  And in yet another EEO case regarding Currie's actions, Gwendolyn Simms-

Hearn, a General Clerk attests to the fact that on February 14, 2000, Currie harassed and yelled at

her about eating lunch in the conference room. When she asked him "if it was because she was

black", he responded that he "[doesn't] have to like Black people, just work with them," and he

"[didn't] know why *you people* are so hard-headed."[152]  And Currie is not alone. Cook has also

referred to West and another African-American employee as "worthless."[153]  Currie's beliefs are

unmistakably bigoted, and Cook's statements embody a racial stereotype of Black incompetence

and intellectual inferiority. More than just evil thoughts, both managers acted upon their biases

in their actions against West. Plaintiff will show that the USPS either has no legitimate non-

---

[151] Ex. 23.
[152] Ex. 15, Declaration of Ms. Gwendolyn Simms-Hearn
[153] Ex. 58, Childs Depo. at 80.

discriminatory reason for these actions and/or presents persuasive evidence that the reasons offered by the Defendant are pretext for discrimination/retaliation.

## C.  ADVERSE TREATMENT, CAUSAL LINKS AND INFERENCES OF DISCRIMINATION

### 1.  CONTINUAL DENIAL OF ACTING 204B SUPERVISOR DETAILS AND SUPERVISORY TRAINING

Over several years, the USPS has consistently denied West supervisory details and training.  West, however, is sufficiently qualified for these supervisory opportunities.  Mr.  West successfully serves as a Level 7 Automotive Mechanic with over 16 years of experience.[154]  In fact, Cook and Joseph King confessed that West is a "good mechanic."[155]  West's former supervisor, Gregory Absher attests to the fact that West is a good mechanic with a "fine" performance record.[156]  And Supervisor Green has told other Largo I employees that West is one of the two "best qualified" mechanics working at the Southern Maryland VMF.[157]  Nonetheless, at various times between the years 2001 and as recently as April 2006, 204B temporary promotions have become available in Southern Maryland.  Postal Service attendance records demonstrate that several individuals who were not admitted into Currie's program were provided 204B details.[158]  Among these individuals were Thomas Buchanan and John Bowser who are both junior to West and Caucasian.  Thomas Buchanan served as an Acting 204B supervisor at Largo I from May 18-25, 2001.[159] USPS refused to select West for any of these details.[160]

#### a.  The USPS' Rationale for Denying West Supervisor Opportunities is Pretext.

The USPS claims that West did not receive supervisory training or 204B temporary

---

[154] Ex. 51, West 56(f) Affidavit ¶ 1.
[155] Ex. 57, King Depo. at 152.
[156] Ex. 59, Absher Depo. at 94.
[157] Ex. 58, Childs Depo. at 108-109.
[158] The dates and duration of VMF temporary promotions are varied and extensive and where possible, have been summarized by both parties. Ex. 21.
[159] Ex. 60.
[160] Plaintiff West moves under Federal Rule of Civil Procedure for an order directing the USPS to produce information and records pertaining to all 204B acting supervisor to uncover facts supporting his claims.

promotions because he did not apply to Currie's 204B Supervisor Training Program.[161] The

USPS contends that because West did not apply to the Program, he was not rejected and

therefore cannot to establish an adverse action for purposes of putting forth a *prima facie* case.[162]

Defendant misapprehends West's claims.  West is not claiming that he was denied admittance to

Currie's special program nor is he claiming that he was denied training or jobs under the

program.  Rather, West is claiming that he has continually been denied supervisory training and

details that existed before, during and after, Currie's short-term project.  By all accounts,

Currie's Program existed from March 2001 to December 2002 – only 21 months.[163]  And during

that time, before that time, and since, supervisory training and temporary promotions have been

afforded vehicle maintenance employees who were not selected for Currie's program.

It is uncontroverted that only six individuals were admitted to and received details and

training through the Training Program.  Indeed, all USPS management officials in this matter –

Currie, Cook, King, Hatfield, and Green – indicate that the following craft employees were

admitted to the Program:  Stamotos Karoutsous, Frank Green, Michael Scott, Pamela Alston,

Robert Smith, and Eugene Morris.[164]  As discussed below, several craft mechanics who were

never admitted to the Program or who never even applied to the Program served as Acting 204B

Supervisors.  The USPS attempts to utilize the Training Program as a smokescreen to disguise its

retaliatory and discriminatory denial of supervisory details to West.  It does not succeed.

Interestingly, USPS management has given inconsistent reasons for his denial of 204B

opportunities.  Currie claims that West's alleged mistreatment of employees while serving as

---

[161] Defendant's Motion for Summary Judgment (hereinafter "MSJ") at 15-19.
[162] MSJ at 18.
[163] Ex. 2, Currie Depo. at 118-119.
[164] Ibid at 109-118; Cook Depo. at 137-38; King Depo. at 137; Green Depo. at 12-13, 75-76, 79.

lead mechanic on one occasion in 1999 and another occasion in 2000, led Currie to ban West from higher level opportunities.[165]

For his part, Cook gave not one, but two entirely different reasons for denying West supervisory training and details.  At first, Cook untruthfully stated that "West had never made a request for [a 204B] opportunity," when West wrote him a letter in May 1999 asking to be considered for these opportunities.[166]  Later, Cook claimed that West was not selected for a 204B detail because he did not participate in Currie's program.   This excuse inconsistent with Currie's explanation and his own.

Shifting, after-the-fact and/or inherently incredible reasons offered to justify a promotion decision support an inference of discriminatory or retaliatory animus.[167] Following *Reeves,* at least one court has held that when an employer provides inconsistent reasons for an adverse action there is a disputed issue of material fact that a jury must resolve.[168] Ultimately, the proffer of differing and inconsistent explanations is reason enough to set the case for trial.

### b.    Supervisor Opportunities: Retaliation - Causal Link

Currie's own statements provide a direct causal link between West's protected activity and his denial of upward mobility.  Currie's request for West to resign because he is a "problem"

---

[165] If Currie had truly believed that West needed to develop his employee-relation skills, surely he would have enrolled West in Postal Service training to correct this alleged deficiency.  In truth, Currie's prohibition against West's had nothing to do with his interpersonal skills but had everything to do with his race and EEO history. Ex. 17, Currie Vol. 9: pp. 2487:1-21, 2488:2-9, 2603:3-21, 2604:1

[166] Ex. 61, Chg. 108 ROI Cook Aff. C; Ex. 62(Compl. Ex. 3).

[167] *See, e.g., Barbour v. Merrill*, 48 F.3d 1270, 1276 (D.C. Cir. 1995)(finding that a jury may infer pretext from discrediting the proffered reasons for an employment decision); *Kolstad v. American Dental Assoc.,* 108 F.3d 1431, 1436 (D.C. Cir. 1997), *vacated and remanded on other grounds,* 527 U.S. 526 (1999) (explanation in court differed from the explanation employer gave plaintiff at time of adverse action); *EEOC v. L.B. Foster*, 123 F. 3d 746, 753 (3d Cir. 1997), *cert denied*, 522 U.S. 1147 (1998) (official who had refused to give a reference for an employee later claimed he was told to refer such requests to another person); *Williams v. Nashville Network*, 132 F.3d 1123, 1132 (6th Cir. 1997) (reversing denial of defendant's motion for judgment because the decision-maker proffered three different reasons for failure to hire plaintiff); *Dennis v. Columbia Colleton Medical Ctr., Inc.,* 290 F.3d 639, 647 (4th Cir. 2002) (upholding a jury finding of pretext based on record evidence establishing that the employer relied on inconsistent post-hoc explanations to justify its employment decision and conducted the promotion selection process in an unequal manner).

[168] *Dennis*, 290 F.3d at 646; *EEOC v. Sears Roebuck,* 243 F.3d 846, 852-53 (4th Cir. 2001).

and Currie's threat to West that he will "never" act in a lead or supervisory capacity[169] establishes the connection between West's prior EEO activity and 204B supervisor details. In a letter to USPS Labor Relations, Currie referred to West as the "boy who cried wolf" and specifically mentions West's statutorily-protected participation in the EEO process.[170]

Cook also made retaliatory statements regarding West's EEO history. Cook claims that West "keeps things stirred up all the time" and Green admits that he and Cook were displeased over West's EEO complaints because they had to "work late" to research documents to "respond" to West's filings.[171] Even more, two Largo I employees attest to the fact that Cook often refers to West as a "troublemaker"[172] and has called him an "asshole."[173] And yet another employee, recalls Cook becoming "frustrated" with West.[174] A jury may consider Cook's routine reference to West as a "troublemaker" as powerful evidence of retaliation.

Additional circumstantial evidence demonstrate that his nonselections for supervisory opportunities were in reprisal for his protected activity. First, the ongoing denials occurred simultaneously with West's ongoing EEO activities and thus are temporally related.[175] Second, Currie and Cook selected individuals for temporary promotion – John P. Miller and Thomas Buchanan – who have no EEO history.

### c. Supervisor Opportunities: Race Discrimination

1) Mechanics

The USPS selected three Caucasian mechanics junior to West for supervisory opportunities. None of the three mechanics were chosen for Currie's program. Thomas

---

[169] Ex. 10, West Decl. ¶ 11.
[170] Ex. 63.
[171] Ex. 26, Green Depo. at 80-83.
[172] Ex. 58, Childs Depo. at 40-42; Ex. 64, Declaration of Chris Simmons ¶ 7.
[173] Ex. 58,Childs Depo. at 69, 120.
[174] Ex. 65, Miller Depo. at 124.
[175] Ex. 66, West's EEO History Report

Buchanan is Caucasian and junior to West, yet he received classroom supervisor training on February 21, 2001 and a week-long supervisor detail in May 2001.[176]  John Bowser who is also a junior to West was selected for a few supervisory details, (see Compl. Ex. 6), over several senior African American mechanics, Chris Simmons, James Thompson and Kevin West.[177] Bowser has also received management training as recent as February 29, 2006 that was not afforded West. Cook has consistently bypassed three senior African-American mechanics – Kevin West, Roland Johnson and Chris Simmons – who all have EEO activity, in favor of junior, less qualified mechanics Bowser and David Lowe.  With this disparate treatment evidence, a reasonable juror could conclude that the 204B decisions were motivated by unlawful discrimination and reprisal.

Currie selected John P. Miller, a junior Caucasian, Largo I employee for a two-year Acting Supervisor detail at T Street and provided him significant supervisor training.[178]  West will show below that he was qualified to serve as Acting Supervisor, expressed a desire for supervisor training, and is senior to all three of these selectees; thus, should have been selected for these 204B opportunities.[179]

### 2)  John P. Miller, III

John P. Miller, III, was a Caucasian Body and Fender Repairman, Level 7 at Largo I VMF.  Miller was similarly situated to West as he was a Tour 2 craft employee at Largo I directly supervised by Cook and governed by the same USPS rules of procedure and the APWU collective bargaining agreement ("CBA").[180]  Both West and Miller perform auto repair work

---

[176] Currie testified that Buchanan was not among the six employees selected for the program.  Ex. 17, Currie Vol. 9 p. 2526:11-21, p.2527:1-21; p.2528:1, 12-16; p.2529:14-19; yet, Cook's rationale for selecting Buchanan was that he was in Currie's program.  Ex. 4, Cook Vol. 7:1928:8-1930:8.  USPS managers directly contradicting one another is fatal to the Agency's defense to this claim.

[177] Ex. 48, Simmons Vol. 10, pp. 2793-94, Ex. 8, Thompson Vol. 8, pp. 2232-33.

[178]  Ex. 19, Miller Vol. 6 p. 1657:16-21, 1658:1-5, 1659:6-17, 1660:20-21, 1661:1-12, 1662:1-10, 1663:1-7

[179] Ex. 4, Cook Vol. 7 pp. 1917:14-21, 1918:1-4, 1932:8-19, 1934:13-21, 1935:1, Ex. 38, Green Vol. 8 p. 2232:5-15, Vol. 10 p. 2794:5-18.

[180] Ex. 5, Cook Depo. at 19.

and have been employed by the USPS for over 10 years. Currie advanced Miller to Acting 204B

Supervisor at the T Street facility from May 2001 to June 2003 – over two years.[181]  Although

the USPS contends that Miller was given this lengthy promotion due to his unique experience as

a bodyman for a special assignment at the T Street location; yet, its contention does not mask the

preferential treatment afforded to a problematic White employee.

Miller was not qualified to serve as an Acting 204B Supervisor because he did not fulfill

the requirements of his craft position.  First, Miller did not maintain a regular work schedule, but

garnered a deplorable attendance record.  While working at Largo I, Miller chronically reported

late to work, often exhausted his sick and annual leave, and frequently took unpaid leave due to

his exhaustion of leave.[182]  Indeed, Miller admits that he had a "very poor sick leave record."[183]

More importantly, Currie and Cook admit to having knowledge of Miller's poor attendance

record.[184]  Yet, Currie professes that he "[doesn't] promote people who don't come to work on a

regular basis."[185]  Despite this self-pronounced prerequisite, Currie interestingly filled a long-

term 204B supervisor job with Miller – an employee with a demonstrated history of failing to

report to work.  These contradictions call into question the real motive behind Miller's selection

for the 204B Supervisor job – a motive West contends is racially biased.

Second, at the time Currie selected Miller for the temporary promotion, Miller did not

possess a valid driver's license as required by the APWU CBA.[186]  The State of Maryland

revoked Miller's license because of one or more of his DWI offenses.[187]  In fact, as of December

---

[181]Ex. 2, Currie Depo. at 131; Ex. 65, Miller Depo. at 17-18.
[182] Ex. 67, Miller's 3972s.
[183] Ex. 65, Miller Depo. at 17.
[184] Ex. 2, Currie Depo. at 61-62.
[185] Ex. 2, Currie Depo. at 61-62.
[186] Ex. 5, Cook Depo., Ex. 10.
[187] Ex. 65, Miller Depo. at 42-45.

16, 2003, Miller still did not have a valid driving permit.[188]  The APWU-USPS collective

bargaining agreement, an interpretive memo, and other USPS requirements prove that a driver's

license is a minimum qualification of a body and fender repairman.[189] As a practical matter,

Mechanics and Body and Fender Repairmen must test drive vehicles they service, and body and

fender repairmen transport vehicles between locations both on and off postal property.[190] Cook

discovered that Miller did not possess a valid driving permit during one of his 90-day inspections

in the year 2000.[191]

    In addition, the Supervisor position that Currie detailed Miller into also requires the

incumbent to have driving privileges because VMF Supervisors must monitor the driving of their

subordinate employees for safety purposes, and perform other driving-related tasks as necessary.

[192]   King considers a driver's license so central to supervisory duties that he likened it to "being

able to see."[193]  In reality, the revocation of Miller's driver's license has, on at least one

occasion, rendered him unable to perform essential functions of the supervisor position.  When

the USPS needed Miller to transport rental vehicles back to the rental agency in October 2001 –

a situation Currie and Cook described as an "emergency" – Miller could not perform the task

because he was unable to drive.[194]

    Third, on his 204B detail at T Street, Miller did not just address the deficient paint booth

or supervise body and fender repairmen, but he also received supervisory training, and

supervised mechanics as well. During Miller's deposition, he testified that he received classroom

---

[188] Ex. 65, Miller Depo. at 47.
[189] Ex.68, USPS/APWU Memorandum.
[190] Ex. 5, Cook Depo. at 18.
[191] Ex. 5, Cook Depo. at 30.
[192] Ex. 57, King Depo. at 249-50.
[193] Ex. 57, King Depo. at 172.
[194] Ex. 5, Cook Depo. at 72-73.

instruction in a variety of areas – all of which Currie arranged.[195]  Miller and Currie also testified

that initially, his supervisory responsibilities were confined to overseeing paint shop employees –

body and fender repairmen, but that Currie subsequently placed him in charge of the whole

garage where he exercised supervision over Automotive Mechanics, also.[196]  Miller's testimony,

therefore, directly contradicts Currie's asserted rationale that Miller supposedly filled a particular

need in the body paint shop.

More, Miller lacks the qualifications and experience to supervise mechanics.  Miller's

work experience consists of body repair.  As King acknowledged, Miller lacks the technical

skills and know-how to perform mechanical repairs.[197]  Yet, Acting 204B Supervisors must

"make sure [their employees'] work is done correctly."[198]  Lacking mechanical knowledge and

skills, Miller could not have ensured subordinates made mechanical repairs properly.  Hence,

Miller was not the "best qualified" craft employee to assume the role of Acting 204B Supervisor

at the T Street garage.  As shown below, West is a far better qualified candidate.

### d.  The USPS Denied West Permanent Promotion to Supervisor

In 2002, the USPS announced two permanent Supervisor positions in the Capital District,

vacancy numbers 31-02 and 33-02.[199]  Again in 2003, the Postal Service filled three Supervisor

positions, under vacancy numbers 14-03, 15-03, and 23-03.  The requirements for all Supervisor

positions are identical:

1.  Knowledge of automotive diagnosis, repair and maintenance, including the use of
    specialized testing equipment.

2.  Knowledge of policies and procedures related to automotive maintenance and repair,
    including preventive maintenance.

---

[195] Ex. 65, Miller Depo. at 106.
[196] Ex. 65, Miller Depo. at 8-9; Ex. 2, Currie Depo. at 132-34.
[197] Ex. 57, King Depo. at 209.
[198] Ex. 5, Cook Depo. at 103-04.
[199] Ex. 23, Chg. 108/Ex. 60 & 70.

3. Knowledge of policies and procedures related to automotive maintenance shop safety, driver safety, and accident investigations.

4. Ability to evaluate the quality of maintenance and repair work.

5. Ability to prepare cost estimates and recommendations for major repair work.

6. Ability to prepare and maintain reports and records.

7. Ability to manage the work of people to meet organizational goals, including organizing, coordinating, monitoring, and evaluating the work; establishing effective work relationships; and facilitating the flow of work-related information.

8. Ability to communicate orally and in writing in order to maintain contact with parts and fuel suppliers, to coordinate activities with other supervisors, to provide advice and instruction on vehicle maintenance matters.

West was neither selected nor interviewed.

### 1)  West Is Fully Qualified for Supervisor Promotion

As his application displays, West is well qualified for the position.[200]   For the first

requirement, West has mastered automotive diagnosis, repair and maintenance through hands-on

vehicle diagnostic and repair experience for over 25 years.  He is proficient in the use of standard

and metric tools and specialized equipment as well as practiced in the use of standardized

manuals.  He has been formally trained in the diagnosis, repair and maintenance of Postal

Service vehicles – from domestic cars and vans to Freightliner and Mack tractors.  Through his

experience and training he has learned and utilized Postal Service policies and procedures for

automotive maintenance and repair.  In his application, West outlines the procedures for vehicle

repair, and preventative or "scheduled" maintenance at the VMF.   He gained first-hand

experience with overseeing these procedures while serving in higher-level lead mechanic details.

Thus he satisfies the second requirement. Regarding the third requirement, West is well-versed

in all USPS safety and accident-related policies and procedures.  He is aware of and consistently

follows federal and local safety laws, and Postal and OSHA guidelines for safe vehicle repair.

---

[200] Ex. 69, West Supervisor application.

West has put these policies into action carrying out his day-to-day duties and identifying and reporting hazardous conditions. The USPS has issued West safety awards for his vigilant observance of safety requirements. For the fourth requirement, West has first-hand experience assessing the quality of maintenance and repair work of other mechanics. West also customarily reviews vehicle history reports and information to determine if repetitive problems and/or poor maintenance practices have contributed to the vehicle malfunction. With regard to the fifth requirement concerning the ability to prepare cost estimates and recommend major repair work, West performed these responsibilities well for the Postal Service as well as for the U.S. Armed Forces. For the USPS, West has diagnosed and repaired major repair work that had been authorized by Postal management. West joined the USPS with experience he gained in the U.S. Army and Naval Surface Warfare Center procuring and ordering major repairs of equipment used in the field. West meets the sixth requirement, since he is intimately familiar with USPS maintenance forms and possesses years of experience preparing and maintaining reports and records. West also meets the seventh requirement in that he routinely coordinates the repair of vehicles with other mechanics and parts and tools personnel. Through "mutual respect for [one's] abilities" West maintains productive work relationships with his co-workers. Finally, West satisfies the eighth requirement because he has multiple years experience effectively communicating, often in writing, with other mechanics to provide advice for the repair and maintenance of Postal vehicles. West also effectively communicates with Postal management officials regarding vehicle repair activities and needs.

> 2) Selecting Officials Prevented West From Successfully Competing for the Supervisor Positions By Persistently Blocking Higher-Level and Supervisory Detail Opportunities and Training.

35

Currie and Cook's obstruction of West's temporary, promotional opportunities hindered him from equally competing for the Supervisor positions. As a result, West vied for the Supervisor jobs alongside Caucasian mechanics who had been freely granted higher-level opportunities, while he was denied equal opportunity to display his abilities and garner relevant experience. USPS management likewise limited West's supervisory training because of his race and EEO activity, while liberally providing training to his White contemporaries.[201] As a consequence, West's counterparts, who had no prior protected activity or were not African Americans, carried with them ample supervisor training, which strengthened their bids for promotion. Indeed one, John P. Miller was unqualified but "rehabilitated" through a special supervisory detail hand-crafted by Currie.

When asked to explain why West was not even interviewed for the two Supervisor jobs in 2002, Review Committee members, Hatfield and King pointed to West's lack of supervisory experience as an Acting 204b supervisor and supervisory training as the reason for its rating.[202] By their own admission, if West had received higher-level details and training similar to the details and training Caucasian mechanics received, he would have been rated "Superior", interviewed for the supervisor positions and possibly, selected. It is completely unjust for an employer to unlawfully deprive a minority candidate of experience and training and then use that

---

[201] 204B details and supervisor training were not the only advantages afforded candidates outside West's protected group. Currie admittedly gave a copy of his 991 application to candidate Gene Morris (White) so that he may better contend for the Supervisor jobs. Currie Depo. at 295-296. Dianne Hatfield went even further by helping to prepare several candidates' 991 applications. Hatfield informed selectee Green, for example, that "[Miller's] 991 was terrible and she threw it away and did his 991." Green Depo. II at 77-78. Both Miller and Hatfield admitted that she helped Miller prepare his application. Miller Depo. at 103-105; Hatfield Depo. at 75-78. This scheme essentially rigged the selection process in favor of these applicants, to West's disadvantage, and fatally damaged the entire process. Where as here a promotion process is so irretrievably harmed, nonselected candidates, like West, should be given another opportunity to fairly compete or granted the position they sought. To do otherwise would tacitly approve of this kind of favoritism.

[202] Ex. 24, Hatfield Depo. at 124-129; Ex. 57, King Depo. at 214-218.

lack of experience and training to deem him unqualified for promotion.  This essentially amounts
to a shell-game that acts as a glass ceiling blocking West's advancement – just as Currie decreed.

Congress passed Title VII decades ago to remove the shackles restricting Black
Americans from inclusion and advancement in the American workplace.  It's purpose centered
around employer practices as well as their effects, which limit the employment opportunities of
minority workers.  VMF management's Jim Crow tactics to block his advancement are precisely
what Congress designed Title VII to end.

### 2. ALONG WITH DENYING WEST SUPERVISORY OPPORTUNITIES, THE USPS DENIED WEST HIGHER-LEVEL CRAFT TEMPORARY AND PERMANENT PROMOTIONS

#### a. Higher-Level Craft Details

Mr. Currie vowed to disallow West not only from supervisory opportunities but also
higher-level craft or "acting Lead Mechanic" jobs.[203]  Lead Automotive Technician details
involve the incumbent acting as "lead" mechanic over other shop mechanics.  Although West has
been seeking this type of higher level detail for over eight years, Cook intentionally overlooks
West when many of these opportunities arise, at Currie's instruction.

Cook selected three Caucasian mechanics who were junior to West for long-term higher-
level craft details: Thomas Buchanan, David Lowe and David Wood.[204]   And given that the
Caucasian selectees had no history of EEO activity, their selections establish pretext for race
discrimination and reprisal.  More, Cook detailed mechanics at Largo II, Tour 2 to higher level
craft positions.  Cook selected James Washington as Level 8 mechanic from November 2001 to
present, David Wood (White) as Level 8 from November 2001 to present, and David Lowe
(White) to a Level 8 from November 2001 to present.[205]  The USPS fails to offer a legitimate,

---

[203] Ex. 10, West Decl. ¶ 11.
[204] Ex. 21.
[205] Ex. 70, Summary of Clockrings

nondiscriminatory reason for the selections of two junior, White mechanics (Wood and Lowe) over West.  With West's *prima facie* case unrebutted, he consequently, establishes a Title VII violation for race discrimination.

### b.  Level 8 Duties

Cook also assigned Level 8 duties to several employees working at the Largo I garage who worked on Tour 3: George Spencer, Lawrence Hobson and Thomas Buchanan.[206]  The assignment of Level 8 duties to craft employees requires the Postal Service to pay these employees a pay rate of a Level 8 mechanic.  West was not afforded Level 8 duties or Level 8 pay and believes that Cook failed to select him for Level 8 work for discriminatory and retaliatory purposes.  In its Motion , the USPS claims that Cook did not assign West Level 8 work because he was on Tour 2.  MSJ at 25.  This argument fails on two grounds.

First, there is absolutely nothing unique or special about Tour 3 at Largo I.  Mechanics on Tour 3 simply work a different time schedule than other mechanics on Tour 2.  In fact, Green called Tour 3 the "make up" shift.[207]  Thus, the implication that some special circumstance exists on Tour 3 that justify Cook choosing Tour 3 mechanics for the details lacks any factual basis. Cook commonly detailed craft employees to higher-level positions away from their normal bid assignment:  Frank Green detailed from Largo I Tour 3, Largo I to Tour 2, Largo I, Riverdale and Largo II,[208] Warren Plater, detailed from Largo I, Tour 2 to Largo 1, Tour 2, Napoleon Woodhouse detailed from Largo I Tour 3 to Riverdale Tour 2 (twice), John Bowser detailed from Largo I to Riverdale, Thomas Buchanan detailed from Largo I, Tour 3 to T Street, James Thompson detailed from Largo I, Tour 3 to Largo I, Tour 2.[209]  Cook admits to the existence of

---

[206] Ex. 5, Cook Depo. at 88-94.
[207] Ex. 26, Green Depo. at 96.
[208] Ex. 11, West Vol. 3 pp.776-78.
[209]  Ex. 21; Ex. 11, West Vol. 3 pp.776-78.

this practice.[210]  Thus, the Postal Service should have employed the same practice by detailing West to Largo II or Tour 3, if necessary.

Second, Cook was free to assign Level 8 duties to any qualified mechanic in Southern Maryland.  The Level 8 duties at issue encompass analyzing vehicle mechanical problems and "writing up" the repairs that must be performed by subordinate mechanics.[211]  These diagnostic and reporting functions can be done by any qualified mechanic working at Largo I.  Put simply, Cook could have chosen any willing, qualified mechanic, like West, to perform Level 8 tasks; yet, he overlooked West and afforded the opportunities to workers he hand-picked for the jobs.

### c.  Denial of Permanent Level 8 Position, Vacancy 03-43

On July 24, 2003, the USPS advertised a Lead Automotve Technician, Level 8 vacancy.  Four employees applied: Kevin West, Automotive Technician Level 7, Stephen Clark, Automotive Technician Level 7, David Lowe, Automotive Mechanic Level 6 and Roland Johnson, Vehicle Operations Maintenance Assistant.  The selecting official, David Cook reviewed candidate applications, found them all best qualified and interviewed all four candidates.[212]  Cook selected Stephen Clark for the position claiming that Clark "interviewed better" than West.[213]  Because no Level 8's applied for the position, the selecting official was required to award the job to the "best qualified" candidate.[214]

Mr. Clark is a Caucasian mechanic with no prior EEO history.  West, however, possesses qualification superior than that of Mr. Clark.  A significant and critical difference between the qualifications of these two mechanics is West's training and experience servicing tractors and

---

[210] Ex. 4, Cook. Vol. 4 p. 1034.
[211] Ex. 26, Green Depo. at 63-64.
[212] Ex. 71, Cook Affidavit for Agency Case NO. 4k-200-0235-03.
[213] Ibid.
[214] Ex. 72, Lead Automotive Technician, Level 8 Job Posting

trailers.[215]  West is a mechanic certified by the USPS Oklahoma Training Center to repair

tractors and trailers.  Mr. Clark posses no work experience or training of any kind on these large,

specialized vehicles.  Additionally, West is fully trained in repairing air brake systems from 5-

ton vehicles to Tractor Trailers.  Mr. Clark does not posses this experience or training.  With

West's superior qualifications, Cook should have selected him for the Level 8 promotion.  Given

West's high qualifications, Currie's mandate, and the totality of other circumstances involving

Cook's disparate treatment of West, a reasonable juror may conclude that Cook's rejection of

West was unlawfully motivated; thus, this claim should not be dismissed.

### 3.  HARASSMENT/HOSTILE WORK ENVIRONMENT

On June 17, 2001, the USPS scheduled West for overtime work at its Riverdale facility

but he was unable to report and requested dependant care sick leave for his daughter, who was

one year old at the time, who had a fever and required his care.[216]  Cook then embarked on a

campaign to harass West until he supplied medical documentation for his dependant-care

absence.  Although denied by the USPS, on June 18, 2001, Cook initiated a heated argument

with West wherein Cook clasped West's shoulders ordering him to acknowledge Cook's

instructions to document his daughter's illness.  West reports that Cook stalked him around the

garage ordering him to acknowledge his request for documentation.   Similarly, a couple of the

witnesses attest to seeing Cook follow West into the garage while West called for Cook to stop

"stalking" him.[217]   The USPS disagrees with West's testimony regarding the events of June 18th

and it remains a question of fact.

---

[215] Ex. 51, West 56f Affidavit ¶ 11,
[216] Ex. 10 West Decl. ¶ 26.
[217] Ibid. ¶¶ 27-28.

Cook admits to having denied West his timecard and ability to work from June 19-21, 2002.  On June 25th – although not admitted by Cook – Cook called West into his office and told West that he was suspended from work until he acknowledges what Cook told him about supplying documentation for June 17th.  West then asked for copies of his June leave slips and Cook refused to give them to him.  Cook then called the postal police who took West's USPS badge and escorted him off postal property.

In addition, Cook's curiously passionate activities lacked common sense and conformity to established postal procedures.  Cook rationalizes locking West out of the jobsite by claiming that West allegedly "failed to acknowledge his instructions" to produce documentation to support his June 17 absence.  Yet, in reality, West had no way of demonstrating that his one-year old child had a fever, which did not necessitate a visit to the pediatrician, through medical documentation.  When asked what kind of documentation could have been submitted under West's circumstances, Acting Supervisor Green responded, "how could he?"[218]  A manager going to such great lengths to demand documentation that does not exist belies common sense.

Further, if Cook wished to immediately suspend West, he should have followed postal procedures for emergency placement.  Article XVI of the APWU CBA dictates how this suspension must be undertaken.  Cook, however, tossed aside those procedures.  Instead, he forced West off the premises with the aid of the police.  Currie concedes that Cook did not properly follow Postal procedures when engaging in this stand-off with West.[219]  In employment discrimination cases, the factfinder may consider as part of its pretext analysis, failure to adhere

---

[218] Ex. 26, Green Depo. I at 38.
[219] Ex. 2, Currie Depo. at 199-200.

to workplace procedures. An agency's failure to abide by its own stated policies provides relevant evidence of discriminatory intent.[220]

This harassment was racially motivated. Cook has not treated any other VMF employee, including Caucasian employees, in this reprehensible manner.[221] Cook's tactics directly parallel discriminatory mistreatment undertaken by Currie against other African-American VMF employees. Like Cook, Currie prevented Melvin Barksdale and Melvin James from working and kicked them off the premises – in two separate incidents in March 1-3, 2000, and March 4, 1999, respectively – for failing to submit adequate medical documentation for health-related absences.[222] Mr. James further contends that Currie assaulted him during a hallway altercation over medical documentation.[223] The striking similarities between the treatment of these two African-American employees and West are not coincidence. Currie instructed Cook "not to let [West] clock in, send him home."[224] This definitively shows that responsible management officials Currie and Cook terrorize minority employees through intimidation and bullying.

#### 4. RESPONSIBLE MANAGEMENT OFFICIALS DISCIPLINED WEST IMPROPERLY AND EXCESSIVELY DUE TO HIS RACE AND PRIOR EEO ACTIVITY

From September 2000 through the end of 2002, USPS disciplined West on six occasions. The disciplinary actions evince a racial bias and reprisal for EEO activity.

---

[220] *Kolstad*, 108 F.3d at 1436, *vacated on other grounds,* 139 F.3d 958 (D.C. Cir. 1998) (violation of its own procedures served to discredit the employer's proffered reason for its decision); *Shelborne v. Runyon*, No. 95-0641, 1997 U.S. Dist. LEXIS (D.D.C. 1997) (agency's failure to follow its own hiring criteria in selection process is evidence of discriminatory animus); *Fischbach v. District of Columbia Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir.1996) ("Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination, if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so." (internal citation omitted).
[221] Ex. 10, West Decl. ¶ 34.
[222] Exhibit 73, Formal EEO Complaints of Melvin Barksdale and Melvin James.
[223] Id..
[224] Ex. 2, Currie Depo. at 196.

### a.   June 8, 2001 Letter of Warning

On May 16, 2001, Cook approved West's absence from work and use of 8 hours annual leave on May 28 and 29, the Memorial Day Holiday, and told West that "he [was] excused from the holiday."[225]  Cook then disciplined West with a Letter of Warning for not reporting to work on May 27, 2000.[226]  The USPS contends that it properly issued the June 8, 2001 Letter of Warning to West because he failed to report during a mandatory holiday period.  This articulation, however, does not tell the whole story.  The USPS admits that Cook approved West's request for leave during the 2001 Memorial Day holiday, (see Form 3971),[227] while conveniently leaving out that Cook also advised West that he was "excused for the holiday."[228] The Agency also conspicuously omits the fact that Cook told West he was excused <u>before</u> he posted the mandatory overtime notice.  It has been the practice for VMF management to allow employees days off during mandatory holidays if management approves the employee's absence prior to noticing the mandatory holiday.  Supervisor Absher confirmed this practice in Southern Maryland in his deposition, and stated that he conducts mandatory holiday reporting procedures in this fashion, under the management of Cook.[229]  Cook admittedly had a long-standing practice of excusing employees for mandatory holiday reporting if they had less than 24 hours preapproved leave on a day before or after the holiday.[230]  In 2001, Cook, for the first time, implemented a *24-hour* preapproved leave policy.[231]  For several holiday periods prior to the 2001 Memorial Day holiday, Cook permitted workers to take any amount of preapproved leave to be excused from reporting during the holiday.  Hence, West's first-time transgression of this

---

[225] Ex. 10, West Decl. ¶ 23.
[226] Ex. 74, Chg 220/Ex. 2.
[227] Ex., 74, Chg 200/Ex. 13.
[228] Ex. 10, West Decl.  ¶ 23.
[229] Ex.59, Absher Depo..
[230] Ex. 5, Cook Depo. at 60-64.
[231] Ex. 5, Cook Depo. at 60-64; Ex. 10, West Decl. ¶ 24.

newly-implemented rule should not have warranted the imposition of corrective action.  Further,

the disciplinary action and West's protected activity are linked.  The LOW followed West's EEO

activity by two months (Apr. 12, 2001 filing of EEO Case No. 145).

### b.  July 17, 2001 7-Day Suspension

Cook suspended West on July 17, 2001, for failing to maintain a regular work schedule

by not reporting to work on June 17, 2001 (the day of West's daughter's illness), June 22, 2001

(approved use of sick leave); June 27-29, 2001 (days Cook refused to allow West to work for

failing to document June 17th dependant care); and July 6, 2001 (the day West received Cook's

letter informing West to return to work after his verbal suspension).  With the exception of June

22nd, all of the absences directly related to Cook's harassment of West for not reporting to work

due to his daughter's illness.   Because the suspension lacked sufficient basis, the USPS

rescinded the suspension, once West contested it through a union grievance.[232]  During the

grievance process, Currie confessed to the improper motive behind the action stating to APWU

Vice President, Ray Williams "[he was] going to teach [West] a lesson even if it meant keeping

him our for months."[233]  Nonetheless, this discipline, just like the harassment and intimidation

that comprised it, is rooted in management's personal animus against West due to his protected

activities under Title VII.

Two Caucasian mechanics working at Southern Maryland routinely fail to report around

holidays; however, manager Cook declines to discipline them.  As one example, "Mr. Lowe did

not work the Veteran's Day holiday schedule Saturday, November 10, 2001 or Monday,

November. 12, 2001 . . . using sick leave for November 6, 2001 through November 13, 2001 . . .

---

[232] Ex. 74, Charge 220/p. 149.
[233] Exhibit 75, APWU letter regarding West grievance dated July 3, 2001 (para. 4).

and . . . November 15, 2001."[234]  Although Cook managed Lowe, he did not discipline Lowe for this infraction or any other attendance infraction.  In another case, White Automotive Mechanic David Wood "has failed to show" or call "for scheduled overtime on non-workdays at Largo II VMF . . . for 2002 and 2003."[235]  Cook has not disciplined him. This persuasive evidence creates triable issues for West's discrimination claim.

### c.   August 24, 2001 7-Day Suspension

Five weeks after a previous, unsuccessful attempt to suspend West, Cook issued another 7-day suspension to West claiming the same charge: failure to maintain a regular work schedule.[236]  This time, Cook attempted to build his action on West's legitimate use of sick leave.  Like the groundless suspension issued the month prior, the USPS withdrew the August 24th suspension as lacking support.

### d.   January 28, 2002 7-Day Suspension

Five months later, USPS management took another corrective action against West utilizing the same allegation – that West failed to be regular in attendance.  In this round of discipline, management claims that West was Absent Without Leave or "AWOL" during the mandatory Dr. Martin Luther King, Jr. Holiday on January 19 and 21, 2002.[237]  Again, the USPS disciplined West without proper substantiation and for discriminatory and retaliatory purposes.

First, Cook approved West's use of 24 hours of annual leave during this holiday period on December 12, 2001.[238]  Second, the facts support inferences of discrimination and reprisal as well. As evidence of disparate treatment, Southern VMF management ignored White

---

[234] Ex. 10, West Decl. ¶ 59.
[235] Ex. 10, West Decl. ¶ 60.
[236] Ex. 74, Charge 220/pp.147,148.
[237] Ex. 39, Charge 31/Ex. 68.
[238] Ex. 39, Charge 31/Ex. 16.

Automotive Mechanic, David Wood's absence during MLK holiday period (Jan. 19, 2002),[239] while having <u>no</u> preapproved leave before or after the holiday period.[240]  And this was not Lowe's first offense.  Lowe chronically missed holidays by using sick leave.  As one example, Lowe did not report to work on Veteran's Day Holiday 2001 – just two months earlier and received no discipline.[241]  A reasonable juror could certainly find that the difference in their treatment of these employees was racially motivated.

### e.  July 17, 2002 14-Day Suspension

And yet again six months later, and six months after West filed EEO Complaint Case No. 31,[242] the USPS disciplined West for "failure to be regular in attendance for his absence from work July 2-5, 2002.[243]  West took emergency annual leave from July 2-5 to aid his mother, who lives in Tennessee, who had been injured in an accident.  Before and during his emergency leave, West informed the VMF that he was unable to report to work as planned due to car trouble, needed leave and the reasons for his absence.  No Caucasian mechanic has been disciplined for absences for these reasons.  Only West has.

### f.  August 22, 2002 "Emergency" Suspension

In August 2002, West reported a hazardous work condition to his managers.  West, specifically, advised the Agency, on August 9, 2002, that removing and replacing/repairing ("R & R") a vehicular engine without a proper engine stand puts him at risk for serious bodily injury.[244]  Because the hazard had not been abated, West could not R & R a 9-ton engine on August 22, 2002, as requested by Green.  When West told Green that he felt it was unsafe to perform the engine-repair work, Green charged him with insubordination and immediately

---

[239] Ex. 76, Wood's clockrings.
[240] Ex. 77, Lowe's clockrings.
[241] Ex. 10, West Decl.¶. 18.
[242] Ex. 10, West Dec. ¶ 45.
[243] Ex. 23, Chg. 108/Ex. 47.
[244] Ex. 10, West Decl..

suspended him under Emergency Placement procedures. Given that this emergency suspension occurred merely 20 days following West's filing of EEO Case No. 108 and all the other evidence of retaliatory conduct, *plus* management's failure to discipline any Caucasian mechanics for such actions, West's disparate discipline claim be heard by a jury to determine motive.

### g.  USPS Disciplined West Close In Time To His Filing Of EEO Complaints And Prosecution Of A Federal Court Lawsuit.

The temporal proximity between West's EEO activity and adverse actions taken by the USPS demonstrate a causal connection for purposes of reprisal.[245]  Here's a snapshot of West's protected activity and temporally related adverse actions occurring from 2000-2002:[246]

- West filed EEO Complaint #4K-200-0004-01 on September 8, 2000.  Cook disciplined him on September 22, 2000;

- West wrote the Postmaster General regarding the discriminatory conduct of Cook and Currie.  He is again disciplined with a Letter of Warning on June 8, 2001.

- In April 2001, West filed EEO Complaint 4K-200-0145-01 alleging disparate treatment.  He also filed a discrimination lawsuit in the U.S. District for D.C. (CA No. 01-0746(JR).  West served a copy of the complaint on Currie on April 10, 2001. The June 2001 Letter of Warning followed two months later and Cook went his harassment campaign against West.

- August 29, 2001, West filed Complaint No. 4K-200-0220-01.  Mr. Cook subsequently refused West overtime and leave requested around Veteran's Day and Thanksgiving Day 2001.

- West filed, on February 11, 2002, EEO Complaint No. 4K-200-0031-02.  Green then denied West's vacation choices 17 days later and issued a 14-day suspension to West six months fooling this filing.

---

[245] The Management Officials' knowledge of West's prior EEO activity is causally linked to the adverse actions taken against him.  *Cones v. Shalala*, 199 F.3d 512, 521 (2001) (temporal proximity between the filing of an EEO complaint and an agency decision not to fill a position competitively sufficient to establish causal connection); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-274 (2001); *Hochstadt v. Worcester Found. for Experimental Biology, Inc*, 425 F. Supp. 318, (D. Mass. 1977), *aff'd*, 545 F.2d 222 (1st Cir. 1976). *See also Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding a *prima facie* case of retaliation where a demotion occurred less than two years after filing of first complaint and approximately six months after second complaint).

[246] See generally, Ex. 10, West Decl.

- ▪ EEO Complaint No. 4K-200-0108-02 was filed by West on August 2, 2002. Twenty days following his complaint to an EEO Counselor, Green suspended West via emergency procedures.

This pattern is not happenstance, but reprisal.

### 5. USPS DENIED WEST VACATION AND ANNUAL LEAVE, REFUSED HIM REVISED SCHEDULES, AND DISPARATELY APPLYING LEAVE RULES.

#### a. November 2001 Holidays

During two holiday periods in November 2001, the USPS treated West disparately with regard to his leave requests. For the Veteran's Day Holiday, November 12, 2001, West requested, in advance of the holiday, for leave to celebrate, because he is a veteran. Cook required West to take 24 hours of annual leave.[247] Yet, while Cook denied West's leave request on November 1, 2001, Cook simultaneously granted Childs' leave request for the holiday.[248] Even more important, Cook did not discipline Childs for failing to report to work[249]

The USPS again denied West's request for leave around a holiday later that month – Thanksgiving, November 23, 2001.[250] West, accordingly submitted another leave slip for 24 hours annual leave (November 22-27, 2001) that Cook then approved.[251] Yet, the Thanksgiving holiday was not mandatory. Because Cook had fallen into a pattern of denying West at every turn, he did not even stop to inquire whether the 24 hour pre-approved leave rule would apply. It did not. Caught up in his animus toward West, Cook denied a perfectly acceptable leave request that should have and would have been granted, absent his retaliatory and discriminatory intent.

---

[247]Ex. 39, Charge 31/Ex. 17.

[248] Ex. 58, Childs Depo, Mysteriously, there exists another PS Form 3971 dated after the first granted request, where Cook purports to deny Ms. Childs' request for leave on November 12. Ex. 5, Cook Depo. Ex. 4; Ex. 58, Childs Depo. Ex. 15A. Although neither Childs nor Cook could provide an answer for why there were two Forms 3971, one granting her leave and one supposedly denying her leave – the fact remains that Childs did not report to work on November 12, 2001. Ex, 58, Childs Depo. at 74-84; Ex. 5, Cook Depo. at 45-46.

[249] Ex. 5, Cook Depo. at 41-49.

[250] Ex. 10, West Decl. ¶ ¶45-46.

[251] Ex, 39, Chg. 31/Ex. 15.

Furthermore, while Cook denied West's request for less than 24 hours of leave for the holiday, he approved a leave request encompassing less than 24 hours made by a White mechanic. Cook approved Cleveland Mansfield's leave request for only eight hours leave on November 23, 2001.[252] The stark contrast between Cook's leave decisions with West and Mr. Mansfield shout disparate treatment.

### b.  Denial of Revised Schedule on February 11, 2002

On February 11, 2002, West arrived at work and requested a revised schedule – a one-time modification to his work-hours schedule – due to his arrival approximately 35 minutes late. USPS management agrees that they routinely grant revised schedules to craft employees.[253] Still, when West sought a revised schedule, Green refused to revise his schedule,[254] citing the APWU Local Agreement, that provides that employees who are less than 30 minutes late for work may, at the discretion of the manager, receive a schedule change and work their full eight hour shift. Nonetheless, the USPS granted Caucasian employee, Miller revised schedules when he has arrived more than a half hour late for work. And on the very same day Green refused West a schedule change, he granted Caucasian craft employee Thomas Sponaugle a revised schedule.[255] Thus, the USPS reliance on a policy that exists only on paper is misplaced and inapplicable to the time period in question is a ruse.

### c.  Denial of Vacation for July 4, 2002 Holiday

Between February and March, craft employees are allowed to submit their vacation choices for the upcoming calendar year. West submitted two vacation choices during the allotted time

---

[252] Ex. 39, Chg 31/ Ex. 15.
[253] Ex. 26, Green Depo. Vol. I at 25; Ex. 5, Cook Depo. at 35-39.
[254] Ex. 23, Chg. 108/Ex. 2.
[255] Ex. 23, Chg 108/Ex. 5.  (Cowan assisted Sponaugle in preparing his 3971, which requested the revised schedule.)

period, one of which sought a one-week vacation covering the July 4th holiday.[256]  The USPS

denied his choice vacation  because Cleveland Mansfield "beat him out."[257]  In other words, a

senior mechanic, Mansfield requested the same time period off as West.  Notwithstanding this,

Green testified that on Tour 3 at Largo I, management allowed mechanics Scott and Clark to take

leave *at the same time* during this same July 4th 2002 holiday.  And this has happened before.

Green also testified that Cook permitted mechanics Spencer and Buchanan to take off from work

simultaneously.  Cook took extra steps to find a replacement by moving a mechanic over from

Tour 2 to Tour 3 to fill in.[258]  Thus, these facts expose the Defendant's rational as pretext.

### d.  Denial of Revised Schedule on January 25, 2005

Again on January 25, 2005, West was denied a revised schedule.  West arrived over 30 minutes

late.  Although the LMOU leaves it to the discretion of the supervisor, West made the request

since, according to the custom and practice, employees have been granted revised schedules

under these circumstances.  Stephen Clark, who was then Acting Supervisor, denied his request

at the instruction of Cook.  The USPS admits that Cook so directed Clark.  MSJ at 47.  Given all

of the preceding evidence regarding Cook's motives, ample evidence exists to suggest that

Cook's actions were not purely motivated by the LMOU provision; thus, this fact should remain

for jury consideration under West's hostile work environment claim.

### 6. DISCRIMINATORY AND RETALIATORY DENIAL OF OVERTIME

### a.  October 2001

The "emergency" situation in October 2001 discussed above where the USPS needed

workers to transport vehicles back to the rental car agency, encompassed an opportunity to work

overtime and double-time on a Saturday and Sunday (October 27 and 28).  Like all other

---

[256] Ex. 23, Chg. 108/Ex. 19,20.
[257] Ex. 26, Green Depo. at 17.
[258] Ex. 26, Green Depo. at 30-31.

overtime opportunities, management must select employees to work overtime from the overtime desired list. Since West identified himself as a worker available for overtime opportunities on his non-scheduled work days at all three Southern Maryland facilities,[259] Cook was compelled, per the APWU CBA, to contact West to offer him the overtime opportunity. Cook, however, did not. West received no notice or message from Cook regarding these opportunities.

The Agency denies the fact that Cook intentionally overlooked West and another African-American body and fender repairman, Chris Simmons when selecting workers for weekend overtime. This then is a question of material fact.

The USPS provided the overtime opportunity to White mechanics, some of whom were junior to West. Cook testified to the following craft employees working overtime that weekend: Thomas Buchanan, John Bowser, and David Wood – all Caucasian mechanics with less seniority than West – and other mechanics Cleveland Mansfield (Caucasian), Williams (race unknown) and James Smith (Caucasian).[260] Indeed, Mr. Smith was not on the overtime desired list at all,[261] and is not even a full-fledge mechanic, but a Modified Mechanic who is not permitted to work overtime ahead of any craft mechanic. And, as discussed above, Miller worked overtime that weekend, although he was unable to perform the duties the USPS needed performed, due to the revocation of his license.[262] Contrasting West's experience and the experiences of similarly-situated, Caucasian mechanics, the differences create an inference of discrimination and reprisal.

---

[259] Ex. 39, Chg. 31/Ex. 29; Ex. 5, Cook Depo. Ex. 7.
[260] Ex. 5, Cook Depo. at 74.
[261] Ex. 5, Cook Depo, Ex. 7.
[262] Ex. 5, Cook Depo. at 75.

### b.  April – July 2003

West signed the overtime desired list for before tour overtime; yet, was not advised of four months of before tour overtime opportunities in accordance with the CBA.[263]   The USPS argues that Supervisor Scott did not offer West overtime because he was located at another garage.  It has long since been established through labor arbitration that mechanics may sign up for overtime in other Southern MD garages where they are not permanently assigned.[264]   And overtime must be offered to employees on the overtime-desired list – without regard to their permanent duty station – in accordance with seniority.  Because West is not aware of those individuals who were offered overtime during this period and is requesting an order under Federal Rule of Civil Procedure 56(f) for the production of this information, he is unable to provide additional evidence creating an inference of discrimination or reprisal, other than inferences that may be drawn from other facts and evidence presented here.

### V.  CONCLUSION

Because of numerous material facts, which are in dispute – many of which go directly to the retaliatory and discriminatory motives of responsible management officials – and the inferences of discrimination and retaliation that may be drawn from the evidence, the Agency's Motion for Summary Judgment must be denied in its entirety.

Respectfully submitted,

January 31, 2007

By:_____/s/_____
          Teresa W. Murray
          **THE LAW OFFICE OF T.W. MURRAY**
          1025 Connecticut Avenue, N.W., Suite 1000
          Washington, D.C. 20036
          Phone: 202-327-5477
          Fax: 202-327-5451

---

[263] Ex. 78, Overtime Desired List
[264] Ex. 10, West Decl. ¶ 8.