# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KEVIN WEST                   :

          Plaintiff             :

v.                          :          Civil Action No. 05-1339  (JR)

JOHN E. POTTER             :

          Defendant.         :

## OPPOSITION TO PLAINTIFF'S RULE 56(f) MOTION

Plaintiff has requested, pursuant to F.R. Civ. P. 56(f), that defendant's summary judgment motion be denied or in the alternative that the case be continued to allow further discovery.

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part:

(f) When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The movant  must show a good reason to be granted relief. *See Donofrio v. Camp*, 470 F.2d 428, 431 (D.C. Cir 1972)("The judge may also deny summary judgment where the adverse party shows the necessary facts exist but for some good reason he can not produce them on the motion.")

In addition, the movant under Rule 56(f) must present an affidavit showing good cause for the relief requested.  *See e.g. Gualandi v. Adams*, 385 F.3d 236, 244 -245 (2d Cir. 2004): To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a

genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful. *See Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 422 (2d Cir.1989). If the district court denies the party's request--even implicitly--that decision is reviewed under an abuse of discretion standard. *See Oneida Indian Nation v. City of Sherrill*, 337 F.3d 139, 167-68 (2d Cir.2003); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 175 (2d Cir.1998).

Plaintiff has failed to meet his burden of showing that he sought and was unable to obtain the information requested by affidavit or other means. Plaintiff has not stated what, if any, efforts he made after the submission of defendant's motion for summary judgment to obtain affidavits from the individuals he now seeks affidavits from, or seeks to depose. Plaintiff also has failed to demonstrate that the necessary facts exist and are reasonably expected to raise a genuine issue of material fact, or other good cause for the relief he requests.

A.  DENIAL OF SUPERVISORY OPPORTUNITIES:

**Acting Supervisory Opportunities**:

Plaintiff contends that he should be allowed discovery concerning the denial of acting supervisory opportunities. He says that he "learned on April 26, 2006 that Acting Supervisor positions have been available at Riverdale VMF that were given to John Bowser and David Lowe. Affidavit of Kevin D. West in Support of Rule 56(f) Motion (West 56 Aff) at ¶ 5. Plaintiff seeks "an affidavit from Defendant identifying all EAS details (204B acting supervisor or manager) selections from May 2002 **to present** at Southern Maryland VMF locations. . . ." *Id*. (emphasis added). Plaintiff contends that

> This information will assist me in establishing proper comparators, in identifying junior, lesser-qualified Caucasians who have been granted supervisory opportunities, instead of me, in calculating the economic loss I have suffered, and to otherwise show disparate treatment.

*Id*.

The only claim of discrimination/retaliation due to denial of supervisory detail to 204B acting supervisor positions in plaintiff's EEO complaints was in Agency No. 4K-200-0108-02 ("108-02")[1] in which plaintiff claimed that

> 3)  In June 2002, he became aware that two African American employees and one Caucasian employee were being utilized as 204B's and his request was denied.

ROI 108-2 at p.1, 18-22, 402-403.   The individuals identified were Mr. Mansfield, Caucasian–acting June 10-14, 2002;  James Thompson, African American --acting June 24-28, 2002; Franklin Green, African American – acting since August 2001.  *Id*. at p. 403.

Those three are the only instances as to which plaintiff has exhausted his administrative remedies concerning acting supervisory assignments, and therefore, which are proper claims of discrimination/retaliation before the Court.  Therefore, the information requested is not material to the determination of the summary judgment motion as to those instances and plaintiff has failed to show how these new facts are reasonably expected to raise a genuine issue of material fact concerning the three June 2002 acting supervisor selections.  Neither are the alleged 2006 acting supervisory assignments relevant or material to calculation of economic loss pertaining  to the June 2002 selections.

During the administrative stage defendant obtained information concerning the selection to acting supervisory positions of individuals not in the 204B training program close to the time

---

[1]  Complaint 108-02 is a consolidation of the following four complaints from plaintiff: 4K-200-0108-02, 4K-206-0074-02, 4K-200-0177-02, 4K-2000016-03.

of the claimed discrimination;  these included Robert Parker and "J.M." as acting supervisors at

the T Street body shop.  See Defendant's Memorandum of Points and Authorities in support of

its Summary Judgment Motion (SJM) at p. 19-23.   Moreover, defendant does not contend that

selection to the 204B training program was, or is, the sole prerequisite to receiving all acting

supervisor assignments.  *See Id.* at p. 19-23.

   **Nonselections**

   **Vacancies 14-03, 15-03, 23-03; 31-02 and 33-02**

   Plaintiff contends that he needs discovery to obtain facts that Mr. Currie and Mr. Cook

unduly influenced the panel members who evaluated his application.

> I believe I was not promoted because of Timothy Currie's decision not to allow me
> upward mobility and Cook's agreement with that decision. To discover facts that
> these discriminating officials unduly influenced the panel members who evaluated
> my application[2], I request an affidavit identifying, and documents containing, all
> communication between Messrs. Currie and Cook and any panel member
> concerning me. I would also request the same for communications between
> Joseph King, Currie's former subordinate and Cook's former counterpart, and any
> of the panel members for these vacancies that concerned me. I would also like
> affidavits from Dickerson, Rose and Barnes, panel members for vacancies 14-03,
> 15-03 and 23-03, stating if they had knowledge of my EEO activity prior to
> serving on the panel and how they became aware of my activity. These facts
> would help me establish a connection between my protected activity and my
> nonpromotion for my retaliation claim.

West 56 Aff at ¶ 10.

   The panel members for vacancies 14-03, 15-03 and 23-03  were Harvey Dickerson, Rose

Barner, and Harvey Banks.  The panel members did not forward plaintiff's name to the selecting

---

[2]  This apparently is a new theory of defendant's because during the administrative proceedings
his counsel, Ms. Murry deposed and/or questioned at the EEO hearing  Mr. King, Ms. Hatfield,
Mr. Currie and Mr. Cook, and never inquired if Mr. Cook or Mr. Curie had attempted to
influence any of the review committee members.  Neither were such questions posed in
plaintiff's written administrative discovery requests.

official, Mr. King.  They each submitted an affidavit stating that they have no knowledge of

plaintiff's race, color or prior EEO activity and that the applicants were selected for an interview

based on the answers to the KSAs in the applications.  Defendants Summary Judgement Exhibits,

Non-Selections, Dickerson Dec. at ¶ 5-8,11-2, Barner Dec. at ¶ 5-8,11-12, Banks Dec. at ¶5-

8;11-12.  Mr. Cook's affidavit states that he had no participation in the selection process.  *Id*. at

Cook affidavit p.8.  Mr. Currie's affidavit states that he "has no knowledge of anything related to

or dealing with this issue."  *Id*. at Currie Aff. p.1.  By the time these positions were posted Mr.

Currie was in a new job at headquarters.  Mr. Currie reported to his new job on September 7,

2002.  Currie Depo at p. 140.

### Vacancy 31-02 & 33-02

The panel members for these vacancies also did not forward plaintiff's name to the

selecting official.    The committee members were Joseph King, Diane Hatfield and Adrian

Ames. Mr. Ames did not know the applicants' race or prior EEO activity and they were not

discussed during the evaluation process.  Ames Dec. at ¶ 7.  Mr. King,  Diane Hatfield, Mr. Cook

and Mr. Currie were deposed and testified at plaintiff's EEO hearing. During none of those

proceedings did plaintiff obtain any evidence indicating that Mr. Cook or Mr. Currie attempted to

influence any panel member.  *See* e.g. Hatfield Depo at p. 133 lines 2-5; 17-19; King Depo. at pp.

151-162 (attached);  and SJM King Depo. at pp.163-170.

Thus, plaintiff has failed to show any basis to believe that any facts exist to believe any

review committee members were influenced against Mr. West.  Neither has plaintiff stated what

efforts, if any,  he made to obtain affidavits on the pertinent  issue from any of the individuals

mentioned above.

Although defendant believes that plaintiff has failed to meet his burden of showing that additional discovery is required, defendant is submitting to plaintiff affidavits from the members of the review panels which state that no one attempted to influence their decisions. [3]

**Vacancy number 03-43– Higher level craft**

On July 24, 2003,  vacancy 03-43 was opened  for Lead Automotive Technician.  Plaintiff applied and was one of four individuals considered "Best Qualified."  Ex 41.  On August 25, 2003, another individual,  Stephen Clark, was selected.  *Id.*  Mr. Clark is a Caucasian male. Cook aff. at p. 9.  David Cook was the review board and selecting official for the position.  Ex. 41. and Cook affidavit at pp.8-9.

Mr. Cook rated the applicants to be about equally qualified.  Cook aff. at p. 9.  Plaintiff's total points were 42 and Mr. Clark's total points were 43.  Ex 38 at p. 2 and ex. 39 at p. 2.  The legitimate non-discriminatory reason for Cook's selection was that the selectee interviewed better than plaintiff.  Cook aff. at p. 9.

At the administrative level, plaintiff contended that he was more qualified than the selectees for the positions because "I exceed with my educational training with college education, labor relations knowledge and knowledge of VMF rules and regulations."  West Aff. at p. 11¶2b, p.14¶26b.  In its motion for summary judgment defendant demonstrated that those factors did not show that plaintiff's qualifications were far superior to those of the selectees.  SJM at p. 12-15.

Plaintiff now asks to depose Mr. Cook and Mr. Clark based on a new theory:

I am more qualified than Mr. Clark. I have been certified through formal training by the USPS Oklahoma Training Center in all postal vehicles, including Tractor

---

[3]  A declaration from Mr. King is not attached because currently he is on sick leave recuperating from a heart attack.

and Trailers. I have been trained in all vehicles with airbrake systems from 5-ton up to Tractor Trailers. Mr. Clark has no experience or training in any of these vehicles with air brake systems. In addition, I have experience working on all of these vehicles. I request from the Court the opportunity to depose Mr. Cook regarding his reasons for selecting Mr. Clark, rejecting me for the promotion, and how he evaluated each candidate's application and interview. I also request from the Court the opportunity to depose Mr. Clark regarding his lack of training and experience on the aforementioned postal vehicles. In addition I request for documents of Mr. Clark's training records to support my claim and prove disparate treatment due to the USPS selection of a lesser-qualified Caucasian employee and to calculate my economic losses suffered.

West 56 Aff at ¶ 11.

The depositions of Mr. Cook and Mr. Clark, and Mr. Clark's training records are not necessary to establish the training and experience which each applicant reflected in his application.  The relevant information is the training and experience each applicant claimed during the application process, i.e. what is on the applications.  See Ex 38 , Ex. 39.

Moreover, plaintiff can submit by his own affidavit describing the training and experience which he believes should have demonstrated to the selecting official that his qualifications were far superior to those of Mr. Clark. Plaintiff has identified no material disputed fact which the requested discovery would supply.  Nor has plaintiff identified any efforts made to obtain affidavits from Mr. Cook or Clark on this issue.

## B.  DISCIPLINARY ACTIONS

Plaintiff contends that he "needs facts and information identifying those employees who did not report on mandatory holidays between the years 2001 and 2002 and the reasons for their absence, in hopes of showing disparate treatment.  Plaintiff's Rule 56(f) Motion at p. 5.

I have received a number of unjust disciplinary actions including a Letter of Warning on June 8, 2001 by Mr. David Cook and a 7-day Suspension by Frank Green on January 28, 2002. Both were related to my alleged failure to report

7

during a mandatory holiday period. I, therefore, would request an affidavit from Defendant identifying all mechanics (by name, race, level, location and seniority) who had not reported to work on mandatory holidays between the years 2001 and 2002. These facts will help me establish that I was being treated differently by being required to work holidays despite have approved leave and by receiving discipline for these legitimate absences.

West 56 Aff at ¶ 6.

I was denied holiday pay on Dr. Martin Luther King, Jr. Birthday in January 2002 by USPS Management and as mentioned above, disciplined for not reporting around the holiday, despite my approval for leave. Unlike me, a Caucasian mechanic David Lowe was absent on January 19 and 21, 2002 but received no discipline. To accurately compare our attendance, reasons for absences, leave approval and discipline received or not, I respectfully request any and all documents relating to Lowe's absence as well as any other vehicle maintenance mechanic in Southern Maryland VMF who did not report on these dates.

West 56 Aff at ¶ 8.

First, the disciplinary actions at issue here were a letter of warning and proposed suspensions which were never put into effect. *See* Statement of Material Facts at ¶ 37-42. Therefore, the actions at issue were not material adverse actions required for a prima facie case of discrimination or retaliation. Therefore, the information requested does not raise a genuine issue of material fact.

Second, plaintiff made no claim for denial of holiday pay at the administrative level. Therefore, he has failed to exhaust his administrative remedies as to such a claim. Thus there are no material issues concerning payment of holiday pay.

Defendant submits the following concerning the particular incidents.

**June 8, 2001 letter of Warning for failure to report for Memorial Day Overtime ('220-01)**

The record has established that no other employee similarly situated to him (in plaintiff's

building, on his shift, having the same supervisor) who was scheduled to work during that

holiday period failed to report to work. Cook Dec. ¶ 16.  Any information  concerning what

happened on other shifts or with other supervisors is not material to this claim.

Plaintiff attempted at the administrative level to show evidence of

discrimination/retaliation because clock rings indicate that Mr. Lowe did not report to work on

Sunday, the 27th and was not disciplined.  Cook:Admin Tr. at p. 1089.  However, plaintiff and

Mr. Lowe were not similarly situated because Mr. Hill was Mr. Lowe's supervisor, and not Mr.

Cook.  See *Id*. at p. 1090 and Lowe: Admin Tr. at p. 2824.

Mr. Lowe testified that he did not report on May 27 and 28 because he had a pre-

approved leave slip from Mr. Hill under the Family Leave Act. Lowe:Admin Tr. at 2836-37 .

**November 2001 Holiday Leave Issues**

 **Veterans Day**

Plaintiff worked the Veterans Day week end.   Plaintiff, however, maintained at the

administrative level that he was discriminated against because the Agency did not discipline and

impermissibly excused another employee on his shift, Monique Childs, from working the holiday

schedule. West Depo. at p. 135-136.

On November 6th, Ms. Monique Childs (Black Female), the Storeroom clerk, submitted a

3971 Form to Mr. Cook, requesting to be excused from working the holiday weekend because

she "already had family plans." Cook Dec. at  ¶ 36.  Cook denied her request as the request for

leave violated the local agreement. *Id*.  Thus, Ms. Childs was treated similarly to plaintiff.

Ms. Childs reported to work and worked on November 10th. *Id.* at ¶ 37.  As part of her

duties and responsibilities, she is responsible for issuing parts to mechanics, for ordering parts

from suppliers, maintaining the inventory and paying suppliers. Many of her duties can be assigned to other employees. *Id*. For example, the Level 8 lead mechanic is authorized to retrieve and issue parts to Mechanics. *Id*. Other clerks assigned to the office can also perform many of Ms. Child's storeroom clerk duties. *Id.*

While at work on Saturday November 10th, Ms. Childs requested to leave work early. *Id. at*. ¶ 38. In accordance with postal procedures, she submitted a Form 3971 seeking to leave work 2 1/2 hours early. *Id*. She presented her request to Mr. Cook. *Id*. Mr. Cook granted the request and permitted her to leave work early. *Id*. Mr. Cook granted the request, because there was little work for her to do at that time and her duties and responsibilities could be assumed by other persons at work at that time. *Id.*

On November 1, 2001, prior to the posting of the mandatory holiday work notice, Ms. Childs had submitted a leave slip for an annual check up. West Ex. 41. That leave slip had been approved on November 1, 2001. *Id*. Because management had been encouraging her to schedule her doctor's appointments during her non-work schedule, management determined that it was in the best interests of the Postal Service to excuse her from working on that day. Cook Dec. at ¶38. Management determined that she was not needed to work on November 12th because other employees could fill in for her. *Id*. Additionally, Ms. Childs submitted proper documentation from her doctor, showing that she did in fact have an appointment. ROI 31-02 at p. 33.

Mr. West maintains that excusing Ms. Childs from work on November 10th and 12th somehow discriminated against him. He, however, never submitted a 3971 leave form requesting to be excused early on the 10th, nor did he request to be excused on the 12th. West Depo. at p. 138. Moreover, the presence of the storeroom clerk was not as important to meeting

the scheduled maintenance performance goal as that of a mechanic who actually repairs and maintains vehicles.  Therefore, plaintiff was not similarly situated to Ms. Childs, and no inference of discrimination is raised.

**Thanksgiving 2001**

In 2001, Thanksgiving Day was November 22, 2001.  Green Dec. at ¶2.  On October 10, 2001, Plaintiff submitted a leave slip for the Thanksgiving holiday weekend.  *Id.*  His original leave slip requested 16 hours of leave for the period Thursday, November 22, 2001 through Monday, November 26, 2001.  *Id.* at its Ex. 1.  Mr. Green disapproved the leave slip on the grounds that it violated the local agreement for holiday leave.  In effect, Plaintiff was attempting to secure leave for the holiday period of November 22 through November 26.  *Id.* at. ¶2.  However, to assure that he would be exempt from a mandatory holiday period, Plaintiff needed to have 24 hours of approved leave. *Id.*  See West Depo. at p. 152 (Q.  Mr. Green told you you had to take 24 hours off to do what? A.  To be off the holiday.  Q.  In other words, not to be required to come in on the holiday?  A. Correct.").  His leave request was denied because he only asked for 16 not 24 hours of leave. *Id* .

Plaintiff resubmitted his leave slip on October 10, requesting 24 hours of leave from November 22 through November 27. *Id.* at ¶ 3.  This leave slip was approved by Mr. Green.  *Id.* and *Id.* at Ex. 1 (bottom slip).   When Plaintiff learned that there was not going to be any mandatory holiday work, he canceled his leave for November 26th and 27th and requested  8 hours of leave on November 23rd. Id. at ¶ 3.

Mr. Michael Mansfield (White Male) also submitted a leave slip to Mr. Green.  *Id.* at ¶ 4.  His leave slip did not attempt to block off the holiday period . *Id.*  Instead, Mansfield requested

only 8 hours of leave for Friday, November 23, 2003. *Id*. Mr. Green granted his leave slip as well. *Id*. ROI 31-02 at p. 34.

Plaintiff alleged that he was "harassed" because he was required to complete a leave slip for 24 hours of leave while Mr. Mansfield was not. However, Mr. Mansfield was not similarly situated to plaintiff because Mr. Mansfield did not appear to be attempting to block off the entire holiday period. If plaintiff truly did not wish to block off the holiday period, he could have reflected that by clearly requesting just the day or days off he actually was requesting, just as Mansfield had done on his leave slip. Instead, as with the other leave slips with which the same issue arose, plaintiff included non-scheduled days within the time span of his request. *See* Vedral: Admin Tr. at p. 110-111 (not proper to include non-scheduled days on leave slip "Because you are not going to charge them with AL or sick leave on their days off.")

**Martin Luther King Day Holiday, January 2002; 7-Day Suspension**

Plaintiff failed to report to work on the mandatory weekend, January 19 and 21, 2002. Green Dec. at ¶ 9. [4] His supervisor, Mr. Green determined that West was AWOL and issued him a 7-day suspension by letter dated January 28, 2002. *Id*. and West Ex. 51.

Two other employees supervised by Mr. Green - Chris Simmons and Monique Childs -- were absent from overtime over the Martin Luther King Weekend. Green Dec. at ¶10.

Mr. Simmons called in on Saturday January 19th requesting to be excused from work due to an illness. *Id*. This request was approved pending documentation. *Id*. On Monday, Simmons

---

[4] Plaintiff now says that he did not come in over the weekend because he did not know that his request to cancel his leave had been approved. West Depo at p. 194. Yet, although under this scenario plaintiff had leave for the 22nd-24th, he came in to work on January 22. West Depo at 194. Plaintiff also admitted that it was neither required, nor was it the practice in the shop to submit a written statement to cancel leave or get a written response. *Id*. at p. 195-201.

failed to call in or report to work.  *Id.*  He was therefore charged AWOL.  *Id.*  Simmons grieved

the issue and the grievance was ultimately settled after he provided adequate documentation that

he was incapacitated from work.  *Id.*  and see Simmons Grievance.

Monique Childs failed to report to work on January 21st.  Green Dec. at ¶ 11.  Ms. Childs

was initially charged with absent from overtime i.e., AWOL.  She, however, produced adequate

documentation of an illness justifying her absence from work.  She accordingly was not

disciplined.  *Id.*  See Childs Depo. at p. 95-101 and Ex. 17.

Thus, both Mr. Simmons and Ms. Childs initially were treated similarly to plaintiff.  They

were charged AWOL for their absence when they presented no adequate justification therefore.

However, unlike plaintiff, they subsequently presented adequate documentation of illness,

justifying their absences and, therefore, were not disciplined.  Plaintiff never provided any

legitimate justification for his absence.

Plaintiff now contends that he needs discovery concerning Mr. Lowe, because "Unlike

me, a Caucasian mechanic David Lowe was absent on January 19 and 21, 2002 but received no

discipline."  West 56 Aff at ¶ 8.

Mr. Lowe testified at plaintiff's administrative hearing.  *See* Admin Tr. at p. 2822-2853

attached hereto.  In 2002, Mr. Lowe worked at Largo 2 second tour and his supervisor was Mr

Hill.  *Id.* at  2822, 2850-52.  His supervisor approved family medical act leave for him.  *Id.* at p.

50.  Thus, plaintiff obtained the information he now is requesting concerning Mr. Lowe during

the administrative proceeding.

Moreover, Mr. Lowe is not similarly situated to plaintiff because plaintiff did not work at

the same facility as Mr Lowe and had a different supervisor.  Thus, the requested information

13

cannot  reasonably be expected to raise a genuine issue of material fact.

Plaintiff has received discovery concerning those on his shift and under the same

supervision who did not work on the above mentioned holidays concerning which claims were

made to the EEO.

## C.  OVERTIME

Plaintiff contends that he needs the following discovery:

On October 27-28, 2001, I was denied overtime by Mr. Cook. Also, on July 31,
2003, I became aware that there were before tour overtime opportunities at Largo
II VMF from April 1 through July 25, 2003 that were not offered to me, but as I
understand, to other junior mechanics. I need an affidavit from Defendant
identifying all individuals (by name, race, level, seniority, and location) who
worked overtime in Southern Maryland VMF on or around October 27 th and
28th, 2001 and from April 1 - July 31, 2003. I would also like an affidavit from
Supervisor Michael Scott or an opportunity to depose him regarding the
compliment of mechanics at Largo II from January - July 2003 to examine him on
the Postal Service's defense to my claim. I would further request the Defendant to
produce the overtime desired list for all three Southern  Maryland VMF facilities
for these time periods as well as the applicable seniority lists for the vehicle
maintenance craft during these times. All of these facts will help me establish the
instances where I was denied overtime opportunities that were given to junior
mechanics in violation of the collective bargaining agreement, identify any
disparate treatment, and help calculate any monetary losses.

West 56 Aff. at ¶ 7.

The only claims concerning overtime for which  plaintiff has exhausted his administrative

remedies are the following:

### 235-03 OVERTIME

Plaintiff claimed discrimination and retaliation because he was not given overtime at the

Largo II facility from April 1, 2003 through July 25, 2003.  235-03 ROI West Aff. at  p. 10.

Plaintiff was on the Largo II overtime desired list for "before tour duty"  235-03 ROI Ex.34 at p.

14

3-4.

Largo I, Largo II and Riverdale are in different buildings in the Capitol Heights VMF. Cook Supplemental aff at p. 4.   At the time in question, plaintiff was assigned to Largo I, pay location 892.  See 235-03 ROI Ex. 36.  Qualified employees can sign up for quarterly overtime desired on the list for their building and for the other two buildings.  *Id.* at Cook Supp. Aff at p. 4.  If the need for overtime at a particular building exceeds the employees from that building on the list, a senior employee from another building who has signed the list is given the opportunity to work overtime.  *Id.*  Michael Scott was the manager at the Largo II building, and he determined the need for overtime there.  *Id.* at p.3-4.   If additional personnel was needed for overtime at Largo II, Mr. Scott  would ask Mr. Cook for Largo I personnel.  *Id.*

The legitimate non-discriminatory reason for plaintiff not being called for overtime is that on the date in question, the employees assigned to the Largo II building who signed the overtime desired list, gave management enough employees to accomplish the needs of the Largo II operation.  *Id.* at p. 3.

Plaintiff says he needs additional discovery to "help him establish the instances where I was denied overtime opportunities that were given to junior employees. . . ."  West 56 Aff. at ¶7.

Since plaintiff's claim was limited to denial of overtime on the before duty tour at Largo II from April through July 25, 2003, any discovery concerning overtime at other facilities, on other tours, and on different dates cannot create a genuine issue of material fact concerning this claim.

Plaintiff received the overtime desired list for Largo II for the pertinent time period during the administrative investigation.  *See* SJM Exhibits at Overtime, Ex 34 p. 3-4 .

15

The decision of whether or not to ask for additional individuals to work overtime at Largo II was Mr. Scott's. Plaintiff has never contended that Mr. Scott discriminated or retaliated against him. Mr. Scott was the management official on plaintiff's Step One Grievance. in August 2003. See *Id*. at Ex 35. The background information included "The Largo ODL supplied sufficient employees to work overtime." *Id.* Ex 35 at §18, ¶4. Management's position through Mr. Scott was "There were no overtime opportunities that were not worked by the employees on the Largo II ODL." *Id.* Ex 35 at p. 1. Thus, plaintiff has failed to present any reason to believe that any necessary fact exists which would create a genuine issue of material fact. Plaintiff also has not explained what efforts he made to obtain the information requested by affidavit.

**October 27 and 28, 2001 Overtime Issues**

Plaintiff contends that he was discriminated and retaliated against when he was denied over time on October 27 and 28, 2001. ROI 31-02 at p. 85, 96.

The Collective Bargaining Agreement establishes rules and procedures for employees to work overtime. EEOC-80X Cook Dec ¶ at 27. The agreement established an overtime desired list, which is comprised of names of employees who have volunteered to work overtime. *Id*. Those employees on the overtime desired list are given first opportunity to work overtime and are offered overtime opportunities based on a rotating seniority basis. *Id*. The contract recognizes, however, that the overtime desired list may not meet the needs of the Postal Service. *Id*. Where there is an insufficient number of volunteers to work overtime, management can require persons not on the overtime desired list to work overtime as well. *Id.*

In October 2001, the Capital District faced an emergency situation. *Id.* at ¶ 28. During

16

that month, the Capital District closed its Washington Processing and Distribution Center

("Brentwood") due to an exposure to anthrax.  *Id*.  Not only was the plant closed but most of the

Capital District's fleet was rendered inoperable due to the vehicles' possible exposure to anthrax.

*Id*.  In response, the District had to lease a fleet of trucks while the Capital District's fleet was

being decontaminated.  During the weekend of October 27 and 28, 2001, the Capital District's

lease on the trucks was expiring.  *Id.*  All of these vehicles had to be returned to the truck rental

facility.  *Id*.  As a result, mechanics were needed to drive and return the trucks.  *Id*.

At this time, the T Street VMF employees had been stretched to the limit and were unable

to handle the additional work of returning the leased trucks.  *Id*.  Because the truck rental facility

was located near the Southern Maryland VMF, it was decided to have the Southern Maryland

VMF mechanics drive and return the trucks along with assisting with other tasks throughout the

District.  *Id*.

At Mr. Currie's direction, Preston Miller, an acting supervisor at the T Street VMF, called

David Cook at home. *Id.* at ¶ 30.  Mr. Miller informed Mr. Cook that Mr. Currie wanted as many

southern Maryland VMF mechanics as possible to report to the T Street VMF to assist with the

return of the rented vehicles and other tasks.  *Id*.

Mr. Cook was at home and did not have an overtime desired list. *Id.* at. ¶ 30.  He did,

however, maintain a list of employees' telephone numbers in his day planner.  *Id*.  He called each

person on the day planner and noted on the planner whether he was able to contact that person or

left a message.  *Id*.  Cook called plaintiff but received no answer.  *Id.* and see West Ex. 33.

James Smith was at Mr. Cook's house while Cook was making the calls to mechanics.

He recounted that:

> He called everybody.  He told every body, persons that he didn't get in touch with to please call him back as an emergency.  They needed people to come in to work down T street.

Smith: Admin Tr. at p. 1612.  Mr. Smith heard Mr. Cook call Mr. West.   He heard Mr. Cook speak Mr. West's name into the telephone.  *Id.* at page 1613.  Plaintiff admits that although Mr. Cook had his home telephone number, he did not have plaintiff's emergency pager number nor his cell phone number.  West Depo. at 112, 116-120.

Thus, the legitimate non-discriminatory reason that plaintiff was not contacted concerning overtime was that Mr. Cook attempted to contact Mr. West using the telephone number in his day planner and was unable to reach him.

There is no dispute that the individuals called  in and who worked on October 27-28, 2001 included individuals not on the overtime list and some of whom were junior to plaintiff. Therefore an affidavit concerning who worked overtime on those days cannot create a genuine issue of material fact and is irrelevant to the decision of the summary judgment motion.

## D.  DENIAL OF REVISED SCHEDULES

Defendant has claimed discrimination because he was denied a revised schedule by acting supervisor Mr. Green on February 11, 2002 and by Mr. Clark, as directed by Mr. Cook on January 25, 2005.

Plaintiff states "I know that other Caucasian employees have received revised schedules when they have arrived over 30 minutes late" and contends that he needs an affidavit "describing all revised schedules granted to Southern Maryland VMF employee[s] when he or she arrived over 30 minutes late to work between the years 2001 and 2005.

Plaintiff has not articulated how the information requested will create an issue of material

18

fact concerning the two instances concerning which he has exhausted his administrative remedies in which he was denied a revised schedule.

First, plaintiff has not identified who the alleged employees are or what supervisors allowed them revised schedules.  He has not demonstrated that the individuals were similarly situated to him.  He has not shown what genuine material issue would be placed in dispute.

### Denial of Revised Schedule Change February 11, 2002

In February 2002, Plaintiff was late for work.  Green Dec.at ¶ 12.  He called Mr. Green to advise him that Plaintiff was running late to work.  *Id*. Mr. Green prepared a 3971. *Id*. Plaintiff arrived to work at 6:63, more than ½ hour after his scheduled reporting time. *Id*.  He requested a change in schedule so that his start and end times would be adjusted, thereby enabling him to work a full 8 hour day.  *Id*.  Mr. Green denied the schedule change request because Plaintiff was more than 1/2 hour late to work.  *Id*.  Thus, plaintiff had to take annual leave for the period he was late.  *See* West Ex. 52, Form 3971 dated Feb. 11, 2002.

Mr. Green's decision was consistent with the terms of the local agreement. The local agreement specifically provides:

> Employees reporting up to thirty minutes late at the beginning of tour or late from lunch may be permitted to work their full eight (8) hour tour of duty by mutual agreement with the supervisor, or the supervisor may approve the employees [sic] request for leave.

Memorandum of Understanding, Cook Dec. Ex. 2 at p. 13 ¶24.

When plaintiff has been less than 30 minutes late for work, Mr. Green has granted plaintiff's request for a schedule adjustment.  Green Dec. ¶ at 13.  See e.g. West Ex. 52, Forms 3971 dated Nov 11, 2001, October 31, 2001, June 20, 2001, October 24, 2001.

Plaintiff contended at the administrative level that he was discriminated against because another individual, Mr. Sponaugle, was allowed a revised schedule on February 11, 2002. However, Mr. Sponagle was not similarly situated to plaintiff.  Mr. Sponaugle was not late for work on that day.  On February 7, 2002, Mr. Sponaugle had submitted an advance request to revise his schedule on February 11, so that he could begin work early.  West Ex. 53.    Mr. Green was the supervisor notified of the request and Mr. Cook approved it.  *Id.*

### January 25, 2005 Request for Revised Schedule

On January 25, 2005, after arriving to work more than 30 minutes late,  plaintiff requested a revised schedule.  Plaintiff's request was denied because he was more than thirty minutes late.  Instead, annual leave was approved for the time missed due to tardiness. ROI 99-05 at Ex. 3.  The legitimate non-discriminatory reason for the agency's action is that the denial is in accordance with the LMOU.  *Id.* at Ex. 7.

At the time plaintiff requested a revised schedule he was working at the Largo II VMF. West Aff. at p. 4.  The Acting supervisor was Steven Clark.  *Id.*   Mr. Clark had never done a schedule change.  He asked Mr. Cook who told him to mark the leave slip disapproved due to the greater than 30 minutes tardiness period.  Clark Aff. at p. 4; See also Cook Affidavit.  Both he and Mr. Green informed Mr. Clark of the 30 minute rule in the MOU.

A grievance settlement was entered into on February 14, 2005.   See Grievance Settlement. At the Step 2- grievance phase, the matter was settled by an agreement to compensate plaintiff for all hours lost and to allow him to makeup over time.    King Depo. at p. 109-12 and its Ex. 2. Since plaintiff initially was granted annual leave for this lateness he lost no salary. With the grievance settlement plaintiff was restored annual leave.  There was no adverse

employment action, nor a material adverse action. Therefore, plaintiff has failed to establish a prima facie case of discrimination or retaliation.

Since there was no adverse action concerning the January 25, 2005 request for a revised schedule, deposition of Mr. Cook concerning his involvement in the matter is not material to the disposition of the summary judgment motion. Moreover, defendant does not dispute that Mr. Cook told acting supervisor Mr. Clark about the 30 minute rule in the MOU, and that this was interpreted by Mr. Scott as a direction to apply the rule. Thus there is no genuine issue in dispute concerning Mr. Cook's involvement.

## E.  DENIAL OF HIGHER LEVEL CRAFT OPPORTUNITIES

1)  See discussion concerning Lead Automotive Technician selection in section A, above.

2)  Plaintiff has requested the following information concerning higher-level craft temporary details.

> I also believe that I have been denied temporary details to higher-level craft positions. I would lastly request an affidavit from Defendant identifying all details at Levels 8 and 9 between the years 2001 to present at Southern Maryland VMF locations, to include the following information:
>
> i. the employee selected: name, race, EEO activity, location, seniority & grade level;
>
> ii. the person(s) making and/or authorizing the selection;
>
> iii. the length of the temporary promotion;
>
> iv. the rate of pay the employee received while on detail;
>
> v. the reasons the individual was selected and why I was not selected;
>
> vi. description of the change of the employees' duties while on higher level; vii. any and all records relating to the selections.

This information will assist me in establishing proper comparators, in identifying junior, lesser-qualified Caucasians have been granted these opportunities, instead of me, in calculating the economic losses I have suffered, and to otherwise show disparate treatment.

The only temporary details to higher level craft as to which plaintiff has exhausted his

administrative remedies was his claim that

2) On February 13, 2002, he became aware that all of Largo VMF Tour 3 mechanics were being paid level 8 pay.

ROI 108-2 at p. 399.

### Higher level Craft assignment for Tour Three Mechanics

The Vehicle Maintenance craft is comprised of several different positions, each receiving

different levels of pay.  '80X Cook Dec ¶ 5.  At the time in question, there were level 4 garage

men and tire repairmen, Level 7 mechanics, Level 7 body and fender repairmen, and Level 8 lead

technicians. *Id*. Each job category has specific duties and responsibilities. For example,

mechanics perform engine and other mechanical work on Postal vehicles.  *Id*.  Level 7 body men

primarily repair fenders, bumpers and bodies of Postal vehicles.  Level 8 employees  perform not

just mechanical work like level 7s but also perform additional duties. *Id*. These additional duties

include performing preventive maintenance inspections and complicated diagnosis of electrical

mechanical problems. *Id*.

Under the collective bargaining agreement, Management has the right to ask qualified

level 7 mechanics to perform work performed by level 8s.  EEO-80X Cook Dec at ¶ 6.  When a

Level 7 mechanic is directed to perform level 8 work, the collective bargaining agreement

requires that the level 7 employee  receive level 8 pay. *Id*.  In other words, when a person does

level 8 work, he/she receives level 8 pay.[5]  *Id.*  This is referred to as  "higher lever craft details "

and "higher level assignments" See Vedral:Admin Tr. at pp. 86-88; West Ex. 110 at p. 131-132.

The collective bargaining agreement requires that an individual detailed to higher level

work "shall be paid at the higher level for time actually spent on such job." *Id.* at §2.  Thus, for

example, if a level 6 does a core duty of a level 8 mechanic for two hours, the level 6 would

receive pay at the level 8  rate for those two hours.  See Vedral:Admin Tr. at pp. 98-101.

The agreement further provides that "Detailing of employees to higher level bargaining

unit work in each craft shall be from those eligible, qualified and available employees in each

craft in the immediate work area in which the temporarily vacant higher level position exists.  *Id*.

at § 4.  The term "available in the immediate area" in the Postal Service means "tour and

section."  Vedral: Admin Tr at p. 86.  Thus, an employee assigned to Tour Two at Largo 1 is not

"available in the immediate area" for a higher level detail opportunity on Tour Three.  *Id*. at pp

87-88.

At Largo One, there are two shifts, known as tour 2 and tour 3.  EEO-80X Cook Dec ¶ at

7.  On tour 2, there were 9 employees.  *Id*.  The composition of the workforce included two level

4s, 4 level 7s, and 3 clerical employees.  *Id*.  On tour 3, there were 4 employees. *Id*.

In June 2002, management determined that Largo One would operate more efficiently if

the level 7 employees on Tour 3 performed both preventive maintenance inspections ("PMI")

---

[5]  A  lower level employee may also be detailed into a level 8 position. '80X Cook Dec at ¶ 6.  A
detail is different from performing level 8 work. *Id* . In a detail situation, one is placed in a level
8 job and is responsible for performing the full duties of the level 8 position. *Id*. When assigned
level 8 work, an employee may be required to perform some but not all of the responsibilities of
a level 8 position. *Id*.

and mechanical work on vehicles. *Id. at* ¶8. Thus, the level 7 employees on tour 3 were assigned both level 7 and level 8 work. Consequently, under the collective bargaining agreement, those Tour 3 Level 7 employees who performed level 8 work were entitled to receive level 8 pay. *Id.* The two level 7 employees on tour 3 were Thomas Buchanan (White Male) and George Spenser (Black Male). *Id.*

Plaintiff was assigned to Tour 2. *Id.* at ¶ 9. At all relevant times, he was not assigned to work on Tour 3. *Id.* Therefore, under the collective bargaining agreement he was not eligible for a higher level craft detail/assignment in Tour 3.

He maintains that he was discriminated and retaliated against because Buchanan and Spenser were assigned to perform level 8 work. *Id.* The difference in treatment arises from the simple fact that Buchanan and Spenser worked a different shift and had work demands different from the work demands on Tour 2. *Id.*

Since plaintiff's only exhausted claim pertains to the higher level details of tour three employees Buchanan and Spencer in June 2002, higher level details at any other time are not material to the disposition of defendant's summary judgment motion. Plaintiff has not identified any genuine material disputed fact which the requested information would show.

## CONCLUSION

Plaintiff has totally failed to show "that he cannot for reasons stated present by affidavit facts essential to justify his opposition" as is required by F.R.Civ. P. 56(f). He has not shown that he attempted to obtain any affidavits to oppose defendant's motion for summary judgment. He has not shown any reason to believe that there is any evidence to support his unsupported speculations. He has not shown how the alleged facts are reasonably expected to raise a genuine

issue of material fact concerning the issues pertaining to the defendant's motion for summary

judgment.

Therefore plaintiff's motion for limited discovery should be denied.


Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____
RUDOLPH  CONTRERAS, D.C. Bar #  434122
Assistant United States Attorney


_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970