```
 1  that as far as he's concerned, there's not any job that
 2  he can't give Mr. West to do that he can't complete.
 3       Q    Are you -- do you know whether or not
 4  Mr. Cook or Mr. Green has communicated this to
 5  Mr. Currie or not?
 6       A    I have no clue.
 7       Q    Are you aware of whether Mr. Cook or
 8  Mr. Green have communicated this to Ms. Hatfield?
 9       A    Have no clue.
10       Q    Mr. Carney?
11       A    I'm sure they haven't.
12       Q    You're sure they have not?
13       A    Correct.
14       Q    Okay.  Has Mr. Cook ever made any derogatory
15  statements about Mr. West?
16       A    No.
17       Q    Has he ever called Mr. West a troublemaker,
18  to your knowledge?
19       A    No.  I've never heard that word associated
20  with him.
21       Q    To your knowledge, has Mr. Cook ever called
22  Mr. West an asshole?
23       A    Not to me.
24       Q    Have you heard of him referring to Mr. West
25  as an asshole?
```

1   A   No.

2   Q   Have you observed or are aware of whether or
3   not Mr. Cook has referred to Mr. West as worthless?

4   A   No. He's a good mechanic. He's certainly
5   not worthless.

6   Q   What does he say of Mr. West -- has Mr. Cook
7   made any statements about Mr. West's prior EEO
8   activity?

9   A   No.

10  Q   Has Mr. Currie made any statements about
11  Mr. West's prior EEO activity?

12  A   No.

13  Q   What about Mr. Green?

14  A   No.

15  Q   Are you aware of Mr. West's prior EEO
16  activity?

17  A   I am aware that Mr. West was active in filing
18  grievances and has previously filed EEO. I am not
19  privy at all to what the issues were, and the truth is,
20  I really, for the longest period of time, not knowing
21  who Mr. West was, I couldn't put two and three
22  together, just that somebody at Southern Maryland was
23  one that was active in those arenas.

24  Q   How did you become aware of Mr. West's prior
25  EEO activity, not the grievance?

1    A    I think it's partially common knowledge among
2  many people, okay? I can't say that there's any one
3  thing. Honestly, I don't know. But then again, I
4  don't have any -- no idea of what they were about.
5  Just I think I knew that a couple supervisors were
6  involved in something or whatnot. I really don't --
7  it's like you know and you don't know.
8    Q    Do you recall anybody making a statement to
9  you with regard to Mr. West's EEO activity?
10   A    No.
11   Q    Do you have any way of knowing how this
12 common knowledge came to you?
13   A    Offhand, I can't say I do.
14   Q    Have you ever heard Mr. Cook make any racial
15 comments or jokes?
16   A    Mr. who?
17   Q    Mr. Cook.
18   A    No.
19   Q    Have you ever heard Mr. Currie make any
20 racial comments or jokes?
21   A    No.
22   Q    Have you had any conversations with
23 Mr. Currie or observed any behavior on the part of
24 Mr. Currie that led you to make an assessment about his
25 feelings about Mr. West?

1   A   Can you repeat that?

2   Q   Well, we can break it down. Has Mr. Currie
3   had -- ever made any statements to you which have
4   helped you form the opinion or make an assessment about
5   how Mr. Currie feels about Mr. West?

6   A   No. I barely talk to Mr. Currie about
7   Mr. West.

8   Q   Have you observed any behavior on the part of
9   Mr. Currie that has led you to make an assessment about
10  how Mr. Currie feels about Mr. West?

11  A   No.

12  Q   Besides the conversation with Mr. Currie
13  about Mr. West's letter regarding the supervisory
14  training, what other conversations have you had with
15  Mr. Currie about Mr. West?

16       MR. CHAKERES: This has already been asked
17  and answered.

18       THE WITNESS: I don't know if I know of any
19  others.

20       BY MS. MURRAY:

21  Q   You mentioned previously that Mr. Currie came
22  and -- came to the Capital area VMF in the spring of
23  2000.

24  A   Uh-huh.

25  Q   Where did Mr. Currie come from? Do you know?

1    A    Chicago, Illinois.
2    Q    And do you know why Mr. Currie came to this
3  area from Chicago?
4    A    Career goal.
5    Q    It was his choice?
6    A    Correct.
7    Q    Have you heard anything about Mr. Currie's
8  prior managerial experience in Chicago?
9    A    Just that he worked there.
10   Q    Have you heard anything with regard to any
11 allegations of discrimination on the part of
12 Mr. Currie while he worked in Chicago?
13   A    No, I have not.
14   Q    Have you had any conversations with
15 Mr. Currie about any complaints lodged against him
16 while he was in Chicago?
17   A    No.
18   Q    Have any conversations with anyone regarding
19 any complaints lodged against Mr. Currie while he was
20 in Chicago?
21   A    No, I have no knowledge of it.
22   Q    Did you have any conversations with
23 Ms. Hatfield about Mr. West?
24   A    I probably discussed the step two grievances
25 that I handled that were Mr. West's, considering she

1  was the acting 22 and --
2      Q    Okay.
3      A    And I was handling their grievances basically
4  by being assigned the step twos, so with her being the
5  VMF, manager of VMF, or Vehicle Maintenance, okay, she
6  should have had knowledge of what I was doing in those
7  particular type cases.
8      Q    Did you have any other conversations with
9  Ms. Hatfield about Mr. West?
10     A    Can't recall.
11     Q    Do you recall Ms. Hatfield ever mentioning
12 Mr. West's prior EEO activity?
13     A    I don't believe so, no.
14     Q    Have you ever heard Ms. Hatfield make any
15 racial comments or jokes?
16     A    No.
17     Q    Have you had any conversations with
18 Mr. Carney about Mr. West?
19     A    No.
20     Q    Are you aware of whether Mr. Carney has
21 knowledge of Mr. West's prior EEO activity?
22     A    I would think he would not.
23     Q    Why do you think that?  Why do you think he
24 would have no knowledge of --
25     A    Because he doesn't work in the VMF, in the

1  VMF umbrella, okay?  He's a Customer Service
2  Postmaster, okay?  It would have -- other than getting
3  his truck serviced there at Gaithersburg with me, he
4  would have no interactivity, okay?
5      Q    Have you heard Mr. Carney make any racial
6  comments or jokes?
7      A    No.
8      Q    On or around July 17th, 2002, were there
9  vacant supervisor positions --
10          MR. CHAKERES:  I'm sorry, what was that date?
11          BY MS. MURRAY:
12     Q    On or around July 17th, 2002, were there any
13 vacant supervisor positions within VMF?
14     A    Could be.
15     Q    Do you recall supervisor position 31-0233-02?
16     A    Sound like numbers of some packages I
17 handled, yes.
18     Q    Do you recall handling -- well, first of all,
19 what is a package?  If you can tell me what that is?
20     A    You have an announcement, 33-02, okay?  The
21 package would be the package of people that applied for
22 that particular job.
23     A    So it's the announcement --
24     A    The and the corresponding --
25     Q    -- the applications?

```
 1    A    -- applications.
 2    Q    So you may have handled some packages for
 3  these two positions, supervisor positions?
 4    A    Very possible.
 5    Q    I'm going to show you --
 6    A    Did you say 2002?
 7    Q    2002.  I'll show you the document.
 8    A    Okay.
 9    Q    I'm going to show you Exhibit 60 to the
10  investigative file for Agency Case Number 4K200010802.
11  That's page 205.
12         MR. CHAKERES:  Okay.  Let the record reflect
13  that Exhibit 60 is before the witness.
14         BY MS. MURRAY:
15    Q    Please take a look at that document,
16  Mr. King.
17    A    Okay.
18    Q    Can you identify that document, sir?
19    A    It's a posting of position at 400 K Street.
20    Q    And that's the supervisor position?
21    A    Correct.
22    Q    Is that position number 31-02?
23    A    Uh-huh.
24    Q    Do you recognize this announcement?
25    A    Looks like the one that was posted.
```

1  Q   Okay. Does this look like one of the
2  packages that you handled at your --
3  A   Yeah.
4  Q   Did you have any involvement in preparing
5  this announcement?
6  A   If this is the one I think it is -- no,
7  preparing the announcement, no.
8  Q   Okay. Who prepared the announcement?
9  A   That's done by Human Resources. All we do is
10 make a request to have the position posted. They
11 verify the position's vacant and should be posted.
12 Q   Who prepares the requirements on the vacancy
13 announcement?
14 A   That's, that's in the system.
15 Q   So it's already predetermined?
16 A   Already predetermined. The only thing we can
17 do is add to it.
18 Q   Okay.
19 A   In other words, if a particular job has six
20 requirements and I want to add six more, I can request
21 to have the other six added.
22 Q   Who has the authority to do that?
23 A   Manager of Vehicle Maintenance or manager of
24 Vehicle -- manager of VMF could have that.
25 Q   Do you know whether or not any particular

1  requirements were added here that --
2      A    I believe those are the standard eight.
3      Q    The standard eight?
4      A    Uh-huh.
5      Q    Had you ever seen this vacancy announcement
6  posted?  Was it posted, for instance, at Gaithersburg?
7      A    Yeah, I'm sure it was.
8      Q    So are vacancy announcements typically posted
9  at all VMF locations?
10     A    All these should be posted in all post
11 offices, not just in the VMF.  It's just that the VMF
12 has obvious interest in them, you know, so therefore it
13 should be posted.  But it should be posted on the
14 Internet.  It should be posted in all post offices and
15 it even may come out in the national announcement
16 thing.
17     Q    So you said the standard eight are kind of
18 predetermined?
19     A    Yes, predetermined.  Most positions in the
20 Postal Service, those are all predetermined.
21     Q    And they --
22     A    And the only thing you can do is add to them.
23     Q    And the predetermination is made by Human
24 Resources?
25     A    Yes.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1  Q   Who predetermines it?
2  A   By headquarters. They've got it in some
3  database and just pull it out.
4  Q   Let's look in the same investigative file for
5  Charge 108 and Exhibit 71, page 267.
6       MR. CHAKERES: Let the record reflect that
7  Exhibit 71 is before the witness.
8       BY MS. MURRAY:
9  Q   Take a look at that document.
10 A   Okay.
11 Q   Is this a vacancy announcement for another
12 supervisor position?
13 A   Yes.
14 Q   And that's for position number 3302?
15 A   Uh-huh.
16 Q   And the requirements are the standard eight
17 as well --
18 A   Correct.
19 Q   -- for that? Does this look like one of the
20 packages that you handled?
21 A   Yes, it does.
22 Q   Are these eight the same eight, standard
23 eight that were used for the 204B program, to your
24 knowledge?
25 A   I assume so, yes.

1       MR. CHAKERES: Can we take a break here for a
2  second, or just go off the record for a second.
3       (Off the record; on the record.)
4       BY MS. MURRAY:
5  Q    Okay. Have you had a chance to review or
6  compare Exhibit 1 and Exhibit 71 of the Agency Case
7  file to see if they're the same?
8  A    Yeah, they look the same.
9  Q    Okay. Please reference Exhibit 69 in the
10 same investigative file for Charge 108, page 265. Do
11 you have that there, sir?
12 A    Uh-huh.
13      MR. CHAKERES: Let the record reflect Exhibit
14 8 is before -- or Exhibit 69 is before the witness.
15      BY MS. MURRAY:
16 Q    Do you recognize this document, Mr. King?
17 A    Yes.
18 Q    Okay. Can you tell me what this is?
19 A    Basically this is a promotion report. This
20 would actually be, would be with the Board and looked
21 at the evaluations filled out. We would send those to
22 the selecting official for him to fill out his part.
23 Q    And let's go through the process for
24 selecting the individuals under the two vacancy
25 announcements that we just reviewed. What's the