21          THE WITNESS: Okay.

1034

Q    Is there any reason why you didn't offer it to Mr. Hobson instead of Mr. Buchanan?
A    Mr. Hobson may have been on leave. I can't say.
Q    So, you don't know?
A    No.
Q    Did you consider any mechanics on tour 2?
A    No.
Q    Why not?
A    Mr. Buchanan was working tour 3, so I selected him.
Q    What do you think is relevant or important about Mr. Buchanan working on tour 3 which led you to conclude that he should act as a supervisor on that tour?
A    That's where the vacancy existed was on that tour. The vacancy would be because of whoever's place he was taking was in training.
Q    We've had previous testimony of people switching tours, even switching locations.
A    Correct.
Q    So, why is it that you would not consider other more senior mechanics for the position?

**Vol. 4**

1122-1128

A    These three right here.
Q    The last three?
A    Correct.
Q    So, you made those first?
A    Yes.
Q    Did you make all three of these at the same time?
A    I don't recall.
Q    Let's take the first of the three, which is really the third document in Exhibit 22.
A    Okay.
Q    First of all, this is a note that you prepared; is that right?
A    Yes.
Q    Can you read what's written in the top portion of the third page of Agency Exhibit 22?
A    Across the very top?
Q    Yes, across the very top.
A    "Cheryl Keith, labor, return to work. Take corrective action and phone number."
Q    Cheryl Keith is a Postal Service employee?
A    She's a labor relations specialist, yes.
Q    For the Postal Service?

*Opp Ex 4 at pp 1122-28, 1144-46*

    A   Yes.
    Q   You spoke to her on the telephone perhaps?
    A   Yes.
    Q   Are the notes that follow, notes you took while you were talking to Ms. Keith or after you talked to Ms. Keith?
    A   I don't recall.
    Q   Do you know when you wrote these notes on this page, the third document of Agency Exhibit 22?
    A   The 25th of June of '01.
    Q   You think you wrote it on that day?
    A   Yes.
    Q   On June 25th, 2001, you were present when Mr. West arrived at work at 5:30 a.m.?
    A   Yes.
    Q   Isn't your normal start time later than 5:30?
    A   Yes.
    Q   What is your normal start time?
    A   8 o'clock.
    Q   Why were you there at 5:30 a.m.?
    A   To challenge Mr. West about the events that had happened the prior week.
    Q   So, you came to work two and a half hours early for that?
    A   Yes.
    Q   Had you done that on the 19th?
    A   Yes.
    Q   Had you done that on the 20th?
    A   Yes.
    Q   Had you done that on the 21st?
    A   Yes.
    Q   Had you come in early on the 22nd?
    A   I don't recall.
    Q   At the top, you have, "Return to work, take corrective action;" is that correct?
    A   Yeah, but that's not my handwriting. I'll put it that way. Apparently, Ms. Keith had this document and wrote this on here and gave it back to me. She only had a part of it.
    Q   I was under the impression that you talked to Ms. Keith on the phone. You had transmitted a document to Ms. Keith?
    A   I don't remember whether I transmitted it to her or not. I know that I called her, yes.
    Q   But, you're sure this writing at the top is not your handwriting?
    A   No, it is not.
    Q   You believe it's Ms. Keith?
    A   Yes, I do.
    Q   Do you recall discussing anything else with Ms. Keith regarding the events of the prior week relating to Mr. West?
    A   I may have, but I don't recall.
    Q   Had you by this time had any understanding of why Mr. West did not report on June 17th by the time you talked to Ms. Keith in labor relations? Did you know why Mr. West didn't report?
    A   Well, according to his leave slip, he took dependent care sick leave.

Q   Do you know anything else besides that?
A   No.
Q   Did Ms. Keith ask you why Mr. West didn't report?
A   The 17th?
Q   Yes.
A   No.
Q   Do you recall any discussions with Ms. Keith about what documentation you expected from Mr. West?
A   No.
Q   Did Ms. Keith ever communicate to you a recommendation that you take corrective action against Mr. West?
A   Looking at the notes here, yes. Return to work, notice, and take corrective action.
Q   Had anyone else advocated taking corrective action against Mr. West besides Ms. Keith?
A   No.
Q   Had you talked to Mr. Currie about all of this?
A   Yes.
Q   What did Mr. Currie say?
A   He asked me if I had called labor and I told him that I had. He told me to follow the instructions of labor.
Q   Did he tell you anything about whether or not he felt it was proper for you to have taken the actions you did on June 18th with respect to Mr. West?
A   I don't recall.
Q   Did Mr. Currie provide any opinion about what you were doing, what you had done with respect to holding Mr. West's badge the 19th, the 20th and the 21st of June?
A   No.
Q   Where did the idea come from to take this out of the ordinary action as you call it, take an employee's badge and not letting him work? Where did that notion come from?
A   My idea.
Q   It was?
A   Yes.
Q   It wasn't Mr. Currie's idea? Mr. Currie didn't share with you he had done that before to other employees?
A   No.
Q   What transpired on June 25th when Mr. West reported to work?
A   Let me see. Let me read my notes. Mr. West reported to work.
Q   How about you telling me what you recall instead of reading the document? Why don't you tell me, as you sit here today, what do you recall from June 25th, 2001?
A   He reported. He clocked in. He asked me what did I want him to hit on. I told him to hit a 91 and come to my office. I again tried to reiterate my instructions to Mr. West. Mr. West kept saying he didn't understand what I was asking for, if I would give it to him in writing. That would be the first time he would know what I'm asking about.
Q   That's what he told you?
A   Yes.
Q   What else happened after that? Again,

1144-1146

in covering the events of June 17th through July of 2001?
    A   Yes, I'm the one that issued Kevin the notice.
    Q   Were you involved in the sort of grievance process regarding that?
    A   Yes.
    Q   What involvement did Mr. Currie have in that process?
    A   Other than concurring on the letter.
    Q   What letter are you referring to?
    A   If I'm not mistaken, I issued him a notice of suspension.
    Q   You issued a notice of suspension covering this time period that we've been speaking of?
    A   I believe so, yes.
    Q   Let's look at Agency Exhibit 28. Does this document appear to be the letter of suspension that you just referenced in your testimony?
    A   Yes.
    Q   What period of time are you suspending Mr. West for this action?
    A   Seven days.
    Q   What was the basis of your decision to suspend Mr. West?
    A   Failure to maintain a regular work schedule.
    Q   In the absences you list midway through are June 17th, 2001, eight hours, AWOL.
    A   Right.
    Q   That's the date we were talking about when Mr. West was supposed to report to Riverdale.
    A   Correct.
    Q   June 22nd, 2001, eight hours of sick leave.
    A   Correct.
    Q   That's sick leave that you approved, right?
    A   Correct, unscheduled.
    Q   Unscheduled?
    A   Correct.
    Q   And for June 27th, 28th, 29th and July 6th, 32 hours of AWOL; is that correct?
    A   Correct.
    Q   Those dates, the 27th, 28th, 29th and July 6th, those were the days Mr. West was out after you told him to leave on the 25th; is that correct?
    A   Correct.
    Q   So, all of these are really wrapped up into a two-week period or the week that we were talking and you believe that was a sufficient reason to suspend Mr. West for seven days?
    A   Yes.
    Q   Was Mr. Currie the concurring official on this?
    A   Yes.
    Q   So, both of you thought that was a sufficient reason to suspend Mr. West, you both concurred in that decision?
    A   Yes. Mr. Currie concurred on my decision to suspend Mr. West. If you would look on the page where Mr. Currie concurred on that document, Mr. West had a letter of warning for a prior AWOL back in June of 2001.

Q    We talked about that one already?

1150-1151

A    Yes, he concurred.
Q    Both Exhibit 28, Agency, and the one that you have right there, August 24th, 2001, both of those were rescinded, were they not, by the union through the union grievance process?
A    I believe so, yes.
JUDGE KINCAID:  Ms. Murray, does your question say both the Agency Exhibit 28 and the Complainant's Exhibit 25 both were resolved?
MS. MURRAY:  That's what my question was, yes.
JUDGE KINCAID:  That's what I asked about is your question.
THE WITNESS:  Yes.
JUDGE KINCAID:  Your answer, sir?
THE WITNESS:  I believe they were, yes.
Q    Weren't they rescinded because they were improperly issued under the collective bargaining agreement?
MR. CHAKERES:  Objection, Your Honor.
JUDGE KINCAID:  I'm going to allow the question.  Overruled.
THE WITNESS:  Yes.
Q    Are you familiar with provisions concerning emergency placement of employees?
A    Yes.
Q    Were you aware of those provisions in June of 2001?
A    Yes.
Q    What are the procedures to place an employee under emergency placement?
A    Disruptive to the operation, could be harmful to themselves or other employees or equipment.
Q    Those are the reasons why you may issue or place an employee on emergency placement?
A    On emergency suspension, yes.
Q    Once you make that decision that's what you want to do as a manager, what steps must you go through in order to effectuate that emergency placement of that employee?
A    You would have to go through labor relations.

## Vol. 5

1301-1302

Mr. Miller had a habit of punching in a little bit late and working over.  Is that fair to say?
THE WITNESS:  From looking at these records here, yes.
Q    Do you recall that from your experience of working with Mr. Miller for a year and a half?
A    Yes.
Q    I think right before we broke, we were at Exhibit 110, page 297.  Do you have that in front of you, Mr. Cook?