2605

1  Postal Service with a behavior trait of that feature.
2  Q   You had formulated an opinion that it's a
3  behavioral trait; is that right?
4  A   It's a personality trait that he has when
5  he's in charge of other employees, yes.
6  Q   This wasn't anything you observed yourself?
7  A   That's correct.
8  Q   This was based on coworker complaints?
9  A   That's correct.
10 Q   Who were the coworkers?
11 A   Mr. Simmons, Monique Childs, Mr. Mansfield,
12 and there's another employee. I can't remember his
13 name right now.
14 Q   It's your testimony that during that
15 meeting on September 7th, Mr. West informed you of his
16 EEO activity, that you're still saying that's how you
17 learned of it?
18 A   Oh, he made it very clear.
19 Q   What did he say?
20 A   He said that there have been managers
21 before you and there will be managers after you that I

2660

1  Q   At some point in time, did you block
2  Ms. Gwendolyn Simms-Hearn in a hallway while you were
3  at Bedford Park, Illinois?
4  A   I don't recall the situation you're
5  discussing.
6  Q   You don't recall her coming in for the day
7  going to the time clock and you not letting her pass
8  in the hallway?
9  A   No.
10 Q   Have you ever physically intimidated any
11 other employees at Bedford Park, Illinois?
12       MR. CHAKERES: Objection, Your Honor.
13       JUDGE KINCAID: I'm going to allow it.
14 Overruled.
15       THE WITNESS: I don't think I have ever
16 physically intimidated anybody.
17 Q   Did you concur in some disciplinary actions
18 against Mr. West in July and August of 2001 issued by
19 Mr. Cook?
20 A   It's very possible I concurred, yes.
21       (Complainant's Exhibit Number 73 was marked

Opp Ex 17 at 2660-65

2661

1  for purposes of identification.)
2      Q    I'm showing you a document that's
3  previously been marked as Complainant's Exhibit 73.
4           MR. CHAKERES:  Your Honor, it's already an
5  admitted exhibit.
6           JUDGE KINCAID:  Where?
7           MR. CHAKERES:  Agency Exhibit 28.
8      Q    I'm showing you that document, as well as
9  Complainant's Exhibit 25.  Can you identify both of
10 those documents for the record, sir?
11     A    They appear to be letters of suspension.
12     Q    They were issued to Mr. West?
13     A    Yes.
14     Q    One for July 17th of 2001 and the other for
15 August 24th, 2001?
16     A    Correct.
17     Q    You concurred in both of those corrective
18 actions?
19     A    That's correct.
20     Q    Do both of those actions cover a period of
21 time when Mr. West was prevented from working for, as

2662

1  we have been describing, for alleged failure to follow
2  instructions from Mr. Cook or acknowledge instructions
3  from Mr. Cook?
4      A    I don't recall the actual dates that you're
5  making reference to.
6      Q    Did at any time during your discussion with
7  Mr. Cook regarding this corrective action either one
8  of you mention Mr. West's EEO activity?
9      A    During the telephone conversation?  You're
10 talking about these actions?
11     Q    Correct.
12     A    That would not be an appropriate
13 conversation.  We would not have discussed EEO
14 activity related to discipline.
15     Q    Again, no, you did not discuss that?
16     A    Correct, we did not discuss EEO activity.
17     Q    When Mr. Cook provides you with
18 disciplinary action to concur with, do you typically
19 discuss the nature of the offenses?
20     A    Generally, I look for the kind of document
21 to be upheld.  Is there evidence of the infraction?

2663
1  Is there a rule? Was the employee aware of the rule?
2  Is that letter written in an acceptable format? Does
3  he have all of that supporting documentation? Does he
4  use the right language? Yes, we also discuss the
5  situation that led to the event.
6     Q    During your discussions, do you recall
7  whether or not you discussed with Mr. Cook the events
8  giving rise to both of those corrective actions?
9     A    Just looking at these two documents
10 standing alone, I have no recollection except that
11 they are an AWOL, sick leave, AWOL, sick leave.
12 That's the only supporting documentation I can see
13 from this.
14    Q    I'm showing you two documents that have
15 been previously marked and entered as Complainant's
16 Exhibits 11 and 12. I'd ask you to review those
17 documents to yourself and let me know when you have
18 completed your review.
19    A    Okay, I have reviewed them.
20    Q    Does that refresh your recollection as to
21 whether or not some of the dates indicated in both of

2664
1  the corrective actions there I showed you, the
2  suspensions of July 17th, 2001 and August of 2001
3  encompass, in part, dates that Mr. Cook had not been
4  allowing Mr. West to report to work?
5     A    I didn't see any reference to the June 22nd
6  date. The June 17th date is not related to him not
7  being at work. It's related to a sick call.
8     Q    Wasn't that the sick call that Mr. Cook was
9  trying to instruct Mr. West about which led to the
10 weeks of him being prevented from working?
11    A    I don't see the dates that he's prevented
12 from working on these documents. I guess I'm
13 confused. I'm looking for the dates that he's
14 actually not allowed to work on the documents. Is
15 that what I'm supposed to be looking for?
16    Q    Do any of the dates correspond, not what's
17 not there, but do any of the dates that correspond
18 from the two documents that I showed you, 11 and 12,
19 do any of those dates where Mr. West was not allowed
20 to work comprise in any part either of the corrective
21 actions of July 17th or August 24th?

2665
1   A   I don't see the connection.
2   Q   Didn't you and Mr. Cook come up with this
3   scheme of not allowing Mr. West to work to quote teach
4   Mr. West a lesson?
5       MR. CHAKERES:  Objection, Your Honor.
6       JUDGE KINCAID:  I'll allow it.  Overruled.
7       THE WITNESS:  I don't know what scheme
8   you're referring to.
9   Q   Not allow every day Mr. West coming into
10  work, Mr. Cook not allowing him to work, not giving
11  him his timecard and eventually taking his badge,
12  having him escorted out by the postal police, putting
13  him on emergency placement, that whole period of
14  harassment as Mr. West alleges, wasn't that, in part,
15  done to teach Mr. West a lesson?
16  A   My involvement with that time period is one
17  phone call where I make reference to making sure he
18  does what he's doing in writing and seek advice from
19  the labor rep.  My understanding is this has already
20  gone on several days before I'm contacted, so I can't
21  see how a scheme is developed after the fact.

2691
1   thought they were going to.  So, one of the rules was
2   we were only going to use people for 120 days.
3   Another rule was we were rotating them.  We quickly
4   discovered that as a supervisor retired, we had an
5   immediate need for somebody, so we tried to identify
6   internally, myself, David Cook and Joe King.  We tried
7   to make concessions for the need that if long term, it
8   would be better to put one person in a single shift
9   where we know every day, every week we have a vacancy
10  rather than rotate a bunch of people out.  We knew
11  there was enough opportunity within the six buildings
12  that all six people were going to get lots of exposure
13  no matter how we did it.
14  Q   Let's take a look at the list.  On the top
15  of the list, you have Mr. Scott.  Was he given one of
16  these like long-term 204b assignments?
17  A   Yes.
18  Q   Mr. Green, was he given a long-term 204b
19  assignment?
20  A   Yes.
21  Q   Ms. Alston, did she receive a long-term