file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 1 of 44

0001
1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3   - - - - - - - - - - - - - - - x
                              :
4   KEVIN D. WEST,            :
                              :
5        Plaintiff,           :
                              :
6   v.                        : Civil Action No.
                              : 05-1339(JR)
7   JOHN E. POTTER,           :
    POSTMASTER GENERAL,       :
8   U.S. POSTAL SERVICE,      :
                              :
9        Defendant.           :
                              :
10  - - - - - - - - - - - - - - - x
11                  Thursday, September 13, 2007
                    Greenbelt, Maryland
12  DEPOSITION OF:
13          DAVID  EDWARD  COOK
14      a Witness in the above-entitled cause,
15  called for examination by counsel for the Plaintiff,
16  pursuant to notice and to agreement of counsel as to
17  time and place, at The Law Office of T.W. Murray,
18  7474 Greenway Center Drive, Suite 820, Greenbelt,
19  Maryland 20770, commencing at 11:27 a.m., before
20  Marney Alena Mederos, RPR, a Notary Public in and
21  for the State of Maryland, when were present on
22  behalf of the respective parties:
0002
1   APPEARANCES:
2          TERESA W. MURRAY, ESQUIRE
3          The Law Office of T.W. Murray
4          7474 Greenway Center Drive
5          Suite 820
6          Greenbelt, Maryland  20770
7          (301) 982-2005
8          On behalf of the Plaintiff.
9
10         RHONDA C. FIELDS, ESQUIRE

11        Assistant United States Attorney

12        Civil Division

13        555 Fourth Street, N.W.

14        Washington, D.C.  20530

15        (202) 514-6970

16        On behalf of the Defendant.

17

18   ALSO PRESENT:

19        Kevin West, Plaintiff

20

21

22            *  *  *

0003

1           C O N T E N T S

2   WITNESS:              EXAMINATION BY:    PAGE:

3   David Edward Cook        Ms. Murray          4

4

5

6           E X H I B I T S

7   NO.   DESCRIPTION                  PAGE:

8   1    Defendant's Response to Plaintiff's      16

9        Interrogatories and Requests for

10       Production of Documents

11

12  2    5/10/99 letter to Mr. Cook, 5/11/99      27

13       response regarding Training Request

14       Memo, 2/23/06 letter to Mr. Absher,

15       2/27/06 letter to Mr. West, 3/2/06

16       letter to Mr. Cook, 3/22/06 letter to

17       Mr. King, and 3/22/06 letter to Mr. West

18

19  3    Announcement regarding Mr. Hall and      34

20       announcement regarding Mr. Warrick

21

22  (Exhibits attached.)

0004

1          P R O C E E D I N G S

2   Whereupon,

3            DAVID  EDWARD  COOK

4        a Witness, called for examination by counsel

5   for the Plaintiff, having first been duly sworn, was

6   examined and testified as follows:

7        EXAMINATION BY COUNSEL FOR PLAINTIFF

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 3 of 44

8          BY MS. MURRAY:
9      Q    Good morning, Mr. Cook.
10     A    Good morning.
11     Q    As you know, I'm Teresa Murray.  I
12  represent Kevin West.  I've taken your deposition
13  before, but I would like to just go through the
14  ground rules again.
15         If you need to take a break for any
16  reason, use the rest room, need something to drink,
17  let me know.  I'll be sure to accommodate that.
18         If you don't understand a question that
19  I ask, let me know and I'll rephrase it until I get
20  it in a form that we both understand.
21         If you don't hear me, let me know that
22  as well and I'll speak up.
0005
1      A    Uh-huh.
2      Q    If you answer, it is assumed that you
3  understood my question, that you heard it, and that
4  you're giving your answer in compliance with your
5  oath.
6      A    Okay.
7      Q    Can you state your full name for the
8  record, sir?
9      A    David Edward Cook.
10     Q    And where are you employed?
11     A    United States Postal Service, Capitol
12  Heights, Maryland.
13         MS. FIELDS:  You have to put that down
14  (indicating), because --
15         THE WITNESS:  I'm sorry.
16         BY MS. MURRAY:
17     Q    Is there a particular subdivision of
18  the Postal Service that you work for?
19     A    The Vehicle Maintenance Facility.
20     Q    And how long have you worked for the
21  Vehicle Maintenance Facility?
22     A    Since February of 1993.
0006
1      Q    What job title do you hold there?
2      A    Manager of vehicle maintenance.
3      Q    Approximately how many employees do you
4  supervise?

 5      A    Forty.

 6      Q    And are you at a particular location in

 7  Southern Maryland?

 8      A    Yes.  I work out of the building that's

 9  called Largo I.

10      Q    Are there other buildings that comprise

11  Southern Maryland?

12      A    Yes.

13      Q    Okay.  What are they?

14      A    Largo II and Riverdale.

15      Q    And you manage all three of those

16  locations?

17      A    Yes.

18      Q    Is there anything that distinguishes

19  any of these three locations amongst each other?  Is

20  there a significant difference in how you manage any

21  of those?

22      A    Yes.  Largo I, where I am stationed, is

0007

 1  the administrative office and the heavy truck shop

 2  for transportation.

 3      Q    And Largo II is just not either one of

 4  those two?

 5      A    No.  Largo II and Riverdale take care

 6  of the delivery trucks.

 7      Q    What is a 204B?

 8      A    Somebody being paid a higher level in a

 9  management position.

10      Q    And can you explain what you mean by

11  paid a higher level?

12      A    There is two rate scales, a PS and an

13  EAS.  The EAS scale is what I'm referring to in the

14  204B.

15      Q    So when an individual is in a 204B

16  position, they're paid at that EAS rate --

17      A    Yes.

18      Q    -- for the time that they're acting in

19  that capacity; is that correct?

20      A    Yes.

21      Q    How are employees selected to serve as

22  a 204B?

0008

 1      A    Depending on -- excuse me.  Depending

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 5 of 44

2  on where the need is and the people that are
3  available.
4      Q    Okay.  So how do those two things
5  affect how an employee is selected?
6      A    Can you restate the question?
7      Q    Okay.  If I'm recalling your testimony
8  correctly, you said -- I asked how was an employee
9  selected for a 204B, and you said it depends on the
10  need and the people that are available.
11      A    Available, yeah.
12      Q    So I was wondering how those two
13  affected how an individual is selected for the
14  position.
15      A    Well, depending on where the need is in
16  whichever building, normally you would select a
17  person from that building.
18      Q    Let me break this down a little bit.
19  In Southern Maryland, who decides who is going to
20  serve as a 204B?
21      A    I do.
22      Q    Do you use any criteria to select an
0009
1  employee to be a 204B?
2      A    Again, I would say the need in --
3  whichever building has the need for a 204B, I would
4  select either an individual that has -- has had past
5  performance in that position or select a senior tech
6  to perform in that position.
7      Q    How do employees know that a 204B
8  opportunity exists?
9      A    They will be informed by me.
10      Q    Would you do that verbally or post a
11  notice?
12      A    Currently, we're doing it verbally.
13      Q    Between 2001 and to date, have you done
14  it any other way besides verbally?
15      A    In 2001, there was a 204B program that
16  my former manager, Mr. Currie, incepted.  He started
17  the program.  During that period of his tenure, he's
18  the one who actually selected the individuals to be
19  in the 204B program.
20      Q    So once you're in the program, how are
21  the individuals in the program aware of 204B

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 6 of 44

22  opportunities?

0010

1      A    Mr. Currie made them aware of them.

2      Q    204B opportunities can be varying in

3  duration; is that correct?

4      A    Correct.

5      Q    You can be a 204B for one day or six

6  months; is that right?

7      A    Yes.

8      Q    And some 204B opportunities occur when

9  a permanent supervisor is out for vacation or sick

10  or et cetera; is that fair to say?

11      A    Yes.

12      Q    Okay.  Did individuals in the 204B

13  program established by Timothy Currie do fill-ins

14  for sick leave or vacation leave taken by permanent

15  supervisors?

16      A    Yes.

17      Q    Did they do longer 204B details, maybe

18  a year or more?

19      A    Yes.

20      Q    And there were how many people in the

21  program?

22      A    Twenty-one.

0011

1      Q    And how did the 21 individuals become a

2  part of the program?

3      A    They applied for it.

4      Q    And once they applied, wasn't there a

5  process of accepting some and rejecting others?

6      A    I'm not sure I understand your

7  question.

8      Q    You said that 21 individuals were in

9  the program, and you said that they --

10      A    Had applied for the program.

11      Q    They applied for the program?

12      A    For the program, yes.

13      Q    Okay.  In response to their

14  application, was there a decision made by a member

15  of VMF management to either grant them admission to

16  the program or deny them admission to the program?

17      A    There was a review board established

18  that established those people's ratings.

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

19      Q      And after the ratings were established,
20  weren't six individuals selected?
21      A      Yes.
22      Q      And the other applicants were not
0012
1  selected; isn't that right?
2      A      At that time, yes.
3      Q      How long did this program operate?
4      A      I don't recall.
5      Q      But others besides the six individuals
6  that were ultimately selected for the program served
7  as 204Bs between 2001 and, let's say, 2004; is that
8  accurate?
9      A      Yes.
10      Q      Isn't it also accurate that others who
11  didn't apply to the program served as 204Bs between
12  2001 and 2004?
13      A      I don't recall.
14      Q      Has Mr. West ever served as a 204B?
15      A      No.
16      Q      Why not?
17      A      He wasn't selected to.
18      Q      Why was he not selected?
19      A      Where the need was, opportunities
20  weren't afforded to him.
21      Q      Okay.  There have been occasions where
22  there's been a need for a 204B where Mr. West has
0013
1  worked; is that fair to say?
2      A      I don't recall.
3      Q      Okay.  Isn't it true that Mr. Currie
4  instructed you to not have Mr. West serve in
5  higher-level positions?
6      A      No.
7      Q      That's not true?
8      A      Not that I recall.
9      Q      Okay.  Do you recall testifying at a
10  hearing in front of an administrative judge in
11  Baltimore in connection with Mr. West's
12  administrative complaint?
13      A      Yes.
14      Q      Okay.  Mr. Currie testified at that
15  hearing as well.

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 8 of 44

16      A    Yes.

17      Q    In response to this question -- I'll

18   read the question.  I was representing Mr. West, and

19   I asked Mr. Currie, "Did you inform any of

20   Mr. West's managers or supervisors that he wasn't to

21   be used in a higher-level role?"

22           Mr. Currie answered, "I made a phone

0014

1   call and talked with Mr. Cook about the meeting I

2   had with Mr. West, yes."

3           My question:  "Tell us about that

4   conversation."

5           Answer:  "I just expressed the concerns

6   I had through my investigation to Mr. Cook and

7   related to him I did not want Mr. West put in charge

8   of the shift until a further date."

9           I also said, "What were your concerns

10   that you communicated to Mr. Cook?"

11           "I told Mr. Cook that when Mr. West is

12   in charge, he does not treat the fellow employees

13   with an acceptable respect level and, therefore, I

14   don't want him representing the management of the

15   United States Postal Service..."

16           So are you saying that Mr. Currie's

17   statements are not true?

18      A    No.  I don't recall those statements,

19   but --

20      Q    Does this refresh your recollection as

21   to your conversation with Mr. Currie?

22      A    Right.  Yes.

0015

1      Q    Okay.  What do you recall with your

2   conversation with Mr. Currie about whether Mr. West

3   should ever be in charge of a shift?

4      A    It's listed on that piece of paper.

5      Q    You don't recall anything else?

6      A    No.

7      Q    Did Mr. Currie reference Mr. West's EEO

8   complaints in your conversation?

9      A    Not that I recall.

10      Q    In your mind, is Mr. West qualified to

11   be a 204B?

12      A    State the question again, please.

13    Q    Sure.
14        In your mind, is Mr. West qualified to
15  be a 204B supervisor?
16    A    As I haven't worked with Kevin West for
17  a while, I couldn't say that.  I couldn't say
18  whether or not he would qualify to do that.
19    Q    But you've supervised his work
20  previously; isn't that right?
21    A    Yes.
22    Q    Based on the times that you did
0016
1  supervise Mr. West, was he qualified, in your mind,
2  to serve as an acting 204B supervisor?
3    A    At that time, no.
4    Q    Why not?
5    A    He had problems with employees and his
6  communication skills.
7    Q    Is that a requirement in order to be a
8  204B supervisor, that you get along with your
9  employees -- fellow employees?
10    A    My requirement, yes.
11    Q    So you take into consideration when
12  selecting an individual for a 204B their
13  relationship or how well they're communicating and
14  getting along with their employees?
15    A    Yes.
16            (Thereupon, Cook Exhibit
17            No. 1 was marked for
18            identification.)
19    BY MS. MURRAY:
20    Q    The court reporter has handed you a
21  document that's been marked as Cook Exhibit 1.
22        Can you review that document and let me
0017
1  know when you've completed your review?
2    A    Okay.
3    Q    Can you identify the document for the
4  record, sir?
5    A    Defendant's Response to Plaintiff's
6  interrogatories and Requests for Production of
7  Documents.
8    Q    Okay.  If you look at page 10 of that
9  document, is that your signature there where you are

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 10 of 44

10  verifying the answers and --
11      A    Yes.
12      Q    Direct your attention to the second
13  page of that document, Interrogatory Number 2, where
14  it asks for the identification of employees who
15  served as a 204B.  There's more words in there than
16  that, but just to summarize it.
17          MS. FIELDS:  Interrogatory Number 2?
18          MS. MURRAY:  Interrogatory Number 2,
19  yes, ma'am.
20          MS. FIELDS:  Okay.
21          BY MS. MURRAY:
22      Q    You've provided the answer at pages 3
0018
1  through 4.
2          Are there any other individuals who are
3  not listed here who have also served as a 204B in
4  the time frame identified in the interrogatory, 2001
5  to present?
6      A    Not that I can recall.
7      Q    What about John Preston Miller?
8      A    He's never served as a 204B for me.
9      Q    What do you mean by for you?
10      A    He was requested by Mr. Currie to come
11  to the Capital Office to manage the body shop
12  operation that Mr. Currie was going to put in place
13  to do all of the body work for the Capital District.
14      Q    So, in your view, Mr. Miller was a 204B
15  for Mr. Currie in that instance?
16      A    Yes.
17      Q    Mr. Miller was not part of that 204B
18  program that Mr. Currie had; is that correct?
19      A    No.
20      Q    He didn't apply either, did he?
21      A    No.
22      Q    If we look back at the question in
0019
1  Interrogatory Number 2, it says, "Identify all EAS
2  details/temporary promotions (204B acting supervisor
3  or manager) from May 2001 to present at Southern
4  Maryland VMF locations (including employees detailed
5  from Southern Maryland VMF to other VMF
6  facilities)."

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 11 of 44

7       Did I read that correctly?

8       A    Yes.

9       Q    Okay.  Was there anyone else, besides

10  whether they were a 204B for you, that was detailed

11  from your location to another VMF location?

12      A    I don't recall.

13      Q    In your answer to Interrogatory

14  Number 2, you identified David Lowe.

15          Do you recall when Mr. Lowe was

16  afforded a 204B opportunity?

17      A    According to this, it was in December

18  of 1996.

19      Q    Okay.  Is that the date he was hired or

20  is that the date of the detail?

21      A    Date of the detail.

22      Q    Do you recall an instance --

0020

1           MS. FIELDS:  (Attorney shakes head.)

2           MS. MURRAY:  Okay.  Let's -- well,

3   we'll talk about that.

4           BY MS. MURRAY:

5       Q    With respect to -- do you recall an

6   opportunity for Mr. Lowe to serve as a 204B in

7   Riverdale?

8       A    Yes.

9       Q    Okay.  When was that, as best you can

10  recall?  It doesn't have to be a precise date.  Do

11  you remember the year, perhaps?

12      A    I can't put a date and time on it.

13      Q    Okay.  How long did Mr. Lowe serve as a

14  204B in Riverdale?

15      A    I can't put a time on that either.

16      Q    Would it have been longer than one

17  year?

18      A    I don't recall.

19      Q    Did you select Mr. Lowe for the 204B

20  opportunity in Riverdale?

21      A    Yes.

22      Q    Why did you select him for that

0021

1   position?

2       A    At the time, he was working in that

3   building and knew the operation.

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 12 of 44

4      Q    At the time, he was working in
5  Riverdale?
6      A    Yes.
7      Q    Were there any senior mechanics in
8  Riverdale who you considered?
9      A    Yes.
10     Q    Who else did you consider?
11     A    The lead tech, Henry Harris.
12     Q    Why was Mr. Harris not selected?
13     A    He declined.
14     Q    Was Mr. Lowe part of Timothy Currie's
15  program -- 204B program?
16     A    No.
17     Q    Was it possible that Mr. Lowe was
18  working at Largo I before you detailed him to
19  Riverdale?
20     A    No.
21     Q    Did you deem Mr. Lowe qualified to be a
22  204B when you put him in that position?
0022
1      A    Yes.
2      Q    How did Mr. Lowe meet the
3  qualifications to serve in that position?
4      A    Good communication skills, dealt
5  well -- dealt well with the vendors, was able to
6  manage the employees.
7      Q    You also identified Thomas Buchanan in
8  response to Interrogatory Number 2.
9          When did Mr. Buchanan serve as a 204B?
10     A    Restate your question, please.
11     Q    Sure.
12          You also identified Thomas Buchanan as
13  an individual who served as a 204B.
14     A    Yes.
15     Q    When did Mr. Buchanan serve in that
16  capacity?
17     A    September 4th of 1996.
18     Q    Do you recall any other time that
19  Mr. Buchanan served as a 204B?
20     A    No.
21     Q    Did Mr. Buchanan serve as a 204B in May
22  of 2001?
0023

1     A    I don't recall.

2     Q    John Bowser is another individual you

3  identified in response to Interrogatory Number 2 as

4  an employee who served as a 204B.

5          When did Mr. Bowser serve as a 204B?

6     A    I can't recall.

7     Q    Do you recall why Mr. Bowser was

8  selected?

9     A    No.

10    Q    Do you recall why Mr. Buchanan was

11  selected?

12    A    No.

13    Q    You also identified Chris Simmons as an

14  individual who was afforded a 204B opportunity.

15          When did Mr. Simmons receive that

16  opportunity?

17    A    I don't recall.

18    Q    Do you recall an occasion where

19  Supervisor Frank Greene recommended Mr. West to

20  serve as a 204B at Riverdale?

21    A    No.

22    Q    You don't recall an occasion in which

0024

1  he recommended Mr. West and then you instead

2  selected Mr. Simmons?

3     A    No.

4     Q    Direct your attention to page 4, still

5  at the answer to Interrogatory Number 2.  This is

6  answer subpart C.  "The employees' detail length was

7  intermittent and varied from one day to one month."

8          Did I read that correctly?

9     A    Yes.

10    Q    Is it your testimony that all of the

11  individuals you've listed in Interrogatory Number 2

12  served in 204B details for one month or less?

13    A    Restate your question.

14    Q    In response to Interrogatory Number 2,

15  you answered in subpart C -- my question was if it

16  was your testimony today that all the individuals

17  that you identified as serving as a 204B served in

18  that capacity for one month or less.

19    A    No.

20    Q    Are there any of the individuals that

21    you've listed in response to Interrogatory Number 2
22    that served in a 204B capacity for over a month?
0025
1        A    Yes.
2        Q    Can you tell me which ones, please?
3        A    David Lowe and Stephen Clark.
4        Q    Those two?
5        A    Uh-huh, that I recall.
6        Q    Okay.  Stephen Clark, how long did
7    Mr. Clark serve as a 204B?
8        A    Longer than a month.
9        Q    Okay.  Would your answer be the same
10    for Mr. Lowe?
11        A    Yes.
12        Q    Mr. Currie's program that we talked
13    about briefly, did that program end when Mr. Currie
14    left as manager of vehicle maintenance?
15        A    Yes.
16        Q    Was Mr. Simmons part of that program?
17        A    No.
18        Q    Do you recall what location Mr. Simmons
19    served as a 204B; Chris Simmons, that is?
20        A    Riverdale.
21        Q    Had he ever worked at Riverdale prior
22    to being a 204B in that location?
0026
1        A    No.
2        Q    How does a VMF employee obtain
3    supervisory training, classroom training?
4        A    Classroom training is normally
5    scheduled through the NCED, which is the employee
6    development center in Oklahoma.
7        Q    So how would an employee schedule
8    training?  Is there a process of getting approval
9    prior to scheduling it?
10        A    The way the system works, the manager
11    requests certain classes for the following fiscal
12    year through the training facility with numbers of
13    the classes requested, okay?
14        The facility then would send back what
15    classes that they were going to give us and when the
16    dates of the classes would be, and then I would have
17    to schedule individuals into each class letting the

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 15 of 44

18  NCED know who I had scheduled.

19      Q    How did you go about selecting the

20  individuals to schedule in the classes?

21      A    Depending on the needs of the different

22  individuals and depending on what classes we had

0027

1  available was how I would request that they go to

2  the training.

3      Q    Could an employee request the training,

4  just simply ask you for supervisory training?

5      A    Yes.

6      Q    Have you ever refused anyone's request

7  for supervisory classroom training?

8      A    Not that I recall.

9      Q    Have you afforded Mr. West supervisory

10  training?

11      A    No.

12      Q    Why not?

13      A    I don't recall him making that request

14  of me.

15              (Thereupon, Cook Exhibit

16              No. 2 was marked for

17              identification.)

18      BY MS. MURRAY:

19      Q    The court reporter has handed you a

20  document that has been marked as Cook Exhibit 2.

21          Direct your attention to the first

22  page, which is addressed to you from Mr. --

0028

1      A    Yes.

2      Q    -- West, dated May 10th, 1999.

3          I won't read the substance of the

4  letter, which you may do, but my question is:  Did

5  you construe this as a request for training?

6      A    Yes.

7      Q    Okay.  And you responded to Mr. West

8  also in writing; is that correct?

9      A    Yes.

10      Q    Is the second document of Exhibit 2

11  your response to Mr. West's May '99 request?

12      A    State your question again, please.

13      Q    The second document in Exhibit 2, the

14  second page of the document, is that your written

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 16 of 44

15  response to Mr. West's request for training, May 10,
16  '99?
17      A    Yes.
18      Q    Your response is the next day, May 11,
19  '99; is that right?
20      A    Yes.
21      Q    You specifically reference courses
22  offered by the PEDC; is that right?
0029
1      A    Yes.
2      Q    Do you recall receiving the third
3  document in Exhibit 2?
4      A    Yes.
5      Q    Did you construe this letter dated
6  February 23rd, 2006 to be a request for training?
7      A    No.
8      Q    What do you understand Mr. West to be
9  asking for in this document?
10      A    Detail or transfer.
11      Q    Was the detail to Acting Supervisor,
12  204B, EAS 17?
13      A    Yes.
14      Q    At any time after May of '99, did
15  Mr. West ever express to you desire for supervisory
16  training verbally?
17      A    I don't recall.
18      Q    You can go back to Exhibit 1.  Those
19  are the interrogatory answers.  Direct your
20  attention to Interrogatory Number 1 where it asks
21  for the identification of employees who --
22          MS. FIELDS:  It's the first document,
0030
1  the first page.
2          MS. MURRAY:  Thanks.
3          THE WITNESS:  Okay.
4          MS. MURRAY:  Let the record reflect
5  that before Mr. Cook is Exhibit 1, Cook Exhibit 1.
6          BY MS. MURRAY:
7      Q    Continuing with my question,
8  Interrogatory Number 1 asks for the identification
9  of employees who have received supervisory training
10  from May 2001 to present.
11          Is this your answer to Interrogatory

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 17 of 44

12  Number 1 on page 2?

13      A    State your question again.

14      Q    My question is whether your answer to

15  Interrogatory Number 1 is stated on page 2, the

16  question which asks you to identify employees who

17  have received supervisory training.

18      A    Yes.

19      Q    Okay.  Are there any other individuals

20  besides those you've identified in response to

21  Interrogatory Number 1 who have received supervisory

22  training since May of 2001 to present?

0031

1       A    I don't recall.

2       Q    Has Mr. John Preston Miller ever

3  received any supervisory training?

4       A    I haven't given him any supervisory

5  training.

6       Q    So you've never scheduled him for a

7  supervisory training class?

8       A    No.

9       Q    Did you select Mr. Buchanan for

10  supervisory training?

11      A    I don't recall.

12      Q    Did you select John Bowser for

13  supervisory training?

14      A    I don't recall.

15      Q    Would there have been anyone else who,

16  as you say, scheduled individuals into the

17  supervisory training classes besides you?

18      A    No.  Mr. Currie scheduled the training

19  classes for the 204Bs.

20      Q    Okay.  During what period of time?

21      A    During the time of his tenure in

22  Washington, D.C.

0032

1       Q    When he did not perform that function

2  and he was not in that capacity --

3       A    No.

4       Q    -- did you do that?

5       A    No.

6       Q    Who then scheduled the individuals for

7  the supervisory training classes?

8       A    Mr. Currie.

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 18 of 44

9     Q    Okay.  When Mr. Currie didn't do it --

10    A    Oh, okay.

11    Q    -- did you do it or did someone else do

12  it?

13    A    No.  There has not been any more

14  supervisory training classes scheduled.

15    Q    I see.

16         Have you requested any supervisory

17  training classes since Mr. Currie has left?

18    A    No.

19    Q    Why have you not done so?

20    A    I didn't see the need.

21    Q    So in your mind, all your employees are

22  adequately trained in all the supervisory duties?

0033

1     A    The ones that work in that role, yes.

2     Q    What about those who aspire to be

3  supervisors?  How can they get training?

4     A    I would have to have requested the

5  classes through NCED.

6     Q    But since you didn't do so, those

7  employees who aspire to be supervisors aren't

8  provided training at all; is that fair to say?  Is

9  that right?

10    A    They have not been provided supervisory

11  training, correct.

12    Q    Did anyone assist you in making that

13  decision to cease requesting supervisory training

14  classes?

15    A    No.

16    Q    If an individual wants to become a

17  permanent supervisor for a vacant position, wouldn't

18  supervisory training be helpful in their bid for

19  that job?

20    A    Yes.

21    Q    How does an employee become a permanent

22  supervisor?

0034

1     A    Applies for the vacant position that's

2  been posted.

3     Q    Are permanent supervisor positions

4  always posted?

5     A    Yes.

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 19 of 44

6      Q      There's never an occasion in which an
7   individual has been just appointed to the position
8   of permanent supervisor?
9      A      Not in my shop.
10     Q      Are there any governing policies that
11  require supervisory positions to be posted?
12     A      Yes.
13     Q      What policies are those?
14     A      Postal policy -- when positions become
15  vacant, they are to be posted stating the position,
16  title, location, hours of work, responsibilities.
17     Q      And after the posting, there's an
18  opportunity for employees to submit applications and
19  be considered for the position; is that correct?
20     A      Yes.
21                    (Thereupon, Cook Exhibit
22                    No. 3 was marked for
0035
1                     identification.)
2          BY MS. MURRAY:
3      Q      I'm handing you a document that has
4   been marked as Cook Exhibit 3.
5              Direct your attention to the first
6   announcement to All Capital District VMF Employees
7   which reads, "I wish to announce that Donald E. Hall
8   has been selected for the position of Supervisor,
9   Vehicle Maintenance for the Capital VMF.  His
10  promotion is effective July 9, 2005," by Joseph D.
11  King.
12             Did I read that announcement
13  correctly?
14     A      Yes.
15     Q      Are you aware of whether this position
16  was posted or people submitted applications and
17  interviewed and were selected for this job?
18     A      I don't recall.
19     Q      Okay.  Direct your attention to the
20  second page of Cook Exhibit 3, an announcement to
21  All Capital District VMF Employees.  "I wish to
22  announce that Thomas D. Warrick has been selected
0036
1   for the position of Supervisor, Vehicle Maintenance
2   for the Suburban VMF.  His promotion is effective

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 20 of 44

3  June 11, 2005," again, signed by Joseph D. King.
4       Did I read that correctly?
5       A    Yes.
6       Q    Are you aware of whether this position
7  that Mr. Warrick was selected for was posted,
8  applications submitted, et cetera?
9       A    I don't recall.
10      Q    Did you have any involvement in the
11  selection of Mr. Hall for the supervisor position?
12      A    No.
13      Q    Did you have any involvement in the
14  selection of Mr. Warrick for the supervisor position
15  at Suburban?
16      A    No.
17      Q    Okay.  We've talked a little bit about
18  details to supervisory positions or managerial
19  positions.
20          There are also detail opportunities for
21  higher-level positions within craft, is that
22  correct, within the vehicle maintenance craft?
0037
1       A    Yes.
2       Q    And that occurs, for example, if an
3  individual is a Level 6 and they may be temporarily
4  detailed to a Level 8 or 9; is that correct?
5       A    Yes.
6       Q    Do you recall whether David Wood has
7  ever been detailed to a higher-level position within
8  the craft -- within the vehicle maintenance craft?
9       A    I don't recall.
10      Q    Direct your attention back to
11  Exhibit 1, which is the interrogatories, page --
12  Exhibit 1, pages 6 and 7 and 8, where it asks for
13  the identification of craft employees who have been
14  selected for a higher-level craft detail.  And on
15  page 8, you've identified David Lowe as an
16  individual who has been so detailed.
17          Do you see that there?
18      A    Yes.
19      Q    Do you recall when Mr. Lowe was
20  detailed to --
21      A    No, I don't recall.
22      Q    You stated here that he's a Level 6

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 21 of 44

0038
1   mechanic, is that correct, David Lowe?
2       A    No.  He's Level 7.
3       Q    Now he's a 7?
4       A    Yes.
5       Q    Okay.  Your answer says that he was
6   detailed from a Level 6 to a Level 8 and 9.
7            So is it fair to say that Mr. Lowe was
8   detailed to a Level 8 and 9 when he was a Level 6?
9       A    I don't recall.
10      Q    Did you prepare this answer here?
11      A    Yes.
12      Q    And when you prepared these answers,
13  did you reference any materials?
14      A    No.  I went from memory.
15      Q    So at the time you prepared this, you
16  recalled; is that fair to say?  This is what you
17  recalled?
18      A    Yes, yes.
19      Q    Did you select Mr. Lowe for the
20  higher-level craft detail?
21      A    I don't recall.
22      Q    Do you recall why Mr. Lowe was
0039
1   selected?
2       A    No.
3       Q    Do you recall the location?  Was it
4   Largo II where Mr. Lowe served in the higher-level
5   craft detail?
6       A    I don't recall.
7            Seniority dates, what is this
8   (indicating)?
9       Q    What are the duties of a Level 8
10  automotive -- is it Level 8 automotive technician?
11      A    Technician.
12      Q    Okay.  What are the duties of that job?
13      A    Performing scheduled maintenance
14  inspections on the more complicated work, as far as
15  diagnosing and assisting the mechanics.
16      Q    What kind of vehicles do Level 8
17  automotive technicians diagnose?
18      A    Everything the Post Office owns.
19      Q    Would that include tractors and

20  trailers?

21      A    Yes.

22      Q    Five-ton vehicles and nine-ton

0040

1  vehicles?

2      A    Yes.

3      Q    Would that include diagnostic and

4  inspections of brake systems?

5      A    Yes.

6      Q    So an individual in that position, that

7  position meaning Level 8 automotive technician,

8  would need to be well-versed in those vehicles and

9  those systems; is that correct?

10      A    Yes.

11      Q    Do you recall -- it's so many years ago

12  now -- back in July and August of 2003 filling a

13  Level 8 position?

14      A    Yes.

15      Q    Okay.  Let me show you a document in

16  the Report of Investigation that's Affidavit C,

17  pages 13 through 18.  You can review -- sorry for

18  the cumbersome nature, but you can review those

19  pages and let me know when you've completed your

20  review.

21          MS. FIELDS:  Take your time and review

22  it.

0041

1          THE WITNESS:  How many pages do you

2  want me to review?

3          BY MS. MURRAY:

4      Q    To 18, the entire posting.

5      A    Okay.

6      Q    Does that document appear to be a copy

7  of the vacancy announcement for the Level 8

8  position, Vacancy Number 0343?

9      A    Yes.

10      Q    Okay.  Were you the selecting official

11  for that position?

12      A    Yes.

13      Q    Take me through the process by which

14  you selected the individual for that job.  What

15  occurred?

16      A    The individuals filled out -- excuse

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 23 of 44

17  me, filled out a 991, which is an application for
18  employment or promotion, which was how the job was
19  supposed to be posted, as it was a best-qualified
20  job.
21          I reviewed and rated the applicants'
22  991s, I gave the four individuals that actually
0042
1  applied for the job an interview, and then made my
2  selection from that.
3      Q    Did anyone assist you in reviewing the
4  991 applications?
5      A    No.
6      Q    Was Mr. Greene, Frank Greene, involved
7  at all in the reviewing of the applications and the
8  rating of them for this position?
9      A    No.
10     Q    I'm going to show you Volume II of this
11  ROI.
12          MS. MURRAY:  For the record, the Report
13  of Investigation that I'm having the witness review
14  is Case No. 4K-200-0235-03.  I'm placing before the
15  witness Volume II of that report and asking him to
16  review Exhibits 22, 23, 24, and 25, and identify
17  each of the exhibits for the record.
18          While you're reviewing that, Mr. Cook,
19  I'm going to step out for just a second.  Take your
20  time and review that, and I'll be back in a few
21  seconds.
22          (Recess.)
0043
1          MS. MURRAY:  During the short break,
2  the witness had reviewed Exhibits 22 through 25.
3          BY MS. MURRAY:
4      Q    Can you identify each of the exhibits
5  for the record, please?  If you can go to 22 and
6  state what that is on the record.
7          THE WITNESS:  Is that 22 (indicating)?
8          MS. FIELDS:  Yes, that's 22.
9          Could I just open this up?  It might be
10  easier.
11          MS. MURRAY:  Sure.  Yes.
12          MS. FIELDS:  It keeps flopping.
13          MS. MURRAY:  Okay.

14        MS. FIELDS:  Let me just take this off
15  so we don't get it mixed up.
16        THE WITNESS:  Okay.  State your
17  question again, please.
18        BY MS. MURRAY:
19    Q    Can you identify Exhibit 22 for the
20  record, sir?
21    A    Exhibit 22 is a qualification rating
22  sheet.
0044
1     Q    For which applicant?
2     A    Kevin West.
3     Q    Okay.  That's the rating sheet.
4          Is that followed by his actual 991
5  application that you reviewed at the time --
6     A    Yes.
7     Q    -- you were considering applicants --
8     A    Yes.
9     Q    -- for the position?
10         And how did you come to rate Mr. West
11  as you did in that rating sheet?
12    A    Going down each KSA, okay, and how they
13  responded to the KSA, that's how I rated them.
14    Q    Okay.  Can you go to Exhibit 23 and
15  identify that document for the record?
16    A    Qualifications rating sheet for Stephen
17  Clark.
18    Q    And is that rating sheet followed by
19  his 991 application for the position --
20    A    Yes.
21    Q    -- that you reviewed at the time of the
22  selection?
0045
1     A    Yes.
2     Q    Okay.  Did you do the same process with
3  respect to how you arrived at the rating --
4     A    Yes.
5     Q    -- for Mr. Clark?
6     A    Yes.
7     Q    You reviewed the KSA's?
8     A    Yes.
9     Q    Okay.  If you go on to Exhibit
10  Number 24, can you identify that document for the

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 25 of 44

11  record?
12      A    Qualifications rating sheet for David
13  Lowe.
14      Q    And is that followed by his application
15  for the position?
16      A    Yes.
17      Q    And did you go through the same process
18  in arriving at your ratings?
19      A    Yes.
20      Q    You compared his KSA answers --
21      A    Yes.
22      Q    -- to the factors?
0046
1           You can go on to 25, and can you
2  identify that document for the record?
3      A    It's a memorandum from Donna Johnson,
4  Human Resources, directed to me listing the
5  applicants that I had reviewed and the selection
6  that I selected.
7           (Discussion off the record.)
8           BY MS. MURRAY:
9      Q    Did you review an application for
10  Roland Johnson?
11      A    Yes.
12      Q    Did you prepare a rating sheet for
13  Mr. Johnson?
14      A    Yes.
15      Q    May I have that (indicating)?
16      A    (Witness complies.)
17      Q    Thank you.
18           Within Exhibit 24, they put both of
19  these together (indicating).  That's what it is.
20  I'm directing your attention now to page 19
21  through -- pages 19 through 27 of Exhibit 24.
22           Could you identify those documents for
0047
1  the record?
2      A    It's a qualification rating sheet for
3  Roland Johnson.
4      Q    And the documents that follow that, is
5  that Mr. Johnson's application for the Level 8 job?
6      A    Yes.
7      Q    And did you go through the same process

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 26 of 44

8   of rating Mr. Johnson, by comparing his KSA answers
9   to the factors --
10        A    Yes.
11        Q    -- as you described?
12            Did you personally prepare each one of
13  the rating sheets for the four applicants?
14        A    Yes.
15        Q    Did anyone assist you in preparation of
16  those rating sheets?
17        A    No.
18        Q    Did you consider any other factors
19  besides the application in deciding who to select
20  for the Level 8 position?
21        A    Yes.
22        Q    Okay.  What other factors did you
0048
1   consider?
2         A    The responses to -- in their interview.
3         Q    Were there any other factors besides
4   their responses in the interview?
5         A    No.
6         Q    Did you consider anyone's personal
7   marital status?
8         A    No.
9         Q    Exhibit 25 indicated who you ultimately
10  selected; is that correct?
11        A    Yes.
12        Q    And that individual was Stephen Clark?
13        A    Yes.
14        Q    As best you can recall, what do you
15  recall from your interview with Mr. Clark?
16        A    I thought he responded well to my
17  questions that I asked him.
18        Q    What questions and responses do you
19  recall taking place during that interview?
20        A    I asked him four questions about
21  technical information as a mechanic.  I do recall
22  one question being, "Can you tell me what a diode
0049
1   is?  Can you tell me what you would use an ohmmeter
2   for?"  I can't remember the other two questions.
3         Q    And he responded satisfactorily --
4         A    Oh, yes.

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 27 of 44

5    Q    -- on that?

6    A    (Witness nods head.)

7    Q    And how did those questions relate to

8  the duties of the Level 8 position?

9    A    The questions that I was asking them

10  were technical questions, which a Level 8 should

11  have that skill.

12    Q    Do you recall anything else transpiring

13  during the interview with Mr. Clark?

14    A    No.

15    Q    You interviewed Kevin West?

16    A    Yes.

17    Q    Okay.  Tell me as best you can recall

18  what you remember being said during that interview.

19    A    I asked Mr. West the same four

20  questions that I asked the other individuals.

21    Q    And how were Mr. West's responses?

22    A    Good.

0050

1    Q    How would you compare his responses to

2  those given by Mr. Clark?

3    A    I felt that Mr. Clark was more sure of

4  himself and gave the answers without hesitating, as

5  if he -- off the top of his head, he knew what -- he

6  knew what the answers were.  There was some

7  hesitation with Mr. West.

8    Q    Did you notice any other difference

9  between Mr. Clark's and Mr. West's interviews?

10    A    No.

11    Q    When you compared the two interviews,

12  did you feel that one fared better than the other?

13    A    I felt Mr. Clark responded to my

14  questions better.

15    Q    You already said that there was no

16  hesitation when Mr. Clark would answer, as opposed

17  to when Mr. West answered.

18        Was there anything else that led you to

19  conclude that Mr. Clark responded better besides the

20  hesitation or lack of hesitation?

21    A    Mr. Clark was going into a little more

22  depth in his responses.

0051

1    Q    Can you give me an example?

2        A    I can't remember which -- which
3    question.
4              MS. FIELDS:  You have to speak up so
5    she can hear you.
6              THE WITNESS:  I don't recall.
7              BY MS. MURRAY:
8        Q    You interviewed Roland Johnson?
9        A    Yes.
10       Q    What do you recall from your interview
11   with Mr. Johnson?
12       A    Mr. Johnson didn't fare well in the
13   interview.
14       Q    What do you recall happening that led
15   you to that conclusion?
16       A    State your question again.
17       Q    Sure.
18             What do you recall occurring during the
19   interview that led you to conclude that he didn't
20   fare well?
21       A    He didn't respond correctly to one of
22   the questions that I asked him.
0052
1        Q    And who was the fourth candidate?
2        A    David Lowe.
3        Q    Did you interview Mr. Lowe?
4        A    Yes.
5        Q    What do you recall from Mr. Lowe's
6    interview?
7        A    I don't recall.
8        Q    So of the four interviews, you
9    concluded -- did you conclude that someone
10   interviewed better than the rest of the candidates?
11       A    Yes.
12       Q    And who was that individual?
13       A    Mr. Clark.
14       Q    How much weight were you giving to the
15   interviews as opposed to the applications and their
16   answers in the applications to the KSAs?
17       A    I would say about 30 percent.
18       Q    Did you conclude that Mr. Clark was
19   best qualified to perform the diagnostics on the
20   variety of vehicles that he may be asked to do PMIs
21   on?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 29 of 44

22     A   Yes.

0053

1     Q   What experience does Mr. Clark have in

2  servicing tractors or trailers?

3     A   None.

4     Q   What experience did Mr. Clark have with

5  air-brake systems?

6     A   None.

7     Q   Did you at any time after reviewing the

8  applications rank the four candidates?

9     A   Yes.

10     Q   Okay.

11     A   Restate the question again.

12     Q   Sure.

13     Did you at any time -- let me strike

14  the question and give you another one.

15     A   Okay.

16     Q   After reviewing the applications and

17  before interviewing the candidates --

18     A   Okay.

19     Q   -- did you rank the four candidates in

20  any order?

21     A   From their qualifications sheet, yes.

22     Q   Did you compare them and say:  Of the

0054

1  four candidates, I'm rating this person one, this

2  person two, this person three, this person four?

3     A   No.

4     Q   You didn't do that?

5     A   No.

6     Q   Okay.  Did seniority play any role in

7  your decision?

8     A   No.

9     Q   This has been a long time now, but if

10  you can think back to June of 2001.

11     A   Okay.

12     Q   I won't ask details about it, but do

13  you recall a series of days in that month and year

14  in which Mr. West reported to work in which he was

15  not permitted to punch in and was asked to leave the

16  premises?

17     A   Yes.

18     Q   We've gone over those details before in

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 30 of 44

19  the past, and I won't spend time doing that today,
20  but do you recall having any conversations with
21  Timothy Currie about those events going on in June
22  2001 or around that time period?

0055

1       A    I don't recall.
2       Q    Okay.  Do you recall whether Mr. Currie
3  gave you any advice or instructions on how to deal
4  with Mr. West during that time period?
5       A    No, I don't recall.
6       Q    Prior to the hearing that we talked
7  about previously that occurred in Baltimore, I
8  deposed several witnesses, one of which was
9  Mr. Currie, and I asked him a series of questions
10  about this time period, June of 2001.
11          I asked him whether he had any
12  involvement in, sort of, your interactions with
13  Mr. West during that time.  I specifically asked
14  these questions (indicating), and he gave these
15  answers (indicating).
16          MS. FIELDS:  Do you have a copy of
17  that?
18          MS. MURRAY:  Sure, I can give you a
19  copy.  This is the only one I have right now, but we
20  can -- I'll do it like this (indicating).
21          MS. FIELDS:  Okay.
22          BY MS. MURRAY:

0056

1       Q    I don't know exactly where it is, but
2  do you recall the time period that I'm talking
3  about --
4       A    Yes.
5       Q    -- because I don't want to go through
6  all of that, because I'm sure we all remember?
7       A    Yes.
8       Q    I asked a question of Mr. Currie -- it
9  says Cook, but it's actually Currie.  Question:
10  "Okay.  What did you recommend then Mr. Cook do?"
11          His answer:  "I recommended that he
12  send him home and then go to talk to the Law
13  Department, the Labor Relations Department, and find
14  out what to do."
15          And there's more in there.  Again, this

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 31 of 44

16   is about your communications with Mr. West.
17       A    Right.
18       Q    And I asked further on in that
19   conversation:  "How did you -- how was Mr. Cook,
20   according to your recommendation, supposed to send
21   Mr. West home?"
22           His answer:  "He should just identify
0057
1    and tell him to go home."
2            I asked a later question:  "Did you
3    tell Mr. Cook to take Mr. West's time card?"
4            Answer:  "I told him not to let him
5    clock in; send him home."
6            That's only a subsection of our
7    exchange, because there was a lot on this section,
8    but does that refresh your recollection at all as to
9    any conversations that you had with Mr. Currie
10   about, you know, what was going on in June of 2001
11   with respect to letting Mr. West clock in or not?
12       A    I don't recall the conversation, but if
13   Currie said it, he must have said that to me.
14       Q    Okay.  What is a revised schedule?
15       A    Employees have set hours --
16           (Discussion off the record.)
17           BY MS. MURRAY:
18       Q    Okay.  What is a revised schedule?
19       A    Okay.  It's a form that an employee
20   would submit to change his reporting or ending
21   time.
22       Q    Is that an employee's right to change
0058
1    his or her schedule?
2        A    Yes.
3        Q    Are there any limits to that right,
4    that an employee can change it up to a certain time
5    period?
6        A    Thirty minutes.
7        Q    If it's over 30 minutes, may an
8    employee receive a revised schedule?
9        A    No.
10       Q    Can a supervisor or manager, at his or
11   her discretion, authorize a revised schedule for
12   over 30 minutes?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 32 of 44

13      A    Yes.

14      Q    Do you counsel your supervisors on

15  whether to approve or deny revised schedules over

16  30 minutes?

17      A    No.

18      Q    Did Stephen Clark come to you and ask

19  your opinion as to whether he should approve a

20  revised-schedule request submitted by Mr. West in

21  January of 2005?

22      A    I don't recall.

0059

1       Q    Do you recall ever instructing

2   Mr. Clark to deny any employee a revised schedule?

3       A    No.

4       Q    Do you recall denying -- strike that.

5           Do you recall instructing any

6   supervisor to deny an employee a revised schedule

7   over 30 minutes?

8       A    No.

9       Q    Let's talk a little bit about

10  overtime.  How are employees selected for overtime

11  opportunities?

12      A    You would -- you would first select

13  those that are on the Overtime Desired List.

14      Q    Okay.  Let's say there's a need for ten

15  employees to work overtime and only five have signed

16  the list.

17           How do you -- how do VMF management

18  handle those situations?

19      A    I've never ran into that situation.

20           MS. FIELDS:  What did you say?

21           THE WITNESS:  I said that I've never

22  ran into that situation.

0060

1           You would select individuals from the

2   other shops that had signed on your ODL in seniority

3   order.

4           BY MS. MURRAY:

5       Q    So who determines when there's a need

6   for overtime in Southern Maryland?

7       A    The person managing the building

8   operation; in other words, the supervisor or the

9   person that is the actual supervisor -- the acting

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 33 of 44

10  supervisor or the supervisor.

11      Q    Does the supervisor get approval from

12  you --

13      A    Yes.

14      Q    -- to put out an overtime opportunity?

15      A    Yes, yes.

16      Q    Does the supervisor then talk with you

17  about the nature of the need or how many people may

18  be needed?

19      A    Yes.

20      Q    Who makes the determination of how many

21  individuals are needed for overtime?

22      A    The person managing the operation.

0061

1      Q    Which is subject to your approval?

2      A    Yes.

3      Q    Do you recall Michael Scott coming to

4  you and saying at any time while he was supervisor,

5  "We need overtime on this date or for this reason"?

6      A    I don't recall.

7      Q    Have you ever informed a supervisor to

8  limit the number of employees utilized?

9      A    No, I don't recall telling a supervisor

10  that.

11      Q    Just so I understand, when a supervisor

12  does call you and say, "I think I need people to

13  work on Saturday or overtime," does the supervisor

14  identify a set number of people to come in, or how

15  do you all determine who is supposed to come in?

16      A    The work that's available that needs to

17  be performed.

18      Q    Okay.  So there's a body of work that

19  needs to be performed, and then the supervisor in

20  charge of that location --

21      A    Correct.

22      Q    -- says, "I think about four or five

0062

1  people will do it"?

2      A    Correct.

3      Q    Do you recall -- again, now it's almost

4  six years ago -- a need for overtime to shuttle

5  vehicles, I guess, to a particular location

6  during -- I think it was related to anthrax.  Do you

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 34 of 44

7  remember that?
8      A    Yes.
9      Q    Okay.  Do you recall if that was
10 October 2001 or -- I don't know if you recall the
11 time.
12     A    I don't remember the particular time
13 frame, but I do remember that happening.
14     Q    Okay.  And do you recall identifying
15 employees that needed to come in to do this overtime
16 and offering those opportunities to employees?
17     A    The way that occurred, I received a
18 call Saturday morning from the Capital District
19 office requesting that I call all my employees for
20 the purpose of going to the T Street office to
21 return vehicles that they had rented that needed to
22 go back that day, yeah.
0063
1      Q    And you were to request this of all of
2  your employees?
3      A    Yes.
4      Q    So did you make reference to the
5  Overtime Desired List for that?
6      A    No.
7      Q    Did you feel that you needed --
8          MS. FIELDS:  You have to make a verbal
9  answer.
10         THE WITNESS:  No.
11         BY MS. MURRAY:
12     Q    Did you feel there was a requirement to
13 follow the overtime procedures that you outlined?
14     A    No.
15     Q    Okay.  Why did you feel that you did
16 not need to follow those procedures?
17     A    My manager had an emergency need.  So
18 at that juncture, the Overtime Desired List didn't
19 play into it.
20     Q    If you can go back to Exhibit 1,
21 specifically Interrogatory Number 4, which is at
22 pages 5 and 6.
0064
1          Do you have that there?
2      A    Interrogatory 4, yes.
3      Q    Okay.  That asks for individuals who

4  worked overtime in Southern Maryland from April 1st
5  to July 31st, 2003.
6          On page 6 is the answer identifying the
7  individuals listed there --
8      A   Yes.
9      Q   -- is that correct?
10     A   Yes.
11     Q   How were these individuals selected?
12  Let's talk John Bowser.
13     A   I don't recall.
14     Q   Stephen Clark?
15     A   I don't recall.
16     Q   Okay.  For each of these individuals,
17  if you could tell me as best you can, just to save
18  time, if you recall when they were afforded overtime
19  and why, okay?  If you don't recall, just simply say
20  that.
21     A   I don't recall.
22     Q   For all of them?
0065
1      A   (Witness nods head.)
2      Q   Okay.  Are there any for which you do
3  recall?  You can review the list.
4      A   No, I don't recall.
5      Q   I would just like for you to identify
6  documents for the record.  I'm handing you a Report
7  of Investigation, Volume II, same case number,
8  4K-200-0235-03.
9          You can just look at pages 21 through
10  26 of this Affidavit C and identify the documents
11  for the record.  You can take them one by one.  That
12  might be easier.
13     A   The first document is an Overtime
14  Desired List for Largo I from the date of 4/1/03 to
15  6/30/03, posted on 4/1/03.
16     Q   As we go through each one, if you can
17  just tell me if that appears to be an accurate copy
18  of the Overtime Desired List as you recall.
19          So does that first page appear to be an
20  accurate copy?
21     A   Yes.
22     Q   Okay.  Move to the next document.
0066

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 36 of 44

1     A    The second page is an Overtime Desired
2  List for Largo I from the period of 7/1/03 to
3  9/30/03, posted on 7/1/03.  Yes, that's an accurate
4  copy.
5     Q    Okay.  Thank you.
6     A    Document 3 is an Overtime Desired List
7  for Largo II Vehicle Maintenance Facility.  The
8  period covered is 4/01/03 to 6/30/03, posted on
9  4/1/03.  Yes, this is an accurate document.
10    Q    Okay.
11    A    The next document is an Overtime
12 Desired List for Largo II.  The period covered is
13 7/1/03 through 9/30/03, posted on 7/1/03.  Yes, it's
14 an accurate document.
15         The next document is --
16         MS. FIELDS:  Excuse me, can I note one
17 thing for the record?
18         MS. MURRAY:  Sure.
19         MS. FIELDS:  There have been privacy
20 redactions on it of telephone numbers.
21         MS. MURRAY:  Okay.
22         THE WITNESS:  The next document is an
0067
1  Overtime Desired List for the Riverdale Maintenance
2  Facility.  The period covered is 4/1/03 to 6/30/03.
3  It was posted on 4/01/03.  Yes, that's an accurate
4  document.
5         The next document is an Overtime
6  Desired List for the Riverdale Maintenance
7  Facility.  The period covered is 7/1/03 through
8  9/30/03, posted on 7/1/03.  Yes, that's an accurate
9  document.
10        BY MS. MURRAY:
11    Q    Okay.  Do you recall an overtime
12 opportunity at Largo II during this time period?
13    A    I don't recall.
14    Q    Do you recall who was making decisions
15 about who would be offered overtime opportunities
16 during April through July of 2003?
17    A    No, I don't recall.
18    Q    Do you recall whether any overtime
19 opportunity was extended to Mr. West between April
20 through July of 2003 for overtime at Largo II?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 37 of 44

21      A    I don't recall that.

22          MS. MURRAY:  All right.  I just need a

0068

1   few minutes to review my notes, and then I think

2   we'll be finished.

3          THE WITNESS:  Is that it?

4          MS. MURRAY:  Maybe.

5          THE WITNESS:  Okay.

6          MS. MURRAY:  Go off the record for just

7   a minute.

8          (Recess.)

9          BY MS. MURRAY:

10     Q    We have a few more subjects to cover.

11         I think you previously testified that

12  you didn't recall when David Lowe was provided a

13  204B opportunity to Riverdale, or do you recall when

14  that was?

15     A    No.

16     Q    Do you recall where Mr. Lowe was

17  assigned prior to his 204B opportunity in Riverdale?

18     A    No.

19     Q    Could it have been Largo II?

20     A    I don't recall.

21     Q    At some point, Mr. Lowe stopped working

22  at Riverdale; is that right?

0069

1      A    It would have had to have been a job

2   that took him from Largo II.

3      Q    Took him from Largo II to Riverdale; is

4   that what you're referring to?

5      A    I think so, yes.

6      Q    Okay.  Where is Mr. Lowe working now?

7      A    At Largo II.

8      Q    Okay.  So at some point, he went from

9   Riverdale to Largo II?

10     A    Yes.

11     Q    Okay.  When Mr. Lowe went from

12  Riverdale to Largo II, is that when Mr. Greene came

13  to Riverdale?

14     A    I don't recall.

15     Q    While Mr. Lowe was at Riverdale, he was

16  acting supervisor; is that right?

17     A    For a time, yes.

18    Q    And then at some later point,
19  Mr. Greene, who was a permanent supervisor, came to
20  Riverdale; is that right?
21    A    Yes.
22    Q    What were the reasons for Mr. Greene
0070
1  being assigned to Riverdale as a supervisor?
2    A    Mr. Absher had been reassigned to
3  Largo II, and I needed a supervisor to manage
4  Riverdale.
5    Q    Okay.  When was Mr. Absher assigned to
6  Largo II?
7    A    I don't recall.
8    Q    Did Mr. Absher fill a vacancy created
9  by Michael Scott?
10    A    No.
11    Q    Was Michael Scott a supervisor at some
12  point at Largo II?
13    A    Yes.
14    Q    When was Mr. Scott a supervisor at
15  Largo II?
16    A    I don't recall.
17    Q    Is Mr. Scott still employed by the
18  Postal Service?
19    A    Yes.
20    Q    What is his duty status?
21    A    He's on extended sick leave pending
22  disability retirement.
0071
1    Q    When Mr. Scott stopped working as a
2  supervisor, who worked in his position at Largo II?
3    A    Steve Clark.
4    Q    When did Mr. Clark take over for
5  Mr. Scott?
6    A    I don't recall.
7    Q    How did Mr. Absher come to go to
8  Largo II?
9    A    I reassigned him there.
10    Q    Why did you do that?
11    A    Because Mr. Scott had been out --
12  Mr. Scott was not there.
13    Q    Okay.  All right.  So Scott had been
14  supervisor at Largo II, he goes out, Steve Clark

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 39 of 44

15  serves as acting for some period of time --

16    A    Yes.

17    Q    -- and then Absher comes over?

18    A    Yes.

19    Q    Okay.  So who selected Steve Clark to

20  be acting supervisor at Largo II?

21    A    Me.

22    Q    And why did you select Mr. Clark?

0072

1    A    I needed somebody to manage the

2  building -- manage the operation, I'm sorry.

3    Q    So why Mr. Clark as opposed to any

4  other employee?

5    A    I thought Mr. -- I felt Mr. Clark had

6  the skills to do that.

7    Q    Do you recall when Mr. Michael Scott

8  first became a supervisor?

9    A    No.

10    Q    Did you have any involvement in the

11  selection of Mr. Scott as a permanent supervisor?

12    A    No.

13    Q    Before deciding to transfer Mr. Absher

14  from Riverdale to Largo II, did you post that

15  supervisor position that Scott had occupied?

16    A    No.

17    Q    Why not?

18    A    Management has the right to move their

19  supervisors.  That particular issue doesn't have to

20  be posted.

21    Q    Okay.  So at some point, Chris Simmons

22  was chosen to be acting 204B in Riverdale; is that

0073

1  correct?

2    A    Repeat your question.

3    Q    At some point, Chris Simmons was chosen

4  to be acting 204B supervisor in Riverdale; is that

5  correct?

6    A    Yes.

7    Q    When did that occur?

8    A    Sometime this year when Mr. Greene went

9  on vacation.

10    Q    And how did you come to select

11  Mr. Simmons for that acting 204B opportunity?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR    Document 45-2    Filed 09/18/2007    Page 40 of 44

12    A    He made a request.

13    Q    Mr. Simmons did?

14    A    Yes.

15    Q    But Mr. Simmons is no longer acting in

16    that capacity?

17    A    No.

18    Q    Mr. Greene is the supervisor of

19    Riverdale, right?

20    A    Yes.

21    Q    Okay.  Who is the supervisor at

22    Largo II?

0074

1    A    (No response.)

2    Q    Who is the current supervisor at

3    Largo II?

4    A    Mr. Clark.

5    Q    Is he permanent or acting?

6    A    Acting.

7    Q    Does Largo II have a permanent

8    supervisor?

9    A    Not now.

10    Q    Has John Preston Miller served as a

11    supervisor at Largo II?

12    A    Yes.

13    Q    When has he done that?

14    A    Over the last two weeks.

15    Q    Okay.  So as we speak, is Mr. Clark the

16    acting supervisor or is Mr. Miller the acting

17    supervisor?

18    A    Mr. Miller is not an acting supervisor.

19    Q    I'm sorry.

20    A    Mr. Miller is a supervisor.

21    Q    Okay.  So I'll ask the question this

22    way:  Who as of this moment is the supervisor at

0075

1    Largo II?

2    A    Preston Miller.

3    Q    Is he now permanently assigned to that

4    location; Largo II, that is?

5    A    Temporarily assigned.

6    Q    Who made that decision?

7    A    My manager.

8    Q    Joseph King?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 41 of 44

9     A     No.

10     Q     Who is your manager?

11     A     Robert Smith is the acting manager.

12     Q     That's right.  That's right.  That's

13 right.  Thank you.

14          Did Mr. Smith consult with you before

15 selecting Mr. Miller to be transferred over there?

16     A     Yes.

17     Q     Okay.  What do you recall from that

18 discussion?

19     A     When Mr. Smith and I talked, he felt

20 that a permanent supervisor -- a supervisor needed

21 to be assigned there until the vacant position was

22 posted and somebody was placed in that position.

0076

1     Q     Did you all discuss Mr. Miller's

2 qualifications?

3     A     No.

4     Q     Do you believe that Mr. Miller is

5 qualified to serve as a supervisor over mechanics --

6     A     Uh-huh.

7     Q     -- at Largo II?

8     A     Uh-huh.

9     Q     Do you know if Mr. Miller has had

10 driving privileges restored to him?

11     A     I don't know.

12     Q     Did you or Mr. Smith ascertain that

13 before putting him in charge of the shop?

14     A     We didn't ask.

15     Q     Why hasn't a permanent supervisor

16 position been posted?

17     A     It has.

18     Q     It has?

19     A     (Witness nods head.)

20     Q     Okay.  Let me finish my question so we

21 get everything on the record.

22     A     Okay.

0077

1     Q     Why hasn't -- well, strike that.

2          Has a vacant permanent supervisor

3 position for Largo II been posted?

4     A     Yes.

5     Q     When was that posted?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 42 of 44

6        A     I can't say when it was posted.  As my
7    manager, Mr. Smith actually was the individual that
8    had made the request to have the job posted.
9        Q     Was that recently or --
10       A     Yes.  It was within the last six
11   weeks.
12       Q     Are you aware of whether
13   African-American employees at Southern Maryland
14   believe that they have equal opportunity for
15   advancement in that facility?
16       A     I can't say.
17       Q     Are you aware of any of your employees
18   who are African-American who have complained about
19   decisions or practices that they believe are
20   discriminatory?
21       A     I don't recall any conversations like
22   that.
0078
1        Q     Do you recall any -- obviously,
2    Mr. West has filed a complaint.  Are there any other
3    employees who have filed complaints that allege that
4    they have been discriminated against during your
5    tenure at Southern Maryland?
6        A     Not that I can recall.
7        Q     What about Chris Simmons?
8        A     Not that I can recall.
9        Q     You don't recall any conversations with
10   Mr. Simmons about Mr. Clark being provided
11   upper-level opportunities?
12       A     No.
13       Q     What about Mr. Johnson, Roland?
14       A     No.
15       Q     Has Mr. Greene ever expressed to you
16   his concern that certain actions may have been
17   discriminatory?
18       A     No.
19           MS. MURRAY:  All right.  I think that
20   concludes my examination.
21           Ms. Fields, do you have any questions?
22           MS. FIELDS:  No.
0079
1            MS. MURRAY:  All right.  I'm sure
2    you'll be reading and signing?

file:///C|/Documents%20and%20Settings/All%20Users/Documents/Curre...les/KWest/West%20General%20File/David%20Cook%20Depo%209-13-07.txt

Case 1:05-cv-01339-JR     Document 45-2     Filed 09/18/2007     Page 43 of 44

 3          MS. FIELDS:  Yes, we will.
 4          MS. MURRAY:  You have the right to read
 5   the transcript, and you'll be getting a copy of
 6   that.  Thank you very much, Mr. Cook.
 7               (Thereupon, signature not having been
 8               waived, the deposition concluded at
 9               2:01 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
0080
 1   CASE:  West v. Potter
 2   DATE:  September 13, 2007
            ACKNOWLEDGMENT OF DEPONENT
 3          I, David Edward Cook, do hereby
 4   acknowledge that I have read and examined pages 4
 5   through 78, inclusive, of the transcript of my
 6   deposition and that:
 7   (Check appropriate box)
 8       [  ]  The same is a true, correct, and
 9   complete transcript of the answers given by me to
10   the questions therein recorded.
11       [  ]  Except for the changes noted in the
12   attached Errata sheet, the same is a true, correct,
13   and complete transcription of the answers given by
14   me to the questions therein recorded.
15
16    Date                   Signature
17
18          Sworn to and subscribed to before me on
19   this     day of              , 200 .
20
21                  NOTARY PUBLIC

22   My Commission expires:

0081

1                CERTIFICATE OF NOTARY PUBLIC

            I, Marney Alena Mederos, the officer

2   before whom the foregoing deposition was taken, do

3   certify that the witness whose testimony appears in

4   the foregoing deposition was duly sworn by me to

5   testify to the truth, the whole truth, and nothing

6   but the truth concerning the matters in this case.

7            I further certify that the testimony of

8   said witness was taken by me in stenotype and

9   thereafter reduced to typewriting under my

10  direction; that said deposition is a true record of

11  the testimony given by said witness.

12           I further certify that I am neither

13  attorney nor counsel, nor related to or employed by

14  any of the parties to the action in which this

15  deposition is taken; and furthermore, that I am not

16  a relative or employee of any attorney or counsel

17  employed by the parties hereto, nor financially or

18  otherwise interested in the outcome of this action.

19

20                Marney Alena Mederos

21                Notary Public for Maryland

22  My commission expires:  November 1, 2008